RUSSELL J. FRACKMAN
YAKUB HAZZARD
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

KAREN L. STETSON
2350 Prairie Avenue
Miami, FL 33140
Telephone: (305) 532-4845
Facsimile: (305) 604-0598

Attorneys for Plaintiffs

**NIGHT BOX**
FILED

JUL 2 1998

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

**ORIGINAL**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT INC., a corporation; A & M RECORDS, INC., a corporation; BMG MUSIC, d/b/a THE RCA RECORD LABEL, a general partnership; CAPITOL RECORDS, INC., a corporation; ELEKTRA ENTERTAINMENT, a division of WARNER COMMUNICATIONS, INC., a corporation; MCA RECORDS, INC., a corporation; POLYGRAM RECORDS, INC., a corporation; and WARNER BROS. RECORDS INC., a corporation, <br><br> Plaintiffs, <br><br> v. <br><br> GLOBAL ARTS PRODUCTIONS, an entity of unknown form; DANNY JORDAN, an individual; SATURN RECORDS, an entity of unknown form; STACK-O-HITS, an entity of unknown form; and JACK MILLMAN, an individual, <br><br> Defendants. | CASE NO. 98-6507-Civ-Middlebrooks <br><br> **PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS AND MOTIONS FOR A MORE DEFINITE STATEMENT; AND** <br><br> **DECLARATIONS OF MARCIO GONCALVES, MATTHEW J. OPPENHEIM, JEAN-MARIE JEAN-BAPTISTE AND JOSEPH H. LODGE IN SUPPORT THEREOF** |

Mitchell Silberberg &
Knupp LLP

0015478.1

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     A.   The Motions Completely Lack Evidentiary And Legal Support, And
         Therefore Should Be Denied . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

     B.   This Court Has Personal Jurisdiction Over The Defendants And Venue Is
         Proper In This District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

           1.   Defendants Jordan And Global Arts Are Domiciled In Florida and
               Subject To The General Jurisdiction Of Its Courts . . . . . . . . . . . . . . . . 7

           2.   This Court Has Specific Jurisdiction Over All Of The Defendants . . . . . . 8

               (a)   The Florida Long-Arm Statute . . . . . . . . . . . . . . . . . . . . . . . . . . 8

               (b)   Federal Due Process Requirements . . . . . . . . . . . . . . . . . . . . . . . 9

               (c)   The Defendants Have Sufficient Minimum Contacts in
                    Florida . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

           3.   Venue Is Proper In This District . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

     C.   This Court Has Subject Matter Jurisdiction Over This Action . . . . . . . . . . . . . 13

     D.   The Action Is Not Barred by Res Judicata or Collateral Estoppel . . . . . . . . . . . 15

     E.   The Complaint Satisfies Rule 12(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

     F.   Jordan Was Properly Served Under Florida Statute § 48.031(1)(a) . . . . . . . . . 18

     G.   Defendants Waived Their Objections Based on Rule 12(b)(2) through (5)
         by Failing to File Their Motions Timely . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Mitchell Silberberg &
Knupp LLP

0017446.1

**Page**

# TABLE OF AUTHORITIES

## FEDERAL CASES

Advideo, Inc. v. Kimel Broad Group, Inc.,
   727 F. Supp. 1337 (N.D. Cal. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Ahbez v. Edwin H. Morris, Inc.,
   548 F. Supp. 664 (S.D.N.Y. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Bangor Punta Operations, Inc. v. Universal Marine Co., Ltd.,
   543 F.2d 1107 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bazal v. Belford Trucking, Co.,
   442 F. Supp. 1089 (S.D. Fla. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Borst v. Hi-Line Electric Co.,
   698 F. Supp. 223 (S.D. Ala. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Bracewell v. Nicholson Air Services, Inc.,
   748 F.2d 1499 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Burger King Corp. v. Rudzewicz,
   471 U.S. 462 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Business Credit Leasing, Inc. v. City of Biddeford,
   770 F. Supp. 31 (D. Me. 1991), aff'd. 978 F.2d 767 (1st Cir. 1992) . . . . . . . . . . . . . . . . 6

Cable/Home Communication Corp. v. Network Productions, Inc.,
   902 F.2d 829 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 12

Campbell v. Miller,
   836 F. Supp. 827 (M.D. Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Capitol Funds, Inc. v. Arlen Realty, Inc.,
   755 F.2d 1544 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Concordia v. Bendekovic,
   693 F.2d 1073 (11th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Diamond v. Chulay,
   811 F. Supp. 1321 (N.D. Ill. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Evans v. American Surplus Underwriters Corp.,
   739 F. Supp. 1526 (N.D. Ga. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

FRA S.P.A. v. Surg-O-Flex of America,
   415 F. Supp. 421 (S.D.N.Y. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Fantasy, Inc. v. Fogerty,
   664 F. Supp. 1345 (N.D. Cal. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

Mitchell Silberberg &
Knupp LLP

0017446.1

**Page**

Farmer's Elevator Mutual Insurance Co. v. Carl J. Austed & Sons, Inc.,
    343 F.2d 7 (8th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fox v. General Motors Corp.,
    859 F. Supp. 216 (S.D.W.Va. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Fun-Damental Too, Ltd. v. Germany Industrial Corp.,
    41 U.S.P.Q. 2d 1427 (S.D.N.Y. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . 13

G.M.C. v. Arriortoa,
    1997 Copyright Law Decisions (CCH) ¶ 27,622 at 29,942 (E.D. Mich. 1997)) . . . . . . 14

Granger v. Kemm, Inc.,
    250 F. Supp. 644 (E.D. Pa. 1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Hanson v. Denckla,
    357 U.S. 235 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Heinz v. The Frank Lloyd Wright Foundation,
    762 F. Supp. 804 (N.D. Ill. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Hodges v. Gellerstedt,
    833 F. Supp. 898 (M.D. Fla. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Howard v. Green,
    555 F.2d 178 (8th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee,
    456 U.S. 694 (1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 19

Lipton v. The Nature Co.,
    781 F. Supp. 1032 (S.D.N.Y. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Milliken v. Meyer,
    311 U.S. 457 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Morris v. SSE, Inc.,
    843 F.2d 489 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

Nacol v. Keith Wood Agency, Inc.,
    750 F. Supp. 1128 (M.D. Fla. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Nelson v. Victory Electric Works, Inc.,
    210 F. Supp. 954 (D. Md. 1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Nieves Domenech v. Dymax Corp.,
    952 F. Supp. 57 (D.P.R. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Novelty Textile Mills, Inc. v. Joan Fabrics Corp.,
    558 F.2d 1090 (2d Cir. 1090 (2d Cir. 1977)) . . . . . . . . . . . . . . . . . . . . . 18

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mitchell Silberberg & Knupp LLP

0017446.1

**Page**

P&D International v. Halsey Publ'g Co.,
    672 F. Supp. 1429 (S.D. Fla. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

Pony International, Inc. v. Genfoot America, Inc.,
    223 U.S.P.Q. 1150 (S.D.N.Y. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Rebozo v. Washington Post,
    515 F.2d 1208 (5th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

Richardson v. Alabama State Board of Education,
    935 F.2d 1240 (11th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

S.E.L. Maduro (Florida), Inc. v. M/V Antonio de Gastaneta,
    833 F.2d 1477 (11th Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Sid & Marty Krofft Television Productions, Inc. v. MacDonald's Corp.,
    562 F.2d 1157 (9th Cir. 1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Sorensen v. Overland Corp.,
    242 F.2d 70 (3d Cir. 1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Thermo-Cell Southeast, Inc. v. Technetic Industries, Inc.,
    605 F. Supp. 1122 (N.D. Ga. 1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Vernon,
    108 F.R.D. 741 (S.D. Fla. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Update Art, Inc. v. Modiin Publ'g, Ltd.,
    843 F.2d 67 (2d Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Williams Electric Co. v. Honeywell, Inc.,
    854 F.2d 389 (11th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

STATE CASES

Florida National Bank v. Halphen,
    641 So. 2d 495 (Fla. App. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Jefferson Bank & Trust v. Levy,
    498 So. 2d 450 (Fla. App. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Klosenski v. Flaherty,
    116 So. 2d 767 (Fla. 1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Smith v. Cuban American National Foundation,
    657 So. 2d 86 (Fla. App. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

State ex In the matter of Merritt v. Hefferman,
    195 So. 145 (Fla. 1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

Mitchell Silberberg & Knupp LLP

0017446.1

**Page**

FEDERAL STATUTES

17 U.S.C. §§ 106 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

17 U.S.C. § 501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

28 U.S.C. §1400(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

F.R.C.P. 12(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

F.R.C.P. 37(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

STATE STATUTES

Fla. Stat. § 48.193 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

MISCELLANEOUS

5A Wright & Miller, Federal Practice and Procedure §1377 . . . . . . . . . . . . . . . . . . . . . . . 18

0017446.1

1    Plaintiffs file this Memorandum of Law in opposition to the Motions to Dismiss

2  and Motions for a More Definite Statement of Defendants Global Art Productions, Danny

3  Jordan, Saturn Records, Stack-O-Hits, and Jack Millman.  As will be shown below, Defendants'

4  motions lack any factual or legal basis.

5  **I.    INTRODUCTION**

6    Plaintiffs are nine record companies engaged in the business of producing and

7  selling musical recordings.  Plaintiffs have brought this action to protect valuable intellectual

8  property rights in their recordings.  Specifically, Plaintiffs seek to stop a conspiracy by which

9  defendants Global Arts Productions ("Global Arts"), Danny Jordan ("Jordan"), Stack-O-Hits,

10  Saturn Records ("Saturn"), and Jack Millman ("Millman") (sometimes collectively referred to

11  herein as "Defendants") unlawfully have copied and distributed and purported to authorize others

12  to further copy and distribute recordings owned by Plaintiffs.

13

14    Plaintiffs filed the Complaint in this action on May 18, 1998, together with a

15  motion for limited, expedited discovery.  The Complaint was served on Jordan on May 21, 1998,

16  and on Stack-O-Hits, Saturn, and Millman on May 22, 1998.[1]  On June 2, 1998, the Court

17  granted Plaintiffs' motion for expedited discovery, ordering that the responses to the discovery

18  were due with Defendants' responses to the Complaint, on June 10 and June 11, respectively.  To

19  date, Defendants have not provided any of the Court-ordered discovery.  (Defendants' failure to

20  comply with this Court's June 2, 1998, Order is the subject of Plaintiffs' pending Motion to

21  Compel Compliance with June 2, 1998 Discovery Order.)

22

23    After failing to timely respond to the Complaint, Defendants then filed frivolous

24  motions to dismiss.  Defendants' motions were filed in a transparent attempt to delay these

25

---

26    [1]    Plaintiffs were not able to determine the nature of the entity Global Arts for
purposes of service.  Insofar as Jordan has admitted that Global Arts is his alter ego (see Global
27  Arts' Motion, p. 5, ¶ 3), service on Jordan constitutes service on Global Arts.  In any event,
28  Global Arts has now appeared by filing the subject motions.

1  proceedings and prevent Plaintiffs from obtaining the relief to which they are entitled.   The

2  motions are virtually identical and are deficient on their face.  They contain no evidentiary

3  support whatsoever, and fail to cite even a single case.  In addition to their obvious procedural

4  deficiencies, the motions are devoid of substantive merit, and should be denied in their entirety.

5  **II.    SUMMARY OF FACTS**

6  Collectively, Plaintiffs are the owners of the copyrights or exclusive reproduction,

7  adaptation, and/or distribution rights under copyrights in various recordings (the "Copyrighted

8  Recordings").   (Complaint, ¶ 22.)  In addition, Plaintiffs have entered into various agreements

9  by which they obtained the sole and exclusive right to manufacture, distribute, and sell

10  recordings embodying certain musical performances of popular and renowned artists which

11  initially were "fixed" prior to February 15, 1972 (the "Pre-1972 Recordings"), and therefore

12  subject to protection under state common and statutory law.  (Complaint, ¶ 23.)  Plaintiffs have

13  never issued any licenses to or otherwise permitted any of the Defendants to manufacture,

14  duplicate, distribute, or authorize others to manufacture, duplicate or distribute any of the

15  Copyrighted Recordings or Pre-1972 Recordings. (Complaint ¶ 38.)

16

17  Defendants Jordan and Millman, through their respective companies, have

18  engaged in a series of transactions and jointly participated in a common scheme to duplicate and

19  distribute records that contain unauthorized copies of Plaintiffs' Copyrighted Recordings and

20  Plaintiffs' Pre-1972 Recordings, and to purport to authorize others to do so.  These transactions

21  and the scheme took place largely in Florida, where Jordan was located.  As a result of this

22  scheme, unauthorized copies of Plaintiffs' Copyrighted Recordings and Pre-1972 Recordings,

23  many of which misleadingly bear the name of Global Arts, are being manufactured, distributed,

24  and offered for sale all over the world.  (Complaint ¶¶ 27-30.)  While a  number of Jordan's

25  licensees apparently manufacture and distribute infringing materials outside the United States,

26  this fact in no way shields Defendants, who have committed, and continue to commit, infringing

27  activities in Florida, from liability in this action.

28

Mitchell Silberberg &
Knupp LLP

0015478.1

1        Pursuant to the conspiracy, Defendants Millman, Stack-O-Hits, and Saturn

2  purported to license rights in Plaintiffs' recordings to others, including defendant Jordan and his

3  company Global Arts.  In furtherance of the conspiracy, Millman delivered copies of the

4  Copyrighted Recordings and Pre-1972 Recordings to Jordan and Global Arts. Jordan and Global

5  Arts then purported to re-license rights in the Copyrighted Recordings and Pre-1972 Recordings

6  to others for further manufacture and distribution.  In connection with those purported licenses,

7  Jordan and Global Arts made or made available unauthorized copies of the Copyrighted

8  Recordings and Pre-1972 Recordings and distributed those copies to their licensees.  (Complaint

9  ¶¶ 27-30.)  Under their purported licenses, Jordan and Millman each are entitled to royalties

10  based on the duplication and sale of Plaintiffs' recordings by Defendants' licensees.

11  **III.**    **ARGUMENT**

12       **A.**    **The Motions Completely Lack Evidentiary And Legal Support, And**

13            **Therefore Should Be Denied.**

14        Local Rule 7.1 requires that "[e]very motion when filed *shall* include or be

15  accompanied by a memorandum of law *citing supporting authorities*." (Emphasis added.)  In

16  direct contravention of this rule, Defendants accompanied each one of their <u>pro forma</u> motions

17  with virtually identical memoranda of law which contain *absolutely no supporting legal*

18  *authorities*.  In addition, despite purporting to raise factual issues relating to venue, personal

19  jurisdiction, service of process, subject matter jurisdiction, and res judicata, Defendants did not

20  provide this Court with any supporting evidence whatsoever -- *not a single affidavit,*

21  *declaration, exhibit, or other piece of evidentiary support*.[2]  Supporting papers that are

22  perfunctory to this degree amount to no supporting papers at all, violating Local Rule 7.1 and

23  requiring denial of the motions.

24

25

26  ────────────────────

27        [2]    Defendants claim to have attached a copy of Jordan's California driver's license
as an exhibit to their motions.  However, at least the copies of Defendants' papers that were

28  served on Plaintiffs contained no such attachment.

1  Under similar circumstances, the Court in <u>Borst v. Hi-Line Elec. Co.</u>, 698 F.

2  Supp. 223, 224 (S.D. Ala. 1988), denied the defendant's Rule 12(b)(2) and 12(b)(6) motions

3  because these issues were not addressed in the supporting brief, in violation of a local rule

4  requiring "that any motion filed pursuant to Fed.Rules Civ.P. 12(b) be supported by a brief."

5  Similarly, in <u>Fox v. General Motors Corp.</u>, 859 F. Supp. 216, 219-20 & n.4 (S.D.W.Va. 1994),

6  the Court found that the failure to submit a memorandum of law in accordance with local rules

7  "alone provides [a] basis to deny [its] motion." <u>See also</u> <u>United States v. Vernon</u>, 108 F.R.D.

8  741, 742 (S.D. Fla. 1986) (defendant's motion denied because, among other things, "the motion

9  itself [was] devoid of any legal authority" and defendants "failed to comply with Local Rule . . .

10  in that they [did] not file[] a supporting memorandum of law").  Here, because Defendants'

11  wholly deficient memoranda are the substantive equivalent of a total failure to file any

12  memoranda at all,[3] this Court should follow <u>Borst</u> and <u>Fox,</u> and deny Defendants' motions as

13  contrary to Local Rule 7.1.

14

15  Moreover, irrespective of Local Rule 7.1, Defendants' complete failure to present

16  any legal or factual support for their motions requires that they be denied.  For example, finding

17  that the parties before it had not "supported their position with any authority," the Court in

18  <u>Diamond v. Chulay</u>, 811 F. Supp. 1321, 1335 (N.D. Ill. 1993), held that a "'skeletal argument,'

19  unsupported by relevant authority or reasoning, is merely an assertion which does not sufficiently

20  raise the issue to merit the court's consideration."  Similarly, in <u>Nieves Domenech v. Dymax</u>

21  <u>Corp.</u>, 952 F. Supp. 57, 65 (D.P.R. 1996), the Court found that Plaintiffs had waived their

22  argument where they "offer[ed] no evidence, cite[d] to no case law, and refer[red] to no statutes

23  to support [their] conclusory [argument].  A party that makes a claim by raising it in a

24  perfunctory manner without any support or development of its argument waives the claim."

25

26  [3]  Defendants' arguments under Rules 12(b)(1) and 12(b)(6) are not even ***mentioned***

27  in their memoranda of law.  Defendants' other arguments under Rule 12(b) consist of three lines
    (Rule 12(b)(5)), four lines (Rule 12(b)(3)), and seven lines (Rule 12(b)(2)) of unsupported

28  conclusions.

