RUSSELL J. FRACKMAN
YAKUB HAZZARD
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone: (310) 312-2000
Facsimile: (310) 312-3100

KAREN L. STETSON
2350 Prairie Avenue
Miami, FL 33140
Telephone: (305) 532-4845
Facsimile: (305) 604-0598

Attorneys for Plaintiffs

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

SONY MUSIC ENTERTAINMENT INC., a
corporation; A & M RECORDS, INC., a
corporation; BMG MUSIC, d/b/a THE RCA
RECORD LABEL, a general partnership;
CAPITOL RECORDS, INC., a corporation;
ELEKTRA ENTERTAINMENT, a division of
WARNER COMMUNICATIONS, INC., a
corporation; MCA RECORDS, INC., a
corporation; POLYGRAM RECORDS, INC.,
a corporation; and WARNER BROS.
RECORDS INC., a corporation,

                              Plaintiffs,

        v.

GLOBAL ARTS PRODUCTIONS, an entity
of unknown form; DANNY JORDAN, an
individual; SATURN RECORDS, an entity of
unknown form; STACK-O-HITS, an entity of
unknown form; and JACK MILLMAN, an
individual,

                              Defendants.

CASE NO. 98-6507-Civ-Middlebrooks

**PLAINTIFFS' MOTION FOR ENTRY
OF PARTIAL DEFAULT JUDGMENT
AGAINST DEFENDANTS GLOBAL
ARTS PRODUCTIONS AND DANNY
JORDAN;**

**MEMORANDUM OF LAW; AND**

**DECLARATION OF MATTHEW J.
OPPENHEIM IN SUPPORT THEREOF**

        Plaintiffs, Sony Music Entertainment Inc., A & M Records, Inc., BMG Music, d/b/a The

RCA Record Label, Capitol Records, Inc., Elektra Entertainment, Warner Communications, Inc.,

Mitchell Silberberg &

1  MCA Records, Inc., Polygram Records, Inc. and Warner Bros. Records Inc., by and through

2  undersigned counsel and pursuant to Rule 55(b)(1), respectfully request this Court's entry of

3  partial default judgment against Defendants Danny Jordan and Global Arts Productions and all

4  other fictitious entities (including Just Great Music) through which Defendant Jordan conducts his

5  illegal infringing activities.  Specifically, by this motion, Plaintiffs seek a declaration affirming

6  Defendants' lack of rights in and to Plaintiffs' sound recordings, a permanent injunction enjoining

7  Defendants from further infringing Plaintiffs' rights, and such other relief as is more particularly

8  described below and in the proposed partial default judgment filed herewith.

9

10

11  .                                    **MEMORANDUM OF LAW**

12

13  **I.**    **INTRODUCTION**

14

15          This Court has ordered that the answers of defendants Global Arts Productions

16  ("Global Arts") and Danny Jordan ("Jordan") be stricken because they "have abused the

17  discovery process and have violated multiple orders and ignored this Court's warnings on multiple

18  occasions." (See October 14, 1998, Order.)  Since the entry of the defaults, Jordan has once again

19  disregarded Court process, thwarted Plaintiffs' ability to obtain relevant information, and

20  increased Plaintiffs' expense in litigating this action by refusing to appear for his twice-scheduled

21  deposition.  (See Plaintiffs' Motion for Sanctions Against Defendant Jordan filed December 14,

22  1998.)[1]

23

24          By this Motion made pursuant to Federal Rule of Civil Procedure 55(b)(1),

25  Plaintiffs request the entry of an immediate partial judgment against Global Arts and Jordan

26  _____

27          [1]       Even more recently, Richard Perlman, a former officer of Global Arts, refused to

28  appear for his deposition, disobeying a subpoena issued from the United States District Court for
    the Central District of California.  An application for contempt currently is pending in that Court.

Mitchell Silberberg &

1   containing, the injunctive relief, declaratory relief and delivery of infringing materials permitted

2   under the Copyright Act, and related relief authorized under Plaintiffs' state law claims.  Although

3   as demonstrated below, Global Arts and Jordan willfully infringed Plaintiffs' recordings and

4   therefore are liable for maximum statutory damages under the Copyright Act and punitive

5   damages on Plaintiffs' state law claims, Plaintiffs suggest that the Court defer the issue of

6   damages only until the entire matter can be resolved.  Plaintiffs seek the injunctive and declaratory

7   relief now in order to halt massive, ongoing worldwide piracy.

8

9          Plaintiffs brought this action to stop Defendants Global Arts and Jordan from

10  infringing Plaintiffs' rights in sound recordings.  As described in the Complaint, Global Arts and

11  Jordan are in the business of copying recordings and purporting to license to others the rights to

12  further copy and distribute recordings.  As a result of Defendants' actions, untold millions of

13  unauthorized compact discs embodying unauthorized copies of Plaintiffs' recordings are being or

14  will be manufactured, distributed and offered for sale worldwide.  While the Complaint alleges

15  infringement of 137 specific sound recordings owned by Plaintiffs, since the filing of this action,

16  Plaintiffs (despite the refusal of Global Arts and Jordan to provide any discovery) have found

17  almost 350 additional, different unauthorized recordings also purportedly licensed by Global Arts

18  and Jordan being sold throughout the world, including the United States, and Plaintiffs are

19  continuing to discover additional recordings on a frequent basis.  Even after this Court entered the

20  defaults of Global Arts and Jordan, they have continued to copy and issue bogus licenses of

21  Plaintiffs' recordings.  Moreover, because of the nature of the record piracy engaged in by

22  Defendants, and their complete failure to provide any discovery, the unlawful conduct of

23  Defendants thus far uncovered is likely to be but a small part of their illicit business.

24

25          Global Arts and Jordan have been given multiple opportunities to defend and

26  justify their activities.  At each turn, they have claimed to have the legal right to engage in their

27  large and growing "music" business, and at each turn, they have refused to provide any evidence

28  to support their hollow claims of rights.  Starting even prior to initiating this action, Plaintiffs

Mitchell Silberberg &

contacted Jordan in an effort to meet and discuss Jordan's claimed "rights" in Plaintiffs'
recordings.  After stringing the Plaintiffs along for months, Jordan refused to meet or provide the
purported documentation supporting his claim of rights -- clearly because such claims are false.
Courts in Europe have now come to a similar conclusion.  Nonetheless, Jordan and Global Arts
continue brazenly to engage in massive piracy.

## II.   **STATEMENT OF FACTS**

### A.   **Procedural Background**

On May 18, 1998, Plaintiffs filed this action together with a motion for limited
expedited discovery.  The complaint included schedules listing and identifying 137 specific
recordings -- 53 Copyrighted Recordings and 84 Pre-1972 Recordings -- which, as a result of
Defendants' activities, were being unlawfully copied, manufactured, and distributed.  While the
Complaint specified 137 recordings by artist and title, Plaintiffs specifically alleged that they were
suing to vindicate rights in all of their recordings.  (Complaint ¶¶ 22 and 23.)

As detailed in Plaintiffs' Motion to Strike the Answers of Global Arts and Jordan,
Global Arts and Jordan repeatedly failed and refused to provide <u>any</u> discovery in this action and
ignored this Court's discovery Orders and repeated warnings.  As a result,  on October 14, 1998,
this Court ordered their answers stricken.  On October 21, 1998, the clerk entered the defaults of
Global Arts and Jordan.

Consistent with his disregard for this Court and his obligations in this action, on
December 4, 1998, Jordan refused to appear for his deposition.  Plaintiffs filed a Motion for
Sanctions Against Jordan on December 14, 1998.

### B.   **Defendants' Illicit Business**

Mitchell Silberberg &

- 4 -

1

2    Collectively, Plaintiffs are the owners of the copyrights in various sound recordings

3  (the "Copyrighted Recordings").  In addition, Plaintiffs have entered into various agreements by

4  which they obtained the sole and exclusive right to manufacture, distribute, and sell recordings

5  embodying musical performances of popular and renowned artists which initially were "fixed"

6  prior to February 15, 1972 (the "Pre-1972 Recordings"), and therefore subject to protection

7  under state common and statutory law.[2]  Plaintiffs have never issued any licenses to or otherwise

8  permitted any of the Defendants to manufacture, duplicate, distribute, or authorize others to

9  manufacture, duplicate or distribute any of Plaintiffs' Copyrighted Recordings or Pre-1972

10  Recordings.

11

12    From their base in Florida, Global Arts and Jordan engineered world-wide

13  duplication and distribution of compact discs that contain unauthorized copies of Plaintiffs'

14  Copyrighted Recordings and Plaintiffs' Pre-1972 Recordings.  This is how the scheme works:

15  Defendants select the most popular and marketable recordings to duplicate.  Among others,

16  Defendants have copied recordings featuring the performances of such successful recording artists

17  as: Frank Sinatra, Harry Belafonte, Aretha Franklin, The Beach Boys, Billy Joel, Bob Dylan,

18  Chicago, Janis Joplin, Neil Diamond, The Who, and Simon and Garfunkel.  Global Arts and

19  Jordan then sell those copies together with bogus licenses which purport to authorize others the

20  unlimited right to further copy, manufacture, and distribute the recordings.  The number of pirate

21  recordings made and sold in this manner are, by Defendants' admission, "huge," and such

22  recordings, bearing the Global Arts name, have been sold worldwide, including in Florida.

23  (Oppenheim Decl., Ex. 1.)

24

25

26

_____

27    [2]    Plaintiffs' recordings "fixed" after February 15, 1972, are protected by federal

28  copyright.  17 U.S.C. § 102(a)(7).  Those recordings "fixed" prior to that date continue to be
   protected by state law.  17 U.S.C. § 301(c).

1      For each bogus license the Defendants sell, they receive an advance payment and

2  additional royalties based on sales of the unauthorized recordings.  (See, e.g., Oppenheim Decl.,

3  Ex. 2.)   Thus, Defendants are profiting immensely from the unauthorized copying and distribution

4  of recordings for which they have no rights.  Defendants are quite brazen in their conduct by

5  requiring their licensees to include on the packaging a reference to "Global Arts" (and in some

6  instances, "Just Great Music") as the licensor.  Defendants are now expanding their unlawful use

7  of recordings and, even after the entry of their defaults by this Court, they have purported to sell

8  the rights to one of Plaintiffs' recordings specifically identified in the action for use on radio and

9  television.  (Oppenheim Decl., Ex. 3)

10

11      Although Global Arts and Jordan continually have claimed the right to duplicate

12  and license recordings, they have refused to provide a single document to substantiate those

13  claims.  Prior to the institution of this action, Global Arts and Jordan claimed rights to recordings

14  through licenses from Defendant Jack Millman and his related entities.  (Oppenheim Decl.,

15  ¶¶ 9-12.)  Although Plaintiffs strongly dispute any rights Millman claims to have (in part because

16  of his past involvement in unlawful tax shelter licensing of recordings and inability to provide

17  evidence of rights), in discovery in this action, Millman categorically has denied ever issuing

18  licenses to Global Arts or Jordan for any recordings. (See Response of Jack Millman to Requests

19  for Admission Nos. 5 and 6, Oppenheim Decl., Ex. 4)  Jordan's contention that he obtained rights

20  in the recordings from Defendant Saturn Records has been met with a similarly terse denial.

21  Shelly Liebowitz, the principal of Saturn, has testified that Saturn never issued licenses to Global

22  Arts or Jordan for any of the recordings at issue in this case.  In fact, Liebowitz testified that a

23  Global Arts' representative in Europe falsified a document Liebowitz had prepared in a fraudulent

24  attempt to show that Liebowitz had licensed to Defendants recordings which he never claimed the

25  right to license and never had licensed.  (See Excerpts from the Deposition of Shelly Liebowitz,

26  pages 80-83, 85-87, and Exhibit 28 thereto, Oppenheim Decl., Ex. 5).

27

28

Mitchell Silberberg &

1       Jordan's failure to support his claim of rights prior to and since the filing of this

2   action is consistent with the experiences of his licensees.  Rob Ebbers, senior product manger of

3   Dureco (one of Defendants' licensees), testified that when Dureco was questioned about its rights

4   to recordings it licensed from Global Arts and Jordan, Global Arts and Jordan refused to supply

5   Dureco with any documentation supporting their claimed rights in several of the recordings.  (See

6   Excerpts from the Deposition of Rob Ebbers, Oppenheim Decl., Ex. 6.)

7

8       This inability to produce documentation supporting its claim of rights was

9   determined by one Court in Belgium to be dispositive.  The Belgian Court enjoined the unlawful

10  distribution of Plaintiffs' recordings and  noted that Global Arts and its licensee "have been unable

11  to produce proper documentation concerning the right to produce the relevant material, let alone

12  furnishing any evidence to indicate consent of the producer or the performing artist . . . ."  (See

13  Belgian Court decision, p. 5, Oppenheim Decl., Ex. 7.)

14

15      Since the filing of the complaint, Plaintiffs have discovered (without the benefit of

16  any discovery from Global Arts and Jordan) that the recordings listed and identified in the

17  schedules to the complaint represent just a small portion of Defendants' piracy operation.

18  Plaintiffs thus far have discovered almost 350 additional recordings that are actively being

19  exploited by Defendants, and which apparently have accounted for sales of substantially over a

20  million discs.  These additional recordings are listed on Schedule C (identifying the additional

21  Copyrighted Recordings) and Schedule D (identifying the additional Pre-1972 Recordings) to the

22  proposed partial default judgment filed herewith.  (Oppenheim Decl., ¶ 15.)  Unfortunately,

23  Plaintiffs are relatively confident that the extent of Jordan's piracy is still only partially known.

24

25      In sum,

26

27      •      Notwithstanding the institution of this action and the entry of default

28  against him, Jordan has continued to copy recordings and issue bogus licenses.  Moreover, as

Mitchell Silberberg &

- 7 -

recently as a few weeks ago, Defendants purported to license one of Plaintiffs' recordings which was included in the original Complaint.  (<u>See</u>, Oppenheim Decl., Ex. 3 dated November 19, 1998.)