1   Accord, e.g., Business Credit Leasing, Inc. v. City of Biddeford, 770 F. Supp. 31, 34 n.4 (D. Me.

2   1991) ("'issues mentioned in a perfunctory manner, unaccompanied by some effort at developed

3   argumentation, are deemed waived'"), aff'd 978 F.2d 767 (1st Cir. 1992); Heinz v. The Frank

4   Lloyd Wright Foundation, 762 F. Supp 804, 807 (N.D. Ill. 1991) ("A litigant who fails to press a

5   point by supporting it with pertinent authority . . . forfeits the point.  The court is not required to

6   do a litigant's research for him.").  Here, by failing to provide any supporting evidence or law,

7   Defendants have waived the arguments alluded to in their motions.

8       **B.**   **This Court Has Personal Jurisdiction Over The Defendants And Venue Is**

9              **Proper In This District.**

10           The procedure this Court follows to determine a motion to dismiss for lack of

11   personal jurisdiction "is clearly established in this circuit." Evans v. American Surplus

12   Underwriters Corp., 739 F. Supp. 1526, 1529 (N.D. Ga. 1989).  The motion "should be denied if

13   plaintiff[s] allege[] sufficient facts to support a reasonable inference that defendant[s] can be

14   subjected to jurisdiction of the court." Id. (internal quotes omitted); Thermo-Cell Southeast, Inc.

15   v. Technetic Industries, Inc., 605 F. Supp. 1122, 1124 (N.D. Ga. 1985) ("For purposes of

16   surviving a motion to dismiss, plaintiff need only make a prima facie demonstration of the facts

17   on which personal jurisdiction is predicated.")  In deciding whether Plaintiffs have made a

18   sufficient showing, the Court "must accept as true those allegations of the complaint which are

19   not controverted by defendant[s'] evidence." Bracewell v. Nicholson Air Services, Inc., 748

20   F.2d 1499, 1504 (11th Cir. 1984); accord Morris v. SSE, Inc., 843 F.2d 489, 492 (11th Cir. 1988)

21   ("The district court must construe the allegations in the complaint as true, to the extent they are

22   uncontroverted by defendant's affidavits or deposition testimony.")  Where, as here, facially

23   sufficient jurisdictional allegations are entirely uncontroverted, the motion to dismiss must be

24   denied.  Bracewell, 748 F.2d at 1504 ("Bracewell's jurisdictional allegations are uncontroverted;

25   he has met his burden of proof.")

26

27

28

Mitchell Silberberg &
Knupp LLP

0015478.1

- 6 -

1    Even if Defendants had presented some contrary evidence on the issue of personal

2 jurisdiction in their moving papers (which they did not), "where the evidence presented by the

3 parties' affidavits and deposition testimony conflicts, the court must construe all reasonable

4 inferences in favor of the non-movant plaintiff." Morris, 843 F.2d at 492.  Thus, in order to

5 defeat Plaintiffs' prima facie showing of personal jurisdiction, Defendants would be required to

6 come forward with evidence affirmatively disproving Plaintiffs' evidence.

7

8    Finally, even assuming, arguendo, that Defendants could at some later time

9 present evidence disputing Plaintiffs' uncontroverted jurisdictional allegations (which they will

10 not be able to do), Plaintiffs currently are under no obligation "to come forward with evidence . .

11 . in the absence of evidence [by defendants] which even supports an inference [that defendants

12 have] done no significant business in [this] state." Bracewell, 748 F.2d at 1504.  Nevertheless, to

13 assure the Court that it clearly has personal jurisdiction over the Defendants, Plaintiffs are

14 providing with this opposition extensive evidence demonstrating that (1) Defendants Jordan and

15 Global Arts are subject to personal jurisdiction as Florida residents and have "continuous and

16 systematic" contacts with Florida which subject them to general jurisdiction, and (2) all of the

17 Defendants are subject to specific jurisdiction in Florida.

18        1.    **Defendants Jordan And Global Arts Are Domiciled In Florida and**

19             **Subject To The General Jurisdiction Of Its Courts.**

20    "It is well settled law that one who is domiciled in a state is subject to the

21 jurisdiction of its courts." Sorensen v. Overland Corp., 242 F.2d 70, 72 (3d Cir. 1957); accord

22 Milliken v. Meyer, 311 U.S. 457, 462 (1940) ("Domicile in the state is alone sufficient to bring

23 [a] . . . defendant within the reach of the state's jurisdiction," even if the defendant is absent from

24 the state at the time of service.)  On the record before this Court, there can be no doubt that

25 Defendants Jordan and Global Arts, Jordan's alter ego, are Florida residents, and therefore,

26 subject to personal jurisdiction in Florida.  Plaintiffs have alleged these facts, and Defendants

27 have not presented any facts to the contrary.  (Complaint ¶¶ 5-6, 15-17.)  Moreover, as set forth

28

Mitchell Silberberg &
Knupp LLP

0015478.1

- 7 -

1   in greater detail below, Jordan and Global Arts have admitted in agreements, oral statements, and

2   pleadings submitted to other Courts that they are domiciled in Florida.

3           **2.**    **This Court Has Specific Jurisdiction Over All Of The Defendants.**

4         This Court may assert personal jurisdiction over the Defendants where (1)

5   jurisdiction exists under Florida's long-arm statute, Fla. Stat. § 48.193, and (2) sufficient

6   "minimum contacts" exist to satisfy the due process requirements. <u>Cable/Home Communication</u>

7   <u>Corp. v. Network Productions, Inc.</u>, 902 F.2d 829, 855 (11th Cir. 1990).

8           **(a)**    **The Florida Long-Arm Statute.**

9         Florida's long-arm statute provides, in relevant part, as follows:

10

11         (1) Any person, whether or not a citizen or resident of this
state, who personally or through an agent does any of the acts

12   enumerated in this subsection thereby submits himself or herself
. . . to the jurisdiction of the courts of this state for any cause of

13   action arising from the doing of any of the following acts:

14       . . .

15       (b) Committing a tortious act within this state.

16       . . .

17       (f) Causing injury to persons or property within this state arising
out of an act or omission by the defendant outside this state, if, at

18   or about the time of the injury, either:

19       (1) The defendant was engaged in solicitation or service activities
within this state; or

20

21       (2) Products, materials, or things processed, serviced, or
manufactured by the defendant anywhere were used or consumed
within this state in the ordinary course of commerce, trade, or use.

22   (Fla. Stat. § 48.193.)

23

24         Courts interpreting the Florida long-arm statute consistently have taken a broad

25   view of its reach. For example, "non-resident defendants have been found liable under the

26   tortious act provision when the precise location of the alleged tort within the state has been

27   difficult to identify." <u>Cable/Home</u>, 902 F.2d at 856. <u>See also</u> <u>Rebozo v. Washington Post</u>, 515

28

1 | F.2d 1208 (5th Cir. 1975) (in libel action, personal jurisdiction over defendant newspaper was

2 | found even though it was unclear where the libel had occurred).  All that is required is a showing

3 | that the non-resident defendant "'committed a substantial aspect of the alleged tort in Florida' by

4 | establishing that the activities in Florida 'w[ere] essential to the success of the tort.'" <u>Williams</u>

5 | <u>Electric Co. v. Honeywell, Inc.</u>, 854 F.2d 389, 394 (11th Cir. 1988) (<u>quoting</u> <u>Watts v. Haun</u>, 393

6 | So. 2d 54, 56 (Fla. App. 1981)).

7 |

8 | Further, Florida's long-arm statute is not limited to situations where the defendant

9 | commits an act in Florida causing injury in Florida, but includes "the situation in which a foreign

10 | tortious act causes injury within the forum." <u>Rebozo</u>, 515 F.2d at 1212; <u>Bangor Punta</u>

11 | <u>Operations, Inc. v. Universal Marine Co., Ltd.</u>, 543 F.2d 1107, 1109 (5th Cir. 1976) (finding

12 | jurisdiction under Florida's long-arm statute over a non-resident defendant accused of infringing

13 | plaintiff's common law copyright, based on the defendant's advertisement of the infringing

14 | product in Florida because defendant's conduct amounted to "tortious acts committed within the

15 | State of Florida"); <u>Cable/Home</u>, 902 F.2d at 856 (nonresident defendants in copyright action held

16 | subject to personal jurisdiction under Florida's long-arm statute based upon their satellite

17 | broadcasts in Florida in violation of the federal copyright and communications statutes).

18 | **(b)    Federal Due Process Requirements.**

19 | Due process requires a two part analysis: whether the defendant has sufficient

20 | "minimum contacts" with Florida; and whether the exercise of personal jurisdiction over the

21 | defendant would "offend traditional notions of fair play and substantial justice." <u>Williams</u>

22 | <u>Electric Co.</u>, 854 F.2d at 392 (quoting <u>International Shoe Co. v. Washington</u>, 326 U.S. 310, 316

23 | (1945)).

24 |

25 | Of course, the "minimum contacts" analysis remains "the constitutional

26 | touchstone." <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 474 (1985).  Sufficient minimum

27 | contacts will be found where the defendant, by whatever means or methods, "purposely avail[ed]

28 |

Mitchell Silberberg &
Knupp LLP

0015478.1

1  itself of the privilege of conducting activities within the forum State, thus invoking the benefits

2  and protections of its laws." Hanson v. Denckla, 357 U.S. 235, 253 (1958). While there are

3  many formulations for the test, this requirement is not unduly difficult to satisfy. As the Court in

4  Thermo-Cell noted, "[o]ne commentator has concisely summarized [the relevant Supreme Court]

5  decisions as requiring only a single, purposeful, arguably commercial contact of some benefit to

6  defendant." 605 F. Supp. at 1124 (finding that plaintiff made a prima facie showing by alleging

7  facts satisfying these requirements); accord, Nacol v. Keith Wood Agency, Inc., 750 F. Supp.

8  1128, 1129 (M.D. Fla. 1990) (allegations of contractual relationship between nonresident

9  defendant and Florida co-defendant sufficient for exercise of long-arm jurisdiction).

10

11           By engaging in their licensing scheme in Florida, the Defendants are subject to

12  personal jurisdiction in Florida. See Lipton v. The Nature Co., 781 F. Supp. 1032, 1036

13  (S.D.N.Y. 1992) (finding licensor subject to New York personal jurisdiction where licensee

14  distributed infringing product in New York and paid licensor royalties based on sales), aff'd. 71

15  F.3d 464 (2d Cir. 1995); Pony Int'l, Inc. v. Genfoot America, Inc., 223 U.S.P.Q. 1150, 1152

16  (S.D.N.Y. 1983) (holding licensor of "worldwide" trademark rights subject to personal

17  jurisdiction in New York where licensee further distributed goods in New York). As set forth

18  below, the evidence Plaintiffs already have adduced establishes numerous "purposeful" and

19  "commercial" contacts by Defendants that were "of some benefit" to them -- far surpassing the

20  requirements established by the Supreme Court.

21           **(c)      The Defendants Have Sufficient Minimum Contacts in Florida.**

22           Here, there is no question that the Defendants have sufficient contacts in Florida

23  to support jurisdiction and venue in Florida. Indeed, even at this early stage of the litigation and

24  without the benefit of any discovery including the discovery ordered pursuant to this Court's

25  Order, there is substantial evidence of Defendants' contacts with Florida, including:[4]

26  _____

27           [4]      Given Defendants' continued refusal to produce the Court-ordered discovery,
    some of which would provide evidence relevant to, among other things, personal jurisdiction and

28                                                                                  (continued...)

Mitchell Silberberg &
Knupp LLP

0015478.1                                          - 10 -

- Jordan owns real estate in Florida (Lodge Decl., ¶ 4);

- Global Arts has a vehicle registered in its name with the Florida Department of Motor Vehicles (Lodge Decl., ¶ 3);

- Millman purported to grant rights in and to recordings, including recordings at issue in this action, to Jordan and Global Arts, located in and doing business in Florida.  (Oppenheim Decl., ¶¶ 2-5, Ex. "D," Goncalves Decl., ¶¶ 3-8);

- Millman and his companies received advances and royalties paid by Jordan and Global Arts from Florida, and Jordan and Global Arts received in Florida advances and royalties from their licensees. (Oppenheim Decl., ¶ 3, Goncalves Decl., ¶ 4, Exs. "E" - "H");

- License agreements between Global Arts and Jordan, on the one part, and third-party licensees, on the other part,

  - list a Florida address and telephone number for Jordan and Global Arts;

  - provide for the receipt of royalties by Jordan and Global Arts in Florida; and

---

[4](...continued)
venue, the Court should assume that the discovery would support Plaintiffs' position on these issues. F.R.C.P. 37(b)(2)(A); Insurance Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 708 (1982) (failure of defendants to supply jurisdictional discovery supports "the presumption that the refusal ... was an admission of the want of merit of the asserted defense")

Mitchell Silberberg & Knupp LLP

0015478.1

- 11 -

○    contain Florida choice of law and venue provisions. (see Exs. "B,", "C," "E" - "H");

●    Correspondence from Jordan's and Global Arts' licensees repeatedly states that Jordan and Global Arts are located, and may be contacted, in Florida. (see Exs. "I" - "K");

●    When Jordan and Global Arts intervened in litigation in the Netherlands bought against one of their licensees, Dureco B.V., they represented to the Netherlands Court that they are located in Florida. (Ex. "M")  In that action, Jordan also filed an affidavit executed in Broward County, Florida wherein he represented that he is the President of Global Arts, and that Global Arts has representation in Florida. (Ex. "L");

●    As recent as May 7, 1998, Jordan and Global Arts entered into a transaction in Florida whereby they purported to license and distributed certain Billy Joel recordings owned by Plaintiff Sony Music Entertainment Inc. to a third party.  In connection with that transaction, Jordan admitted that he made copies of the recordings at a studio in Florida, and distributed these in Florida to his purported licensee. (Goncalvees Decl., ¶¶ 4-8, Exs. "A" - "C").

**3.**    **Venue Is Proper In This District**.

Civil actions arising under the Copyright Act may be brought in the district in which the defendant is found. 28 U.S.C. §1400(a).  For purposes of venue in copyright cases, a defendant is "found" in any jurisdiction where he is amendable to personal jurisdiction. Cable/Home Communication Corp. v. Network Prods., Inc., 902 F.2d at 856-9; Advideo, Inc. v.

1    Kimel Broad Group, Inc., 727 F. Supp. 1337 (N.D. Cal. 1989).  Thus, since this Court has

2    personal  jurisdiction over the Defendants as discussed above, venue in this District is proper.

3         **C.    This Court Has Subject Matter Jurisdiction Over This Action.**

4              Defendants Jordan and Global Arts contend, without any factual or legal support,

5    that the Court lacks subject matter jurisdiction.  Their argument apparently is premised upon

6    their completely unsubstantiated statement that they "entered into transactions for certain audio

7    recordings which may have been described as the subject matter of this litigation but that any

8    such transaction occurred in Germany and not the United States."  (See Jordan's Motion to

9    Dismiss at ¶ 4, Jordan's Memorandum of Law at ¶1d; Global Arts Productions' Motion to

10   Dismiss ¶1d) (emphasis in original).  Like the rest of their arguments, this contention is without

11   merit.

12

13             As Plaintiffs' declarations and exhibits show, the representation by Defendants

14   that all of the relevant transactions took place in Germany is false.  To the contrary, most of

15   Defendants' infringing conduct took place in the United States, and particularly in Florida.

16   (Complaint, ¶ 5.)   In any event, where, as here, a plaintiff alleges *any* completed act of copyright

17   infringement in the United States, the Court has subject matter jurisdiction over the action,

18   notwithstanding that the infringing acts may continue in a foreign jurisdiction.   P&D Int'l v.

19   Halsey Publ'g Co., 672 F. Supp. 1429, 1432-3 (S.D. Fla. 1987) (since plaintiff alleged that

20   duplication of an infringing videotape occurred within the United States, the Court had subject

21   matter jurisdiction, including claims involving the offshore public performance of those

22   videotapes; "Because an infringing act is alleged to have occurred in the United States, this Court

23   has subject matter jurisdiction ....").  See also Update Art, Inc. v. Modiin Publ'g, Ltd., 843 F.2d

24   67, 73 (2d Cir. 1988) (although the infringing publication of plaintiff's poster took place abroad,

25   where the poster had been reproduced within the United States, the defendant may be liable

26   under the Copyright Act); Fun-Damental Too, Ltd. v. Germany Indus. Corp., 41 U.S. P.Q.2d

27   1427, 1431 (S.D.N.Y. 1996) ("Where an individual commits an act of infringement in the United

28

Mitchell Silberberg &
Knupp LLP

0015478.1

- 13 -

1  States that permits further reproduction outside the United States - such as when an individual

2  makes unauthorized copies of copyrighted material and then sends them out of the country - a

3  court may assert jurisdiction over those foreign acts and a plaintiff may recover damages for the

4  foreign acts that took place extraterritorially.").  Once a plaintiff alleges an act of infringement

5  within the United States, subject matter jurisdiction over all extraterritorial acts is proper and the

6  defendant may be held liable for "related infringing acts occurring outside this country." Ahbez

7  v. Edwin H. Morris, Inc., 548 F. Supp. 664, 667 (S.D.N.Y. 1982); Fantasy, Inc. v. Fogerty, 664

8  F. Supp. 1345, 1352 (N.D. Cal. 1987) ("if any infringing act ... occurs in the United States, then

9  the Court may impose a constructive trust upon the extraterritorial profits derived from that

10  infringing act").