        &bull;    Based on present information, Defendants' unlawful compact discs discovered to date contain unauthorized copies of almost 500 sound recordings owned by Plaintiffs and Plaintiffs' affiliates.  (Oppenheim Decl., ¶ 15.)

        &bull;    Over a million compact discs containing unauthorized copies of Plaintiffs' recordings purportedly licensed by, and bearing the names of Global Arts, Jordan and/or Just Great Music are being offered for sale and sold all over the world.  (Oppenheim Declaration, ¶¶ 5 and 15-17.)

        &bull;    The countries of which Plaintiffs are aware that these recordings are being "authorized" and distributed by Defendants from their base in the United States include: Australia, Austria, Belgium, Canada, Chile, Czechoslovakia, Denmark, Finland, Germany, Holland, Japan, Poland, Spain, Sweden, Switzerland, the U.K., and the U.S.  (Oppenheim Decl., ¶¶ 16.)

        &bull;    In addition, Defendants have unsuccessfully attempted to expand their business into Italy and South Africa, which refused to permit the importation of their illicit product .  (Oppenheim Decl., ¶ 19.)

        &bull;    Defendants' most recent license (Oppenheim Decl., Ex. 3) purported to grant rights for use on radio and television.  This is a substantial expansion of the rights Global Arts and Jordan previously purported to grant, and will cause Plaintiffs significant, additional harm.

Mitchell Silberberg &

1          •      Jordan is continuing to conduct and expand his unlawful business, including

2 under at least one other fictitious name, Just Great Music. (Oppenheim Decl., ¶ 30 and Ex. 9.)

3 He created this new entity specifically because his name had become associated with Global Arts.

4 (See Goncalves Decl., ¶ 5 previously filed with Plaintiffs' Oppositions to Defendants' Motions to

5 Dismiss and for a More Definite Statement.)

6

7          •      Jordan has not only conducted his unlawful business in a surreptitious

8 manner and failed to provide his basic business records, but he has falsified documents and made

9 false statements to other courts concerning his operations and concerning the status of this

10 lawsuit. (Oppenheim Decl. ¶ 22 and, Exs. 5 and 8.)

11

12          •      Jordan (and one other Global Arts officer) have stonewalled all discovery

13 from the outset of the case and have engaged in dilatory conduct preventing Plaintiffs from

14 ascertaining and stopping the full extent of his operations.

15

16          •      Jordan frequently changes his location (See Oppenheim Decl., Ex. 5) and

17 has moved twice during the pendency of this action without providing his own lawyers his new

18 addresses.

19

20      C.       **Defendants' Business is Record Piracy**

21

22         Defendants are engaged in "record piracy." See, e.g., A&M Records, Inc. v.

23 Heilman, 75 Cal. App. 3d 554, 560 n.4 (1977). Record piracy has long been recognized to violate

24 both copyright and state law rights in sound recordings. U.S. v. Dowling, 473 U.S. 207, 211 n.4

25 (1985); A&M Records, Inc. v. M.V.C. Distributing Corp., 574 F.2d 312 (6th Cir. 1978). Pirate

26 sales of recorded music are now estimated to be worth over $5 billion per year on a worldwide

27 basis.

28

Mitchell Silberberg &

1         As is usual in these cases of piracy, Defendants duplicate the best, most popular or

2 marketable recordings, and do not pay any royalties or fees to the record company owners, the

3 recording artists, songwriters, musicians or various union trust funds;[3] nor, obviously, do they

4 make the large expenditures necessary to record and market a "hit" record or bear the risk of the

5 many recordings which fail and lose money.  See generally Tape Industries Association of

6 America v. Younger, 316 F. Supp. 340, 343-44 (C.D. Cal. 1970).  Therefore, the illicit "profit" to

7 record pirates is substantial, because "[i]t is just at this point -- after the record company has

8 invested enormous sums on a high-quality album, produced a hit, and achieved wide market

9 popularity -- that the pirate swoops in to reap the benefits at little or no expense.  M. Kravilovsky

10 & S. Shemel, This Business of Music, at 115 (7th ed. 1995).  And frequently, as is apparently the

11 case here, that profit is not subject to substantiation because of a lack of business books and

12 records.  See A&M Records, supra, 75 Cal. App. 3d at 570.

13

14         Not only does Defendants' piracy deprive Plaintiffs (and others) of the monetary

15 rewards of their endeavors, it also usurps Plaintiffs' exclusive control over the method and means

16 of exploitation of their unique intellectual property.  Thus, while Plaintiffs' businesses depend on

17 deciding and controlling when, where, how, and whether to exploit specific recordings by specific

18 artists, Defendants effectively nullify that ability by indiscriminately permitting the wholesale and

19 unlimited exploitation of the very same recordings, without any controls by Plaintiffs, while

20 appending their own names to Plaintiffs' product, and distributing it in direct competition with

21 Plaintiffs.  This leaves little wonder why Defendants' conduct may be subject to criminal

22 prosecution (Florida Statutes § 812.014), and has been called "statutory theft" under Florida law.

23 CBS, Inc. v. Garrod, 622 F. Supp. 532, 536 (M.D. Fla. 1985), aff'd., 803 F.2d 1183 (1986).

24

25

—————————————

26      [3]    In 1971, when Congress first afforded federal copyright protection to sound
recordings, it did so expressly recognizing that "the pirating of records and tapes is not only
27 depriving legitimate manufacturers of substantial income, but of equal importance is denying
performing artists and musicians of royalties and contributions to pensions and welfare funds, and
28 federal and state governments are losing tax revenues."  H.R. Rep. No. 92-487, at 2 (1971).

Mitchell Silberberg &

III.   **PLAINTIFFS ARE ENTITLED TO A DEFAULT JUDGMENT AGAINST GLOBAL ARTS AND JORDAN.**

   A.   **Plaintiffs Are Entitled To The Judgment They Seek.**

   Since Global Arts and Jordan have defaulted, the well-pleaded factual allegations in the complaint are taken as true.  See TeleVideo Systems, Inc. v. Heidenthal, 826 F.2d 915, 917 (9th Cir. 1987) (upon default, the factual allegations of the complaint will be taken as true); Nishimatsu Const. Co., Ltd. v. Houston Nat. Bank, 515 F.2d 1200, 1210 (5th Cir. 1975) ("The defendant, by his default, admits plaintiff's well-pleaded allegations of fact).  "When a Court determines . . . that a defendant is in default, its liability to the plaintiff is deemed established and the plaintiff is not required to establish his right to recover."  Caribbean Produce Exchange v. Caribe Hydro-Trailer, Inc., 65 F.R.D. 46, 48 (2d Cir. 1974).  Thus, Plaintiffs' have established their entitlement to the relief against Global Arts and Jordan on all of the counts in the complaint, including the entry of an injunction, and a declaration concerning their rights in their recordings, and an order for the delivery and destruction of the infringing materials.

   1.   Plaintiffs Are Entitled To An Injunction Protecting All Of Their Recordings.

   Plaintiffs seek injunctive relief with respect to (a) those specific recordings identified in Schedule A (Copyrighted Recordings) and Schedule B (Pre-1972 Recordings) to the complaint; and (b) all other recordings owned by Plaintiffs, including but not limited to, those being infringed by Defendants which Plaintiffs discovered since the institution of this action and identified in Schedule C (Copyrighted Recordings) and Schedule D (Pre-1972 Recordings) to Plaintiffs' proposed partial default judgment filed herewith.

Mitchell Silberberg &

1    Additionally, Plaintiffs continue to investigate and discover further infringements

2   of their rights by Defendants.  It is clear that Defendants' entire business is illicit and that

3   Defendants do not have the rights to any of the recordings they are copying and purporting to

4   license.[4]  As Plaintiffs identify additional, specific recordings infringed, they will supplement the

5   Schedules submitted with this motion; however, given the magnitude and continuing nature of the

6   defaulting Defendants' conduct, Plaintiffs require an _immediate judgment_ to attempt to stop the

7   harm inflicted by Defendants' piracy operation.

8

9    Injunctive relief is a traditional remedy for infringement of copyright (17 U.S.C.

10   § 502) and for violation of state law rights in intellectual property.  See, e.g., United Features

11   Syndicate, Inc. v. Sunrise Mold Co., Inc., 569 F.Supp. 1475 (S.D. Fla. 1983) (injunction issued

12   for violation of the Copyright Act and state law intellectual property claims).  Such a permanent

13   injunction may be included as part of a default judgment.  D.C. Comics, Inc. v. Mini Gift Shop,

14   912 F.2d 29 (2d Cir. 1990).  On their copyright infringement claims, Plaintiffs prayed for, among

15   other things a "permanent injunction enjoining defendants, and each of them, and their respective

16   agents, servants, employees, officers, attorneys, successors, licensees and assigns, and all persons

17   acting in concert or participation with each or any of them, from (i) directly or indirectly

18   infringing in any manner *any of plaintiffs' copyrights (whether now in existence or hereafter*

19   *created), including, without limitation, the Copyrighted Recordings listed in Schedule "A"*

20   . . ." (Complaint, 21:1-26) (emphasis added).  On their claims relating to the Pre-1972

21   Recordings, Plaintiffs prayed for a "permanent injunction enjoining defendants, and each of them,

22   and their respective agents, servants, employees, officers, attorneys, successors, licensees and

23   assigns, and all persons acting in concert or participation with each or any of them, from

24   (i) directly or indirectly reproducing in any manner *any of plaintiffs' Pre-1972 Recordings*

25

26

_____

27     [4]     Jordan claimed to derive his "rights" solely from Defendants Millman and Saturn.

28   Both have denied licensing to Jordan or Global Arts any of the recordings involved (Oppenheim
     Decl. Exhs. 4 and 5).

Mitchell Silberberg &

1    *including without limitation those listed in Schedule "B"*..."(Complaint, 22:26-23:2) (emphasis

2    added).

3

4            It is well-settled that a successful plaintiff in a copyright infringement action is

5    entitled to precisely the broad injunction Plaintiffs are seeking, protecting not only those works

6    identified in the complaint, but all copyrighted works owned by Plaintiffs.  See, e.g., Pacific and

7    Southern Company, Inc. v. Duncan, 744 F.2d 1490, 1499 (11th Cir. 1984) (District Court abused

8    its discretion by refusing to issue broad permanent injunction, including injunction for works not

9    yet created, since the Copyright Act "provides for injunctions to prevent infringement of 'a

10   copyright,' not necessarily the registered copyright that gave rise to the infringement action");

11   Olan Mills, Inc. v. Linn Photo Co., 23 F.3d 1345, 1349 (8th Cir. 1994) (where there is "a threat

12   of continuing infringement," it may be proper to enjoin infringement of future works that have not

13   yet been registered); Walt Disney Co. v. Powell, 897 F.2d 565, 568 (D.C. Cir. 1990) ("Where, as

14   here, liability has been determined adversely to the infringer, there has been a history of continuing

15   infringement and a significant threat of future infringement remains, it is appropriate to

16   permanently enjoin the future infringement of works owned by the plaintiff but not in suit.");

17   Picker International Corp. v. Imaging Equipment Services, Inc., 931 F. Supp. 18, 45 (D. Mass.

18   1995) (proper to enjoin infringement of "not only . . .. the works as to which infringement has

19   already been adjudicated, but also ... any other works presently owned by plaintiff");

20   Encyclopaedia Britannica Educational Corp. v. Crooks, 542 F. Supp. 1156, 1187 (W.D.N.Y.

21   1982) (proper to enjoin infringement of works that are not subject of the present lawsuit); Orth-

22   O-Vision v. Home Box Office, 474 F. Supp. 672, 686 (S.D.N.Y. 1979) (proper to enjoin "the

23   infringement of future registered works").  A similar rationale supports the issuance of injunctive

24   relief with respect to all of Plaintiffs' Pre-1972 Recordings.  See Firma Melodiya v. Zyx Music

25   GmbH, 882 F. Supp. 1306, 1316 (S.D.N.Y. 1995) (preliminary injunction under state law

26   enjoining defendants from "manufacturing, copying, distributing or selling any [plaintiff's] ...

27   sound recordings).

28

Mitchell Silberberg &

1    Plaintiffs sought the broad injunctive relief authorized by the law precisely because

2   they feared that Defendants' conduct was far more extensive than the specific recordings listed in

3   the complaint.  Now Plaintiffs know they were correct, as hundreds of additional recordings

4   (embodied in over a million discs) have been copied and purportedly licensed throughout the

5   world by Defendants.  Without such injunctive relief, Plaintiffs will be forced to file additional

6   future lawsuits, including a new action for infringement of those additional recordings Plaintiffs

7   have discovered since the filing of this action.  Britannica, 542 F. Supp. at 1187 ("it would serve

8   no purpose to relitigate the same issues with respect to each of" the plaintiff's other works).

9   Therefore, the Court should enjoin Global Arts and Jordan from infringing Plaintiffs' rights in and

10   to all of their recordings.

11

12   2.   Plaintiffs Are Entitled To An Order Requiring Global Arts And Jordan To

13        Provide Written Notification To Their Licenses.

14

15    In order to stop the world-wide duplication and distribution of compact discs

16   containing unauthorized copies of Plaintiffs' recordings engineered by Global Arts and Jordan,

17   Plaintiffs request that the Court order Global Arts and Jordan (a) to provide written notification

18   to all of their purported licensees that such licenses are invalid, and (b) to furnish each of their

19   purported licensees with a copy of the judgment of this Court.   Such relief is particularly

20   necessary because Global Arts and Jordan apparently are advising their licensees and others that

21   they have prevailed in this action.  (Oppenheim Decl. ¶ 22.)  The Court has the authority to issue

22   such an order.  See, e.g., Robinson v. Random House, Inc., 877 F.Supp. 830, 844 (S.D.N.Y.

23   1995) (infringer of book produced to give notice of injunction to publisher).

24

25

26

27

28

Mitchell Silberberg &

1          3.       <u>Plaintiffs Are Entitled To A Declaration Of Their Rights In Their</u>

2                   <u>Recordings</u>.