11

12        Here, Plaintiffs have alleged predicate, completed acts in the United States of

13  infringement of the Copyrighted Recordings and violation of their rights in the Pre-1972

14  Recordings.  Specifically, Plaintiffs have alleged that as part of their common scheme and

15  conspiracy each of the Defendants violated Plaintiffs' rights in the Copyrighted Recordings and

16  Pre-1972 Recordings by reproducing and/or distributing copies of the Copyrighted Recordings

17  and Pre-1972 Recordings.  (See Complaint ¶¶29 ["defendants MILLMAN, SATURN and

18  STACK-O-HITS reproduced and or distributed to defendants JORDAN and GLOBAL ARTS

19  unauthorized copies of the Copyrighted Recordings and Pre-1972 Recordings"] and 30 [ pursuant

20  to transactions entered into in Florida, Jordan and Global Arts "agreed to make or made and

21  provided to [their third party licensees] unauthorized copies of the Copyrighted Recordings and

22  Pre-1972 Recordings"]).  Thus, Plaintiffs have alleged acts of infringement in Florida.

23  (Complaint, ¶ 5).  These allegations state claims for infringement of Plaintiffs' copyrights under

24  17 U.S.C. §§ 106 and 501.  As a result, this Court clearly has subject matter jurisdiction.  P&D

25  Int'l v. Halsey Publ'g Co., 672 F. Supp. at 1432-3.  See also G.M.C. v. Arriortoa, 1997

26  Copyright Law Decisions (CCH) ¶ 27,622 at 29,942 (E.D. Mich. 1997) (allegations "that the

27  Defendants copied, or directed others to copy, Plaintiffs' copyrighted works in the United States

28

1   for the purpose of facilitating their theft, and that they participated in transporting the documents

2   abroad so that they could be further copied and delivered" stated a claim for copyright

3   infringement.).

4

5          Moreover, Plaintiffs have produced evidence that the Defendants have, in fact,

6   engaged in the conduct alleged in the Complaint. For example, in their license agreements,

7   Jordan and Global Arts agree to provide copies of the purportedly licensed recordings to their

8   licensees (see, e.g., Ex. "H" at ¶ 2), thus violating the distribution right in Plaintiffs' recordings.

9   17 U.S.C. § 106(3).  Moreover, Jordan admitted that he makes the copies of the recordings at his

10  office in Florida, and has made such copies in connection with a license he and Global Arts

11  issued as recently as May 1998 (see Goncalves Decl., ¶ 7, Oppenheim Decl., ¶ 3), thus violating

12  Plaintiffs' reproduction rights in their recordings.  17 U.S.C. § 106(1).

13          **D.      The Action Is Not Barred by Res Judicata or Collateral Estoppel.**

14          Defendants' res judicata argument is based on completely unsupported conclusory

15  statements, which do not specify any information concerning the action.  Defendants do not

16  identify the parties, the court, the nature of the claims, the recordings or transactions, that the

17  judgment is final, nor any other pre-requisite to the application of res judicata or collateral

18  estoppel.  Indeed, even Defendants' minuscule recitation establishes that res judicata does not

19  apply: Defendants assert (1) that the law applied was German law, not the U.S. law implicated

20  here; (2) that, at best, only one of the Plaintiffs here – Sony Music Entertainment, Inc. "or its

21  foreign affiliate" – was a party in the German action; and (3) that the transaction involved were

22  "similar," not "identical."  Of course, even these allegations are completely unsupported.  (See,

23  Danny Jordan's Motion to Dismiss, p. 3, ¶ 4.)

24

25          In any event, Defendants' argument is procedurally defective.  "Res judicata . . .

26  is not a defense under [Rule] 12(b); it is an affirmative defense that should be raised under Rule

27  8(c)."  Concordia v. Bendekovic, 693 F.2d 1073, 1075 (11th Cir. 1982).  This defense can be

28

1  raised in a Rule 12(b) motion **only** "where the defense's existence can be judged on the face of

2  the complaint." Id. Here, of course, the Complaint does not even mention the German action

3  that allegedly presents a bar to the present case.  As a result, the Court cannot even consider

4  Defendants' res judicata argument.

5

6  Even if the Court were to consider Defendants' res judicata claim, it would have

7  to be rejected.  Because res judicata is "an affirmative defense, . . . the burden of proof is upon

8  the party asserting it." Howard v. Green, 555 F.2d 178, 181 (8th Cir. 1977); accord, e.g., Capitol

9  Funds, Inc. v. Arlen Realty, Inc., 755 F.2d 1544, 1546 (11th Cir. 1985) (a party arguing res

10  judicata "has the burden of proof on the affirmative defense of res judicata").  That burden is not

11  easily met:

12

13  "For the doctrine of res judicata to be properly applied, four
   essential elements must be present: (1) the first action must result

14  in a final judgment on the merits, (2) the decision must be rendered
   by a court of competent jurisdiction, (3) the parties to both actions,

15  or those in privity with the parties, must be identical, and (4) the
   causes of action in both suits must be identical."

16

17  S.E.L. Maduro (Florida), Inc. v. M/V Antonio de Gastaneta, 833 F.2d 1477, 1481 (11th Cir.

18  1987); Richardson v. Alabama State Board of Education, 935 F.2d 1240, 1244 (11th Cir. 1991)

19  (same).  Here, Defendants have not even attempted to prove **any** of these four elements.  Indeed,

20  Defendants do not even identify the parties to the German action, the name or location of the

21  Court in Germany, or the case number or other identification of that action.  Under the

22  circumstances, this Court has no option but to deny Defendants' motions. See, Concordia, 693

23  F.2d at 1076-77 (denying res judicata claim where the "evidence . . . [did] not satisfy all of the

24  requisites necessary to invoke the doctrine of res judicata" nor did "the defense of res judicata

25  appear from the face of the complaint").

26

27

28

Mitchell Silberberg &
Knupp LLP

0015478.1

- 16 -

**E.**      **The Complaint Satisfies Rule 12(e).**

Although they have not challenged the sufficiency of the pleading of any of the claims alleged in the Complaint, Defendants curiously moved for a more definite statement under Rule 12(e), apparently on the grounds that Plaintiffs did not plead every evidentiary detail supporting their claims.  Of course, motions for a more definite statement are strongly disfavored and rarely granted.  Campbell v. Miller, 836 F. Supp. 827, 832 (M.D. Fla. 1993) ("Motions for a more definite statement are not favored in the federal court system"); Bazal v. Belford Trucking, Co., 442 F. Supp. 1089, 1101 (S.D. Fla. 1977) (motions for more definite statement generally are denied).  Further, "a motion for more definite statement is not to be used as a substitute for discovery," Campbell, 836 F. Supp. at 832.  Rather, such a motion should be granted only where the complaint is so vague and unintelligible that the defendant cannot ascertain the nature of the claim being asserted or reasonably be expected to frame a responsive pleading.  F.R.C.P. 12(e); Hodges v. Gellerstedt, 833 F. Supp. 898, 902 (M.D. Fla. 1993) ("A motion for more definite statement should only be granted when the pleading to which it is directed is so ambiguous or vague that a party cannot be reasonably expected to respond."); FRA S.P.A. v. Surg-O-Flex of America, 415 F. Supp. 421, 427 (S.D.N.Y. 1976) (a motion for more definite statement attacks unintelligibility in a pleading, not simply lack of detail, and will fail where the complaint is specific enough to apprise the defendant of the substance of the claim being asserted).

Here, even a cursory review of the Complaint reveals that Plaintiffs have satisfied the pleading requirements of Rule 12(e).  The Complaint specifies the titles of and artists who recorded the Copyrighted Recordings and Pre-1972 Recordings at issue, ownership of those recordings, and unauthorized copying.[5]  Those allegations state a claim for copyright infringement (Sid & Marty Krofft Television Productions, Inc. v. MacDonald's Corp., 562 F.2d

---

[5]      Plaintiffs believe Defendants wrongful conduct also extends to numerous other recordings owned by Plaintiffs, in addition to those set forth in the Complaint.  This is the subject of certain of the discovery Defendants have refused to provide.

- 17 -

1  1157 (9th Cir. 1977); Novelty Textile Mills, Inc. v. Joan Fabrics Corp., 558 F.2d 1090 (2d Cir.

2  1090 (2d Cir. 1977)), and are sufficient to withstand a motion for more definite statement.  5A

3  Wright & Miller, Federal Practice and Procedure §1377, p. 614-5 ("A very general claim of

4  copyright infringement should be sufficient as a against a motion for more definite statement.")

5  **F.    Jordan Was Properly Served Under Florida Statute § 48.031(1)(a).**

6     Jordan was served pursuant to Florida Statutes Section 48.031(1)(a) which

7  permits substituted service by leaving the summons and complaint at a party's "usual place of

8  abode" with any person residing therein who is 15 years of age or older and by informing the

9  person of their contents.  The process server's original return of service affidavit (filed herein on

10  June 9, 1998) recites each of the above elements.

11

12     A presumption of valid service arises from evidence of a return of service which

13  is regular on its face.  Klosenski v. Flaherty, 116 So. 2d 767 (Fla. 1959).  The party challenging

14  service must overcome the presumption of valid service by ***clear and convincing evidence***.

15  Florida National Bank v. Halphen, 641 So.2d 495 (Fla. App. 1994) (mere denial of service

16  insufficient to meet the requisite "high burden of proof"); Jefferson Bank & Trust v. Levy, 498

17  So. 2d 450 (Fla. App. 1986) (uncorroborated self-serving testimony insufficient to satisfy "clear

18  and convincing" burden of proof).  Where the objecting party fails to meet his burden, the Court

19  may deny the motion without conducting an evidentiary hearing.  See, e.g., Smith v. Cuban

20  American National Foundation, 657 So. 86 (Fla. App. 1995).

21

22     Here, without any supporting evidence, Jordan baldly asserts that he is a resident

23  of California, not Florida.  Not only is Jordan's contention unsupported, it is irrelevant.  The

24  Florida Supreme Court has defined "usual place of abode" to mean the "place where the

25  defendant is actually living at the time of service".  State ex re. Merritt v. Hefferman, 195 So.

26  145 (Fla. 1940).  Where, a defendant appears to have several residences, but his family resides in

27  Florida, the burden is on the defendant to show that he does not "live" with his family and has no

28

- 18 -

1 | plan on returning to Florida.  Id. at 147.  Here, Jordan's daughter (and wife) reside in Florida.

2 | Jordan's daughter advised the process server that Jordan was out of town.  At no time did she say

3 | that he did not live at the residence.  (See, Jean-Baptiste Decl.)  Thus, substituted service on

4 | Jordan at that residence was proper.

5 |       **G.**    **Defendants Waived Their Objections Based on Rule 12(b)(2) through (5) by**

6 |             **Failing to File Their Motions Timely.**

7 |       Rule 12(h)(1) of the Federal Rules of Civil Procedure provides that "[a] defense of

8 | lack of jurisdiction over the person, improper venue, insufficiency of process, or insufficiency of

9 | service of process is waived ... (B) if it is neither made by motion under this rule nor included in

10 | a responsive pleading or an amendment thereof permitted by Rule 15(a) to be made as a matter of

11 | right." Under Rule 12(a), responsive pleadings, including motions under Rule 12(b), must be

12 | served within 20 days after service of the summons and complaint.  Thus, under Rule 12(h), the

13 | failure to file a motion based upon lack of personal jurisdiction, improper venue, and

14 | insufficiency of service of process within 20 days after service of the summons and complaint

15 | constitutes a waiver of those defenses.  Insurance Corp. of Ireland, 465 U.S. at 740 ("the failure

16 | to enter a timely objection to personal jurisdiction constitutes, under Rule 12(h)(1), a waiver of

17 | the objection"); Nelson v. Victory Elec. Works, Inc., 210 F. Supp. 954 (D. Md. 1962) (objection

18 | to venue waived where motion filed 28 days after service of complaint) Granger v. Kemm, Inc.,

19 | 250 F. Supp. 644 (E.D. Pa. 1966) (objections to venue and service of process waived where

20 | motion was filed 55 days after service of complaint).  See also Farmer's Elevator Mut. Ins. Co. v.

21 | Carl J. Austed & Sons, Inc., 343 F.2d 7, 12 (8th Cir. 1965) (venue waived by failure to file

22 | timely motion).

23 |

24 |       Here, Jordan was served with the summons and complaint on May 21, 1998.  His

25 | responsive pleading was due on or before June 10, 1998.  Stack-O-Hits, Saturn, and Millman

26 | were served on May 22, 1998.  Their responsive pleadings were due on or before June 11, 1998.

27 | Defendants did not file and serve their motions to dismiss until June 17, 1998 -- six days after

28 |

0015478.1

1   Jordan's responsive pleading was due, and five days after Stack-O-Hits', Saturn's, and

2   Millman's responsive pleadings were due.  Defendants did not obtain, or even seek, from the

3   Court an extension of time within which to file a responsive pleading.  Rather, they engaged in a

4   series of misrepresentations to induce Plaintiffs to stipulate to an extension.  Defendants then

5   refused to sign the stipulation, which memorialized their promises, and instead reneged on those

6   promises.[6]  Under these circumstances and because Defendants' motions were not timely filed,

7   they waived their objections to the Complaint based upon lack of personal jurisdiction (Rule

8   12(b)(2)), improper venue (Rule 12(b)(3)), and insufficiency of service of process (Rule

9   12(b)(5)).  Thus, Defendants' motions on those grounds should be denied as untimely (as well as

10  for the substantive reasons set forth above).

11  **IV.    CONCLUSION**

12          For all of the foregoing reasons, the Court should deny Defendants' untimely and

13  unsupported motions in their entirety.

14

15  DATED: July _2_, 1998                          RUSSELL J. FRACKMAN
                                                   YAKUB HAZZARD
16                                                 MITCHELL SILBERBERG & KNUPP LLP
                                                       and
17                                                 KAREN L. STETSON

18

19                                                 By: _Russell J. Frackman_
                                                   RUSSELL J. FRACKMAN
20                                                 Attorneys for Plaintiffs

21

22

23

24

25

26  _____

27      [6]    See Plaintiffs' Motion to Compel Compliance with June 2, 1998 Discovery Order,
    and Motion for Expedited Briefing Schedule for a more detailed recitation of these facts.

28
                                          - 20 -

## DECLARATION OF MARCIO GONCALVES

I, MARCIO GONCALVES, declare:

1.     I am a resident of Sao Paulo, Brazil.  I am employed by the Brazilian Recording Industry.  I have personal knowledge of the following facts, and if called as a witness, I would and could competently testify thereto.

2.     I am familiar with defendant Danny Jordan and his company, Global Arts Productions ("Global Arts").  I learned of Mr. Jordan and Global Arts from seeing compact discs bearing Global Arts' name being sold in Brazil.  These compact discs, including recordings of such artists as The Doors, Simon & Garfunkel and Neil Diamond.  These recordings indicated that they were licensed by Global Arts, and distributed by a Swiss licensee of Global Arts, Gruezi Shallplatten, A.G.

3.     I obtained the telephone number of Mr. Jordan and Global Arts, and contacted Mr. Jordan by telephone to discuss whether he would be interested in licensing product to me for distribution in Brazil.  After several conversations, Mr. Jordan and I arranged to meet in Fort Lauderdale, Florida.

4.     On May 7, 1998, I personally met with Mr. Jordan at the Embassy Suites Hotel in Fort Lauderdale, Florida.  The purpose of the meeting was my interest in acquiring rights in certain Billy Joel sound recordings on an album entitled "Cold Spring Harbor."  Mr. Jordan told me that he and Global Arts had purportedly acquired the rights in "Cold Spring Harbor" through a licensing chain that dated back to 1977.  Mr. Jordan said that one of the sources of rights in "Cold Springs Harbor" was defendant Jack Millman.

Mitchell Silberberg & Knupp LLP

0015478.1

5.     During my May 7, 1998 meeting with Mr. Jordan, he told me that he has done business as Global Arts since 1990, and works out of the Global Arts office located in Coral Springs, Florida.  Mr. Jordan also said that he maintains a home in Florida.  Mr. Jordan said that because his name had become too associated with Global Arts, he intended to shut down Global Arts, and set up a new company called Just Great Music.

6.     During that meeting, I paid Mr. Jordan $3,750 in exchange for obtaining the rights to sell the "Cold Spring Harbor" recording in Brazil.  A true and correct copy of the written receipt prepared by Mr. Jordan reflecting receipt of the $3,750 is attached hereto as Exhibit "A."  In addition, attached hereto as Exhibit "B" and "C" respectively are two license agreements provided to me by Mr. Jordan at the May 7, 1998 meeting.  Mr. Jordan executed one of the agreements (Ex. "B") in my presence during that meeting.  On one of the agreements (Ex. C"), Mr. Jordan changed all references to Global Arts Productions to a new company he was setting up, Just Great Music.

7.     At the meeting, Mr. Jordan provided me with a digital audio tape of the Billy Joel recordings he was purporting to license to me.  In addition, Mr. Jordan provided me with an audio cassette sampler of the "Cold Spring Harbor" recordings.  Mr. Jordan told me that these tapes were copied by him at a studio in Florida, and that he could make copies of any other recordings I wished to license from him.

Mitchell Silberberg &
Knupp LLP

0015478.1

8.    At the conclusion of the meeting, Mr. Jordan provided me with five (5) samples of compact discs that he had licensed for distribution. The discs included recordings of The Who, Chicago, Eric Burdon and the Animals, Jimi Hendrix and The Beach Boys.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this ___ day of July 1998 at Sao Paulo, Brazil.

MARCIO GONCALVES

0015478.1

## DECLARATION OF MATTHEW J. OPPENHEIM

I, MATTHEW J. OPPENHEIM, declare:

1.      I am Associate Counsel, Civil Litigation, for the Recording Industry Association of America (the "RIAA"). I am a member of the bars of Maryland and the District of Columbia. I have personal knowledge of the following facts, and if called as a witness, I would and could competently testify thereto.

2.      On or about February 23, 1998, I received a telephone message from defendant Danny Jordan. Mr. Jordan left a Florida telephone number of (973) 338-5567, and asked that I return his call.