3

4         For all of the same reasons that Plaintiffs are entitled to and need injunctive relief,

5 Plaintiffs are entitled to a declaration affirming their rights in their recordings and Defendants'

6 lack of rights.  Again, such relief is all the more necessary because Defendants apparently are

7 misrepresenting to their licensees and others that <u>they</u> have prevailed in this action (Oppenheim

8 Decl. ¶ 22).  A declaration of the type sought is common in copyright actions, and may be entered

9 after a default.  <u>Fred Ahlert Music Corp. v. Warner/Chappell Music, Inc.</u>, 155 F.3d 17, 21 (2d

10 Cir. 1998) (affirming District Court's judgment granting declaratory relief in copyright action

11 involving two parties, each of which claimed right to license same copyrighted work); <u>National</u>

12 <u>Football League v. White</u>, 1997 WL 736665 (W.D.N.Y. 1997) (noting that Court earlier entered

13 default judgment awarding injunctive and declaratory relief in copyright action).

14

15          4.       <u>Plaintiffs Are Entitled To An Order For The Delivery And Destruction Of</u>

16                   <u>The Infringing Materials</u>.

17

18         "As part of the final judgment or decree, the court may order the destruction or

19 other reasonable disposition of all copies or phonorecords found to have been made or used in

20 violation of the copyright owners's exclusive rights, and all plates, molds, matrices, masters,

21 tapes, film negatives, or other articles by means of which such copies of phonorecords may be

22 reproduced."  17 U.S.C. § 503(b).  <u>See</u> <u>Duchess Music Corp. v. Stern</u>, 458 F.2d 1305 (9th Cir.

23 1972).  <u>See also</u> <u>Paramount Pictures Corp. v. Labus</u>, 1990 Copyright Law Decisions (CCH)

24 ¶ 26,587 (W.D. Wis. 1990) (infringing copies ordered delivered to plaintiff).  In addition, the

25 Court has authority to order that Global Arts and Jordan deliver to Plaintiffs their books and

26 records documenting the manufacture, sale or receipt of recordings embodying or representing

27 that they embody any of Plaintiffs' recordings.  <u>See, e.g.</u>, <u>Microsoft Corporation v. Grey</u>

28 <u>Computer</u>, 910 F. Supp. 1077, 1094 (D.Md. 1995); <u>Foreign & Domestic Music Corporation v.</u>

## DECLARATION OF MATTHEW J. OPPENHEIM

I, MATTHEW J. OPPENHEIM, declare:

1.    I am associate counsel, civil litigation for the Recording Industry Association of America ("RIAA").

2.    The RIAA is a not-for-profit trade association formed in 1952.  The RIAA's members are record companies that, among other things, are the copyright proprietors of or owners of exclusive rights under copyright and common law in and to sound recordings of musical works that have been embodied in digital musical recordings or analog musical recordings lawfully made and distributed in the United States.  The RIAA's member companies together create, manufacture or distribute over ninety percent of all legitimate sound recordings sold in the United States.  Among other things, the RIAA represents the collective interest of its membership before legislative, regulatory, and judicial bodies with respect to federal, state, and local proceedings affecting the entire record industry.  One of the responsibilities of the RIAA is the commencement of civil proceedings on behalf of its member companies against those who unlawfully exploit and usurp the member companies' rights under copyright or common law.

3.    I was and am the attorney primarily responsible for overseeing the investigation of Danny Jordan, Global Arts Productions, Jack Millman, Stack-O-Hits and Saturn Records.  In this capacity, I have also taken the role of coordinating the international aspects of the investigation.  I am also the attorney primarily responsible for controlling the instant litigation.  I serve as the Plaintiffs' representative in this case.

4.    I am providing this Declaration to describe factual matters of which I have become aware.  I am not waiving attorney/client privilege or work product.

5.   In late 1997, the RIAA began investigating Danny Jordan ("Jordan") and Global Arts Productions (Global Arts") to determine whether and to what extent they were engaging in music piracy.  In particular, the RIAA understood that Jordan and Global Arts were issuing bogus licenses to third-parties to manufacture and distribute well-known musical recordings owned by RIAA members.  At the time, the RIAA was in possession of compact discs containing its members recordings which had been manufactured and distributed by third-parties who lacked the rights to do so.  Those compact discs contain the by-lines :  "Licensed by Global Arts Productions" or "Courtesy of Global Arts Productions."

6.   Among the recordings the RIAA was aware had been purportedly licensed by Jordan and Global Arts were those recordings listed on Schedules A and B attached to the Complaint in this action.

7.   In the course of confirming that Global Arts and Jordan had issued bogus licenses to manufacture and distribute these recordings, I contacted Peter Baumgartner.  Mr. Baumgartner is one of the principals of Gruezi Schallenplatten ("Gruezi") -- one of the companies manufacturing and distributing illegal music.  Mr. Baumgartner confirmed to me that the basis of Gruezi's purported rights was Global Arts.

8.   On February 23, 1998, Jordan left me a telephone message to return his call.  I had never previously spoken to Jordan.  When I returned the call later that day, he indicated that the purpose of his call was to address any RIAA concerns about the basis for rights he was purporting to license.  According to Jordan, he had learned from Mr. Baumgartner of the RIAA investigation and my role in it.

9.   During the conversation, Jordan explained  to me that he is in the business of purchasing rights to recordings and licensing them to third parties.  Jordan told me that he acquires rights to the recordings through "bills of sales" from defendant Jack Millman

1   ("Millman"), and pays Millman monthly for the rights.  Jordan told me that he and Millman have

2   all of the documents necessary to pursue his rights to copy and distribute the recordings.  Jordan

3   offered to meet with me and show me this documentation.  At the conclusion of the conversation,

4   Jordan provided me with Global Arts' Florida telephone number (973) 755-0551.  In addition,

5   Jordan asked me to send him a list of artists whose recordings we believed he was unlawfully

6   copying and distributing.  He asked that I send that material to the Global Arts office at 7160

7   Knob Hill Road, Suite 135, Tamarac, Florida 33321.  He also gave me his Florida fax number

8   (954) 775-1201.  We agreed to meet on March 10, 1998.

9

10      10.    On February 24, 1998, I sent a letter to Jordan confirming the meeting and listing

11  the artists whose recordings we believed he was infringing.  The letter was sent to Jordan via fax

12  at his Florida fax number.

13

14      11.    On March 3, 1998, I received a telephone message from  Jordan stating that he had

15  to cancel the March 10, 1998 meeting.  Jordan asked me to call him in Florida at (954) 775-0551.

16

17      12.    On March 4, 1998, I telephoned Jordan.  During our conversation, Jordan stated

18  that he purchased digital audio tapes and compact discs of the recordings he was licensing from

19  Millman and one of Millman's companies, Saturn Records.  Since that March 4, 1998 telephone

20  conversation, I have had no contact with Jordan.

21

22      13.    Subsequently, counsel for Jordan told me that Jordan would not meet with the

23  RIAA to disclose the documentation supporting his rights in and to the recordings he was

24  licensing.

25

26      14.    In the course of investigating the activities of Jordan and Global Arts, I have been

27  active coordinating the international aspects of the investigation.  On a regular basis, I speak and

28

1  correspond with both international record companies and investigators at International Federation

2  of the Phonographic Industry ("IFPI").  The IFPI is an international trade association representing

3  1,300 record producers in 70 countries throughout the world.  These efforts have discovered

4  hundreds of additional infringements in almost a dozen countries.

5

6      15.    Among the additional recordings we have discovered to date that appear to be

7  owned by Plaintiffs or their affiliated companies, are those listed on Schedules C and D attached

8  to the proposed partial default judgment filed with the accompanying motion.  (Schedule C is

9  comprised of Copyrighted Recordings and Schedule D is comprised of Pre-1972 Recordings.)

10  Through our ongoing investigation, we are continuing to discover recordings unlawfully licensed

11  by Jordan and Global Arts.

12

13      16.    Among the countries where we have discovered the Global Arts and Just Great

14  Music recordings are: Australia, Austria, Belgium, Brazil, Canada, Chile, Czechoslovakia,

15  Denmark, Finland, Germany, Holland, Japan, Poland, Spain, Sweden, Switzerland, the U.K., and

16  the U.S.

17

18      17.    The licensees of Global Arts and Just Great Music have taken full advantage of the

19  licenses they believe they have acquired.  So far, well in excess of one million illicit compact discs

20  have been located in Europe alone.

21

22      18.    The Global Arts' licenses often distribute both in their own countries, as well as in

23  others.  For example, we are aware that Gruezi Schallenplatten in Switzerland has been exporting

24  its product into Brazil and the Netherlands.  Snake's Music in Poland has been exporting in

25  Czeckloslovakia.  In addition, Elam Music in Denmark has been exporting to Sweden.  When

26  licenses export the illicit product, it makes it even more difficult to track down and stop the

27  distribution.

28

19.   In at least two instances, countries have refused to permit the importation of illicit Global Arts' compact discs -- Italy and South Africa.  These instances are, however, rare because it is difficult to learn in advance where the next Global Arts' compact discs will be headed.

20.   In connection with my investigative efforts with the IFPI , I have received numerous licenses, letters, decisions from European Courts involving litigation against Global Arts' and Jordan's licensees, and other documents concerning Global Arts' and Jordan's activities.

21.   Attached hereto as Exhibit 1 is a copy of a September 29, 1997, letter from Dr. Kukik to Mechanical-Copyright Protection Society Ltd ("MCPS") (in London) which I received during the course of the Global Arts and Jordan investigation.  In the letter Dr. Kukik identifies himself as the "permanent legal representative of Global Arts Productions of Florida."  Dr. Kukik further explains that Global Arts is "licensee of a huge number of sound recordings which he grants by way of sublicensees to customers in Europe."  (emphasis added).  It is my understanding that MCPS has refused to grant a mechanical license for the Global Arts recordings because Global Arts could not provide adequate proof of ownership.

22.   I also was informed by IFPI in London, within the last two months, that a representative of Global Arts was claiming to their licensees that it was "winning" this lawsuit.

23.   Attached hereto as Exhibit 2 is a copy of a September 3, 1996, License Agreement between Global Arts and Gruezi Schallplatten that I received during the course of the Global Arts and Jordan  investigation.

24.   Very recently, I received a copy of another bogus license which Global Arts Productions apparently issued to use certain Dean Martin recordings.  A copy of that license is attached as hereto as Exhibit 3.  This license differs from other licenses Global Arts Productions

1   has issued in the past in that it is for television and radio broadcast.  Dean Martin recordings

2   purportedly licensed are among recordings originally included in the Complaint in this action.  The

3   license was, according to the document, apparently issued on November 19, 1998.  This is

4   substantially after the filing of the Complaint in this action, on May 18, 1998, and after this Court

5   entered the Defaults of Danny Jordan and Global Arts Productions on October 14, 1998.

6

7       25.     Attached hereto as Exhibit 4 is copy of Defendant Jack Millman's Responses to

8   Plaintiffs' First Set of Requests for Admissions.

9

10      26.     On December 1, 1998, I attended the deposition Shelly Liebowitz.  Attached hereto

11  as Exhibit 5 are certain excerpts from Mr. Liebowitz's deposition transcript.

12

13      27.     On August 25, 1998, I attended the deposition of Rob Ebbers of Dureco, one of

14  Global Arts' licensees.  Attached hereto as Exhibit 6 are excerpts from Mr. Ebbers deposition

15  transcript.

16

17      28.     Attached hereto as Exhibit 7 is a translated copy of the decision of the Belgian Court

18  in a case brought against Dureco, a Global Arts' licensee.  As indicated in the Court's decision,

19  Global Arts voluntarily intervened in that action.  The Belgian Court ruled against Dureco and

20  noted at page 5 of the decision that Global Arts and its licensee "have been unable to produce

21  proper documentation concerning the right to produce the relevant material, let alone furnishing

22  any evidence to indicate consent of the producer of performing artist...."

23

24      29.     Attached hereto as Exhibit 8 is an Affidavit of Danny Jordan submitted in litigation

25  in Europe which I received in connection with the Global Arts and Jordan investigation.  The

26  attachments referenced in the Affidavit were never produced for the plaintiff or the Court in the

27  European Action.

28

30.     Attached hereto as Exhibit 9 is a certified copy of the Fictitious Business Name Statement filed by Jordan with California Secretary of State indicating that Jordan is doing business under the name "Just Great Music."

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this /7ᵗʰ day of December, 1998, at Washington, D.C.

MATTHEW J. OPPENHEIM

0068106.1

11:21:98   13:35 FAX 202 223 8322   B L I ↓

- 2 OCT 1997

# DR. KUKUK
RECHTSANWALT

JUNGFERNSTIEG 50  20354 HAMBURG  TELEFON 040/35 750 950
TELEFAX 040 / 35 750 975  GERICHTSFACH 520

Rechtsanwalt Dr. Kukuk, Jungfernstieg 50, 20354 Hamburg

**MCPS**
Att: Mr. Graham Churchill
41, High Road

London, SW 16

United Kingdom

By Fax 00 44 181 769 8792

Global Arts ./. MCPS

Hamburg, 29. September 1997
3784/97 GK

Dear Graham,

I am the permanent legal representative of Global Arts Productions of Florida, please let me draw your personal attention to the following.

My client is licensee of a huge number of soundrecordings which he grants by way of sublicensing to customers in Europe. Some of them are claimed by major companies as being their exclusive property. In no case those who have claimed their exclusive property have ever managed to proof their legal position. Nevertheless MCPS is refusing to grant mechanical rights to my client's licensees, e.g. BONED or HITLINE in respect of some major's complaints.

According to the rules and provisions governing collecting societies MCPS is obliged to grant these licenses. Withdrawing them would mean maintaining that my client is not in the legal position to license these soundrecordings. Doing so without any prove would have to be regarded as an abuse of your business power and conflict anti trust laws to my understanding.

Maybe I could ask you to intervene in this matter to avoid any further damages and, consequently, disputes between my client and you in court. I would appreciate if you could let me have a quick statement.