3.      I returned Mr. Jordan's call later that day, and asked him about the business he conducts through Global Arts Production ("Global Arts"). Mr. Jordan explained to me that he is in the business of purchasing rights to recordings and licensing them to third parties. Mr. Jordan told me that he acquires rights to the recordings through "bills of sales" from defendant Jack Millman ("Millman"), and pays Millman monthly for the rights. Mr. Jordan told me that he and Millman have all of the documents necessary to pursue his rights to copy and distribute the recordings. Mr. Jordan offered to meet with me and show me this documentation. At the conclusion of the conversation, Mr. Jordan provided me with Global Arts' Florida telephone number (973) 755-0551. In addition, Mr. Jordan asked me to send him a list of artists whose recordings we believed he was unlawfully copying and distributing. He asked that I send that material to the Global Arts office at 7160 Knob Hill Road, Suite 135, Tamarac, Florida 33321. He also gave me his Florida fax number (954) 775-1201. We agreed to meet on March 10, 1998.

Mitchell Silberberg &
Knupp LLP

0015478.1

1    4.    On February 24, 1998, I sent a letter to Mr. Jordan confirming the meeting

2    and listing the artists whose recordings we believed he was infringing. The letter was sent to

3    Mr. Jordan via fax at his Florida fax number. A true and correct copy of my February 24, 1998

4    letter is attached hereto as Exhibit "D."

5

6    5.    On March 3, 1998, I received a telephone message from Mr. Jordan stating

7    that he had to cancel the March 10, 1998 meeting. Mr. Jordan asked me to call him in Florida at

8    (954) 775-0551.

9

10    6.    On March 4, 1998, I telephoned Mr. Jordan. During our conversation,

11    Mr. Jordan stated that he purchased digital audio tapes and compact discs of the recordings he

12    was licensing from Millman and one of Millman's companies, Saturn Records. Since that

13    March 4, 1998 telephone conversation, I have had no contact with Mr. Jordan.

14

15    7.    Subsequently, counsel for Mr. Jordan told me that Mr. Jordan would not

16    meet with the RIAA to disclose the documentation supporting his rights in and to the recordings

17    he was licensing.

18

19    I declare under penalty of perjury under the laws of the United States of America

20    that the foregoing is true and correct.

21

22    Executed this ___1ST___ day of July 1998 at _Washington, DC_

23

24

25

26    MATTHEW J. OPPENHEIM

27

28

Mitchell Silberberg &
Knupp LLP    0015478.1

## DECLARATION OF JEAN-MARIE JEAN-BAPTISTE

STATE OF FLORIDA     )
                       )
COUNTY OF BROWARD  )

      I, JEAN-MARIE JEAN-BAPTISTE, hereby declare under penalty of perjury, the following:

      1. I am a certified process server, authorized to serve process in Broward County, Florida.

      2. On May 20, 1998 at approximately 8:00 P.M., I attempted to serve Defendant Danny Jordan with a copy of the Complaint and other pleadings in <u>Sony Music Entertainment, Inc., et al. vs. Global Arts Productions, et al.</u>, in the United States District Court for the Southern District of Florida (Case No. 98-6507-Civ-Middlebrooks) at 4022 N.W. 73rd Avenue, Coral Springs, Florida.

      3. A young woman came to the door, but refused to open the door. She indicated that Danny Jordan was "not here right now," and directed me to return in the morning.

      4. The next day, on May 1, 1998, in the late afternoon, I returned to the residence located at 4022 N.W. 73rd Avenue, Coral Springs, Florida. The occupant of the residence called the police, who arrived and entered the residence to speak with the occupant. The policeman thereafter came out of the house with the occupant who identified herself as Melissa Florio, Danny Jordan's daughter. The policeman explained to her that I was a process server attempting to serve a Complaint on her father. The policeman asked for her age and she indicated she was 20 years old.

5. Defendant Danny Jordan's daughter, Melissa Florio, stated that Danny Jordan was out of town and would be back on Monday. At no time did Ms. Florio state that Danny Jordan did not live at the address located at 4022 N.W. 73rd Avenue, Coral Springs, Florida.

6. I then handed Ms. Floria the Complaint and other pleadings, together with the Summons directed to Defendant Danny Jordan and left.

7. Several days later, I revisited the residence located at 4022 N.W. 73rd Avenue, Coral Springs, Florida to serve process on Defendant Global Arts, by and through Danny Jordan. This time I was greeted by Defendant Danny Jordan's wife, Carmela A. Jordan, who indicated that her husband was out of town and would be back in approximately a month.

8. At no time did Defendant Danny Jordan's wife indicate that Danny Jordan did not live at the residence located at 4022 N.W. 73rd Avenue, Coral Springs, Florida.

DATED this _26_ day of June, 1998.

SPS
#379

JEAN-MARIE JEAN-BAPTISTE

-2-

## DECLARATION OF JOSEPH H. LODGE

STATE OF FLORIDA     )
                            )
COUNTY OF DADE      )

      I, JOSEPH H. LODGE, hereby declare under penalty of perjury, the following:

      1. I am a licensed investigator authorized to conduct investigations in the State of Florida.

      2. At the direction of Karen L. Stetson, Esquire, I conducted a data base search of the public records of the State of Florida for information regarding Danny Jordan (date of birth: 11-25-39; social security number: 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) and Global Arts.

      3. The public records of the State of Florida revealed a vehicle registered to Global Arts at the following address: 4022 N.W. 73rd Avenue, Coral Springs, Florida.

      4. The public records of the State of Florida further revealed the ownership of property in Charlotte County, Florida, by Danny Jordan and his wife, Carmela Jordan.

      DATED this _26th_ day of June, 1998.

                                        Joseph H. Lodge

May 7- 1998

I Danny Jordan on Behalf of lucky Eagle and Just great music Inc. a California Corporation. Received from Claudio Costa Today the sum of $3,850.00 United State funds the fee for the licensing of Billy Joel Track. 18 in Total. Copies of Which have Been given to MR Costa. a formal agreement shall be drawn By & Between Just great music and the new company of Claudio Costa. This letter of intent for this new agreement Shall Be given to Just great music Within 30 to 45 days from this agreement.

Yours truly Danny Jordan

EXHIBIT   A

MCGG
7-5-98

## AGREEMENT

This Agreement by and between Global Arts Productions, Inc. ("Global Arts"), .

WHEREAS Global Arts is the owner or co-owner of certain "Master Recordings" ( a descriptive list of which is attached as Exhibit A), as that term is defined in the recording industry, from which many forms of marketable product may be reproduced;

WHEREAS Lessees desire to reproduce or duplicate from these Master Recordings for the sole purpose of entering into Licensing Agreements which would result in profits or royalties to Global Arts and Lessees;

WHEREAS Lessees requires a granting of rights in order to reproduce or duplicate from these Master Recordings for the sole purpose of entering into Licensing Agreements which would result in profits or royalties to Global Arts and Lessees;

WHEREAS Lessees warrant and represent that they, jointly and severally, shall only reproduce or duplicate the Master Recordings for the sole purpose of entering into Licensing Agreements which would result in profits to Global Arts and Lessees; and

WHEREAS Lessees warrant and represent that they, jointly and severally, have established customers who would be interested in entering into Licensing Agreements which would result in profits or royalties to Global Arts and Lessees.

NOW THEREFORE, in consideration of .. $3750 U S$     the receipt of which is acknowledged herein, and for other good and valuable consideration recognized by the parties to this Agreement, Global Arts and Lessees agree and covenant as follows:



1.  That Global Arts shall grant to Lessees a lease of rights to the Master Recordings, singular and plural, under the recitations, warrants and representations contained above and under the terms and conditions described herein, for a period of . 3 years from the date of execution of this Agreement;

2.  That Lessees shall be responsible for all expenses incurred to induce Licensing Agreements for the Master Recordings owned or co-owned by Global Arts;

3.  That Lessee shall not enter into any Licensing Agreement for the Master Recordings owned or co-owned by Global Arts without the expressed written premission of Global Arts;

4.  That Global Arts and Lessees shall equally share in all revenues received by Lessees, Lessees's heirs Lessees' agents or Lessees' assigns from any Licensing Agreement for the Master Recordings owned or co-owned by Global Arts;

5.  That Lessees shall not enter into any other agreement relating to the merchandising, agency or commercialization rights related to the Master Recordings owned or co-owned by Global Arts without the expressed written permission of Global Arts;

6.  That Lessees shall not assign or transfer any of their joint or several rights, title or interest under this Agreement without the expressed written permission of Global Arts;

7.  That Global Arts shall indemnify and hold Lessees harmless from any and all others who may at some other time claim rights or ownership to the Master Recordings owned or co-owned by Global Arts;

8.  That if at any time a dispute of rights or ownership arises, Global Arts will present contracts or documents to any third parties claiming ownership and, in the event that contracts or documents

EXHIBIT    B

from third parties are legally determined to nullify Lessees' contracts or documents, then any and all monies paid to Global Arts under those contracts shall be returned to Lessees;

9.    That this Agreement is governed under the laws of the State of Florida; and

10.   That this Lease shall terminate immediately, and all rights, title and interest granted to Lessee under this Agreement shall cease, upon the occurrence of any of the following:

    a.    That Lessees becomes insolvent;
    b.    That Lessees files a petition for bankruptcy under the laws of the United States; and/or
    c.    That Lessees is adjudicated to have criminal or civil liability for any acts or omissions arising from Lessees' representations in the entertainment industry.


AGREED TO AND ACCEPTED THIS     DAY OF '              199

By and Between:

DANIEL F. JORDAN
PRESIDENT
GLOBAL ARTS PRODUCTIONS

AGREEMENT

This Agreement by and between ~~Global Arts Productions~~, Inc. ("~~Global Arts~~"),

WHEREAS ~~Global Arts~~ is the owner or co-owner of certain "Master Recordings" ( a descriptive list of which is attached as Exhibit A), as that term is defined in the recording industry, from which many forms of marketable product may be reproduced;

WHEREAS Lessees desire to reproduce or duplicate from these Master Recordings for the sole purpose of entering into Licensing Agreements which would result in profits or royalties to Global Arts and Lessees;

WHEREAS Lessees requires a granting of rights in order to reproduce or duplicate from these Master Recordings for the sole purpose of entering into Licensing Agreements which would result in profits or royalties to ~~Global Arts~~ and Lessees;

WHEREAS Lessees warrant and represent that they, jointly and severally, shall only reproduce or duplicate the Master Recordings for the sole purpose of entering into Licensing Agreements which would result in profits to ~~Global Arts~~ and Lessees; and

WHEREAS Lessees warrant and represent that they, jointly and severally, have established customers who would be interested in entering into Licensing Agreements which would result in profits or royalties to ~~Global Arts~~ and Lessees.

NOW THEREFORE, in consideration of $3, 750.00-US the receipt of which is acknowledged herein, and for other good and valuable consideration recognized by the parties to this Agreement, Global Arts and Lessees agree and covenant as follows:

1.      That Global Arts shall grant to Lessees a lease of rights to the Master Recordings, singular and plural, under the recitations, warrants and representations contained above and under the terms and conditions described herein, for a period of 3 yrs from the date of execution of this Agreement;

2.      That Lessees shall be responsible for all expenses incurred to induce Licensing Agreements for the Master Recordings owned or co-owned by ~~Global Arts~~;

3.      That Lessee shall not enter into any Licensing Agreement for the Master Recordings owned or co-owned by Global Arts without the expressed written premission of ~~Global Arts~~;

4.      ~~That Global Arts and Lessees shall equally share in all revenues received by Lessees, Lessees's heirs Lessees' agents or Lessees' assigns from any Licensing Agreement for the Master Recordings owned or co-owned by Global Arts~~;

5.      That Lessees shall not enter into any other agreement relating to the merchandising, agency or commercialization rights related to the Master Recordings owned or co-owned by Global Arts without the expressed written permission of ~~Global Arts~~;

6.      That Lessees shall not assign or transfer any of their joint or several rights, title or interest under this Agreement without the expressed written permission of ~~Global Arts~~;

7.      ~~That Global Arts~~ shall indemnify and hold Lessees harmless from any and all others who may at some other time claim rights or ownership to the Master Recordings owned or co-owned ~~by Global Arts~~;

8.      That if at any time a dispute of rights or ownership arises, ~~Global Arts~~ will present contracts or documents to any third parties claiming ownership and, in the event that contracts or documents

**EXHIBIT** U

from third parties are legally determined to nullify Lessees' contracts or documents, then any and all monies paid to ~~Global Arts~~ under those contracts shall be returned to Lessees;

9.      That this Agreement is governed under the laws of the State of ~~Florida,~~ and CALIFORNIA

10.     That this Lease shall terminate immediately, and all rights, title and interest granted to Lessee under this Agreement shall cease, upon the occurrence of any of the following:

a.      That Lessees becomes insolvent;
b.      That Lessees files a petition for bankruptcy under the laws of the United States; and/or
c.      That Lessees is adjudicated to have criminal or civil liability for any acts or omissions arising from Lessees' representations in the entertainment industry.

AGREED TO AND ACCEPTED THIS      DAY OF '              199

By and Between:

C.M.A
Licensing

DANIEL F. JORDAN
PRESIDENT
~~GLOBAL ARTS~~ PRODUCTIONS

MATTHEW J. OPPENHEIM





RECEIVED
MAR 02 1998
Mitchell, Silberberg & Knupp

February 24, 1998

Danny Jordan
Global Arts Productions
7160 Nobhil Road
Poit Plaza, Suite 135
Tamarac, FL 33321

VIA FAX

Dear Mr. Jordan; *Danny*

I am pleased that we had the opportunity to speak yesterday afternoon regarding the activities of Global Arts Productions. I am looking forward to meeting with you on March 10, 1998 to review in greater depth the matters we discussed on the telephone. In that regard, I am particularly interested in documents that show how the rights conveyed from the labels through each entity to land, ultimately, with Global Arts. I do not understand this process. As well, you asked what artists we were interested in, we are curious of the following: The Doors, Cat Stevens, Simon & Garfunkel, Linda Rondstadt, ZZ Top, Frank Sinatra, Dean Martin, The Mamas & The Papas, Neil Diamond, The Monkees, Harry Belafonte, The Who, and Ray Charles.

My preference is to meet at your offices in Tamarac, rather than here in Washington, D.C. This will allow you to have all of the documents within easy reach, and it will also allow me to deal with some other business I have in Florida at that time. Please let me know if this is feasible.

Also, you indicated that you would be meeting with Milman over the next few weeks. I could not tell whether you were intending to obtain additional titles at that time. If so, it might make sense for us to include whatever titles you are obtaining from him as part of our discussion and document review.

If you have any questions for me in the interim, please do not hesitate to call.

Sincerely Yours,

Matthew J. Oppenheim, Esq.

RECORDING INDUSTRY ASSOCIATION OF AMERICA
1330 CONNECTICUT AVE, NW SUITE 300, WASHINGTON, DC 20036
PHONE 202 775 0101  FAX 202 775 7253  EMAIL moppenheim@riaa.com

EXHIBIT D

bcc:   Ken Giel
       Bob Welsh
       Steve Fabrizio

12/11 '97  16:48  FAX 0719353669      CAROLINE LEWIS  → WMI NEW YORK    ☑002/005

12-NOV-1997  14:53  FROM WARNER MUSIC POLAND        TO    900441719353669    P.02

31/10 '97  10:40  ☎+48322838364          SNAKE'S MUSIC SC                 ☑001/001

## GENERAL AGREEMENT

This Agreement entered into this 16th of October
1996 by and between

**GLOBAL ARTS PRODUCTION**
7100 Nels Hill Road
Suite 136 - Point Plaza Building.
TAMARAC, FLA 33321

USA

(hereinafter called "Lessor")

and

**SNAKE'S MUSIC S.C**
ul. Wopistow 16B
43840 Sosnowiec
Poland

(hereinafter called "Licensee")

Whereas Lessor represents and warrants that it has the right to
authorise the manufacturing and distribution of the  contractual
artist and titles according the schedule item 1 to this agreement
for the Licensed Territory (hereinafter called the Master
Recordings)

and

Whereas Licensee is in a position directly  or indirectly to
provide manufacturing in the Licensed Territory - according to
the schedule item 2 to this agreement.

Now Therefore in consideration of the foregoing and of the
mutual promises hereinafter set forth, it is agreed:

1. Lessor grants to Licensee the nonexclusive right and license
to use the Master Recordings for the purpose of manufacturing
and selling phonograph recordings derived therefrom in the
Licensed Territory on compilations according to the schedule
item 3 to this agreement.
Lessor herewith rents to Licensee the rights for Master
Recordings only for the term of this agreement. The rent of
rights does not constitute any changes in ownership; all rights
remain the property of the Lessor.

12/11 '97 16:48 FAX 0718353869        CAROLINE LEWIS    →→→ WMI NEW YORK    003/005

12-NOV-1957 14:54   FROM WARNER MUSIC POLAND          TO      900441719353869    P.03

## SCHEDULE   NO. 3

to the Agreement dated August 1st, 1987 by and between

## GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")

and

## SNAKE'S MUSIC S.C.
(hereinafter called "Licensee")

1A. ARTISTS: THE DOORS
1B. TITLES: 1. Light My Fire
2. Riders On The Storm
3. People Are Strange
4. The WASP
5. Break On Through
6. Roadhouse Blues
7. Alabama Song
8. L. A. Woman
9. The End
10. The Unknown Soldier

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Warsaw, August 21st, 1987     Szanowiec,
GLOBAL ARTS                    SNAKE'S MUSIC
Productions Ltd.

For Global Arts Prod.