Sincerely yours

Dr. Kukuk

*EX 1*

DR. GERD KUKUK (LG UND OLG HAMBURG)  CHRISTINA KUKUK (NUR LG ATHEN)

GENERAL AGREEMENT

This Agreement entered into this 3rd of September
1996 by and between

GLOBAL ARTS PRODUCTION
represented by Mr. Danny Jordan
7160 Nob Hill Road
Suite 135 - Point Plaza Building
TAMARAC, FLA 33321

USA

(hereinafter called "Lessor")

and

GRÜEZI
Schallplatten AG
Oststr. 2
CH 8854 Siebnen
Switzerland

(hereinafter called "Licensee")

Whereas Lessor represents and warrants that it has the right to
authorise the manufacturing and distribution of the contractual
artist and titles according the schedule item to this agreement
for the Licensed Territory (hereinafter called the Master
Recordings)

and

Whereas Licensee is in a position directly or indirectly to
provide manufacturing in the Licensed Territory - according to
the schedule item 2 to this agreement.

Now Therefore in consideration of the foregoing and of the
mutual promises hereinafter set forth, it is agreed:

1. Lessor grants to Licensee the nonexclusive right and license
to use the Master Recordings for the purpose of manufacturing
and selling phonograph recordings derived therefrom in the
Licensed Territory on compilations according to the schedule
item 3 to this agreement.

EXHIBIT   H

Ex2

this Agre    nt and granting rights to Licensee    under and thereafter during the term. Lessor will be the owner or will controll all rights therein which are granted to Licensee hereunder and that it will secure the consent in writing of all artists including musicians. whose performances are reproduced in the recordings. together with all necessary copyright informations for the manufacture and sale of records by Licensee in connection with the recorded performances. Lessor agrees to forward to Licensee on Licensees desire a DAT of the MASTER RECORDINGS at the selfcost price of duplication of US $ 10.- in respect of each title.

3. Subject to paragraph 6 below furtheron. Lessor represents and warrants that except as otherwise expressively provided herein, Licensee shall be under no liability whatsoever to the artist or any third party arising out of the manufacture sale, use and publications as aforesaid. which Lessor may be responsible to pay and account which Lessor shall so pay and the Lessor shall at all times keep Licensee indemnified against all cost, damages and expenses or claims arising out of manufacture, sale, use and publication to the extend that there is a breach of the warranties contained in this clause.

4.1. Licensee represents and warrants that it has the capability to fully perform all the terms and conditions contained in this agreement and that it has the right, power and authority to enter into and to perform all of the terms and conditions contained herein. Licensee shall not have the right to sublicense or convey any rights granted under this agreement.

4.2. Licensee will make all payments which may be due and owing to any person, firm or corporation involved in the manufacture and/or sale of any of the recordings hereunder and will hold Lessor harmless from any and all claims. Licensee will use its best efforts to enforce collection of all accounts receivable for the sale of all recordings within the Licensed Territory.

4.3. Licensee will comply with all copyright provisions as to recordings within the Licensed Territory.

5. Licensee shall be solely responsible for the timely and accurate fulfilment of all copyright obligations arising out of the manufacture and the sale of records hereunder and agrees to indemnify the Lessor in respect thereof. Licensee agrees to obtain appropriate licenses and to do all things necessary to

record copyright material under the laws of the Licensed Territory.

6.1. In consideration of the rights herein granted, Licensee agrees to pay to Lessor a royalty as provided in the schedule item 4 to this agreement on 100% of the actual PPD- published price to dealer, less 10% on cassettes respectively 15% technical deduction on compact discs per title rata for each and every sold and not returned recording.

6.2. Upon the execution of this agreement, Licensee shall make payment to Lessor as provided in the schedule, item 5 to this agreement. The provided payment is a nonrefundable advance on account of royalties payable hereunder. Advance payments hereunder shall be non-returnable and fully recoupable from sums which may become due to Lessor hereunder for the relevant contractual recording according to the schedule of this agreement. There shall be no crosscollaterisation with other recordings provided in further schedules to this agreement.

6.3. Royalty Payments, including advances by Licensee to Lessor due hereunder shall be accompanied by a statement setting forth the full details the computations of the amount thereof. Such statements and payments shall be made semi-annually within 90 days following June 30 th and December 31st of each year and shall be forwarded to the adress for GLOBAL ARTS Production and to the adress set forth below for Hans Ballo.

a)   Eighty (80%) percent to GLOBAL ARTS Production

b)   Twenty (20%) percent to
      Hans Ballo, Goethestr. 73, 63477 Maintal, Germany

6.4. Lessor or its authorized representatives shall have the right to audit the books and records of Licensee, regarding the contractual titles, with the unrestricted right to make excerts therefrom and copies thereof. Such inspection shall be made during normal business hours, upon 30 days prior written notice to Licensee and no more than once for each year hereunder during the period of this agreement. In the event that in any inspection the books and records disclose a discrepancy in amounts payable to Lessor in excess of ten percent (10%) of the total royalties paid, Licensee shall promptly pay all costs of such inspection including accountant's fees incurred by Lessor

7.   Licensee will manufacture records from the Master Recordings within 60 (sixty)   days after signing of this

Agreement and agrees to mail to Lessor five (5)  copies of each format of the released records within 15 (fifteen) days of its/their release.

8. The term of this agreement shall be for a period as provided in item 6 of the schedule to this agreement. After termination of the contractual period Licensee shall have the right to distribute the existing stock of the contractual compilation cd- and musicasette productions for a further sell-off period of  (6) six months.

9. This agreement sets forth the entire agreement between the parties hereto with respect to the subject matter hereof and shall benefit and be binding upon the parties herto and their respective legal representatives, successors and assigns. No modification, amendment  or waiver of agreement  or any provision(s) thereof shall be effective unless confirmed by a written instrument signed by both parties.

10. Any difference arising under this agreement  between Lessor and Licensee shall be handled in accordance with the laws of the state of Florida and the competent state and federal courts of Tamarac shall have jurisdiction of any dispute arising out of  or  relating  to  this  agreement  or  the  alleged  breach thereof.

IN WITNESS WHEREOF; the parties herto have caused this agreement  to  be  executed  by  their  duly  authorized representatives as of the day and year first above written.

Tamarac, Nov. 5th,1996          Siebnen,
GLOBAL ARTS                     GRÜEZI Schallplatten AG
PRODUCTION

Danny Jordan

to the Agreement dated September 3rd, 1996 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Lessor")

and

GRÜEZI SCHALLPLATTEN AG
(hereinafter called "Licensee")

1. a) ARTISTS: THE DOORS

1. b) TITLES:     1. Light My Fire
                  2. Roadhouse Blues
                  3. L. A. Woman
                  4. Riders On The Storm
                  5. Touch Me
                  6. Hello I Love You
                  7. Wait For The Sun
                  8. Love Her Madly
                  9. Crystal Ship
                  10. When The Music Is Over

2. TERRITORY:  Germany, Austria, Switzerland incl. export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassettes
low price

4. ROYALTY:     % One Time Payment
5. ADVANCE:

6. TERM:  3 years, starting  march 1st. 1997
          until  February 28th 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac, *Feb 21st. 97*          Siebnen,
GLOBAL ARTS                      GRÜEZI Schallplatten AG
PRODUCTIONS

Danny Jordan                     Jakob Baumgartner

between

GLOBAL ARTS PRODUCTIONS
(hereinafter called "Lessor")

and

GRÜEZI SCHALLPLATTEN AG
(hereinafter called "Licensee")

1. a) ARTISTS: LINDA RONSTADT

1. b) TITLES:    1. Different Drum
                 2. Long Long Time
                 3. Love Has No Pride
                 4. Silver Treads And Golden Needles
                 5. You're No Good
                 6. When Will I Be Loved
                 7. It Doesn't Matter Anymore
                 8. Heat Wave
                 9. Love Is A Rosa
                 10. Tracks Of My Tears
                 11 That'll Be The Day
                 12 Blue Bayou
                 13 Desperado

2. TERRITORY:  Germany, Austria, Switzerland incl. export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - low price

4. ROYALTY:    % One Time Payment

5. ADVANCE

6. TERM:  3 years, starting *may* March 1st, 1997
          until February 28th 2000, plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac, *May 14, 97*          Siebnen
GLOBAL ARTS                     GRÜEZI Schallplatten AG
PRODUCTIONS

.....................          .....................
Danny Jordan                   Jakob Baumgartner

SCHEDULE

(°    nafter called "Licensee")

1. a) ARTISTS:  THE MONKEES

1. b) TITLES.    1. (Theme From) The Monkees
                 2. Last Train To Clarksville
                 3. I'm A Believer
                 4. (I'm Not Your) Steppin' Stone
                 5. A Little Bit Me, A Little Bit You
                 6. The Girl I Knew Somewhere
                 7. Pleasant Valley Sunday
                 8. Words
                 9. Daydream Believer
                 10. Goin' Down
                 11. Valleri
                 12. The Porpoise Song (Theme From "Head")
                 13. That Was Then, This Is Now
                 14. Heart And Soul

2. TERRITORY:  Germany, Austria, Switzerland incl. export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - low price

4. ROYALTY:  -

5. ADVANCE:

6. TERM:  3 years starting  march 1st, 1997
          until  February 28th 2000.  next 6 months sell-off

7. COURTESY?  THE  Licensed by GLOBAL ARTS

Tamarac, March 3. 1997          Siebnen,
GLOBAL ARTS                     GRÜEZI Schallplatten AG
PRODUCTIONS

Danny Jordan                    Jakob Baumgartner

SCHEDULE



LETTER AGREEMENT made this 19th, day of November 1998
by and between
GLOBAL ARTS PRODUCTIONS INC
6025 Sandy Springs Circle, Suite 222
Atlanta, Georgia 30328
United States Of America
(hereinafter called "Licensor")
and

███████████████████████████████

Germany
(hereinafter called "Licensee")

WHEREAS Licensor  and Licensee mutually agree to sign the following agreement

1.  Licensor  grants to Licensee the right and non-exclusive license to use the title
     "Winter Wonderland" by Dean Martin in a TV- and Radiopromotion Spot for the
     company Douglas during the period November 23rd, 1998 until December 23rd,1998
     Licensee shall be entitled to let the promotion spot be broadcasted by the Radio-
     and TV Stations chosen by Licensee without any limitation in the territorioy of Germany,
     Austria and Switzerland during the agreed contractual period.

2. Licensor represents and warrents that it has the right to authorise the right on the
    contractual title for the use in TV and Radio promotion spots and that he is entitled
    to grant these rights to Licensee.

3. Licensor grants and warrents that the license rights granted to Licensee do not
    infringe copyright laws. In case of any claim of a third party araising in connection
    with this agreement, Licensor shall be obligated to use all legal steps to protect
    its interest to fulfil this agreement.

4. Licensee agrees to pay to Licensor for the rights granted under the terms of this
    agreement a onetime compensation payment / flat fee in the amount of $ 2.000,-
    (Twothousand US Dollar). Payment shall be made by Licensee to Licensor upon
    signing of this agreement, according to a seperate invoice with all relevant bank
    details.

5. This agreement is subject to the laws of Georgia, USA and the court of Atlanta
    shall have jurisdiction in connection with all claims o this agreement.

IN WITNESS WHEREOF the parties hereto have caused this Letter Agreement to be
executed by their duly authoried representatives as of the day and year first above
written
Atlanta, Nov. 19th. 1998              Koblenz, Nov: 19th, 1998
GLOBAL ARTS PRODDUCTIONS           ████████████████████

Danny Jorden

*Ex 3*

1  RUSSELL J. FRACKMAN
   YAKUB HAZZARD
2  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
3  Los Angeles, CA 90064-1683
   Telephone: (310) 312-2000
4  Facsimile: (310) 312-3100

5  KAREN L. STETSON
   2350 Prairie Avenue
6  Miami, FL 33140
   Telephone: (305) 532-4845
7  Facsimile: (305) 604-0598

8  Attorneys for Plaintiffs

**RECEIVED**

**SEP 29 1998**

Mitchell, Silberberg & Knupp

9              UNITED STATES DISTRICT COURT

10            SOUTHERN DISTRICT OF FLORIDA

11

12  SONY MUSIC ENTERTAINMENT INC., a          CASE NO. 98-6507
    corporation; A & M RECORDS, INC., a
13  corporation; BMG MUSIC, d/b/a THE RCA      **PLAINTIFFS' FIRST SET OF**
    RECORD LABEL, a general partnership;       **REQUESTS FOR ADMISSIONS TO**
14  CAPITOL RECORDS, INC., a corporation;      **DEFENDANT JACK MILLMAN**
    ELEKTRA ENTERTAINMENT, a division of
15  WARNER COMMUNICATIONS, INC., a
    corporation; MCA RECORDS, INC., a
16  corporation; POLYGRAM RECORDS, INC.,
    a corporation; and WARNER BROS.
17  RECORDS INC., a corporation,

18                          Plaintiffs,

19        v.

20  GLOBAL ARTS PRODUCTIONS, an entity
    of unknown form; DANNY JORDAN, an
21  individual; SATURN RECORDS, an entity of
    unknown form; STACK-O-HITS, an entity of
22  unknown form; and JACK MILLMAN, an
    individual,
23
                            Defendants.
24

25

26  PROPOUNDING PARTY:       PLAINTIFFS

27  RESPONDING PARTY:        DEFENDANT JACK MILLMAN

28  SET NO.:                 One (1)

Mitchell Silberberg &
Knupp LLP

0036868.1

*Ex 4*

Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiffs hereby request that defendant Jack Millman admit the following matters, within thirty (30) days of service hereof or such other time as may be ordered by the Court. .

## DEFINITIONS

A.    "PHONORECORDS" means and refers to phonorecords as that term is defined in Section 101 of the United States Copyright Act, 17 U.S.C § 101, including without limitation compact discs, audio cassette tapes, long-playing disc record albums, digital audio tapes, and reel to reel tapes.

B.    "YOU" and "YOUR" means and refers to defendant Jack Millman, and any of his licensees, assigns or successors in interest, and any corporation or entity under which he conducts business.