.............................   .............................
Danny Jordan                    Dariusz Waz

PRZEDSIEBIORSTWO MUZYCZNE
Snake's Music S.C.
NIP 000-001-70-70

GENERAL AGREEMENT

This Agreement entered into this 25th of November ,
1996 by and between

GLOBAL ARTS PRODUCTION
represented by Mr. Danny Jordan
7160 Nob Hill Road
Suite 135 - Point Plaza Building
TAMARAC, FLA 33321

USA

(hereinafter called "Lessor")

and

K-tel INTERNATIONAL (Switzerland) AG
Riedstraße 1
CH 6343 Rotkreuz

Switzerland

(hereinafter called "Licensee")


Whereas Lessor represents and warrants that it has the right to
authorise the manufacturing and distribution of the  contractual
artist and titles according the schedule item 1 to this agreement
for the Licensed Territory (hereinafter called the Master
Recordings)

and

Whereas Licensee is in a position directly  or indirectly to
provide manufacturing in the Licensed Territory - according to
the schedule item 2 to this agreement.


Now Therefore in consideration of the foregoing and of the
mutual promises hereinafter set forth, it is agreed:

1. Lessor grants to Licensee the nonexclusive right and license
to use the Master Recordings for the purpose of manufacturing
and selling phonograph recordings derived therefrom in the
Licensed Territory on compilations according to the schedule
item 3 to this agreement.

EXHIBIT   F
1

2. Lessor represents and warrants that at the time of signing this Agreement and granting rights to Licensee hereunder and thereafter during the term, Lessor will be the owner or will controll all rights therein which are granted to Licensee hereunder and that it will secure the consent in writing of all artists including musicians, whose performances are reproduced in the recordings, together with all necessary copyright informations for the manufacture and sale of records by Licensee in connection with the recorded performances. Lessor agrees to forward to Licensee on Licensees desire a DAT of the MASTER RECORDINGS at the selfcost price of duplication of US $ 10,- in respect of each title.

3. Subject to paragraph 6 below furtheron, Lessor represents and warrants that except as otherwise expressively provided herein, Licensee shall be under no liability whatsoever to the artist or any third party arising out of the manufacture sale, use and publications as aforesaid, which Lessor may be responsible to pay and account which Lessor shall so pay and the Lessor shall at all times keep Licensee indemnified against all cost, damages and expenses or claims arising out of manufacture, sale, use and publication to the extend that there is a breach of the warranties contained in this clause.

4.1. Licensee represents and warrants that it has the capability to fully perform all the terms and conditions contained in this agreement and that it has the right, power and authority to enter into and to perform all of the terms and conditions contained herein. Licensee shall not have the right to sublicense or convey any rights granted under this agreement.

4.2. Licensee will make all payments which may be due and owing to any person, firm or corporation involved in the manufacture and/or sale of any of the recordings hereunder and will hold Lessor harmless from any and all claims. Licensee will use its best efforts to enforce collection of all accounts receivable for the sale of all recordings within the Licensed Territory.

4.3. Licensee will comply with all copyright provisions as to the recordings within the Licensed Territory.

5.   Licensee shall be solely responsible for the timely  and accurate fullfilment of all copyright obligations arising out of the manufacture and the sale of records hereunder and agrees to

2

indemnify the Lessor in respect thereof. Licensee agrees to obtain appropriate licenses and to do all things necessary to record copyright material under the laws of the Licensed Territory.

6.1. In consideration of the rights herein granted, Licensee agrees to pay to Lessor a royalty as provided in the schedule item 4 to this agreement, on 100% of the actual PPD- published price to dealer, less 10% on cassettes respectively 10% technical deduction on compact discs per title rata for each and every sold and not returned recording.

6.2. Upon the execution of this agreement, Licensee shall make payment to Lessor as provided in the schedule, item 5 to this agreement. The provided payment is a nonrefundable advance on account of royalties payable hereunder. Advance payments hereunder shall be non-returnable and fully recoupable from sums which may become due to Lessor hereunder for the relevant contractual recording according to the schedule of this agreement. There shall be no crosscollaterisation with other recordings provided in further schedules to this agreement.

6.3. Royalty Payments, including advances by Licensee to Lessor due hereunder shall be accompanied by a statement setting forth the full details the computations of the amount thereof. Such statements and payments shall be made semi-annually within 90 days following June 30 th and December 31st of each year and shall be forwarded to the adress for GLOBAL ARTS Production.

6.4. Lessor or its authorized representatives shall have the right to audit the books and records of Licensee, regarding the contractual titles, with the unrestricted right to make excerts therefrom and copies thereof. Such inspection shall be made during normal business hours, upon 30 days prior written notice to Licensee and no more than once for each year hereunder during the period of this agreement. In the event that in any inspection the books and records disclose a discrepancy in amounts payable to Lessor in excess of ten percent (10%) of the total royalties paid, Licensee shall promptly pay all costs of such inspection including accountant's fees incurred by Lessor.



7. Licensee will manufacture records from the Master Recordings within 60 (sixty) days after signing of this Agreement and agrees to mail to Lessor five (5) copies of each format of the released records within 15 (fifteen) days of its/their release.

8. The term of this agreement shall be for a period as provided in item 6 of the schedule to this agreement. After termination of the contractual period Licensee shall have the right to distribute the existing stock of the contractual compilation cd- and musicasette productions for a further sell-off period of (6) six months.

9. This agreement sets forth the entire agreement between the parties hereto with respect to the subject matter hereof and shall benefit and be binding upon the parties herto and their respective legal representatives, successors and assigns. No modification, amendment or waiver of agreement or any provision(s) thereof shall be effective unless confirmed by a written instrument signed by both parties.

10. Any difference arising under this agreement between Lessor and Licensee shall be handled in accordance with the laws of the state of Florida and the competent state and federal courts of Tamarac shall have jurisdiction of any dispute arising out of or relating to this agreement or the alleged breach thereof.

IN WITNESS WHEREOF, the parties herto have caused this agreement to be executed by their duly authorized representatives as of the day and year first above written.

Tamarac,                            Rotkreuz,
GLOBAL ARTS                         K-tel INTERNATIONAL
PRODUCTION

4

- 2 -

2. TERRITORY: Germany, Austria and Switzerland incl. export rights

3. CATEGORY OF RELEASE: 2-cd set and double cassette,
including compilation rights

4. ROYALTY:

5. FLAT FEE:

6. TERM:  3 years, starting  1st of March 1997
until  28th of February 2000   plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac, Fe. 27.97                     Rotkreuz, 20 Mai 97
GLOBAL ARTS                            K-tel INTERNATIONAL
PRODUCTIONS                            (Switzerland) AG

..............................         ..............................
Danny Jordan.                          Martin Schiess

SCHEDULE    NO. 3
to the Agreement dated November 25th, 1996 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Lessor")
and
K-tel INTERNATIONAL (Switzerland) AG
(hereinafter called "Licensee")

1. A)  ARTIST : FRANK SINATRA
   B)  TITLES:
1. Here's That Rainy Day
2. Autumn In New York
3. In The Wee Small Hour Of The Morning
4. For Once In My Life
5. What Now My Love
6. All Or Nothing At All
7. My Kind Of Town
8. Ol' McDonald
9. Come Fly With Me
1o. All The Way
11. Night And Day
12. The Lady Is A Tramp
13. It Was A Very Good Year
14. The Last Dance
15. Strangers In The Night
16. Learnin' The Blues
17. Nancy
18. I Get A Kick Out Of You
19. Young At Heart
20. South Of The Border
21. That's Life
22. Summerwind
23. The Girl From Ipanema with A.C. Jobim
24. Love And Marriage
25. Yesterday
26. Something Stupid (with Nancy Sinatra)
27. Three Coins In The Fountain
28. Witchcraft
29. My Way
30. I've Got You Under My Skin
31. This Can't Be Love
32. My Happiness
33. Long Ago And Far Away
34. One Hundred Years From Today
35. Hair Of Gold, Eyes Of Blue
36. Let Me Love You Tonight
37. I'll Get By
38. I Wonder Who's Kissing Her Now
39. I Wish I Didn't Love You So
40. Lilli Bolero

- 2 -

## MASTER LICENSE AGREEMENT

AGREEMENT made as of the 16th day of June 1997,
by and between

GLOBAL ARTS PRODUCTIONS
represented by Mr. Danny Jordan
7160 Nob Hill Road
Suite 135 - Point Plaza Building
TAMARAC, FLA 33321
United States Of America
(hereinafter called "Licensor")

and

DURECO B.V.
represented by the General Manager Mr. Harry R. Chün
Pampuslaan 45
1382 JM Weesp
Netherlands
(hereinafter called "Licensee")

WITNESSETH:

IN CONSIDERATION of the mutual promises herein contained, other good
and valuable consideration receipt whereof is hereby acknowledged, and of
the promises, it is agreed:

1.      Licensor hereby authorizes in Licensee, for the territory of BENELUX
and export rights (the "Licensed Territorry"), the non-exclusive rights to
manufacture, advertise, distribute and sell phonorecords derived from
Licensor's masters as listed and only through the method of sale as
stipulated in Schedule to the agreement, (the "Masters") for use only in one
album, but upon and subject to all of the terms, covenants and conditions of
this agreement.

2.      Upon the execution of this agreement, Licensee shall make payment
to Licensor the amount as stipulated in Schedule to the agreement in United
States currency as an advance payment for royalties payable hereunder.
Payments hereunder shall be non-returnable and shall be fully recoupable
from sums which may become due Licensor hereunder

3.      Licensee shall make payment to Licensor the royalty set forth in
Paragraph 2 of this agreement, for each phonorecord manufactured and sold
and/or distributed under this agreement and shall pay to Licensor fifty
percent (50%) of Licensee's net receipts of performance royalties received
by Licensee as a result of public performances of the master recordings
licensed hereunder in the Licensed Territory, if not contrary to government
rules/law.



- 2 -

EXHIBIT   G



- 2 -

4.    It is a condition of this agreement that Licensee pay:

(a)    All so-called "mechanical royalties" to the owners of the copyright in the musical compositions embodied in the Masters for the reproduction thereof in phonorecords manufactured and sold under the authority of this agreement, and

Licensee shall indemnify and hold Licensor harmless from any loss or damage suffered by this Paragraph 4.

5.    True and correct accounts, open to the inspection of Licensor or its authorized representatives (with the unrestricted right to make excerpts therefrom and copies thereof), shall be kept by Licensee, showing the number of phonorecords manufactured and sold under authority of this agreement and the amount of money payable to Licensor in respect thereof. Such inspection shall be made during normal business hours, upon 30 days prior written notice to Licensee and no more than once for each accounting period hereunder. In the event that in any inspection the books and records disclose a discrepancy in amounts payable to Licensor in excess of ten percent (10%) of the total royalties paid, Licensee shall promptly pay all costs of such inspection, including accountant's fees incurred by Licensor. Licensee shall prepare and forward to Licensor statements of account as of June 30, and December 31 in each year, within ninety (90) days after each of said dates, by mail, duly stamped and correctly addressed to Licensor, and all monies which shall become payable to Licensor on each of said dates under this agreement shall be paid by Licensee upon the rendition of each such statement.

6.    The Masters, together with sound recording copyright therein and the performance therein and the performance embodied therein, shall be entirely Licensor's property, free of any claims whatsover by Licensee or any person deriving any rights or interest from Licensee. Licensee acknowledges that Licensor is to be considered the author for the purpose of copyrights in sound recordings and that Licensor owns all the rights comprised in such copyright, including any rights to renew and extend the copyright. Without limitation of the foregoing Licensee and/or Licensee's subsidiaries and affiliates shall have the right to make cassette tapes and/or compact disc reproductions of the performances embodied in the Masters, and to sell and deal in the same under trademark or tradenames or labels designated by Licensee during the term of this Agreement and the sell-off period provided in paragraph 10 below, or Licensee may at its election refrain therefrom. Licensee shall take all steps and do all things necessary to secure and protect Licensor's rights in the Masters in the Licensed Territory in the name of the Licensor. 

- 3 -

- 3 -

7.    Licensee shall have the right to use and to allow to use others to use the name, likeness and biographical material concerning the artist performing on the Masters, for advertising and purposes of trade, in connection with the recordings licensed hereunder to the extent that Licensor has such rights. Notwithstanding anything herein to the contrary, the license granted by Licensor hereunder is limited to a one time use of the Masters in the album title as set forth in Schedule to the agreement . Licensee shall not have the rights to sub-license or convey any rights granted under the agreement.

8.    Licensor represents and warrants that it is under no disability, restriction or prohibition, whether contractual or otherwise, with respect to its right to execute this Agreement. Licensor agrees to and does hereby indemnify, save and hold Licensee harmless arising out of or connected with any claim by a third party which is not consistent with any of the warranties or representations made by Licensor in this Agreement, and Licensee at any time after the date hereof with respect to any liability or claim adjudicated by a competent court of law to which the foregoing indemnity applies.

9.    This Agreement sets forth the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, assignment, termination or discharge of this Agreement or any provisions hereof shall be binding unless confirmed by a written instrument signed by an officer of Licensee and by Lisensor's authorized representative. No waiver of any provision of this Agreement or any default hereunder shall affect either party's rights or remedy in the event of any other default, whether or not similar.

10.    The term of this agreement shall be for the period set forth in Schedule to the agreement, annexed hereto. Licensee shall not have the right to manufacture any inventory after the expiration of the term hereof but shall have the right to sell all existing inventory on hand after the expiration of the term hereof, but shall have the right to sell all existing inventory on hand at the expiration of this agreement for a period of six (6) months afer the expiration date.

11.    In addition to all other rights and remedies in law or in equity which Licensor may have, upon the default of Licensee (1) in making any payment when the same shall be come due under this agreement, (2) in the keeping of any accounts or rendering of any statement thereof as in this agreement provided, and (3) in carrying out or performing any of the terms, covenants or conditions of this agreement, Licensor, upon any such default of Licensee, shall have the right, thirty (30) days from the sending of demand and if such default remains uncured,

- 4 -

to forthwith terminate this agreement by sending a written communication to Licensee to such effect, and upon the sending of such written communication this agreement shall terminate and come to an end and any and all rights and interests whatsoever acquired by Licensee and everyone in interest through it, under this agreement, shall, anything to the contrary notwithstanding, forthwith cease, terminate and revert to Licensor, without affecting the obligations of Licensee to make payment to Licensor of all monies as to which Licensee may be or become obligated under this agreement.

12.    In the event that at any time (a) any application, petition, suit or proceeding is filed or instituted by or against Licensee involving or relating to the general property rights of Licensee, (b) a receiver, liquidator, assignee, or anyone occupying a like or similar position is designated or appointed for, or takes charge of, the business or any of the assets of Licensee, (c) an assignment, or any other steps or proceedings are taken by or against Licensee on behalf of or for the benefit of creditors, or (d) any rights, interest, property or assets of Licensee are levied upon and sold in any action or proceeding or under any judgment, lien, order or decree, then in any such event, Licensor shall have the right to forthwith terminate this agreement by sending of a letter or fax to Licensee to such effect. Upon the sending of such letter or fax, this agreement shall forthwith terminate and come to an end and any and all rights and interest whatsoever acquired by Licensee and everyone in interest through it under this agreement shall forthwith cease, terminate and revert to Licensor, anything to the contrary notwithstanding, without affecting the obligations of Licensee to make payment to Lisensor of all monies as to which Licensee may be or become obligated under this agreement.

13.    All payments hereunder, including advances, shall be payable in the percentages listed below to GLOBAL ARTS PRODUCTIONS and Hans Ballo and shall be forwarded together with statements to the address set forth above for
GLOBAL ARTS PRODUCTIONS and to the address set forth below for Hans Ballo.

(a.) Eighty (80%) percent to GLOBAL ARTS PRODUCTIONS.



(b.) Twenty (20%) percent to Hans Ballo, Goethestraße 73, 63477 Maintal, Germany

- 5 -

- 5 -

14. As used in this agreement, the word "phonorecords" shall include phonograph records, cassette tapes and compact discs, but shall exclude so-called audio-visual products and material.

15. Neither this agreement nor any obligations undertaken by Licensee hereunder may be assigned by Licensee subject to Paragraph 12.

16. All rights not expressly authorized in Licensee are reserved unto Licensor.

17. Licensee agrees to furnish to Licensor, at no charge to Licensor and within thirty (30) days of the album release date, five (5) sample copies of each configuration of each phonorecord released hereunder.

18. This agreement shall be construed and interpreted in accordance with the laws of the State of Florida, irrespective of the place of execution or performance. Licensee hereby consents and submits to the exclusive jurisdiction of the state and federal courts located in Tamarac, Florida for the adjudication of any dispute arising out of or relating to this agreement or the alleged breach thereof.

19. This agreement constitutes the entire understanding of the parties relating to the subject matter and may not be modified except by an instrument in writing signed by each of the parties.

20. Licensor and Licensee mutually agree that the advance payment on the albums of Schedule No. 1 until Schedule No. 12 shall be cross collateral against all earned royalties due and payable by Licensee to Licensor hereunder.  → only 6 schedules

IN WITNESS WHEREOF, the parties hereto have executed this agreement and set their hands and seals the day first set forth above.

GLOBAL ARTS PRODUCTIONS

By: _____

Hans Ballo, as Agent for
GLOBAL ARTS PRODUCTIONS

By: _____

Danny Jordan

DURECO B.V.