## REQUESTS FOR ADMISSIONS

REQUEST NO. 1:

Admit that YOU do not now claim and never have claimed any right to license, manufacture, distribute, and/or sell PHONORECORDS of any of the sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto, except for the following:

(a)    "Baby, We Better Try And Get It Together" - Barry White

(b)    "Honey Please, Can't Ya See" - Barry White

- 2 -

0036868.1

(c)    "Let The Music Play" - Barry White

(d)    "Never Never Gonna Give Ya Up" - Barry White

(e)    "You See The Trouble With Me" - Barry White

(f)    "Benedictus" - Simon & Garfunkel

(g)    "Peggy-O" - Simon & Garfunkel

(h)    "Sparrow" - Simon & Garfunkel

(i)    "The Sounds Of Silence" - Simon & Garfunkel

(j)    "Wednesday Morning - 3 A.M." - Simon & Garfunkel

        ADMIT

**REQUEST NO. 2:**

        Admit that Stack-O-Hits does not now claim and never has claimed any right to license, manufacture, distribute, and/or sell PHONORECORDS of any of the sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto.

        ADMIT

**REQUEST NO. 3:**

        Admit that Saturn Records does not now claim and never has claimed any right to license, manufacture, distribute, and/or sell PHONORECORDS of any of the sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto. I HAVE NO KNOWLEDGE OF SATURN RECORDS. I HAVE NO ACCESS TO ANY OF SATURN RECORDS FILES, PAPERS, DOCUMENTS OR RECORDS.

Mitchell Silberberg &
Knupp LLP

0036868.1

- 3 -

**REQUEST NO. 4:**

Admit that, other than M/V Productions, Inc., no entity in which YOU have an ownership interest or under which YOU conduct business now claims or ever claimed any right to license, manufacture, distribute, and/or sell PHONORECORDS of any of the sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto.

ADMIT

**REQUEST NO. 5:**

Admit that YOU have not licensed, sold or otherwise transferred to defendant Danny Jordan any rights in any of the sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto.

ADMIT

**REQUEST NO. 6:**

Admit that YOU have not licensed, sold or otherwise transferred to defendant Global Arts Productions any rights in any of the sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto.

ADMIT

**REQUEST NO. 7:**

Admit that the only sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto, that YOU licensed, sold or transferred to others are the following:

(a)     "Baby, We Better Try And Get It Together" - Barry White

(b)     "Honey Please, Can't Ya See" - Barry White

(c)     "Let The Music Play" - Barry White

- 4 -

Mitchell Silberberg &
Knupp LLP          0036868.1

(d)    "Never Never Gonna Give Ya Up" - Barry White

(e)    "You See The Trouble With Me" - Barry White

(f)    "Benedictus" - Simon & Garfunkel

(g)    "Peggy-O" - Simon & Garfunkel

(h)    "Sparrow" - Simon & Garfunkel

(i)    "The Sounds Of Silence" - Simon & Garfunkel

(j)    "Wednesday Morning - 3 A.M." - Simon & Garfunkel

## REQUEST NO. 8:

Admit that Wesley Sanborn of Koala Records is the only person or entity to whom YOU have licenced, sold or transferred any rights in the following sound recordings:

(a)    "Baby, We Better Try And Get It Together" - Barry White

(b)    "Honey Please, Can't Ya See" - Barry White

(c)    "Let The Music Play" - Barry White

(d)    "Never Never Gonna Give Ya Up" - Barry White

(e)    "You See The Trouble With Me" - Barry White

- 5 -

(f)    "Benedictus" - Simon & Garfunkel

(g)    "Peggy-O" - Simon & Garfunkel

(h)    "Sparrow" - Simon & Garfunkel

(i)    "The Sounds Of Silence" - Simon & Garfunkel

(j)    "Wednesday Morning - 3 A.M." - Simon & Garfunkel

DENI, SEE ANSWERS TO INTERROGATORIES

DATED;September ___29___ 1998                    JACK MILLMAN

By:

NOTARY PUBLIC
STATE OF ARIZONA
YAVAPAI COUNTY
FRANCES MELLO
My Commission Expires April 15, 1999

Mitchell Silberberg &
Knupp LLP          0036868.1

1               UNITED STATES DISTRICT COURT

2               SOUTHERN DISTRICT OF FLORIDA

3

4

5   SONY MUSIC ENTERTAINMENT,     )        **CERTIFIED COPY**
    INC., et al.,                 )
6                                 )
                   Plaintiffs,    )
7                                 )
         vs.                      )    No. 98-6507-CIV
8                                 )      MIDDLEBROOKS
    GLOBAL ARTS PRODUCTIONS,      )
9   et al.,                       )
                                  )
10                 Defendants.    )
    _____)

11

12

13

14

15

16            DEPOSITION OF SHELLY LIEBOWITZ

17              Tuesday, December 1, 1998

18

19

20

21                                      The
                                        Egnatuk
22                                      Agency
                                 CERTIFIED SHORTHAND REPORTERS
23   REPORTED BY:
     Ingrid Suarez Egnatuk       370 South Crenshaw Blvd.
24   CSR No. 3098, RPR           Suite E-102
                                 Torrance, California 90503
25   File No.:  12-2-981         (310) 787-3240        Ex 5

                                                              1

1    status of the lawsuit at that time?

2          A     No, he didn't.

3          Q     Did -- during the course of that

4    conversation, did you discuss with Mr. Jordan whether

5    he would pay your legal fees in connection with the

6    action?

7          A     No, I did not.

8          Q     Did he ask you to pay his legal fees?

9          A     No, he did not.

10         Q     Did the subject of legal fees come up

11   at all?

12         A     No.  Not at all.

13         Q     Is there anything else about that

14   conversation at all that you recall, sir?

15         A     No.  Nothing specific.

16         Q     How long did it take?

17         A     Maybe 10, 15 minutes.  I know Dan

18   Jordan a long time.  He's been a friend.  He knows my

19   wife and my child.  He was at my son's bris.  So he

20   asked a lot of questions, how the baby is doing, how

21   my wife is adjusting to California.  The basics.

22         Q     Did you make any notes during the

23   conversation?

24         A     No.  Not at all.

25         Q     Have you spoken to Mr. Jordan since

                                                    15

1    that time?

2        A     No, I haven't.

3        Q     Do you know where he is presently

4    residing?

5        A     No.  He's always -- he travels so much,

6    I never know where he's going to call from.

7        Q     But do you know where he lives?

8        A     I have an answering service that I

9    usually leave a message for him at.

10       Q     Do you happen to remember what that

11   number is?

12       A     No, I don't.  Not offhand.  I don't

13   have those numbers with me.

14       Q     Do you ever mechanically record,

15   tape-record, any telephone conversations?

16       A     Never.

17       Q     And it's your recollection that this

18   conversation with Mr. Jordan was before you were

19   served initially with a Subpena in this case?

20       A     Yes.

21       Q     And sometime thereafter you were served

22   with a Subpena, sir; correct?

23       A     Correct.

24       Q     Now, that Subpena asked you to appear

25   at a deposition on a specified date sometime earlier

16

1    together for Mr. Jordan regarding the Stack --

2    regarding the --

3         Q       I'm a little confused because I thought

4    what you gave Mr. Jordan was what Mr. Millman gave

5    you.

6         A       Yes.  Earlier I explained that what I

7    had given Mr. Jordan was either a bill of sale or

8    license on that material.  And I also put together

9    that document, an affidavit, basically a letter

10   stating that these are how -- these are the

11   background of these recordings and everything else.

12            Somehow Mr. Ballo got that letter and

13   attached that to some -- something pertaining to Bob

14   Marley.  Because when San Juan contacted me, I faxed

15   them back immediately saying I have no business

16   dealings with Hans Ballo.  I have nothing to do with

17   Bob Marley recordings.  I have never purported to own

18   or control or license Bob Marley recordings.

19        Q       Do you know whether Mr. Ballo got that

20   document from Mr. Jordan?

21        A       I have no idea.

22        Q       Did you ever discuss that with

23   Mr. Jordan?

24        A       No, I did not.  Excuse me.  Yes, I did.

25   I did mention once to him that if he knew this guy,

                                                      80

1   to make sure that he does not try to put something

2   out with anything to do with -- anything that I had

3   anything to do with.  It was not anything that I had

4   anything to do with.

5        Q    Did Mr. Jordan tell you he knew

6   Mr. Ballo?

7        A    I think that -- I believe that he

8   mentioned that he knows Mr. Ballo.

9        Q    Did Mr. Jordan tell you that Mr. Ballo

10   represented him or Global Arts?

11        A    No.  He didn't mention anything of that

12   sort.

13        Q    Did you ever learn that from any

14   source?

15        A    No, I haven't.

16        Q    Do you still have someplace the fax

17   that you got from San Juan Music or your reply?

18        A    I don't believe so.

19        Q    Who at San Juan Music?

20        A    I don't remember who it was.

21        Q    Do you remember what Bob Marley

22   recordings were involved?

23        A    Just mentioned Bob Marley recordings.

24        Q    Was it only Bob Marley recordings?

25        A    Yes, sir.

1          Q       Any other -- strike that.

2          A       No other artists.   Just Bob Marley

3     recordings.

4          Q       And how many?

5          A       They just mentioned that they owned and

6     controlled Bob Marley recordings.

7          Q       In other words -- why was San Juan

8     Music contacting you?

9          A       I gather that Mr. Ballo was purporting

10    to have paperwork for me, or whatever, offering it

11    to -- the Bob Marley recordings.  And what he was

12    using was that one document they put together saying

13    that the following recordings were a product that I

14    know had come to tax shelter programs, had been used

15    for other things, and had been put out through the

16    years, originally came from Mr. Millman and his

17    assorted companies listing them out; and to the best

18    of my knowledge there have never been a challenge on

19    any of these recordings, blah, blah, blah.  That

20    statement was attached to obviously some kind of

21    schedule of Bob Marley recordings.

22         Q       In other words, Mr. Bollo, to your

23    understanding, had basically taken your statement and

24    switched the list of recordings, had falsified it?

25         A       That's how it appeared from when I was

                                                        82

1    contacted.

2         Q      Have you ever heard from any other

3    source that Mr. Bollo -- we'll take Mr. Bollo

4    initially -- that Mr. Bollo was representing rights

5    to any other recordings based on your statement that

6    you had given Mr. Jordan?

7         A      No, sir.  That was the only time that

8    his name came up like that.  And that was enough.

9         Q      Or that anyone else was doing that?

10        A      No, sir.

11        Q      And you were being contacted by

12   San Juan, to your understanding, because Mr. Bollo

13   wanted to sell these to San Juan, and they were

14   checking up?

15        A      I'm not sure how that came about,

16   whether someone -- he approached someone else with

17   it, some other company, and that they went to

18   San Juan or San Juan heard about it or whatever it

19   was.  But they faxed me, and I responded immediately

20   to them.  And that was the end of it.  There was no

21   further communication regarding that.

22        Q      Do you know whether Mr. Jordan has ever

23   represented to anyone that he had obtained rights to

24   any recordings from you, other than the Stack-O-Hits

25   100 recordings and those few other recordings that

                                                    83

1           MR. FRACKMAN:  Would you mark this, please.

2                   (Plaintiff's Exhibit 28 was

3                   marked for identification

4                   and is attached hereto.)

5     BY MR. FRACKMAN:

6           Q       Can you identify Exhibit 28,

7     Mr. Liebowitz.

8           A       Yes, sir.  This is the document that I

9     had mentioned earlier that I put together at

10    Mr. Jordan's request.  And this is what was

11    purportedly attached to that Bob Marley . . . . . .

12          Q       When you prepared this, for -- strike

13    that.

14                  Just to make the record clear, this is

15    the document, Exhibit 28, that Mr. Ballo purportedly

16    attached to the Bob Marley recordings?

17          A       That's what I was told, sir.

18          Q       Now, when you prepared this document --

19    strike that.  Let me ask it first.

20                  Did you prepare Exhibit 28, or did

21    Mr. Jordan prepare it for you?

22          A       I did, sir.

23          Q       When you prepared Exhibit 28, was there

24    a list or a schedule attached to it?

25          A       What was attached to this was the --

                                                    85

1    the Stack-O-Hits 100.

2         Q     Was this list of 100 recordings?

3         A     The Schedule A of the 100 recordings.

4         Q     And that was the schedule that had been

5    a schedule to your agreement with Mr. Millman?

6         A     My purchase from Mr. Millman, yes.

7         Q     Now -- and was this prepared,

8    Mr. Liebowitz, on or around November 21, 1977?

9    That's the date that it has.

10        A     Yes, sir.

11        Q     Is that your signature, or is that a

12    stamp?

13        A     That's a computer signature.

14        Q     Did you affix it?

15        A     Yes.

16        Q     Cause it to be affixed?

17        A     Yes, I did.

18        Q     Did you give a copy of this document to

19    Mr. Jordan?

20        A     Yes, sir.

21        Q     And did it have the schedule attached?

22        A     I believe so.

23        Q     Did you give a copy to anyone else?

24        A     No, sir.

25        Q     Did Mr. Jordan ever tell you to whom he

1    gave copies?

2          A      No, sir.

3          Q      Did you ever find out how Mr. Ballo got

4    a copy?

5          A      No, I did not.

6          Q      Do you know of any source that

7    Mr. Ballo might have gotten a copy from, other than

8    Mr. Jordan?

9          A      I have no idea.

10         Q      Well, you didn't give it to him; right?

11         A      Excuse me?

12         Q      You did not give it to Mr. Ballo?

13         A      No, sir.  I've never met Mr. Ballo.

14         Q      And the only person you gave it to was

15   Mr. Jordan?

16         A      That's correct.

17         Q      You say on Exhibit 28, "We purchased

18   master recordings from Jack Millman (Stack-O-Hits,

19   Banyon, etc.) on several occasions."

20                What were you referring to there?

21         A      When I bought the San Francisco series,

22   Mr. Millman was an intermediary on that.

23         Q      Anything else?

24         A      I had initially sent Mr. Millman my

25   first purchase of anything -- he had sent me a large

                                                    87

# SItt Label Group

**Saturn Records**          **SRI RECORDS**          Flamingo Jazz

November 21, 1997

TO WHOM IT MAY CONCERN.