By: _____

Harry R. Chün

SCHEDULE     NO. 1

to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: CAT STEVENS

1. b) TITLES:       1. Baby Get Your Head Screwed On
                    2. Bring Another Bottle Baby
                    3. Come On And Dance
                    4. Granny
                    5. Here Comes My Baby
                    6. Hummingbird
                    7. I Love My Dog
                    8. I'm Gonna Get Me A Gun
                    9. I've Found A Love
                    10. Lady
                    11. Lady d'Arbanville
                    12. Matthew & Son
                    13. Morning Has Broken
                    14. Portobello Road
                    15. School Is Out
                    16. The Tramp
                    17. When I Speak To The Flowers

2. TERRITORY: BENELUX AND  export rights

3. CATEGORY OF RELEASE: Compact Disc and MusiCassette
   - mid price category

4. ROYALTY: - 14 % on 100 % less 10% packaging; respectively
             club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting July 1st, 1997
          until June 30th, 2000, plus 6 months sell-off

7. COURTESY LINE: Licensed by GLOBAL ARTS

Tamarac, June 16, 1997          Weesp,
GLOBAL ARTS                     DURECO B. V.
PRODUCTIONS

Danny Jordan                    Harry R. Chun

SCHEDULE    NO. 2
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: NEIL DIAMOND

1. b) TITLES:     1. Cherry Cherry
                  2. Girl You'll Be A Woman Soon
                  3. Hanky Panky
                  4. I'll Come Running
                  5. I'm A Believer
                  6. Kentucky Woman
                  7. La Bamba
                  8. Monday Monday
                  9. New Orleans
                  10. Oh No No
                  11. Red Red Wine
                  12. Shilo
                  13. Solitary Man
                  14. Thank The Lord For The Nighttime
                  15. The Boat That I Row
                  16. You Got To Me

2. TERRITORY:  BENELUX  AND  export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
              club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting  July 1st, 1997
          until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac,  June 16, 1997        Weesp,
GLOBAL ARTS                    DURECO B. V.
PRODUCTIONS

Danny Jordan                   Harry R. Chun

SCHEDULE   NO. 3

to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")

and

DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: THE DOORS

1. b) TITLES:        1. Crystal Ship
                     2. Hello I Love You
                     3. L. A. Woman
                     4. Light My Fire
                     5. Love Her Madly
                     6. Riders In The Storm
                     7. Roadhouse Blues
                     8. Touch Me
                     9. Wait For The Sun
                     10. When The Music Is Over

2. TERRITORY:  BENELUX and export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
              club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting  July 1st, 1997
          until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS


Tamarac,  June 16, 1997        Weesp,
GLOBAL ARTS                    DURECO B. V.
PRODUCTIONS

Danny Jordan                   Harry R. Chun

SCHEDULE    NO. 4
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: SIMON & GARFUNKEL

1. b) TITLES:    1. A Most Peculiar Man
                 2. Anji
                 3. Baby Driver
                 4. Blessed
                 5. Bridge Over Troubled Water
                 6. Bye Bye Love
                 7. Cecilia
                 8. El Condor Pasa
                 9. I Am A Rock
                 10. Kathy's Song
                 11. Richard Cory
                 12. Somewhere They Can't Find Me
                 13. The Boxer
                 14. The Sounds Of Silence


2. TERRITORY: BENELUX AND export rights

3. CATEGORY OF RELEASE: Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
             club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM: 3 years, starting July 1st, 1997
         until June 30th, 2000, plus 6 months sell-off

7. COURTESY LINE: Licensed by GLOBAL ARTS


Tamarac, June 16, 1997          Weesp,
GLOBAL ARTS                      DURECO B. V.
PRODUCTIONS

Danny Jordan                    Harry R. Chun

SCHEDULE    NO. 5
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: THE MAMAS & THE PAPAS

1. b) TITLES:     1. California Dreamin'
                  2. Creeque Alley
                  3. Dancing In The Street
                  4. Dedicated To The One I Love
                  5. Dream A Little Dream Of Me
                  6. Glad To Be Unhappy
                  7. I Call Your Name
                  8. I Saw Her Last Night
                  9. Look Through My Window
                  10. Midnight Voyage
                  11. Monday Monday
                  12. My Girl
                  13. Twelve-Thirty
                  14. Words Of Love

2. TERRITORY:  BENELUX AND  export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
              club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting  July 1st, 1997
          until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac,  June 16, 1997         Weesp,
GLOBAL ARTS                     DURECO B. V.
PRODUCTIONS

Danny Jordan                    Harry R. Chun

SCHEDULE    NO. 6
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: THE WHO

1. b) TITLES:    1. Anyway, Anyhow, Anywhere
                 2. Baba O' Riley
                 3. Happy Jack
                 4. I Can See For Miles
                 5. I Can't Explain
                 6. I'm A Boy
                 7. Let's See Action
                 8. My Generation
                 9. Pictures Of Lily
                 10. Pinball Wizard
                 11. Substitute
                 12. Won't Get Fooled Again
                 13. Who Are You
                 14. You Better You Bet
                 15. The Seeker

2. TERRITORY:  BENELUX  and  export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
               club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting  July 1st, 1997
           until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac,  June 16, 1997        Weesp,
GLOBAL ARTS                     DURECO B. V.
PRODUCTIONS

Danny Jordan                   Harry R. Chün

SCHEDULE    NO. 6
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: THE WHO

1. b) TITLES:         1. Anyway, Anyhow, Anywhere
                      2. Baba O' Riley
                      3. Happy Jack
                      4. I Can See For Miles
                      5. I Can't Explain
                      6. I'm A Boy
                      7. Let's See Action
                      8. My Generation
                      9. Pictures Of Lily
                      10. Pinball Wizard
                      11. Substitute
                      12. Won't Get Fooled Again
                      13. Who Are You
                      14. You Better You Bet
                      15. The Seeker

2. TERRITORY:  BENELUX  and  export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
             club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting July 1st, 1997
          until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac,  June 16, 1997        Weesp,
GLOBAL ARTS                     DURECO B. V.
PRODUCTIONS

Danny Jordan                    Harry R. Chün

GENERAL AGREEMENT

This Agreement entered into this 3rd of September
1996 by and between

GLOBAL ARTS PRODUCTION
represented by Mr. Danny Jordan
7160 Nob Hill Road
Suite 135 - Point Plaza Building
TAMARAC, FLA 33321

USA

(hereinafter called "Lessor")

and

GRÜEZI
Schallplatten AG
Oststr. 2
CH 8854 Siebnen
Switzerland

(hereinafter called "Licensee")


Whereas Lessor represents and warrants that it has the right to
authorise the manufacturing and distribution of the  contractual
artist and titles according the schedule item to this agreement
for  the  Licensed  Territory  (hereinafter  called  the  Master
Recordings)

and

Whereas Licensee is in a position directly  or indirectly to
provide manufacturing in the Licensed Territory - according to
the schedule item 2 to this agreement.


Now Therefore in consideration of the foregoing and of the
mutual promises hereinafter set forth, it is agreed:

1. Lessor grants to Licensee the nonexclusive right and license
to use the Master Recordings for the purpose of manufacturing
and selling phonograph recordings derived therefrom in the
Licensed Territory on compilations according to the schedule
item 3 to this agreement.

EXHIBIT    H

2. Lessor ( sents and warrants that at the tin f signing this Agreement and granting rights to Licensee he, .nder and thereafter during the term, Lessor will be the owner or will controll all rights therein which are granted to Licensee hereunder and that it will secure the consent in writing of all artists including musicians, whose performances are reproduced in the recordings, together with all necessary copyright informations for the manufacture and sale of records by Licensee in connection with the recorded performances. Lessor agrees to forward to Licensee on Licensees desire a DAT of the MASTER RECORDINGS at the selfcost price of duplication of US $ 10,- in respect of each title.

3. Subject to paragraph 6 below furtheron, Lessor represents and warrants that except as otherwise expressively provided herein, Licensee shall be under no liability whatsoever to the artist or any third party arising out of the manufacture sale, use and publications as aforesaid, which Lessor may be responsible to pay and account which Lessor shall so pay and the Lessor shall at all times keep Licensee indemnified against all cost, damages and expenses or claims arising out of manufacture, sale, use and publication to the extend that there is a breach of the warranties contained in this clause.

4.1. Licensee represents and warrants that it has the capability to fully perform all the terms and conditions contained in this agreement and that it has the right, power and authority to enter into and to perform all of the terms and conditions contained herein. Licensee shall not have the right to sublicense or convey any rights granted under this agreement.

4.2. Licensee will make all payments which may be due and owing to any person, firm or corporation involved in the manufacture and/or sale of any of the recordings hereunder and will hold Lessor harmless from any and all claims. Licensee will use its best efforts to enforce collection of all accounts receivable for the sale of all recordings within the Licensed Territory.

4.3. Licensee will comply with all copyright provisions as to recordings within the Licensed Territory.

5. Licensee shall be solely responsible for the timely and accurate fullfilment of all copyright obligations arising out of the manufacture and the sale of records hereunder and agrees to indemnify the Lessor in respect thereof. Licensee agrees to obtain appropriate licenses and to do all things necessary to

record copyright material under the laws of the Licensed Territory.

6.1. In consideration of the rights herein granted, Licensee agrees to pay to Lessor a royalty as provided in the schedule item 4 to this agreement on 100% of the actual PPD- published price to dealer, less 10% on cassettes respectively 15% technical deduction on compact discs per title rata for each and every sold and not returned recording.

6.2. Upon the execution of this agreement, Licensee shall make payment to Lessor as provided in the schedule, item 5 to this agreement. The provided payment is a nonrefundable advance on account of royalties payable hereunder. Advance payments hereunder shall be non-returnable and fully recoupable from sums which may become due to Lessor hereunder for the relevant contractual recording according to the schedule of this agreement. There shall be no crosscollaterisation with other recordings provided in further schedules to this agreement.

6.3. Royalty Payments, including advances by Licensee to Lessor due hereunder shall be accompanied by a statement setting forth the full details the computations of the amount thereof. Such statements and payments shall be made semi-annually within 90 days following June 30 th and December 31st of each year and shall be forwarded to the adress for GLOBAL ARTS Production and to the adress set forth below for Hans Ballo.

a)   Eighty (80%) percent to GLOBAL ARTS Production

b)   Twenty (20%) percent to
      Hans Ballo, Goethestr. 73, 63477 Maintal, Germany

6.4. Lessor or its authorized representatives shall have the right to audit the books and records of Licensee, regarding the contractual titles, with the unrestricted right to make excerts therefrom and copies thereof. Such inspection shall be made during normal business hours, upon 30 days prior written notice to Licensee and no more than once for each year hereunder during the period of this agreement. In the event that in any inspection the books and records disclose a discrepancy in amounts payable to Lessor in excess of ten percent (10%) of the total royalties paid. Licensee shall promptly pay all costs of such inspection including accountant's fees incurred by Lessor

7.   Licensee will manufacture records from the Master Recordings within 60 (sixty)   days after signing of this

Agreement and agrees to mail to Lessor five (5) copies of each format of the released records within 15 (fifteen) days of its/their release.

8. The term of this agreement shall be for a period as provided in item 6 of the schedule to this agreement. After termination of the contractual period Licensee shall have the right to distribute the existing stock of the contractual compilation cd- and musicasette productions for a further sell-off period of (6) six months.

9. This agreement sets forth the entire agreement between the parties hereto with respect to the subject matter hereof and shall benefit and be binding upon the parties herto and their respective legal representatives, successors and assigns. No modification, amendment or waiver of agreement or any provision(s) thereof shall be effective unless confirmed by a written instrument signed by both parties.

10. Any difference arising under this agreement between Lessor and Licensee shall be handled in accordance with the laws of the state of Florida and the competent state and federal courts of Tamarac shall have jurisdiction of any dispute arising out of or relating to this agreement or the alleged breach thereof.

IN WITNESS WHEREOF; the parties herto have caused this agreement to be executed by their duly authorized representatives as of the day and year first above written.

Tamarac, Nov. 5th, 1996          Siebnen,
GLOBAL ARTS                       GRÜEZI Schallplatten AG
PRODUCTION

Danny Jordan

to the Agreement dated September 3rd, 1996 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Lessor")

and

GRÜEZI SCHALLPLATTEN AG
(hereinafter called "Licensee")

1. a) ARTISTS: THE DOORS

1. b) TITLES:     1. Light My Fire
                  2. Roadhouse Blues
                  3. L. A. Woman
                  4. Riders On The Storm
                  5. Touch Me
                  6. Hello I Love You
                  7. Wait For The Sun
                  8. Love Her Madly
                  9. Crystal Ship
                  10. When The Music Is Over

2. TERRITORY:  Germany, Austria, Switzerland incl. export rights

3. CATEGORY OF RELEASE: Compact Disc and MusiCassettes
low price

4. ROYALTY:     % One Time Payment
5. ADVANCE:

6. TERM:  3 years, starting  march 1st, 1997
          until  February 28th 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac, *Feb 21st. 97*          Siebnen,
GLOBAL ARTS                      GRÜEZI Schallplatten AG
PRODUCTIONS

Danny Jordan                     Jakob Baumgartner

to the Agreement dated September 3rd, 1996 g___ng between

GLOBAL ARTS PRODUCTIONS
(hereinafter called "Lessor")

and

GRÜEZI SCHALLPLATTEN AG
(hereinafter called "Licensee")

1. a) ARTISTS: LINDA RONSTADT

1 b) TITLES:   1. Different Drum
               2. Long Long Time
               3. Love Has No Pride
               4. Silver Treads And Golden Needles
               5. You're No Good
               6. When Will I Be Loved
               7. It Doesn't Matter Anymore
               8. Heat Wave
               9. Love Is A Rose
               10. Tracks Of My Tears
               11 That'll Be The Day
               12 Blue Bayou
               13 Desperado

2. TERRITORY:  Germany, Austria, Switzerland incl. export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - low price

4. ROYALTY:    % One Time Payment

5. ADVANCE:

6. TERM:  3 years, starting *May* ~~March~~ 1st, 1997
          until February 28th 2000. plus 6 months sell-off

7. COURTESY LINE: Licensed by GLOBAL ARTS


Tamarac, *May 14, 97*            Siebnen
GLOBAL ARTS                      GRÜEZI Schallplatten AG
PRODUCTIONS

Danny Jordan                     Jakob Baumgartner


SCHEDULE

(r(     after called "Licensee")

1. a) ARTISTS:  THE MONKEES

1. b) TITLES.     1. (Theme From) The Monkees
                2. Last Train To Clarksville
                3. I'm A Believer
                4. (I'm Not Your) Steppin' Stone
                5. A Little Bit Me, A Little Bit You
                6. The Girl I Knew Somewhere
                7. Pleasant Valley Sunday
                8. Words
                9. Daydream Believer
                10. Goin' Down
                11. Valleri
                12. The Porpoise Song (Theme From "Head")
                13. That Was Then, This Is Now
                14. Heart and Soul

2. TERRITORY:  Germany, Austria, Switzerland incl. export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusicCassette
    - low price

4. ROYALTY:  -

5. ADVANCE:

6. TERM:  3 years starting  march 1st, 1997
          until  February 28th 2000.  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac, March 3, 1997        Siebnen,
GLOBAL ARTS              GRÜEZI Schallplatten AG
PRODUCTIONS

Danny Jordan                Jakob Baumgartner

SCHEDULE

11.09.97  11:59   BELLAPHON RECORDS   FRANKFURT → 310 441 6579                    NR.748  S001

# TELEFAX - MESSAGE                                          bellaphon

| | |
|---|---|
| An / To: | Rhino International |
| z.H. / Attn: | Mr. Peter Pasternak |
| Fax No.: | 001 310 474 4778 |
| Datum / Date: | 11.09.1997 |
| Von / From: | Joachim Pauthner |
| Betr./Subj: | „What I Say" - 267.07.254 |

Bellaphon Records
GmbH & Co. KG
Mainzer Landstr. 87-89
D-60329 Frankfurt
Telefon  (069) 27139
Telefax  (069) 2712 117

Dear Mr. Pasternak,

thank you for your fax to Mrs. Zivanovic-Riedel dated 09/09/1997.

We licensed the titles of the above mentioned CD from Global Arts Productions Inc. and  we
have an agreement which is still valid.

We herewith provide you with the adress of Global Arts and the person responsible:

Global Arts Productions, Inc.
7160 Nobhill Road
Point Plaza 22a, Suite 135
Tamarac, FLA 33321

attn.: Mr. Danny Jordan
phone: 954-537-5720
fax:     954-755-1201

Best regards
BELLAPHON records

09/19/97   FRI 12:30 FAX 212 405 5537          PHIL WILD•ATLANTIC                    ☑012

Joachim Pauthner                    Jochen Glofke

EXHIBIT    I

15-AUG-97 18:23   BALLO STICHTING STEMRA   NR.:   TEL:06109+65830   5:01

DATUM   1 9 AUG. 1997
BESTEL.
KÖPIE:

Ballo H.W.          TelefGEHANDELD D.D.   **Fax Message**          Ⅳ
Goethestr.73        06109/65830
63477 Maintal

| (Datum) | (Zeit) | Fax-NO.: |
|---|---|---|
| DATE: August 19th, 1997 | TIME: *18 : 00* | 0031 - 203 470 59 |

| An | | An | |
|---|---|---|---|
| TO:  Mr. Weibers | | TO:  STEMRA | |
| Name | | Company(Firma) | |

| Von | | Reply Required (Antwort) | Seite/n |
|---|---|---|---|
| FROM:  Hans Ballo | | [X]YES   [ ]NO | Page/s  *1* |

Betreff
SUBJEKT/REF.:  Registration - MUSIC DE LUXE

Dear Mr. Weibers,

I refer to the inspections of STEMRA regarding license rights of Stevie Wonder and
Cliff Richard.
As I have only been informed last Friday afternoon that STEMRA has not completed its
inspections, I have been asked and have been instructed by Mr. Danny Jordan of
GLOBAL ARTS PRODUCTIONS to inform you in absence of the attorney about the
following.

1. The nonexclusive license rights have been granted for both titles by Mr. Danny
   Jordan of Global Arts Productions.

2. The license rights for Cliff Richard are based upon Tax Shelter agreements with
   Mark Gordon and Curtis Masters and for Stevie Wonder upon agreements with
   Curtis Masters.

3. We respectfully request you to inform the companies which informed STEMRA
   that they are entitled to exclusive license rights about the foregoing and in case of
   any further questions please ask them to contact Mr. Jordan by phone or fax at
   phone : 001-954-755-0551 ; fax  001-954-755-1201. Furtheron please ask them
   to forward to Mr. Jordan a copy of their exclusive license agreements.