    We purchased master recordings from Jack Millman (Stack-O-Hits, Banyon, etc.) on several occasions. These purchases also included recordings that were previously utilized for tax shelter purposes. We purchased these properties with the knowledge that these were legitimate properties and that they were no challenges from any original source. The dates of our purchases were 5/21/93, 11/5/93, 1/3/95 and 6/30/95.

    We have negotiated for sale of these properties with Danny Jordan, the president of Global Arts Productions.

        Sincerely.

        *Shelly Liebowitz*

        Shelly Liebowitz
        President

PLFS EXHIBIT 28
Ingrid Suarez Egnatuk, CSR #3098
12-1 19 98
WITNESS Liebowitz
Page 1 of 1

1

1            UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF FLORIDA
2            CASE NO. 98-6507-CIV-MIDDLEBROOKS

3

4   SONY MUSIC ENTERTAINMENT, INC.,        )
    et al.,                                 )
5                                           )
                    Plaintiff,              )
6                                           )
         vs.                                )
7                                           )
    GLOBAL ARTS PRODUCTIONS, et al.,        )
8                                           )
                    Defendant.              )
9                                           )
    _____)
10

11              DEPOSITION OF ROB EBBERS

12

13

14            Taken before Andrea J. Stefanick,

15   Registered Merit Reporter and Notary Public in

16   and for the State of Florida at Large, pursuant

17   to Notice of Taking Deposition filed by the

18   Plaintiff in the above cause.

19

20                      - - -

21   Tuesday, August 25, 1998              ORIGINAL
     Suite 2310
22   100 Southeast 2nd Street
     Miami, Florida  33131
23   10:15 a.m. - 1:00 p.m.

24

25                          E×6

MUDRICK WITT
PROFESSIONAL REPORTING SERVICE

Miami • North Miami • Hollywood • Fort Lauderdale • Deerfield Beach • Boca Raton • West Palm Beach • Stuart • Vero Beach

5

1       break, we'll conclude our questioning until

2       another time, to be continued on another

3       date.  So if there is time at the end to ask

4       the questions, you may ask questions today.

5               Is that agreeable?

6               MR. SEIF:  Yeah, that sounds fine.

7               MS. STETSON:  Okay.  Let's proceed.

8               THE WITNESS:  Well, I don't have that

9       much time, because I'm here only for the

10      MIDEM Convention and I am flying back on

11      Saturday.

12              MS. STETSON:  No, no, no, I didn't mean

13      to continue during this trip.  To continue

14      at some unspecified future time.

15              I understand the time commitments for

16      today and we'll honor that, as we've spoken

17      about previously.

18  BY MS. STETSON:

19      Q       Okay.  Mr. Ebbers, by whom are you

20  employed?

21      A       Dureco.

22      Q       How long have you been with Dureco?

23      A       Since 1972.

24      Q       And in what capacity are you employed

25  by them?

6

1    A     For the moment, being I'm senior

2 product manager, as you can see on my business

3 card.

4    Q     All right.  Can you describe generally

5 for us the business that Dureco is engaged in?

6    A     This is a Dutch record company,

7 completely independent company.  Completely

8 independent company.  We develop our own

9 product.  We have products under license.  And

10 the product that we record ourselves, we license

11 to foreign countries.

12          And most all the products that we put

13 out, go through marketing and promotion in

14 Benelux, Belgium.  That's Luxembourg.

15    Q     Is Dureco also involved in

16 manufacturing/distribution?

17    A     We have two sister companies, one that

18 makes CDs and the other one that distributes CDs.

19    Q     What are the names of those two sister

20 companies?

21    A     They -- the CD manufacturing company

22 is Dureco Manufacturing B.V., and distribution

23 company is Music Net B.V.

24    Q     Where are Dureco Manufacturing and

25 Music Net located?

30

1    communication with Danny Jordan?

2        A    Yes, several times.

3        Q    Okay.  Can you tell me the nature of

4    that communication, those communications?

5        A    Because we had been intimated by the

6    NVPI that the products may or may not be

7    illegal.

8            We tried to get information via the

9    phone and a fax to Danny Jordan, and we had

10   questions for him to -- for him to explain to us

11   how the product was acquired.

12       Q    Where was Danny Jordan located at that

13   time?

14       A    Either in New York or in California,

15   and I'm not sure whether it was San Francisco or

16   Los Angeles.

17       Q    Did he respond to your inquiries?

18       A    Yes.

19       Q    And what did le say?

20       A    He explained that the rights had been

21   acquired via tax shelters that he had bought and

22   that -- and he submitted documents, including the

23   prices and the titles that he had purchased.

24       Q    Okay.  Approximately when did this

25   take place?

31

1        A       That was approximately at the end of

2    '97, after we ceased the sale, we started to

3    inquire.

4        Q       Who has paid Dureco's legal fees that

5    they have incurred in connection with the IFPI

6    action?

7        A       We paid for our own attorney.

8        Q       Has Dureco ever asked Danny Jordan to

9    reimburse them for those legal fees?

10       A       I don't know.

11       Q       Who would know?

12       A       Maybe the general manager of Dureco.

13       Q       What is his name?

14       A       Harry Chun.  H-a-r like Harry, and

15   Chun is C-h-u-n, with two dots on the u-n.

16       Q       Okay.  And other than the Simon and

17   Garfunkel documents that you referred to

18   previously, do you recall any other artists

19   specifically referenced in the documents provided

20   to you by Danny Jordan, purportedly granting him

21   rights?

22       A       I believe, but I'm not quite sure,

23   that I also saw information about the Mamas and

24   the Papas and The Doors.

25       Q       Any others that you recall?

32

1    A    I may have seen others and I really

2    don't remember, but I definitely didn't see all

3    of -- 12 of them.

4        Q    Okay.  Do you think that they were

5    documents referencing at least six artists?

6        A    It could be.  Could be.  I don't

7    remember.

8            I believe I saw something about Neil

9    Diamond.  Neil Diamond.

10       Q    How much did Dureco ultimately pay

11   Global Arts in royalty fees?

12       A    I don't know.  Hans Ballo has the

13   statement and I have no idea what the amount was.

14       Q    You can't even approximate?

15       A    I know that we bought -- we paid about

16   $3,000 for the down payments, whether that was

17   covered or not -- approximately that.  I don't

18   remember.

19       Q    The approximate amount of the 18 to 20

20   percent, do you know the approximate amount of

21   that portion of the royalties?

22       A    I'm not quite sure that I understand

23   the question.

24       Q    Okay.  Well, we know that you paid

25   $3,000 per CD and that there were initially 12

IN THE PRESENCE OF:

GLOBAL ARTS PRODUCTIONS INC., having its registered office at
Point Plaza Building, 7160 Nob Hill Road, Tamarac, Florida
33321 (United States).

VOLUNTARILY INTERVENING PARTY

Represented by Mr. Marinus VROMANS, Solicitor (1070 Brussels,
Ninoofsesteenweg, 643).

\*  \*  \*
\*  \*

Arguments at these proceedings were presented in Dutch at the
public session of 5 December 1997.

After consultation the Chairman of the court of first instance
handed down judgment:

   Having seen:

-    the summons issued by writ served by registered mail by
     Mr. Michel Leroy, bailiff resident at Etterbeek, dated 3
     October 1997;

-    the summons in intervention issued by writ served by
     registered mail by Mr. Thierry Van Diest acting for Mr.
     Emmanuel Leroy, bailiff resident at Etterbeek, dated 18
     November 1997;

-    the petition filed in voluntary intervention and legal
     arguments filed with the clerk of the court on 6 November
     1997;

-    the pleadings for the plaintiff filed at the sitting of 5
     December 1997;

-    the pleadings and second pleadings for Dureco Nederland
     filed at the sitting of 5 December 1997;

-    the pleadings for Dureco Belgium filed at the sitting of
     5 December 1997;

-    the supplementary pleadings for Global Arts filed at the
     sitting of 5 December 1997;

The solicitors of the parties having presented their arguments
at the sitting of 5 December 1997.

\*  \*  \*
\*  \*

The action by IFPI against both DURECO NEDERLAND and DURECO
BELGIUM, instituted subject to Section 87 of the Copyright
Act, entails:

(1)  to establish that the defendants violated Sections 35 and

*Ex 7*

2

39 of the Act of 30 June 1994 concerning Copyright and related rights by the distribution and/or offering for sale of sound-recording mediums bearing unlawful (i.e. made at the time without the consent of the copyright owners) reproductions of musical recordings;

(2)    to have the defendants ordered to cease these practices subject to a fine of BEF 50,000 per copy of the sound-recording medium which, in contravention of the judgment to be handed down, was nevertheless distributed and/or offered for sale;

(3)    to have the judgment published in three newspapers as selected by the plaintiff, at the expense of the defendants, subject to the proviso that these costs shall be payable on demand upon submission of an invoice, even pro forma.

Both DURECO NEDERLAND and DURECO BELGIUM formulate a subordinate action below against GLOBAL ARTS PRODUCTIONS as follows: to have GLOBAL ARTS PRODUCTIONS ordered to hold DURECO fully harmless for each order with respect to DURECO, including the full legal costs.

\*   \*   \*
\*   \*

## CONCERNING THE FACTS

IFPI is a professional association in the sense of Section 87 §1 of the Act of 30 June 1994 concerning Copyright and related rights (hereinafter referred to as "the Copyright Act"). It brings together producers and distributors of phonograms.

DURECO is a producer and publisher of phonograms (records, CD's, cassettes, ...).

GLOBAL ARTS is said to be DURECO's licensee for the disputed sound-recordings.

In a letter of 15 September 1997 addressed to "DURECO, Mr. H. CHUN, Louisalaan, 390, 1050 Brussels" IFPI warns DURECO immediately to suspend the sale of the sound-recording mediums issued under the "Hit Line" and "Mad Price" labels and to recall these products from retail outlets. IFPI states that it "strongly suspects" that the licensee (of DURECO) does not have the necessary rights.

In response to this letter IFPI received a fax dated 17 September 1997 from DURECO NEDERLAND, signed by Harry R. CHUN, General Manager, stating among other things that DURECO BELGIUM handles the sale and distribution in Belgium on its behalf of, among other things, the CD's issued under the "Mad Price" label. It is curious that DURECO does not respond to the summons by drawing attention to its rights to market the CD's in question.

3

A further exchange of letters took place between IFPI and DURECO (IFPI's faxes were consistently sent to DURECO BELGIUM) before the summons was served, but with no constructive outcome.

On 3 October 1997 IFPI served a temporary injunction on DURECO NEDERLAND, while also instituting proceedings under Section 87 of the Copyright Act. On account of the overloading of the list for trial and owing to the need to resolve a procedural point relating to the rights of the defence, the two proceedings took a different course from the sitting of 6 November 1997 onwards.

## CONCERNING THE ALLEGED INVALIDITY OF THE WRIT INSTITUTING PROCEEDINGS

DURECO NEDERLAND "enters reservations" with respect to the "validity" of the summons as this had been served at neither its registered office nor its business address.

The writ instituting the proceedings was served at "the permanent establishment in Belgium" of DURECO NEDERLAND, namely at Louisalaan, 390/2n, 1050 Brussels, being DURECO BELGIUM's principal place of business. Not only did the aforementioned exchange of letters take place via this address (cf. Section 39 of the Civil Code) but, in particular, it needs to be established that the alleged irregular summons achieved the aim as intended by the law, without violating DURECO NEDERLAND's rights of defence. The interests of DURECO NEDERLAND were not harmed and the alleged irregularity does not consequently involve any penalty (cf. Section 862 of the Civil Code).

## CONCERNING THE NATURE OF THE MEASURES AND THE URGENCY

Both the defendants and the intervening party invoke exceptions and arguments relating solely to the interim injunction proceedings. Evidently these parties have applied the same defence in both proceedings, although a number of exceptions and arguments are not relevant to the suspension proceedings, conducted as though an interim injunction. It is sufficient to establish this without need for further rebuttal.

## CONCERNING THE ALLEGED LACK OF INTEREST

DURECO contends that IFPI is unable to invoke its status as a professional association in the sense of Section 87 §1 of the Copyright Act since it is not representing (all) its members in the proceedings in question but is seeking to support and substantiate the individual interests of some of its members against other of its members.

4

In so far as this argument proceeds from DURECO NEDERLAND this exception is factually incorrect since the latter party is not a member of IFPI (although it is of NVPI, the IFPI's sister organisation in the Netherlands). DURECO NEDERLAND and DURECO BELGIUM are evidently the one in the same when it suits them (in relation to the present exception) and to be distinguished when it suits them differently (see exception of irregular summonsing). Such an attitude is not easy to take seriously and creates suspicion.

DURECO BELGIUM is certainly a member of IFPI.

Among other things IFPI was set up in order to protect the professional and moral interests of its members and, more generally, of all those participating in the phonographic industry in Belgium. In furtherance of that goal it is authorised legally to contest any infringements of the rights and interests of its members and of the profession in general (cf. Article 3 of the statutes of the IFPI). The sale and distribution in Belgium of phonograms without the consent of the copyright-holders (authors, performing artists and producers) can constitute an infringement of the rights protected by Sections 35 and 39 of the Copyright Act. If the IFPI takes legal action against such infringements its action unquestionably comes within the formal objects of the association, namely the protection of the rights and interests - both patrimonial and moral - of its members. As a professional association it therefore in principle has the necessary interest to institute the action (see: RAES, S., "Het optreden in rechte van de Orde ter verdediging van het beroepsbelang", T.R.V., 1988, p. 59 ff.; note under Cass. 19 May 1987).