Mr. Weibers, without prejudice of the above and the reservation of the license rights
of Global Arts, please be so kind and inform us according to which statutes of STEMRA,
you act as a license society. We consider STEMRA as a collection society.

Yours faithfully          cc: Global Arts, Mr. D. Jordan 001-954-755-1201
                              Attorney of G A  Dr. Kukuk  040- 35750975
                              Music De Luxe

Hans Ballo

EXHIBIT   J

22-AUG-97 11:48   BALLO

C6109+65830

TEL:06109+65830

Ballo H.W.            Telefon/Fax         **Fax Message**
Goethestr.73         06109/65830
63477 Maintal

| (Datum) | (Zeit) | Fax-NO.: |
|---|---|---|
| DATE: August 22nd, 1997 | TIME: | 0031 - 35 - 624 1954 |

| An | An |
|---|---|
| TO: Mr. A. Looye | TO: NVPI audio |
| Name | Company(Firma) |

| Von | Reply Required (Antwort) | Seite/n |
|---|---|---|
| FROM:   Hans Ballo | [X]YES   [ ]NO | Page/s |

Betreff
SUBJEKT/REF.: Your letter dated 21st Aug. 1997 to Geerlings Import / Export

Dear Mr. Looye,

Please be informed that I act as an agent and consultant of several US - and European
Record and Publishing companies.

In reply to your letter Ref.: EJ / 97476 we resectfully request you to confirm your
personal answer on your claims of exclusive rights of several mentioned major
companies and your confirmation that you are able to proove these exclusive
rights by copies of the relevant agreements.

Please be informed that the nonexclusive license rights on all albums has been gran
by Mr. Danny Jordan of Global Arts Productions.

In case of any questions concerning license rights don't hesitate to contact
Mr. Danny Jordan of GLOBAL ARTS at phone 001-954-755 0551 or by fax
001-954-755 1201.

I look forward to receive your reply to the forgoing as soon as possible.

Yours faithfully
- Agent of GLOBAL ARTS-

Hans Ballo

cc: Global Arts Mr. Danny Jordan        - 001 954 755 1201
    Global Arts - Legal Dept.
    Grüezi - Label mgr. Rondo Hitline    - 0041 55 450 2107

EXHIBIT   K

# AFFIDAVIT OF
# DANNY JORDAN

I, Danny Jordan President of and on behalf of Global Arts Productions Inc., a California Company with representation in the United Kingdom, The States of Florida, New Jersey, New York and the Country of Canada, hereby make oath and say as follows:

1. The recording artists listed in schedule "A" have been given to Global Arts Productions Inc.. These artists are part of an enormous list of recording artists that was provided by the Major Record Labels.

2. From 1975 through 1984 various tax shelters were set up by California Corporations for investors looking for a certain kind of tax benefit; (example) Recording artists master tapes were pledged to the investor. A five to one ratio was promised to the investor. If a contribution of twenty thousand ($20,000) US dollars was made by the investor, he/she would be given world wide rights to a master tape of an artist. In addition he/she would be allowed a legal write-off against earned income of one hundred thousand ($100,000) US dollars. A twenty thousand ($20,000) note was made by the Corporation to the investor, however there was never a specific time given on the note to pay off the loan. In the aforementioned contracts the investor was granted the non-exclusive right to exploit the artists master recording. There was never a specific time frame for that exploitation to run out.

3. There were various third parties who were granted these non exclusive rights for exploitation, by the owners of the tax shelters. We have proof that product was manufactured, distributed and put into commerce. The major record labels had, under US law, seven years from the date of the products distribution, to challenge those releases, however they have failed to do so.

4. These tax shelters did in fact exist and I need not prove that they did. The burden of proof is on the Plaintiff to prove that they did not.(see attachment entitled "Burden of Proof"). As you review the attachment, give close attention to the statement "Except in cases of Tax Fraud".

5. It is a fact that various agents who represented these type of tax shelters were convicted for income tax evasion. These cases were directly associated with the contracts given for the master recordings. Not because the premise of the contract was fraudulent, but rather because the income that these people received was not reported to the Government of the US, and taxes were evaded. During the trials of those individuals, the major record labels were not present, and I ask the question, why not?

6. If the major record labels are in fact claiming they have a right to challenge my ownership, and can be allowed to utilize documents, contracts and affidavits from the United States, I ask what is the difference between theirs and ours? Does the IFPI only recognize documents from the major record labels and discount any other proof as meaningless?

7. It is my opinion that foreign Companies who have objected to the release of my products, have no legal jurisdiction as it relates to ownership and contracts emanating from the United States. The foreign courts do have a right to know the truth before they make a judgment. In the United States the term Judgment is used to denote the

EXHIBIT   1.

reason which the Court gives for it's decision, but this is more properly denominated an opinion. I look forward to your opinion.

Danny Jordan

Sworn and subscribed before me
By the said Danny Jordan This
20th day of October, 1997.

STATE OF FLORIDA
COUNTY OF BROWARD
On this 20th Day of October, 1997, Danny Jordan
did appear before me and affix his signature to
this document. Mr. Jordan is personally known
to me.

GARY E. PIKE
MY COMMISSION # CC 437288
EXPIRES: February 8, 1999
Bonded Thru Notary Public Underwriters

IN THE PRESENCE OF:

**GLOBAL ARTS PRODUCTIONS INC.,** having its registered office at Point Plaza Building, 7160 Nob Hill Road, Tamarac, Florida 33321 (United States).

VOLUNTARILY INTERVENING PARTY

Represented by Mr. Marinus VROMANS, Solicitor (1070 Brussels, Ninoofsesteenweg, 643).

*   *   *
*   *

Arguments at these proceedings were presented in Dutch at the public session of 5 December 1997.

After consultation the Chairman of the court of first instance handed down judgment:

Having seen:

−   the summons issued by writ served by registered mail by Mr. Michel Leroy, bailiff resident at Etterbeek, dated 3 October 1997;

−   the summons in intervention issued by writ served by registered mail by Mr. Thierry Van Diest acting for Mr. Emmanuel Leroy, bailiff resident at Etterbeek, dated 18 November 1997;

−   the petition filed in voluntary intervention and legal arguments filed with the clerk of the court on 6 November 1997;

−   the pleadings for the plaintiff filed at the sitting of 5 December 1997;

−   the pleadings and second pleadings for Dureco Nederland filed at the sitting of 5 December 1997;

−   the pleadings for Dureco Belgium filed at the sitting of 5 December 1997;

−   the supplementary pleadings for Global Arts filed at the sitting of 5 December 1997;

The solicitors of the parties having presented their arguments at the sitting of 5 December 1997.

*   *   *
*   *

The action by IFPI against both DURECO NEDERLAND and DURECO BELGIUM, instituted subject to Section 87 of the Copyright Act, entails:

(1)   to establish that the defendants violated Sections 35 and

EXHIBIT **M**

2

39 of the Act of 30 June 1994 concerning Copyright and related rights by the distribution and/or offering for sale of sound-recording mediums bearing unlawful (i.e. made at the time without the consent of the copyright owners) reproductions of musical recordings;

(2) to have the defendants ordered to cease these practices subject to a fine of BEF 50,000 per copy of the sound-recording medium which, in contravention of the judgment to be handed down, was nevertheless distributed and/or offered for sale;

(3) to have the judgment published in three newspapers as selected by the plaintiff, at the expense of the defendants, subject to the proviso that these costs shall be payable on demand upon submission of an invoice, even pro forma.

Both DURECO NEDERLAND and DURECO BELGIUM formulate a subordinate action below against GLOBAL ARTS PRODUCTIONS as follows: to have GLOBAL ARTS PRODUCTIONS ordered to hold DURECO fully harmless for each order with respect to DURECO, including the full legal costs.

* * *
* *

## CONCERNING THE FACTS

IFPI is a professional association in the sense of Section 87 §1 of the Act of 30 June 1994 concerning Copyright and related rights (hereinafter referred to as "the Copyright Act"). It brings together producers and distributors of phonograms.

DURECO is a producer and publisher of phonograms (records, CD's, cassettes, ...).

GLOBAL ARTS is said to be DURECO's licensee for the disputed sound-recordings.

In a letter of 15 September 1997 addressed to "DURECO, Mr. H. CHUN, Louisalaan, 390, 1050 Brussels" IFPI warns DURECO immediately to suspend the sale of the sound-recording mediums issued under the "Hit Line" and "Mad Price" labels and to recall these products from retail outlets. IFPI states that it "strongly suspects" that the licensee (of DURECO) does not have the necessary rights.

In response to this letter IFPI received a fax dated 17 September 1997 from DURECO NEDERLAND, signed by Harry R. CHUN, General Manager, stating among other things that DURECO BELGIUM handles the sale and distribution in Belgium on its behalf of, among other things, the CD's issued under the "Mad Price" label. It is curious that DURECO does not respond to the summons by drawing attention to its rights to market the CD's in question.

3

A further exchange of letters took place between IFPI and DURECO (IFPI's faxes were consistently sent to DURECO BELGIUM) before the summons was served, but with no constructive outcome.

On 3 October 1997 IFPI served a temporary injunction on DURECO NEDERLAND, while also instituting proceedings under Section 87 of the Copyright Act. On account of the overloading of the list for trial and owing to the need to resolve a procedural point relating to the rights of the defence, the two proceedings took a different course from the sitting of 6 November 1997 onwards.

## CONCERNING THE ALLEGED INVALIDITY OF THE WRIT INSTITUTING PROCEEDINGS

DURECO NEDERLAND "enters reservations" with respect to the "validity" of the summons as this had been served at neither its registered office nor its business address.

The writ instituting the proceedings was served at "the permanent establishment in Belgium" of DURECO NEDERLAND, namely at Louisalaan, 390/2n, 1050 Brussels, being DURECO BELGIUM's principal place of business. Not only did the aforementioned exchange of letters take place via this address (cf. Section 39 of the Civil Code) but, in particular, it needs to be established that the alleged irregular summons achieved the aim as intended by the law, without violating DURECO NEDERLAND's rights of defence. The interests of DURECO NEDERLAND were not harmed and the alleged irregularity does not consequently involve any penalty (cf. Section 862 of the Civil Code).

## CONCERNING THE NATURE OF THE MEASURES AND THE URGENCY

Both the defendants and the intervening party invoke exceptions and arguments relating solely to the interim injunction proceedings. Evidently these parties have applied the same defence in both proceedings, although a number of exceptions and arguments are not relevant to the suspension proceedings, conducted as though an interim injunction. It is sufficient to establish this without need for further rebuttal.

## CONCERNING THE ALLEGED LACK OF INTEREST

DURECO contends that IFPI is unable to invoke its status as a professional association in the sense of Section 87 §1 of the Copyright Act since it is not representing (all) its members in the proceedings in question but is seeking to support and substantiate the individual interests of some of its members against other of its members.

4

In so far as this argument proceeds from DURECO NEDERLAND this
exception is factually incorrect since the latter party is not
a member of IFPI (although it is of NVPI, the IFPI's sister
organisation in the Netherlands). DURECO NEDERLAND and DURECO
BELGIUM are evidently the one in the same when it suits them
(in relation to the present exception) and to be distinguished
when it suits them differently (see exception of irregular
summonsing). Such an attitude is not easy to take seriously
and creates suspicion.

DURECO BELGIUM is certainly a member of IFPI.

Among other things IFPI was set up in order to protect the
professional and moral interests of its members and, more
generally, of all those participating in the phonographic
industry in Belgium. In furtherance of that goal it is
authorised legally to contest any infringements of the rights
and interests of its members and of the profession in general
(cf. Article 3 of the statutes of the IFPI). The sale and
distribution in Belgium of phonograms without the consent of
the copyright-holders (authors, performing artists and
producers) can constitute an infringement of the rights
protected by Sections 35 and 39 of the Copyright Act. If the
IFPI takes legal action against such infringements its action
unquestionably comes within the formal objects of the
association, namely the protection of the rights and interests
- both patrimonial and moral - of its members. As a
professional association it therefore in principle has the
necessary interest to institute the action (see: RAES, S.,
"Het optreden in rechte van de Orde ter verdediging van het
beroepsbelang", T.R.V., 1988, p. 59 ff.; note under Cass. 19
May 1987).

Neither the law nor the statutes of the IFPI oblige the latter
to promote the interest of "all" its members. Nor does the law
or the statutes of the IFPI prohibit the latter from
instituting procedures against a member on the grounds of an
infringement. The professional association can only take
action in order to protect the "lawful" interest of its
members. If DURECO'S stance were to be adopted this would
seriously complicate efforts to combat infringements of
copyright and related rights. There is no conflict between the
lawful interests of the members of the IFPI and the alleged
unlawful interests of a single member.

IFPI has the necessary interests in this matter to institute
proceedings (its interest is not purely theoretical).

<u>CONCERNING THE ALLEGED INADEQUACIES IN FOLLOWING THE
ARBITRATION PROCEDURE</u>

DURECO erroneously argues that an arbitration procedure should
have been followed in this matter. This exception (in the
absence of jurisdiction) is totally unfounded given the lack

5

of any useful and binding legal source.

## CONCERNING THE INFRINGING NATURE OF THE SOUND-RECORDING MEDIUMS

There are grounds for first establishing whether the CD's that are the subject of litigation form an infringement of Section 35 and 39 of the Copyright Act before establishing who the infringing party might be. It may be noted that if one of the summoned parties has not performed any unlawful actions, this does not concern the admissibility but the grounds of the action.

Pursuant to Section 35 of the Copyright Act, only the performing artist has the right to reproduce his performances or to permit the reproduction thereof. Pursuant to Section 39 of the Copyright Act only the producer of phonograms has the right to reproduce his performance or permit the reproduction thereof.

The plaintiff argues that the CD's distributed under the "Rondo Hitline" and "Mad Prices" labels were reproductions of musical recordings that could be made without the consent of the producer or the performing artists. These are reproductions of recordings of musical performances by groups of singers, such as The Doors, Neil Diamond, ZZ Top, The Who and Linda Ronstadt.

The defendants and the voluntarily intervening party, who have been unable to produce proper documentation concerning the right to reproduce the relevant material, let alone furnishing any evidence to indicate the consent of the producer or the performing artist, allow that the vital question in this matter is whether the individual members of the plaintiff, who allege that they enjoy certain exclusive rights, in fact effectively enjoy those rights and whether those rights are indeed exclusive.

The challenge does not however concern CD's distributed by the plaintiff or certain other of its members.

In view of the role assigned to the plaintiff in the Copyright Act and in view of the documents submitted by the plaintiff in order to substantiate the suspicion that the defendants did not have the necessary rights, the stance adopted by the defendants and the voluntarily intervening party constitutes an unjustified reversal of the burden of proof. In addition the rules of evidence need to be interpreted dynamically and the plaintiff cannot be charged with supplying the proof that the copyright-holders have not transferred their rights of reproduction to the defendants and the voluntarily intervening party.

In fact it is sufficient to establish that the voluntarily intervening party writes in its most recent legal arguments,

6

deposited at the sitting of 5 December 1997, that it had
proved "impossible" for it to produce the necessary documents
in the brief time-span in order to substantiate its voluntary
intervention and to invalidate the plaintiff's action. This
argument does not hold up in the age of the fax.

## CONCERNING ANY PRE-1972 MUSICAL RECORDINGS

The distinction drawn in "American" law between recordings
made before and after 1972 is irrelevant in view of the
assimilation principle contained in Article 4 of the Berne
Convention (26 June 1948) and Article 1 of the Trip
agreements,(15 April 1994). The defendants do not demonstrate
that they enjoyed reproduction rights, even under foreign law,
so that the aforementioned distinction is of no relevance.

## CONCERNING THE INFRINGING PARTIES

The exchange of letters conducted between the parties prior to
the institution of legal proceedings took place between IFPI
and DURECO NEDERLAND or DURECO BELGIUM, but in all cases via
the same address in Brussels.

In its initial statement of defence DURECO NEDERLAND did not
assert that it was not performing any of the actions preferred
against it by IFPI. It did do so orally at the sitting of 13
November 1997, at the interim injunction proceedings, as a
result of which the plaintiff was obliged to draw DURECO
BELGIUM into the matter. The attitude adopted by DURECO
NEDERLAND in this matter cannot be regarded as serious.

When subsequently DURECO BELGIUM claims in its statement of
defence that it is not a distributor of the CD's forming the
subject of litigation but one B.V. MUSICNET, the attitude
towards the proceedings of the two DURECO'S can only arouse
suspicion. The appearances are that these parties wish to
postpone (the essence of) the debate as long as possible.

The reverse of the CD's forming the subject of litigation
bears the inscription "marketed by DURECO B.V.". There can be
no doubt that DURECO NEDERLAND has brought the litigious CD's
on to the Belgium market via DURECO BELGIUM (cf. the filed
exchange of letters). IFPI has produced an invoice made out by
DURECO BELGIUM in which the litigious CD's are invoiced to a
record shop in Mol. The attitude of the defendant is not
merely dilatory and hard to take seriously but also displays
evidence of bad faith. In a different legal system this might
amount to "contempt of Court".

Both defendants have committed infringing actions.

## CONCERNING THE SCOPE OF THE CLAIMS

7

The plaintiff has formulated its action in general terms and
has not confined itself to certain (unlawful) musical
recordings. If so required, it contends, the injunction could
be confined to unlawful reproductions of lawful musical
recordings "belonging to the category of the IFPI members".

An injunction may not be vague and amount to no more than a
repetition of the statutory prohibition. The formulation must
be sufficiently precise to permit the concrete application of
the injunction and also to provide sufficient room to prevent
new infringements arising out of the infringement in question
but taking another form, so as to prevent the injunction from
losing all efficacy (cf. EVRARD, J-J., Les pratiques de
commerce, Chronique de jurisprudence, J.T., 1985 p. 195, no.
92). A vital part of the judicial process is that the courts
are asked to qualify certain facts or actions so as to bring
them under the application of the law. If the decision of the
court does not relate to certain facts, the court will be
repeating the law and so not administering justice. The
judge's decision would then be enforceable according to the
personal insights of the litigant, which would no longer
involve implementation of a granted title.