Neither the law nor the statutes of the IFPI oblige the latter to promote the interest of "all" its members. Nor does the law or the statutes of the IFPI prohibit the latter from instituting procedures against a member on the grounds of an infringement. The professional association can only take action in order to protect the "lawful" interest of its members. If DURECO's stance were to be adopted this would seriously complicate efforts to combat infringements of copyright and related rights. There is no conflict between the lawful interests of the members of the IFPI and the alleged unlawful interests of a single member.

IFPI has the necessary interests in this matter to institute proceedings (its interest is not purely theoretical).

## CONCERNING THE ALLEGED INADEQUACIES IN FOLLOWING THE ARBITRATION PROCEDURE

DURECO erroneously argues that an arbitration procedure should have been followed in this matter. This exception (in the absence of jurisdiction) is totally unfounded given the lack

5

of any useful and binding legal source.

## CONCERNING THE INFRINGING NATURE OF THE SOUND-RECORDING MEDIUMS

There are grounds for first establishing whether the CD's that are the subject of litigation form an infringement of Section 35 and 39 of the Copyright Act before establishing who the infringing party might be. It may be noted that if one of the summonsed parties has not performed any unlawful actions, this does not concern the admissibility but the grounds of the action.

Pursuant to Section 35 of the Copyright Act, only the performing artist has the right to reproduce his performances or to permit the reproduction thereof. Pursuant to Section 39 of the Copyright Act only the producer of phonograms has the right to reproduce his performance or permit the reproduction thereof.

The plaintiff argues that the CD's distributed under the "Rondo Hitline" and "Mad Prices" labels were reproductions of musical recordings that could be made without the consent of the producer or the performing artists. These are reproductions of recordings of musical performances by groups of singers, such as The Doors, Neil Diamond, ZZ Top, The Who and Linda Ronstadt.

The defendants and the voluntarily intervening party, who have been unable to produce proper documentation concerning the right to reproduce the relevant material, let alone furnishing any evidence to indicate the consent of the producer or the performing artist, allow that the vital question in this matter is whether the individual members of the plaintiff, who allege that they enjoy certain exclusive rights, in fact effectively enjoy those rights and whether those rights are indeed exclusive.

The challenge does not however concern CD's distributed by the plaintiff or certain other of its members.

In view of the role assigned to the plaintiff in the Copyright Act and in view of the documents submitted by the plaintiff in order to substantiate the suspicion that the defendants did not have the necessary rights, the stance adopted by the defendants and the voluntarily intervening party constitutes an unjustified reversal of the burden of proof. In addition the rules of evidence need to be interpreted dynamically and the plaintiff cannot be charged with supplying the proof that the copyright-holders have not transferred their rights of reproduction to the defendants and the voluntarily intervening party.

In fact it is sufficient to establish that the voluntarily intervening party writes in its most recent legal arguments,

6

deposited at the sitting of 5 December 1997, that it had proved "impossible" for it to produce the necessary documents in the brief time-span in order to substantiate its voluntary intervention and to invalidate the plaintiff's action. This argument does not hold up in the age of the fax.

## CONCERNING ANY PRE-1972 MUSICAL RECORDINGS

The distinction drawn in "American" law between recordings made before and after 1972 is irrelevant in view of the assimilation principle contained in Article 4 of the Berne Convention (26 June 1948) and Article 1 of the Trip agreements,(15 April 1994). The defendants do not demonstrate that they enjoyed reproduction rights, even under foreign law, so that the aforementioned distinction is of no relevance.

## CONCERNING THE INFRINGING PARTIES

The exchange of letters conducted between the parties prior to the institution of legal proceedings took place between IFPI and DURECO NEDERLAND or DURECO BELGIUM, but in all cases via the same address in Brussels.

In its initial statement of defence DURECO NEDERLAND did not assert that it was not performing any of the actions preferred against it by IFPI. It did do so orally at the sitting of 13 November 1997, at the interim injunction proceedings, as a result of which the plaintiff was obliged to draw DURECO BELGIUM into the matter. The attitude adopted by DURECO NEDERLAND in this matter cannot be regarded as serious.

When subsequently DURECO BELGIUM claims in its statement of defence that it is not a distributor of the CD's forming the subject of litigation but one B.V. MUSICNET, the attitude towards the proceedings of the two DURECO'S can only arouse suspicion. The appearances are that these parties wish to postpone (the essence of) the debate as long as possible.

The reverse of the CD's forming the subject of litigation bears the inscription "marketed by DURECO B.V.". There can be no doubt that DURECO NEDERLAND has brought the litigious CD's on to the Belgium market via DURECO BELGIUM (cf. the filed exchange of letters). IFPI has produced an invoice made out by DURECO BELGIUM in which the litigious CD's are invoiced to a record shop in Mol. The attitude of the defendant is not merely dilatory and hard to take seriously but also displays evidence of bad faith. In a different legal system this might amount to "contempt of Court".

Both defendants have committed infringing actions.

## CONCERNING THE SCOPE OF THE CLAIMS

7

The plaintiff has formulated its action in general terms and has not confined itself to certain (unlawful) musical recordings. If so required, it contends, the injunction could be confined to unlawful reproductions of lawful musical recordings "belonging to the category of the IFPI members".

An injunction may not be vague and amount to no more than a repetition of the statutory prohibition. The formulation must be sufficiently precise to permit the concrete application of the injunction and also to provide sufficient room to prevent new infringements arising out of the infringement in question but taking another form, so as to prevent the injunction from losing all efficacy (cf. EVRARD, J-J., Les pratiques de commerce, Chronique de jurisprudence, J.T., 1985 p. 195, no. 92). A vital part of the judicial process is that the courts are asked to qualify certain facts or actions so as to bring them under the application of the law. If the decision of the court does not relate to certain facts, the court will be repeating the law and so not administering justice. The judge's decision would then be enforceable according to the personal insights of the litigant, which would no longer involve implementation of a granted title.

In view of the above the injunction sought by the plaintiff appears inadequate. The subordinate proposal by the plaintiff confining matters to unlawful reproductions of lawful musical recordings forming part of the catalogue of IFPI members is equally as inadequate. The litigious CD's may well have appeared on the catalogue of the second defendant, which is an IFPI member. The injunction needs to be formulated as determined below.

## CONCERNING THE INTERVENING PARTY

No injunction is being sought with respect to the voluntarily intervening party.

In so far as the voluntarily intervening party is being asked to hold harmless from the parties forming the object of the injunction with respect to each judgment against these parties, it should be noted that the principal action concerns the suspension of violations of reproduction rights committed by these parties and that, in contrast to a demand for compensation, an injunction cannot be transferred from one party to another.

The action to be held harmless is consequently unfounded.

## CONCERNING THE PUBLICATION MEASURE

An order for publication in extenso of this relatively lengthy judgment would appear exaggerated, and publication of a part thereof will suffice.

8

FOR THESE REASONS;

We, BOON J., Judge appointed to replace the Chairman of the
Court of the first instance in Brussels;

Assisted by Clerk of the Court MELIS E.;

Given the Act of 15 June 1935 concerning the use of languages
in legal proceedings;

Delivering judgment after full argument on both sides;

Rejecting all other or contrary decisions;

Grants GLOBAL ARTS PRODUCTIONS, INC. deed of its voluntary
intervention.

Declare the principal actions as admissible and founded as
follows:

Establish that B.V. DURECO and N.V. DURECO BELGIUM, by the
distribution or offering for sale of sound-recording mediums,
such as CD's, under the labels "RONDO HITLINE" and "MAD
PRICES", containing reproductions of musical recordings by The
Door, Neil Diamond, Simon & Garfunkel, Cat Stevens, The Mama's
& The Papa's, ZZ Top, The Who, and Linda Ronstadt are
violating Sections 35 and 39 of the Act of 30 June 1994
concerning Copyright and related rights, as this is taking
place without the consent of the copyright holders.

Order these parties to suspend these practices and any
distribution or offerings for sale of sound-recording mediums,
in respect of which no evidence of consent is deposited "from
the performing artists or the producer" within 14 days from
the notice of default served by registered mail by the V.Z.W.
IFPI BELGIUM, subject to payment of a fine of BEF 50,000 per
copy of the each sound-recording medium which, contrary to
this order, is distributed or offered for sale, as determined
solely by a bailiff.

Order the publication of the judgment as determined below and
the enacting terms of the present judgment in three newspapers
at the choice of IFPI BELGIUM, at the expense of DURECO B.V.
and DURECO BELGIUM B.V., subject to the proviso that these
costs, including any translation costs, shall be reclaimable
upon simple submission of an invoice (even pro forma), the
judgment establishing the identity of the court of justice,
the date of the judgment and the identity of the parties.

Declare the action to be held harmless to be admissible but
unfounded.

Leave the court expenses of GLOBAL ARTS PRODUCTIONS INC.,
estimated at 4,100 francs, to be borne by that party.

9

Order B.V, DURECO and N.V. DURECO BELGIUM to pay the remaining costs, assessed for V.Z.W. IFPI BELGIUM at 13,353 + 9,418 + 4,100 francs and for themselves at 4,100 francs.

Judgment handed down at the public interim injunction hearing on 31 December 1997.


[Signature]                                         [Signature]
Melis E.                                            Boon J.

10

## COURT OF FIRST INSTANCE IN BRUSSELS

In public session of the interim injunction proceedings of 31 December 1997.

No. 97/1453/C
of the register

<u>Annexes</u>

1 summons
1 summons of intervention
1 partition for voluntary intervention
4 pleadings

Section 584 of Civil Code concerning Copyright - Interest of authors' association - Urgency

IN THE CASE OF:

<u>The V.Z.W. IFPI BELGIUM BELGISCHE FONOGRAFISCHE INDUSTRIE</u>, having its seat at Almaplein, 3/5, 1200 Sint-Lambrechts-Woluwe (hereinafter abbreviated as IFPI).

PLAINTIFF

Represented by Mr. Benoît MICHAUX, solicitor (Tervurenlaan, 268 A, 1150 Brussels).

AGAINST:

1.   <u>B.V.DURECO,</u> a company established under Dutch law, with its registered office at Pampuslaan, 45, 1382 Weesp, the Netherlands, H.R. Hilversum 26.275 (hereinafter abbreviated as "DURECO NEDERLAND")

FIRST DEFENDANT

2.   <u>N.V. DURECO BELGIUM,</u> a company established under Belgian law, with its registered office at Vleurgatsesteenweg, 213, 1050 Brussels, H.R.B. 426.117.

DEFENDANT IN ENFORCED INTERVENTION

Both represented by Mr. Joren DE WACHTER, solicitor (Vossendreef 6, 1180 Brussels - box 14).

IN THE PRESENCE OF:

<u>GLOBAL ARTS PRODUCTION INC.</u>, established at Point Plaza Building, 7160 Nob Hill Road, Tamarac, Florida 33321 (United States).

VOLUNTARILY INTERVENING PARTY

11

Represented by Mr. Marinus VROMANS, solicitor
(Ninoofsesteenweg, 643, 1070 Brussels).

\*   \*   \*
\*   \*

Arguments at these proceedings were presented in Dutch at the
public sittings of 13 and 27 November 1997.

After consultation the Chairman of the court of first instance
issued the following order:

Having seen:

- the summons issued by the writ served by registered mail
  by Mr. Michel Leroy, bailiff resident at Etterbeek, of 3
  October 1997;

- the summons in intervention issued by the writ served by
  registered mail by Mr. Thierry Van Diest acting for Mr.
  Emmanuel Leroy bailiff resident at Etterbeek, dated 18
  November 1997;

- the petition for voluntary intermediation and pleadings
  for Global Arts filed with the clerk of the court on 6
  November 1997;

- the pleadings for DURECO NEDERLAND filed with the clerk
  of the court on 6 November 1997;

- the pleadings for DURECO BELGIUM filed at the session of
  27 November 1997;

- the supplementary pleadings for Global Arts filed at the
  session of 27 November 1997;

- Having heard the arguments of the solicitors of the
  parties at the sessions of 13 and 27 November 1997.

\*   \*   \*
\*   \*

The action by IFPI against both DURECO NEDERLAND and DURECO
BELGIUM, as instituted subject to the application of section
584 of the Civil Code, seeks:

(1) to have the defendant ordered to suspend all distribution
    or offering for sale of sound-recording mediums
    containing an unlawful reproduction of a recording of a
    musical performance, subject to payment of a fine of BEF
    50,000 for each sound-recording medium which is
    nevertheless distributed or offered for sale at variance
    with the order in question;

(2) to have the defendants ordered to recall all sound-
    recording mediums with an unlawful reproduction of a

12

recording of a musical performance from all their direct
clients (subject to possible payments) within eight days
after the order in question has been served, subject to a
fine of BEF 50,000 per sound-recording medium that is not
recalled within the aforementioned period;

(3)   to have a sequestrator appointed for all the sound-
      recording mediums recalled in this way (this demand is
      formulated somewhat differently with respect to DURECO
      BELGIUM: "to have a sequester appointed for all litigious
      CD's, including sound-recording mediums recalled").

Both DURECO NEDERLAND and DURECO BELGIUM have formulated a
subordinated action against GLOBAL ARTS PRODUCTION as follows:
to order Global Arts Productions to hold DURECO fully harmless
from any judgment against DURECO, including the full court
costs.

*   *   *
*   *

## CONCERNING THE FACTS

IFPI is a professional association in the sense of Section 87
§ 1 of the Act of 30 June 1994 concerning Copyright and
related rights (hereinafter referred to as "the Copyright
Act"). It brings together producers and distributors of
phonograms.

DURECO is a producer and publisher of phonograms (records,
CD's, cassettes, ...).

GLOBAL ARTS is said to be DURECO's licensee for the disputed
sound-recordings.

In a letter of 15 September 1997 addressed to "DURECO, Mr. H.
CHUN, Louisalaan, 390, 1050 Brussels" IFPI warns DURECO
immediately to suspend the sale of the sound-recording mediums
issued under the "Hit Line" and "Mad Price" labels and to
recall these products from retail outlets. IFPI states that it
"strongly suspects" that the licensee (of DURECO) does not
have the necessary rights.