In view of the above the injunction sought by the plaintiff
appears inadequate. The subordinate proposal by the plaintiff
confining matters to unlawful reproductions of lawful musical
recordings forming part of the catalogue of IFPI members is
equally as inadequate. The litigious CD's may well have
appeared on the catalogue of the second defendant, which is an
IFPI member. The injunction needs to be formulated as
determined below.


## CONCERNING THE INTERVENING PARTY

No injunction is being sought with respect to the voluntarily
intervening party.

In so far as the voluntarily intervening party is being asked
to hold harmless from the parties forming the object of the
injunction with respect to each judgment against these
parties, it should be noted that the principal action concerns
the suspension of violations of reproduction rights committed
by these parties and that, in contrast to a demand for
compensation, an injunction cannot be transferred from one
party to another.

The action to be held harmless is consequently unfounded.


## CONCERNING THE PUBLICATION MEASURE

An order for publication in extenso of this relatively lengthy
judgment would appear exaggerated, and publication of a part
thereof will suffice.

8

**FOR THESE REASONS;**

We, BOON J., Judge appointed to replace the Chairman of the Court of the first instance in Brussels;

Assisted by Clerk of the Court MELIS E.;

Given the Act of 15 June 1935 concerning the use of languages in legal proceedings;

Delivering judgment after full argument on both sides;

Rejecting all other or contrary decisions;

Grants GLOBAL ARTS PRODUCTIONS, INC. deed of its voluntary intervention.

Declare the principal actions as admissible and founded as follows:

Establish that B.V. DURECO and N.V. DURECO BELGIUM, by the distribution or offering for sale of sound-recording mediums, such as CD's, under the labels "RONDO HITLINE" and "MAD PRICES", containing reproductions of musical recordings by The Door, Neil Diamond, Simon & Garfunkel, Cat Stevens, The Mama's & The Papa's, ZZ Top, The Who, and Linda Ronstadt are violating Sections 35 and 39 of the Act of 30 June 1994 concerning Copyright and related rights, as this is taking place without the consent of the copyright holders.

Order these parties to suspend these practices and any distribution or offerings for sale of sound-recording mediums, in respect of which no evidence of consent is deposited "from the performing artists or the producer" within 14 days from the notice of default served by registered mail by the V.Z.W. IFPI BELGIUM, subject to payment of a fine of BEF 50,000 per copy of the each sound-recording medium which, contrary to this order, is distributed or offered for sale, as determined solely by a bailiff.

Order the publication of the judgment as determined below and the enacting terms of the present judgment in three newspapers at the choice of IFPI BELGIUM, at the expense of DURECO B.V. and DURECO BELGIUM B.V., subject to the proviso that these costs, including any translation costs, shall be reclaimable upon simple submission of an invoice (even pro forma), the judgment establishing the identity of the court of justice, the date of the judgment and the identity of the parties.

Declare the action to be held harmless to be admissible but unfounded.

Leave the court expenses of GLOBAL ARTS PRODUCTIONS INC., estimated at 4,100 francs, to be borne by that party.

9

Order B.V, DURECO and N.V. DURECO BELGIUM to pay the remaining costs, assessed for V.Z.W. IFPI BELGIUM at 13,353 + 9,418 + 4,100 francs and for themselves at 4,100 francs.

Judgment handed down at the public interim injunction hearing on 31 December 1997.


[Signature]                              [Signature]
Melis E.                                 Boon J.

10

## COURT OF FIRST INSTANCE IN BRUSSELS

In public session of the interim injunction proceedings of 31 December 1997.

No. 97/1453/C
of the register

Annexes

1 summons
1 summons of intervention
1 partition for voluntary intervention
4 pleadings

Section 584 of Civil Code concerning Copyright - Interest of authors' association - Urgency

IN THE CASE OF:

The V.Z.W. IFPI BELGIUM BELGISCHE FONOGRAFISCHE INDUSTRIE, having its seat at Almaplein, 3/5, 1200 Sint-Lambrechts-Woluwe (hereinafter abbreviated as IFPI).

PLAINTIFF

Represented by Mr. Benoît MICHAUX, solicitor (Tervurenlaan, 268 A, 1150 Brussels).

AGAINST:

1.   B.V.DURECO, a company established under Dutch law, with its registered office at Pampuslaan, 45, 1382 Weesp, the Netherlands, H.R. Hilversum 26.275 (hereinafter abbreviated as "DURECO NEDERLAND")

FIRST DEFENDANT

2.   N.V. DURECO BELGIUM, a company established under Belgian law, with its registered office at Vleurgatsesteenweg, 213, 1050 Brussels, H.R.B. 426.117.

DEFENDANT IN ENFORCED INTERVENTION

Both represented by Mr. Joren DE WACHTER, solicitor (Vossendreef 6, 1180 Brussels - box 14).

IN THE PRESENCE OF:

GLOBAL ARTS PRODUCTION INC., established at Point Plaza Building, 7160 Nob Hill Road, Tamarac, Florida 33321 (United States).

VOLUNTARILY INTERVENING PARTY

11

Represented by Mr. Marinus VROMANS, solicitor
(Ninoofsesteenweg, 643, 1070 Brussels).

* * *
* *

Arguments at these proceedings were presented in Dutch at the
public sittings of 13 and 27 November 1997.

After consultation the Chairman of the court of first instance
issued the following order:

Having seen:

−    the summons issued by the writ served by registered mail
     by Mr. Michel Leroy, bailiff resident at Etterbeek, of 3
     October 1997;

−    the summons in intervention issued by the writ served by
     registered mail by Mr. Thierry Van Diest acting for Mr.
     Emmanuel Leroy bailiff resident at Etterbeek, dated 18
     November 1997;

−    the petition for voluntary intermediation and pleadings
     for Global Arts filed with the clerk of the court on 6
     November 1997;

−    the pleadings for DURECO NEDERLAND filed with the clerk
     of the court on 6 November 1997;

−    the pleadings for DURECO BELGIUM filed at the session of
     27 November 1997;

−    the supplementary pleadings for Global Arts filed at the
     session of 27 November 1997;

−    Having heard the arguments of the solicitors of the
     parties at the sessions of 13 and 27 November 1997.

* * *
* *

The action by IFPI against both DURECO NEDERLAND and DURECO
BELGIUM, as instituted subject to the application of section
584 of the Civil Code, seeks:

(1)  to have the defendant ordered to suspend all distribution
     or offering for sale of sound-recording mediums
     containing an unlawful reproduction of a recording of a
     musical performance, subject to payment of a fine of BEF
     50,000 for each sound-recording medium which is
     nevertheless distributed or offered for sale at variance
     with the order in question;

(2)  to have the defendants ordered to recall all sound-
     recording mediums with an unlawful reproduction of a

12

recording of a musical performance from all their direct clients (subject to possible payments) within eight days after the order in question has been served, subject to a fine of BEF 50,000 per sound-recording medium that is not recalled within the aforementioned period;

(3)   to have a sequestrator appointed for all the sound-recording mediums recalled in this way (this demand is formulated somewhat differently with respect to DURECO BELGIUM: "to have a sequester appointed for all litigious CD's, including sound-recording mediums recalled").


Both DURECO NEDERLAND and DURECO BELGIUM have formulated a subordinated action against GLOBAL ARTS PRODUCTION as follows: to order Global Arts Productions to hold DURECO fully harmless from any judgment against DURECO, including the full court costs.

\*   \*   \*
\*   \*

### CONCERNING THE FACTS

IFPI is a professional association in the sense of Section 87 § 1 of the Act of 30 June 1994 concerning Copyright and related rights (hereinafter referred to as "the Copyright Act"). It brings together producers and distributors of phonograms.

DURECO is a producer and publisher of phonograms (records, CD's, cassettes, ...).

GLOBAL ARTS is said to be DURECO's licensee for the disputed sound-recordings.

In a letter of 15 September 1997 addressed to "DURECO, Mr. H. CHUN, Louisalaan, 390, 1050 Brussels" IFPI warns DURECO immediately to suspend the sale of the sound-recording mediums issued under the "Hit Line" and "Mad Price" labels and to recall these products from retail outlets. IFPI states that it "strongly suspects" that the licensee (of DURECO) does not have the necessary rights.

In response to this letter IFPI received a fax dated 17 September 1997 from DURECO NEDERLAND, signed by Harry R. CHUN, General Manager, stating among other things that DURECO BELGIUM handles the sale and distribution in Belgium on its behalf of, among other things, the CD's issued under the "Mad Price" label. It is curious that DURECO does not respond to the summons by drawing attention to its rights to market the CD's in question.

A further exchange of letters took place between IFPI and DURECO (IFPI's faxes were consistently sent to DURECO BELGIUM) before the summons was served, but with no constructive

13

outcome.

On 3 October 1997 IFPI served a temporary injunction on DURECO NEDERLAND, while also instituting proceedings under Section 87 of the Copyright Act. On account of the overloading of the list for trial and owing to the need to resolve a procedural point relating to the rights of the defence, the two proceedings took a different course from the sitting of 6 November 1997 onwards.

## CONCERNING THE ALLEGED INVALIDITY OF THE WRIT INSTITUTING PROCEEDINGS

DURECO NEDERLAND "enters reservations" with respect to the "validity" of the summons as this had been served at neither its registered office nor its business address.

The writ instituting the proceedings was served at "the permanent establishment in Belgium" of DURECO NEDERLAND, namely at Louisalaan, 390/2n, 1050 Brussels, being DURECO BELGIUM's principal place of business. Not only did the aforementioned exchange of letters take place via this address (cf. Section 39 of the Civil Code) but, in particular, it needs to be established that the alleged irregular summons achieved the aim as intended by the law, without violating DURECO NEDERLAND's rights of defence. The interests of DURECO NEDERLAND were not harmed and the alleged irregularity does not consequently involve any penalty (cf. Section 862 of the Civil Code).

## CONCERNING THE COMPETENCE

Since the terms of the writ instituting the proceedings claim that the action is urgent in nature, the chairman of the temporary injunction session is in principle competent to investigate the grounds of that writ (Cass. 11 May 1990, Pas. 1990, I, 1045).

## CONCERNING THE ALLEGED INADMISSIBILITY OF THE ACTION

1. According to DURECO IFPI is not demanding any "provisional" measures and the measures sought in fact go further a temporary injunction. The action would consequently be inadmissible.

   The question as to whether the measure sought are more than just provisional relates to the powers of the judge in interim injunction proceedings and the grounds of the interim injunction and not the competence of the Chairman or the admissibility of the action (MAERTENS A-S., "Uitspraak bij voorraad: voorschrift over de machten van de rechter in kort geding", note under Cass. 14 June 1991, T.B.H., 1992, 260). This question will accordingly be investigated below.

14

2.    DURECO argues that the ordinary administration of justice
      (as in interim injunction proceedings) is equipped to
      resolve the dispute in good time. The action would
      consequently be inadmissible.

      Implicitly DURECO therefore argues that the action is not
      urgent. Now that the competence of the judge in interim
      injunction proceedings in this matter is clear, the
      investigation into the actual urgency forms part of the
      grounds of the case, which will be investigated here.

3.    <u>CONCERNING THE ALLEGED LACK OF INTEREST</u>

      DURECO contends that IFPI is unable to invoke its status
      as a professional association in the sense of Section 87
      § 1 of the Copyright Act since it is not representing
      (all) its members in the proceedings in question but is
      seeking to support and substantiate the individual
      interests of some of its members against other of its
      members.

      In so far as this argument proceeds from DURECO NEDERLAND
      this exception is factually incorrect since the latter
      party is not a member of IFPI (although it is of NVPI,
      the IFPI's sister organisation in the Netherlands).
      DURECO NEDERLAND and DURECO BELGIUM are evidently the one
      in the same when it suits them (in relation to the
      present exception) and to be distinguished when it suits
      them differently (see exception of irregular summonsing).
      Such an attitude is not easy to take seriously and
      creates suspicion.

      DURECO BELGIUM is certainly a member of IFPI.

      Among other things IFPI was set up in order to protect
      the professional and moral interests of its members and,
      more generally, of all those participating in the
      phonographic industry in Belgium. In furtherance of that
      goal it is authorised legally to contest any
      infringements of the rights and interests of its members
      and of the profession in general (cf. Article 3 of the
      statutes of the IFPI). The sale and distribution in
      Belgium of phonograms without the consent of the
      copyright-holders (authors, performing artists and
      producers) can constitute an infringement of the rights
      protected by Sections 35 and 39 of the Copyright Act. If
      the IFPI takes legal action against such infringements
      its action unquestionably comes within the formal objects
      of the association, namely the protection of the rights
      and interests - both patrimonial and moral - of its
      members. As a professional association it therefore in
      principle has the necessary interest to institute the
      action (see: RAES, S., "Het optreden in rechte van de
      Orde ter verdediging van het beroepsbelang", T.R.V.,

15

1988, p. 59 ff.; note under Cass. 19 May 1987).

Neither the law nor the statutes of the IFPI oblige the latter to promote the interest of "all" its members. Nor does the law or the statutes of the IFPI prohibit the latter from instituting procedures against a member on the grounds of an infringement. The professional association can only take action in order to protect the "lawful" interest of its members. If DURECO's stance were to be adopted this would seriously complicate efforts to combat infringements of copyright and related rights. There is no conflict between the lawful interests of the members of the IFPI and the alleged unlawful interests of a single member.

IFPI has the necessary interests in this matter to institute proceedings (its interest is not purely theoretical).

4.    DURECO erroneously argues that an arbitration procedure should have been followed in this matter. This exception (in the absence of jurisdiction) is totally unfounded given the lack of any useful and binding legal source.

## CONCERNING THE ALLEGED LACK OF URGENCY

DURECO draws attention to the existence of "ordinary" administration of justice "as in" interim injunction proceedings, which would enable the dispute to be resolved in good time. In other words DURECO considers that IFPI does not have an "urgent interest" to seek protection in interim injunction proceedings.

Since interim injunction procedures should retain their exceptional nature, this proposition is "procedurally logical" and also relevant in terms of judicial efficiency.

IFPI argues however that it is demanding the appointment of a sequestrator in the interim injunction proceedings for the recalled sound-recording mediums - a measure it would not be able to demand if seeking an injunction in an ordinary court.

The appointment of a sequestrator constitutes a solely custodial measure in anticipation of the basic decision. In accordance with Section 87 § 2 of the Copyright Act the handing over (to the plaintiff) of the imitation products and those still in the possession of the defendant can be ordered. It therefore appears superfluous to institute interim injunction proceedings, in this case together with legal proceedings along the lines of an interim injunction, solely in order to order to enable the appointment of a sequestrator. There is no valid urgency in this matter. The interim injunction proceedings are unfounded.

16

**FOR THESE REASONS;**

We, BOON J., Judge appointed to replace the Chairman of the Court of the first instance in Brussels;

Assisted by Clerk of the Court MELIS E.;

Given the Act of 15 June 1935 concerning the use of languages in legal proceedings;

Delivering judgment on the interim injunction after full argument on both sides;

Rejecting all other or contrary decisions;

Grants GLOBAL ARTS PRODUCTIONS, INC. deed of its voluntary intervention.

Declare the interim injunction action as admissible but unfounded for lack of genuine urgency.

Declare the action to be held harmless consequently to be without substance.

Order the plaintiff to pay the costs, estimated for itself at 12,727 + 9,208 + 4,100 francs, for DURECO BELGIUM and DURECO NEDERLAND at 4,100 francs and for GLOBAL ARTS PRODUCTIONS at 4,100 francs.

Judgment handed down at the public interim injunction hearing on 31 December 1997.


[Signature]                                    [Signature]
Melis E.                                       Boon J.

17

## COURT OF FIRST INSTANCE IN BRUSSELS

In public session of the interim injunction proceedings of 31 December 1997.

No. 97/10.661/A
of the roll

Annexes

1 summons
1 summons of intervention
1 partition for voluntary intervention
4 pleadings

Section 87 of Copyright Act - Interest of professional association - Related rights - Burden of proof - Range of the injunction

IN THE CASE OF:

The V.Z.W. IFPI BELGIUM BELGISCHE FONOGRAFISCHE INDUSTRIE, having its seat at Almaplein, 3/5, 1200 Sint-Lambrechts-Woluwe (hereinafter abbreviated as IFPI).

PLAINTIFF

Represented by Mr. Benoît MICHAUX, solicitor (Tervurenlaan, 268 A, 1150 Brussels).

AGAINST:

1.  B.V.DURECO, a company established under Dutch law, with its registered office at Pampuslaan, 45, 1382 Weesp, the Netherlands, H.R. Hilversum 26.275 (hereinafter abbreviated as "DURECO NEDERLAND")

DEFENDANT

2.  N.V. DURECO BELGIUM, a company established under Belgian law, with its registered office at Vleurgatsesteenweg, 213, 1050 Brussels, H.R.B. 426.117.

DEFENDANT IN ENFORCED INTERVENTION

Both represented by Mr. Joren DE WACHTER, solicitor (Vossendreef 6, 1180 Brussels - box 14).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of **PLAINTIFFS'**
**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO**
**DISMISS AND MOTIONS FOR A MORE DEFINITE STATEMENT; AND**
**DECLARATIONS OF MARCIO GONCALVES, MATTHEW J. OPPENHEIM, JEAN-**
**MARIE JEAN-BAPTISTE AND JOSEPH H. LODGE IN SUPPORT THEREOF** was

served via facsimile and mail to David Seif, Esq., 2400 E. Commercial Blvd., Suite 723, Ft.

Lauderdale, FL 33308, this 2nd day of July 1998.

_____
Yakub Hazzard

0017382.1