In response to this letter IFPI received a fax dated 17
September 1997 from DURECO NEDERLAND, signed by Harry R. CHUN,
General Manager, stating among other things that DURECO
BELGIUM handles the sale and distribution in Belgium on its
behalf of, among other things, the CD's issued under the "Mad
Price" label. It is curious that DURECO does not respond to
the summons by drawing attention to its rights to market the
CD's in question.

A further exchange of letters took place between IFPI and
DURECO (IFPI's faxes were consistently sent to DURECO BELGIUM)
before the summons was served, but with no constructive

13

outcome.

On 3 October 1997 IFPI served a temporary injunction on DURECO
NEDERLAND, while also instituting proceedings under Section 87
of the Copyright Act. On account of the overloading of the
list for trial and owing to the need to resolve a procedural
point relating to the rights of the defence, the two
proceedings took a different course from the sitting of 6
November 1997 onwards.

## CONCERNING THE ALLEGED INVALIDITY OF THE WRIT INSTITUTING PROCEEDINGS

DURECO NEDERLAND "enters reservations" with respect to the
"validity" of the summons as this had been served at neither
its registered office nor its business address.

The writ instituting the proceedings was served at "the
permanent establishment in Belgium" of DURECO NEDERLAND,
namely at Louisalaan, 390/2n, 1050 Brussels, being DURECO
BELGIUM's principal place of business. Not only did the
aforementioned exchange of letters take place via this address
(cf. Section 39 of the Civil Code) but, in particular, it
needs to be established that the alleged irregular summons
achieved the aim as intended by the law, without violating
DURECO NEDERLAND's rights of defence. The interests of DURECO
NEDERLAND were not harmed and the alleged irregularity does
not consequently involve any penalty (cf. Section 862 of the
Civil Code).

## CONCERNING THE COMPETENCE

Since the terms of the writ instituting the proceedings claim
that the action is urgent in nature, the chairman of the
temporary injunction session is in principle competent to
investigate the grounds of that writ (Cass. 11 May 1990, Pas.
1990, I, 1045).

## CONCERNING THE ALLEGED INADMISSIBILITY OF THE ACTION

1.  According to DURECO IFPI is not demanding any
    "provisional" measures and the measures sought in fact go
    further a temporary injunction. The action would
    consequently be inadmissible.

    The question as to whether the measure sought are more
    than just provisional relates to the powers of the judge
    in interim injunction proceedings and the grounds of the
    interim injunction and not the competence of the Chairman
    or the admissibility of the action (MAERTENS A-S.,
    "Uitspraak bij voorraad: voorschrift over de machten van
    de rechter in kort geding", note under Cass. 14 June
    1991, T.B.H., 1992, 260). This question will accordingly
    be investigated below.

14

2.   DURECO argues that the ordinary administration of justice
     (as in interim injunction proceedings) is equipped to
     resolve the dispute in good time. The action would
     consequently be inadmissible.

     Implicitly DURECO therefore argues that the action is not
     urgent. Now that the competence of the judge in interim
     injunction proceedings in this matter is clear, the
     investigation into the actual urgency forms part of the
     grounds of the case, which will be investigated here.

3.   **CONCERNING THE ALLEGED LACK OF INTEREST**

     DURECO contends that IFPI is unable to invoke its status
     as a professional association in the sense of Section 87
     § 1 of the Copyright Act since it is not representing
     (all) its members in the proceedings in question but is
     seeking to support and substantiate the individual
     interests of some of its members against other of its
     members.

     In so far as this argument proceeds from DURECO NEDERLAND
     this exception is factually incorrect since the latter
     party is not a member of IFPI (although it is of NVPI,
     the IFPI's sister organisation in the Netherlands).
     DURECO NEDERLAND and DURECO BELGIUM are evidently the one
     in the same when it suits them (in relation to the
     present exception) and to be distinguished when it suits
     them differently (see exception of irregular summonsing).
     Such an attitude is not easy to take seriously and
     creates suspicion.

     DURECO BELGIUM is certainly a member of IFPI.

     Among other things IFPI was set up in order to protect
     the professional and moral interests of its members and,
     more generally, of all those participating in the
     phonographic industry in Belgium. In furtherance of that
     goal it is authorised legally to contest any
     infringements of the rights and interests of its members
     and of the profession in general (cf. Article 3 of the
     statutes of the IFPI). The sale and distribution in
     Belgium of phonograms without the consent of the
     copyright-holders (authors, performing artists and
     producers) can constitute an infringement of the rights
     protected by Sections 35 and 39 of the Copyright Act. If
     the IFPI takes legal action against such infringements
     its action unquestionably comes within the formal objects
     of the association, namely the protection of the rights
     and interests - both patrimonial and moral - of its
     members. As a professional association it therefore in
     principle has the necessary interest to institute the
     action (see: RAES, S., "Het optreden in rechte van de
     Orde ter verdediging van het beroepsbelang", T.R.V.,

15

1988, p. 59 ff.; note under Cass. 19 May 1987).

Neither the law nor the statutes of the IFPI oblige the
latter to promote the interest of "all" its members. Nor
does the law or the statutes of the IFPI prohibit the
latter from instituting procedures against a member on
the grounds of an infringement. The professional
association can only take action in order to protect the
"lawful" interest of its members. If DURECO's stance were
to be adopted this would seriously complicate efforts to
combat infringements of copyright and related rights.
There is no conflict between the lawful interests of the
members of the IFPI and the alleged unlawful interests of
a single member.

IFPI has the necessary interests in this matter to
institute proceedings (its interest is not purely
theoretical).

4.   DURECO erroneously argues that an arbitration procedure
     should have been followed in this matter. This exception
     (in the absence of jurisdiction) is totally unfounded
     given the lack of any useful and binding legal source.

## CONCERNING THE ALLEGED LACK OF URGENCY

DURECO draws attention to the existence of "ordinary"
administration of justice "as in" interim injunction
proceedings, which would enable the dispute to be resolved in
good time. In other words DURECO considers that IFPI does not
have an "urgent interest" to seek protection in interim
injunction proceedings.

Since interim injunction procedures should retain their
exceptional nature, this proposition is "procedurally logical"
and also relevant in terms of judicial efficiency.

IFPI argues however that it is demanding the appointment of a
sequestrator in the interim injunction proceedings for the
recalled sound-recording mediums - a measure it would not be
able to demand if seeking an injunction in an ordinary court.

The appointment of a sequestrator constitutes a solely
custodial measure in anticipation of the basic decision. In
accordance with Section 87 § 2 of the Copyright Act the
handing over (to the plaintiff) of the imitation products and
those still in the possession of the defendant can be ordered.
It therefore appears superfluous to institute interim
injunction proceedings, in this case together with legal
proceedings along the lines of an interim injunction, solely
in order to order to enable the appointment of a sequestrator.
There is no valid urgency in this matter. The interim
injunction proceedings are unfounded.

16

**FOR THESE REASONS;**

We, BOON J., Judge appointed to replace the Chairman of the Court of the first instance in Brussels;

Assisted by Clerk of the Court MELIS E.;

Given the Act of 15 June 1935 concerning the use of languages in legal proceedings;

Delivering judgment on the interim injunction after full argument on both sides;

Rejecting all other or contrary decisions;

Grants GLOBAL ARTS PRODUCTIONS, INC. deed of its voluntary intervention.

Declare the interim injunction action as admissible but unfounded for lack of genuine urgency.

Declare the action to be held harmless consequently to be without substance.

Order the plaintiff to pay the costs, estimated for itself at 12,727 + 9,208 + 4,100 francs, for DURECO BELGIUM and DURECO NEDERLAND at 4,100 francs and for GLOBAL ARTS PRODUCTIONS at 4,100 francs.

Judgment handed down at the public interim injunction hearing on 31 December 1997.


[Signature]                              [Signature]
Melis E.                                 Boon J.

17

## COURT OF FIRST INSTANCE IN BRUSSELS

In public session of the interim injunction proceedings of 31 December 1997.

No. 97/10.661/A
of the roll

<u>Annexes</u>

1 summons
1 summons of intervention
1 partition for voluntary intervention
4 pleadings

Section 87 of Copyright Act - Interest of professional association - Related rights - Burden of proof - Range of the injunction

### IN THE CASE OF:

The <u>V.Z.W. IFPI BELGIUM BELGISCHE FONOGRAFISCHE INDUSTRIE,</u> having its seat at Almaplein, 3/5, 1200 Sint-Lambrechts-Woluwe (hereinafter abbreviated as IFPI).

PLAINTIFF

Represented by Mr. Benoît MICHAUX, solicitor (Tervurenlaan, 268 A, 1150 Brussels).

### AGAINST:

1.   <u>B.V.DURECO,</u> a company established under Dutch law, with its registered office at Pampuslaan, 45, 1382 Weesp, the Netherlands, H.R. Hilversum 26.275 (hereinafter abbreviated as "DURECO NEDERLAND")

DEFENDANT

2.   <u>N.V. DURECO BELGIUM,</u> a company established under Belgian law, with its registered office at Vleurgatsesteenweg, 213, 1050 Brussels, H.R.B. 426.117.

DEFENDANT IN ENFORCED INTERVENTION

Both represented by Mr. Joren DE WACHTER, solicitor (Vossendreef 6, 1180 Brussels - box 14).

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of **PLAINTIFFS'**

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO**

**DISMISS AND MOTIONS FOR A MORE DEFINITE STATEMENT; AND**

**DECLARATIONS OF MARCIO GONCALVES, MATTHEW J. OPPENHEIM,  JEAN-**

**MARIE JEAN-BAPTISTE AND JOSEPH H. LODGE IN SUPPORT THEREOF** was

served via facsimile and mail to David Seif, Esq., 2400 E. Commercial Blvd., Suite 723, Ft.

Lauderdale, FL 33308, this 2nd day of July 1998.

_____
Yakub Hazzard

0017382.1

# AFFIDAVIT OF
# DANNY JORDAN

I, Danny Jordan President of and on behalf of Global Arts Productions Inc., a California Company with representation in the United Kingdom, The States of Florida, New Jersey, New York and the Country of Canada, hereby make oath and say as follows:

1. The recording artists listed in schedule "A" have been given to Global Arts Productions Inc.. These artists are part of an enormous list of recording artists that was provided by the Major Record Labels.

2. From 1975 through 1984 various tax shelters were set up by California Corporations for investors looking for a certain kind of tax benefit; (example) Recording artists master tapes were pledged to the investor. A five to one ratio was promised to the investor. If a contribution of twenty thousand ($20,000) US dollars was made by the investor, he/she would be given world wide rights to a master tape of an artist. In addition he/she would be allowed a legal write-off against earned income of one hundred thousand ($100,000) US dollars. A twenty thousand ($20,000) note was made by the Corporation to the investor, however there was never a specific time given on the note to pay off the loan. In the aforementioned contracts the investor was granted the non-exclusive right to exploit the artists master recording. There was never a specific time frame for that exploitation to run out.

3. There were various third parties who were granted these non exclusive rights for exploitation, by the owners of the tax shelters. We have proof that product was manufactured, distributed and put into commerce. The major record labels had, under US law, seven years from the date of the products distribution, to challenge those releases, however they have failed to do so.

4. These tax shelters did in fact exist and I need not prove that they did. The burden of proof is on the Plaintiff to prove that they did not.(see attachment entitled "Burden of Proof"). As you review the attachment, give close attention to the statement "Except in cases of Tax Fraud".

5. It is a fact that various agents who represented these type of tax shelters were convicted for income tax evasion. These cases were directly associated with the contracts given for the master recordings. Not because the premise of the contract was fraudulent, but rather because the income that these people received was not reported to the Government of the US, and taxes were evaded. During the trials of those individuals, the major record labels were not present, and I ask the question, why not?

6. If the major record labels are in fact claiming they have a right to challenge my ownership, and can be allowed to utilize documents, contracts and affidavits from the United States, I ask what is the difference between theirs and ours? Does the IFPI only recognize documents from the major record labels and discount any other proof as meaningless?

7. It is my opinion that foreign Companies who have objected to the release of my products, have no legal jurisdiction as it relates to ownership and contracts emanating from the United States. The foreign courts do have a right to know the truth before they make a judgment. In the United States the term Judgment is used to denote the

**EXHIBIT**   **L**

*Ex 8*

THIS FORM WILL BE ACCEPTED FOR FILING ONLY IF IT IS TYPED
OR PRINTED "LEGIBLY" IN BLACK INK.

Mailing Address: (Not a newspaper)

Name: Danny Jordan

Address: 14715 Oxnard St.

City: Van Nuys, CA 91411

REGISTRAR - RECORDER / COUNTY CLERK'S BIG STAMP

**98   856773**

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA
4:01 PM MAY 20 1998

1  ( ✓ First Filing   [ ] Renewal Filing With Changes

FICTITIOUS BUSINESS NAME STATEMENT   FEE $10.   BF&R

THE FOLLOWING PERSON(S) IS (ARE) DOING BUSINESS AS: (Attach additional pages if required)

2  Fictitious Business Name(s)
1. JUST GREAT MUSIC
2.

3  Street Address & City of Principal place of Business in California (P.O. Box alone not acceptable)   Zip Code
15030 VENTURA BLVD SHERMAN OAKS CA 91405   S. 728   91403

4  Full Name of Registrant
DANNY JORDAN

Residence Street Address: 14715 OXNARD St   City: VAN NUYS   State: CA   Zip Code: 91411

5  This Business is conducted by: ( ✓ ) an individual

8  [signature] Danny Jordan   DANNY JORDAN — TYPE OR PRINT NAME

This statement was filed with the County Clerk of LOS ANGELES County on date indicated by file stamp above.

Ex 9

This is a true and certified copy of the record
if it bears the seal, imprinted in purple ink,
of the Registrar-Recorder/County Clerk

OCT 22 1998

REGISTRAR-RECORDER/COUNTY CLERK
LOS ANGELES COUNTY, CALIFORNIA

REGISTRAR-RECORDER/COUNTY CLERK ◆ COUNTY OF LOS ANGELES - CALIFORNIA ◆