RUSSELL J. FRACKMAN
YAKUB HAZZARD
MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
Los Angeles, CA 90064-1683
Telephone:  (310) 312-2000
Facsimile:  (310) 312-3100

KAREN L. STETSON
2350 Prairie Avenue
Miami, FL 33140
Telephone:  (305) 532-4845
Facsimile: (305) 604-0598

Attorneys for Plaintiffs

ORIGINAL

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| SONY MUSIC ENTERTAINMENT INC., a corporation; A & M RECORDS, INC., a corporation; BMG MUSIC, d/b/a THE RCA RECORD LABEL, a general partnership; CAPITOL RECORDS, INC., a corporation; ELEKTRA ENTERTAINMENT, a division of WARNER COMMUNICATIONS, INC., a corporation; MCA RECORDS, INC., a corporation; POLYGRAM RECORDS, INC., a corporation; and WARNER BROS. RECORDS INC., a corporation,<br><br>                    Plaintiffs,<br><br>          v.<br><br>GLOBAL ARTS PRODUCTIONS, an entity of unknown form; DANNY JORDAN, an individual; SATURN RECORDS, an entity of unknown form; STACK-O-HITS, an entity of unknown form; and JACK MILLMAN, an individual,<br><br>                    Defendants. | CASE NO. 98-6507-Civ-Middlebrooks<br><br>**PLAINTIFFS' APPLICATION FOR ENTRY OF DEFAULT JUDGMENT FOR DAMAGES AGAINST DEFENDANTS GLOBAL ARTS PRODUCTIONS AND DANNY JORDAN; AND**<br><br>**MEMORANDUM OF LAW** |

Mitchell Silberberg & Knupp LLP

0060098.1.2

**TABLE OF CONTENTS**

**PAGE(S)**

MEMORANDUM OF LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.   SUMMARY OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      A.    The Parties . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      B.    Defendants' Piracy Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

      C.    The Harm to Plaintiffs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

      D.    Defendants' Unlawful Proceeds . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

III.  PLAINTIFFS ARE ENTITLED TO THE DEFAULT JUDGMENT FOR
      DAMAGES   AGAINST GLOBAL ARTS AND JORDAN THEY SEEK . . . . . . . . . . . 15

      A.    Plaintiffs Are Entitled To Entry Of The Default Judgment They Seek . . . . . . . . . 15

      B.    Plaintiffs Are Entitled To The Maximum Statutory Damages For Each Of
            The 53 Copyrighted Recordings Identified In Their Complaint . . . . . . . . . . . . . . 16

      C.    Plaintiffs are Entitled to Damages Under State Law . . . . . . . . . . . . . . . . . . . . . 21

            1.    Compensatory Damages    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

            2.    Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

      D.    Plaintiffs Are Entitled To An Award Of Their Attorneys' Fees And Costs . . . . . 26

      E.    The Court May Issue A Final Judgment Against Global Arts and Jordan . . . . . . . 27

IV.   RELIEF SOUGHT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

V.    CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Mitchell Silberberg &
Knupp LLP

- i -

0060098.1.2

1         Plaintiffs Sony Music Entertainment Inc., A & M Records, Inc., BMG Music, d/b/a

2 The RCA Label, Capital Records, Inc., Elektra Entertainment, Warner Communications, Inc.,

3 MCA Records, Inc., PolyGram Records, Inc., and Warner Bros. Records Inc., by and through

4 undersigned counsel and pursuant to Rule 55(b)(2), respectfully request this Court's entry of

5 judgment for damages against Defendants Danny Jordan and Global Arts Productions and all other

6 fictitious entities (including Just Great Music) through which Defendant Jordan conducts his illegal

7 infringing activities.

8

9         As the Court is aware from previous motions, and as set forth herein, Defendants

10 Jordan and Global Arts Productions have been engaged in one of the most consummate cases of

11 persistent, willful copyright infringement.  Defendants' conduct warrants the imposition of the

12 highest permissible damages.  As such, Plaintiffs seek the <u>maximum</u> statutory damages under the

13 Copyright Act, compensatory and punitive damages under Florida law, attorneys' fees, and such

14 other relief as is more particularly described below and in the proposed judgment filed herewith.

15 In total, as described herein, Plaintiffs seek damages in the amount of $ 13.7 million.

16

17                   **MEMORANDUM OF LAW**

18

19 **I.**    **INTRODUCTION**

20

21         This Court previously ordered the answers of defendants Global Arts Productions

22 ("Global Arts") and Danny Jordan ("Jordan") stricken because they "have abused the discovery

23 process and have violated multiple orders and ignored this Court's warnings on multiple

24 occasions."  On January 14, 1999, the Court again observed that Jordan "has egregiously flouted

25 this Court's authority on numerous occasions," and granted Plaintiffs' Motion for Entry of a Partial

26 Default Judgment against Jordan and Global Arts providing for injunctive relief, declaratory relief,

27 notification to licensees, and delivery of infringing materials.  As the Court noted in the Temporary

28 Restraining Order issued on March 15, 1999, "the contumacious conduct of Defendants Global

Mitchell Silberberg &
Knupp LLP

- 2 -

0060098.1.2

1   Arts Productions and Danny Jordan is well-documented in this Court's previous Orders . . . ."

2   Defendants' "utter disregard for this Court's authority" now includes their continued disobedience

3   of the terms of the partial judgment.

4

5              At the time Plaintiffs moved for and the Court granted entry of a partial judgment,

6   Plaintiffs notified the Court they would move for an award of damages against Global Arts and

7   Jordan when all issues as to the other, non-defaulting Defendants were resolved. This action has

8   now been concluded as to those other Defendants. All that remains is the entry of a final award of

9   damages against Global Arts and Jordan. As set forth in this Memorandum, Plaintiffs now seek

10  such an award calculated upon the statutory measure of damages under the Copyright Act (17

11  U.S.C. § 504(c)), including damages based on Defendants' "willful" infringement. Defendants'

12  willful conduct has been established in previous motions filed with this Court and is further

13  described herein. Moreover, "willfulness" also is established by the entry of Defendants' default,

14  which admits the allegations of the complaint.

15

16             In addition, substantial damages are necessary to recompense Plaintiffs for the

17  severe harm caused by Defendants' unauthorized use of some of Plaintiffs' most valuable

18  recordings, and the attendant (undisclosed) profit realized by Defendants from the conduct of their

19  wholly unlawful business. A large award here is necessary to further the purposes of the Copyright

20  Act, including protecting intellectual property rights and, ultimately, the public interest, by alerting

21  those who commit commercial piracy that they cannot do so with impunity, ignore the judicial

22  system, and then treat any award simply as a cost of doing (unlawful) business. Indeed, as the

23  Supreme Court has recognized, that is the very reason the statutory damages provision of the

24  Copyright Act was promulgated: "The statutory rule, formulated after long experience, not merely

25  compels restitution of profit and reparation for injury, but also is designed to discourage wrongful

26  conduct." F.W. Woolworth Co. v. Contemporary Arts, Inc., 344 U.S. 228, 233 (1952).

27

28

Mitchell Silberberg &
Knupp LLP

- 3 -

## II.     SUMMARY OF FACTS[1]

### A.     The Parties

Collectively, Plaintiffs are the owners of the copyrights in various sound recordings (the "Copyrighted Recordings"). In addition, Plaintiffs have entered into various agreements by which they obtained the sole and exclusive right to manufacture, distribute, and sell recordings embodying musical performances of popular and renowned artists which initially were "fixed" prior to February 15, 1972 (the "Pre-1972 Recordings"), and therefore subject to protection under state common and statutory law.[2] Plaintiffs have never issued any licenses to or otherwise permitted any of the Defendants to manufacture, duplicate, distribute, or authorize others to manufacture, duplicate or distribute any of Plaintiffs' Copyrighted Recordings or Pre-1972 Recordings.

From their base, which at one time was located in Florida, Defendants Global Arts and Jordan engineered world-wide duplication and distribution of records that contain unauthorized copies of Plaintiffs' Copyrighted Recordings and Plaintiffs' Pre-1972 Recordings. Jordan previously falsely claimed that Global Arts was a "California company," and further claimed Global Arts had "representation in the United Kingdom, the states of Florida, New Jersey, New York, and the country of Canada." Jordan has used at least one other alias in the past and, in order to further conceal his activities, Jordan is now also conducting his unlawful business under at least one other fictitious name -- Just Great Music -- for which he has provided an apparently phoney address. Defendants' licensees are located throughout the world, and Defendant Jordan himself has now disappeared and is attempting to conceal himself.

---

[1]     All of the facts set forth herein are contained in the Declarations of Matthew J. Oppenheim, Bruce Resnikoff, Martin Olinick, and Lynn Haller filed herewith.

[2]     Plaintiffs' recordings "fixed" after February 15, 1972, are protected by federal copyright. 17 U.S.C. § 102(a)(7). Those recordings "fixed" prior to that date continue to be protected by state law. 17 U.S.C. § 301(c).

Mitchell Silberberg &
Knupp LLP

- 4 -

0060098 1 2

1    Prior to the institution of this action, when confronted with their infringing activity,

2   Defendants Global Arts and Jordan claimed rights to Plaintiffs' recordings through licenses from

3   the other Defendants -- Jack Millman and related entities.  Although Millman in the past has been

4   involved in unlawful tax shelter licensing of recordings, in discovery in this action Millman

5   categorically has denied ever issuing licenses to Global Arts or Jordan for <u>any</u> recordings, and no

6   such licenses have been produced.  None of the other Defendants is in default, and each has now

7   submitted to discovery, which does not support and often contradicts the position of Defendants

8   Global Arts and Jordan.  Plaintiffs have completed settlements with those other Defendants and

9   judgments have been entered as to them.

10

11        **B.**    **Defendants' Piracy Activities**

12    Defendants' business commonly and descriptively is referred to by the courts as

13   "record piracy."  <u>See</u>, <u>e.g.</u>, <u>A&M Records, Inc. v. Heilman</u>, 75 Cal. App. 3d 554, 560 n.4 (1977).

14   The record piracy engaged in by Defendants has long been recognized to violate both copyright,

15   <u>U.S. v. Dowling</u>, 473 U.S. 207, 211 n.4 (1985), and state law rights in sound recordings, <u>A&M</u>

16   <u>Records, Inc. v. M.V.C. Distributing Corp.</u>, 574 F.2d 312 (6th Cir. 1978).

17

18    Defendants Global Arts and Jordan operate their piracy business as follows:

19   Defendants first select and duplicate from the most popular and marketable of Plaintiffs' classic

20   recordings.  Among others, Defendants have copied and sold recordings featuring the performances

21   of such successful recording artists as:  Frank Sinatra, Harry Belafonte, Aretha Franklin, the Beach

22   Boys, Billy Joel, Bob Dylan, Chicago, Janis Joplin, Neil Diamond, The Who, and Simon and

23   Garfunkel.  Defendants' infringing recordings feature four of the very few recording artists

24   awarded the recently created Diamond Award of the Recording Industry Association of America,

25   Inc., signifying over *10 million* sales of a specific album.  Most of the other recording artists copied

26   by Defendants have been awarded numerous "Gold" and "Platinum" awards. *Forty-seven* of the

27   specific recordings subject to this lawsuit achieved sales of over one million recordings. *Forty-one*

28

Mitchell Silberberg &
Knupp LLP

- 5 -

0060098.1.2

1  recordings unlawfully licensed by defendants were *No. 1* on the Billboard record industry sales
2  charts, and many more were in the Top 10.

3

4    Global Arts and Jordan then sell their infringing copies together with bogus licenses
5  which purport to authorize others the *unlimited* right to manufacture, distribute, sell, and to export
6  the recordings.  Defendants also provide to their licensees fraudulent and forged documentation
7  purporting to support their claim of right.  The number of pirate recordings made and sold in this
8  manner are, by Defendants admission, "huge," and such recordings, bearing Global Arts name,
9  have been sold worldwide, including in and from Florida.  Even after the entry of the partial
10  judgment, Defendants not only continued but also expanded their infringing activities by licensing
11  one of Plaintiffs' recordings for use on a television show.

12

13    Generally, in return for the bogus licenses Defendants sell, they receive an advance
14  payment and additional royalties based on sales of the unauthorized recordings.  Thus, Defendants
15  are profiting immensely from the unauthorized copying and distribution of recordings for which
16  they have no rights.  Defendants are quite brazen in their conduct by requiring their licensees to
17  include on the packaging a reference to "Global Arts" (and in some instances, "Just Great Music")
18  as the licensor.

19

20    The Complaint alleges infringement of 137 specific sound recordings owned by
21  Plaintiffs -- 53 Copyrighted Recordings and 84 Pre-1972 Recordings.  (See Schedules A and B to
22  the Complaint and to the Order on Plaintiffs' Motion for Entry of Partial Default Judgment.)  Since
23  the filing of this action (and despite the refusal of Global Arts and Jordan to provide any
24  discovery), Plaintiffs have discovered almost 350 additional, different unauthorized recordings also
25  purportedly licensed by Global Arts and Jordan and being sold throughout the world, including the
26  United States.  Plaintiffs are continuing to investigate and discover additional recordings, even
27  after the entry of the partial judgment.  Thus, Defendants' compact discs discovered to date contain
28  unauthorized copies of almost 500 sound recordings owned by Plaintiffs and Plaintiffs' affiliates.

Mitchell Silberberg &
Knupp LLP

- 6 -

0060098.1.2

1 (See Schedules A-D to the Order on Plaintiffs' Motion for Entry of Partial Default Judgment.)

2 Given Defendants' default and disappearance, Plaintiffs did not seek to amend their Complaint to

3 specifically add the subsequently discovered infringements; however, they clearly are relevant and

4 illuminating as to Defendants' conduct and appropriate measure of damages.

5

6          Millions of compact discs containing unauthorized copies of Plaintiffs' recordings

7 purportedly licensed by Global Arts, Jordan, and/or Just Great Music, are being offered for sale and

8 sold all over the world.  Defendants and their licensees are responsible for the manufacture and

9 sale of these pirated CDs bearing the names of Global Arts, Jordan, and/or Just Great Music,

10 including sales in:  Argentina, Australia, Austria, Belgium, Brazil, Canada, Chile, the Czech

11 Republic, Denmark, Finland, Germany, Japan, the Netherlands, Poland, the Slovak Republic,

12 Spain, Sweden, Switzerland, the U.K., and the U.S.  In addition, Defendants have unsuccessfully

13 attempted to expand their business into Italy, Luxembourg, and South Africa, which refused to

14 permit the importation of their illicit product.

15

16          As a result of the surreptitious nature of the record piracy engaged in by Defendants,

17 their complete failure to provide any discovery, and their refusal to comply with this Court's orders

18 including the partial judgment, the unlawful conduct of Defendants thus far uncovered is likely to

19 be but a small part of their infringement.  Undoubtedly, there are numerous other countries in

20 which these pirated recordings are being sold.  Undoubtedly, too, there are numerous other of

21 Plaintiffs' sound recordings being infringed.  And, undoubtedly, there are far more bogus licenses

22 sold by Defendants than those presently known.

23

24     **C.     <u>The Harm to Plaintiffs</u>**

25          In order to begin to assess the enormous damage caused by Defendants' activities, it

26 is important to focus on their specific infringing conduct, as described in the Declarations of Bruce

27 Resnikoff, Martin Olinick, and Lynn Haller filed concurrently herewith:

28

Mitchell Silberberg &
Knupp LLP

0060098.1.2

1      Plaintiffs invest large sums to discover recording artists and to record, manufacture,

2   and promote and market recordings in a highly competitive environment.  Over a period of years, a

3   very small percentage of these artists (and their recordings) prove highly successful.  More so,

4   certain artists and recordings develop an identity and public recognition; they become part of the

5   goodwill of the record company and a highly valuable *and* continuing commercial asset.  The radio

6   stations that play "oldies," the sale of "catalog" recordings in reissues and compilations, and the

7   frequent use of "catalog" recordings in motion picture and television soundtracks and in

8   commercials is testimony to this continuing value.  As one article recently summarized:  "For the

9   music industry, the true power of hit albums is measured in years, not months.  Frank Sinatra, the

10  Beatles and Led Zeppelin may be gone, but their music still sells."  "Staying and Playing Power,"

11  Los Angeles Times, Part F, page 1 (April 3, 1999).  And, as another explained:  "The lesson:  Like

12  the attachments people develop, ... the music people use as the soundtrack to their lives tends to

13  stay constant.  And that means they'll keep buying it."  "Beat Goes On For Boomers Over-30

14  Crowd Making the Cash Register Ring," USA Today, page 1A (Nov. 17, 1998).

15

16      The financial impact is that the recordings appropriated by Defendants have great

17  value:  "'Older' or 'catalog' albums account for more than 30% of all sales in the $13.7 billion-a-

18  year record business..." (id); "Tower Records . . . thrives more on catalog sales than on new release

19  business. . . ." Id.  "The result is that even though the stars fade away (or die), their albums keep

20  selling."  USA Today, supra.  Such artists and recordings include, for example, Frank Sinatra (who

21  is identified with a large number of recordings); The Beach Boys (e.g., "Good Vibrations," "I Get

22  Around," "Surfin Safari"); Chuck Berry (e.g., "Johnny B. Goode," "Roll Over Beethoven"); The

23  Mamas and The Papas (e.g., "California Dreamin'"); Dionne Warwick ("That's What Friends Are

24  For"); Harry Belafonte ("This Land Is Your Land"); Perry Como ("Catch A Falling Star," "Hot

25  Diggity").  Each of these (and numerous others) was appropriated by Defendants.

26

27      These classic recordings are so important that Plaintiffs have created separate

28  divisions specifically to exploit these "catalog" recordings and to maximize their value.  Plaintiffs

Mitchell Silberberg &
Krupp LLP

- 8 -

0060098.1.2

1   conduct this business by, among other things, reissuing specific albums; issuing or licensing the

2   use of specific "tracks" (sound recordings) for compilation albums (including private label, mail

3   order, or promotional albums); and licensing the use of recordings for movies, television or

4   commercials.  In doing so, Plaintiffs carefully devise a strategic plan in order to control and limit

5   the nature and extent of the use of their "catalog" recordings and preserve and maximize their long-

6   term value.  Thus:

7

8         •      Plaintiffs plan their release schedules far in advance.  They determine the companies

9                to which they will license their recordings and assure the quality of the releases and

10               their public acceptability.  They do so by either manufacturing the recorded product

11               themselves (for their customers) or by providing technically satisfactory masters to

12               established companies for use in the manufacturing process.  Defendants do not do

13               so.

14

15        •      Plaintiffs approve the content of the product to be sold, including not only the

16               specific recordings licensed but the <u>other</u> recordings and artists to be "coupled" with

17               their own recordings, the packaging and art work, and any product or brand

18               associated with the recordings.  Plaintiffs frequently devise or approve the

19               advertising for their product.  Defendants do not do so.

20

21        •      Plaintiffs control the availability of their recordings by withholding or limiting use

22               of specific tracks.  Plaintiffs do not license the same recording for simultaneous use

23               in numerous competing recordings, Plaintiffs spread around and use the "best" or

24               most popular tracks in different compilations, rather than combined in one

25               compilation, and insure that a particular recording artist is not overexposed or

26               diluted.  Plaintiffs may time the release of their recordings, not only to space the use

27               of their recordings, but also to coincide with specific events that will maximize their

28

1    exposure and value (e.g., induction of a recording artist into the Rock & Roll Hall

2    of Fame; the anniversary date of a relevant event, etc.).

3

4    •    Plaintiffs also limit and determine the geographic territories in which to release their

5    recordings and the methods of distribution.  Defendants do not do so.

6

7    •    Finally, in planning and executing all of the foregoing, Plaintiffs often consult with

8    the recording artist involved or his or her representatives (sometimes they are

9    required do so contractually) before approving a use of that artist's recordings.

10    Defendants do not do so.

11

12    While the business of record pirates, such as Defendants, severely damages or

13    destroys the record companies' valuable assets and significant investment, at the same time, the

14    Defendants reap an enormous windfall for themselves.  As is usual in cases of piracy, Defendants

15    select the best, most popular or marketable of Plaintiffs' recordings, and do not pay royalties or

16    fees to the record company owners, the recording artists, songwriters, musicians, producers or

17    various union trust funds.[3]  Defendants also do not make the large expenditures necessary to

18    discover artists and record and market a "hit" record or bear the risk of the many recordings which

19    fail and lose money.  See generally Tape Industries Association of America v. Younger, 316 F.

20    Supp. 340, 343-44 (C.D. Cal. 1970).  Instead, Defendants simply steal the thunder of the record

21    companies' investment in the creation and public recognition of records and recording artists and

22    in their advertising and promotion, by selling recordings simultaneously and in competition with

23    the record companies' well-planned projects, frequently a lower price.  Such activities also destroy

24    the record companies' long-term strategic plans.

25

26    [3]    In 1971, when Congress first afforded federal copyright protection to sound

27    recordings, it did so expressly recognizing that "the pirating of records and tapes is not only
depriving legitimate manufacturers of substantial income, but of equal importance is denying

28    performing artists and musicians of royalties and contributions to pensions and welfare funds,
and federal and state governments are losing tax revenues."  H.R. Rep. No. 92-487, at 2 (1971).

Mitchell Silberberg &
Knupp LLP

0060098.1.2

1    Record pirates in other ways avoid the costs involved in selling recordings: they do

2  not use technically satisfactory masters, but instead use commercially available CDs -- simply

3  buying a CD from a record store and digitally reproducing it; they frequently use inferior packaging

4  and art work; they do not exercise quality control. Therefore, the illicit "profit" to record pirates is

5  substantial, because "[i]t is just at this point -- after the record company has invested enormous

6  sums on a high-quality album, produced a hit, and achieved wide market popularity -- that the

7  pirate swoops in to reap the benefits at little or no expense. M. Kravilovsky & S. Shemel, This

8  Business of Music, at 115 (7th ed. 1995). Pirate sales of recorded music are now estimated to be

9  worth over $5 billion per year on a worldwide basis. And frequently, as is apparently the case here,

10  those sales are not subject to substantiation because of a lack of business books and records. See

11  A&M Records, supra, 75 Cal. App. 3d at 570.

12

13    Record pirates additionally appropriate for themselves the record companies'

14  invaluable credit, goodwill, and association with recording artists and popular recordings. Instead

15  of credit to one of Plaintiffs which owns a recording, Defendants place their own names on the

16  pirated recordings sold to the public, falsely stating: "Licensed by Global Arts." In those cases

17  where recording artists are or were "exclusive" recording artists for a record company, Defendants'

18  conduct appropriates both the credit *and* the exclusivity.

19

20    Defendants also disrupt the Plaintiffs' valuable and sometimes delicate relationships

21  with their recording artists. These artists frequently have and exercise approval over the use of

22  their catalog, including the compilations, art work, type of use, association with a product or

23  service, and distribution method. When recording artists or their representatives see a pirated

24  recording for which they are not paid and which they did not approve, they may blame or at least

25  look to their record company to police and stop the unlawful product.

26

27    Finally, Defendants' activities are in direct competition with Plaintiffs. The

28  performances on the recordings they sell is *identical* to the performances on the recordings sold by

1   Plaintiffs (subject, of course, to quality control problems not apparent until after a consumer

2   purchases the record.)  Defendants' recordings are sold worldwide, just as Plaintiffs' recordings.

3   Defendants' products are imported into the United States to compete with Plaintiffs' recordings

4   domestically, as well as overseas.  The Defendants' unlawful products are not copies or re-

5   recordings -- they are mechanical duplications and appropriation of Plaintiffs' recordings, thus

6   making the conduct qualitatively different from and even more harmful than other types of

7   counterfeiting.

8

9          In sum, Defendants' piracy usurps Plaintiffs' exclusive control over the method and

10  means of exploitation of their unique and valuable intellectual property.  While Plaintiffs'

11  businesses depend on deciding and controlling when, where, how, and whether to exploit specific

12  recordings by specific artists, Defendants effectively nullify that ability by indiscriminately

13  permitting the wholesale and unlimited exploitation of the very same recordings, without any

14  controls by Plaintiffs, while appending their own names to Plaintiffs' product, and distributing it in

15  direct competition with Plaintiffs.  Their conduct cheats Plaintiffs, recording artists, and others

16  involved in the recording process, as well as the public.  Little wonder record piracy is subject to

17  federal felony prosecution (17 U.S.C. § 506), state criminal prosecution (Florida Statutes

18  § 812.014), and has been called "statutory theft" under Florida law.  CBS, Inc. v. Garrod, 622

19  F. Supp. 532, 536 (M.D. Fla. 1985), aff'd, 803 F.2d 1183 (11th Cir. 1986).

20

21     **D.**    **Defendants' Unlawful Proceeds**

22          As a starting point in assessing Defendants' illicit gains, it should be considered that

23  Plaintiffs themselves receive substantial minimum advances and continuing royalties to license

24  compilations of their sound recordings.  Fees to Plaintiffs for master use licenses for motion

25  pictures, television or commercials can reach hundreds of thousands of dollars.  From Defendants'

26  side, although they have hidden the magnitude of the proceeds they have appropriated by means of

27  their illegal activities, Plaintiffs have been able to uncover a number of the pieces of the puzzle

28  hinting at the size of Defendants' business.

1      •    Defendants' "permanent legal representative" in Europe has stated that Defendants

2            license "a huge number of sound recordings."

3      •    Global Arts vice-president and general counsel (calling Jordan as a witness at his

4            own West Virginia State Bar disciplinary proceeding) in describing Jordan's

5            reputation stated that people "have given [Jordan] millions of dollars."

6      •    Jordan himself testified in that disciplinary proceeding that he had personally been

7            involved in "thousands of licensing transactions," that he has been in the business

8            30 years, and that he issued 500 licenses in the course of a *single year*.

9      •    Defendants have *at least* 28 different licensees, sublicensees, and distributors, with

10          Defendants' unlawful product sold in at least 17 countries.

11     •    Defendants' licensees are selling millions of recordings, and Defendants are

12          receiving a royalty based on sales.

13     •    Jordan testified (again, at his lawyer's disciplinary proceedings) that the profit (at

14          wholesale) for a CD was almost $4.00.

15     •    Defendants receive as much as a $5,000 to $10,000 advance for a single album

16          license to one licensee.

17     •    As reflected in a memorandum from Defendants' agent to Jordan, Defendants

18          received payments of over $80,000 from just four licensees in one month --

19          *4 months after this lawsuit was filed.*

20     •    The total license fees paid by one licensee (Koch International) to Global Arts in

21          1997-1999 was $208,656; another licensee, Gruezi Schallatten AG ("Gruezi"), paid

22          Defendants over $200,000 in 1997-98.  Plaintiffs believe these amounts, substantial

23          as they are, are understated.

24     •    Gruezi admits to manufacturing over 300,000 copies of Global Arts' licensed

25          recordings in 1997/98.  A *single* manufacturing order from Gruezi amounted to

26          25,000 copies for each of four different CDs.

27     •    Another licensee,  Falcon Neue Medien GmbH in Germany, manufactured over

28          750,000 CD copies in Germany, including performances of such well-known

recording artists as Simon and Garfunkel, Neil Diamond, The Doors, Joe Cocker, ZZ Top, and The Who.

- Defendants limited bank records show receipt in just two bank accounts of over $660,000 from only a portion of their licensees in only about two years.  (Jordan apparently maintains other bank accounts in both the U.S. and overseas.)

- Defendant Millman  (for his tax shelter business) valued similar recordings by the same or comparable artists, including by the Beach Boys and Paul Simon, as worth millions of dollars.

Nor has Defendants' conduct abated since the Court's entry of the partial judgment:

- Defendants' unlawful product -- the very subject of this action -- continues to be offered for sale.  Defendants completely refused to obey this Court's order designed to end their unlawful business by requiring Defendants to turn over infringing materials and the means to make them, and to notify their licensees of this Court's previous judgment.  (See Order on Plaintiffs' Motion for Entry of Partial Default Judgment at 5, ¶ 2, and at 6, ¶ 3(d).)

- Plaintiffs have discovered yet additional infringements since the entry of partial judgment.  For example, Plaintiffs discovered after a raid on a distributor in the Netherlands that substantial product was still available for sale, and that no notice had been given as required by the Court's partial judgment.

- Defendants continue to receive substantial payments from their licensees.

- Instead, Defendants (through their attorney) notified their licensees (falsely) that the partial judgment was a nullity, did not notify them to cease selling infringing product, and caused those licensees, who had been cooperating with Plaintiffs, to cease such cooperation.

1     •     Defendant Jordan submitted to the Court (but did not serve on Plaintiffs) an

2     affidavit which the Court described as "incredulously asserting that [Defendants]

3     have none of Plaintiffs' recordings in their possession."

4     •     Plaintiffs were forced to obtain a Court order in the United States District Court for

5     the Central District of California sanctioning and compelling the alleged former

6     vice-president and general counsel of Global Arts to appear at his deposition, after

7     he refused to obey a subpoena. (At the deposition, he denied any meaningful

8     knowledge of Defendants' activities.)[4] The imposition of sanctions was appealed

9     by the deponent and the appeal subsequently was ordered dismissed by the Ninth

10     Circuit.

11     •     Finally, Defendants have taken steps to avoid a final judgment in this case, and may

12     have fled the country. Although Defendants remain in business, Jordan's location is

13     unknown, and he even has hidden his location from his counsel of record. And,

14     despite his affidavit filed with this Court, Defendants continue to refuse to provide a

15     single piece of information to Plaintiffs or to the Court.

16

17 **III.    PLAINTIFFS ARE ENTITLED TO THE DEFAULT JUDGMENT FOR DAMAGES**

18      **AGAINST GLOBAL ARTS AND JORDAN THEY SEEK**

19

20     **A.    Plaintiffs Are Entitled To Entry Of The Default Judgment They Seek**

21         Since Global Arts and Jordan have defaulted, the well-pleaded factual allegations in

22 the complaint are taken as true. <u>Nishimatsu Const. Co., Ltd. V. Houston Nat. Bank</u>, 515 F.2d

23 1200, 1206 (5th Cir. 1975) ("The defendant, by his default, admits plaintiff's well-pleaded

24 allegations of fact). "When a Court determines . . . that a defendant is in default, its liability to the

25 plaintiff is deemed established and the plaintiff is not required to establish his right to recover."

26 See <u>TeleVideo Systems, Inc. v. Heidenthal</u>, 826 F.2d 915, 917 (9th Cir. 1987) (upon default, the

27 _____

28     [4]    As noted, he currently is subject of a disciplinary proceeding by the West Virginia
Bar.

0060098.1.2

1 | factual allegations of the complaint will be taken as true); <u>Caribbean Produce Exchange v. Caribe</u>

2 | <u>Hydro-Trailer, Inc.</u>, 65 F.R.D. 46, 48 (D. P.R. 1974).  Thus, Plaintiffs' have established their

3 | entitlement to the relief against Global Arts and Jordan on all of the counts in the complaint,

4 | including the award of damages.[5]

5 |

6 | **B.**      **<u>Plaintiffs Are Entitled To The Maximum Statutory Damages For Each Of The</u>**

7 | **<u>53 Copyrighted Recordings Identified In Their Complaint</u>**

8 |      If ever a case justified the imposition of the maximum damages provided by statute,

9 | this is such a case.  Global Arts and Jordan have been on notice of Plaintiffs' intention to seek

10 | maximum statutory damages since the complaint in this action was filed and served.  Plaintiffs

11 | specifically alleged and requested maximum statutory damages for each of the 53 willful copyright

12 | infringements pleaded in the complaint.  (<u>See</u>, Complaint, ¶¶ 43, 50 and page 22:14-18).

13 |

14 |      Section 504(c) of the Copyright Act provides for a maximum statutory damages

15 | award of up to $100,000 per infringement in the event of a willful infringement:

16 |

17 |      "The copyright owner may elect, at any time before final

18 | judgment is rendered, to recover, instead of actual damages and

19 | profits, and award of statutory damages for all infringements

20 | involved in the action, . . . .

21 | . . . .

22 |

23 |

---

24 |      [5]      Since Defendants committed acts of infringement in the U.S. (<u>see</u> Complaint,

25 | ¶¶ 5, 29, 30), they are liable for all damages that ensued.  <u>See</u>, <u>e.g.</u>, <u>Fun-Damental Too, Ltd. v.</u>
<u>Gemmy Indus. Corp.</u>, 41 U.S.P.Q. 2d 1427, 1431 (S.D.N.Y. 1996) ("where an individual

26 | commits an act of infringement in the United States that permits further reproduction outside of
the United States -- such as when an individual makes unauthorized copies of copyrighted

27 | material and then sends them out of the country -- a court may assert jurisdiction over those
foreign acts and a plaintiff may recover damages for the foreign acts that took place

28 | extraterritorially."); <u>Abbez v. Edwin H. Morris, Inc.</u>, 548 F. Supp. 664, 667 (S.D.N.Y. 1982);
<u>Los Angeles News Serv. v. Reuters Television Int'l., Ltd.</u>, 149 F.3d 987 (9th Cir. 1998).

Mitchell Silberberg &
Knupp LLP

0060098.1.2

1           In a case where the copyright owner sustains the burden of

2           proving, and the court finds, that infringement was committed

3           willfully, the court in its discretion may increase the award of

4           statutory damages to a sum not more than $100,000."

5

6           "Willfulness" is defined as knowledge that the defendant's conduct constitutes

7 copyright infringement <u>or</u> reckless disregard of a copyright owner's rights.  4 M.&D. Nimmer, <u>On</u>

8 <u>Copyright</u> § 14.04[B][3] (1997).  Proof of actual knowledge is not required.  <u>Fitzgerald Publishing</u>

9 <u>Co. v. Baylor Publishing Co.</u>, 807 F.2d 1110, 1115 (2d Cir. 1986).  Defendants' conduct here

10 easily falls within the statutory definition.  Moreover, Global Arts' and Jordan's defaults, which

11 acknowledge as true the well-pleaded, factual allegations of the Complaint, also serve to admit the

12 fact that their infringement was willful (Complaint, ¶¶ 40, 43, 47, 50, 85).  <u>Fallaci v. New Gazette</u>

13 <u>Literary Corp.</u>, 568 F. Supp. 1172, 1173 (S.D.N.Y. 1983) ("We draw a further inference of

14 willfulness from the defendant's failure to appear and defend this action and [the complaint's]

15 demand for 'increased statutory damages applicable to willful infringers'").  <u>See</u> <u>Silverman v. CBS</u>

16 <u>Inc.</u>, 632 F. Supp. 1344, 1352 n.11 (S.D.N.Y. 1986) ("any determination of 'willfulness' . . . is an

17 issue of fact).  Therefore, Plaintiffs are entitled to increased statutory damages.  Such increased

18 damages are appropriate here to further one of the primary purposes for the inclusion of the

19 statutory damage provision in the Copyright Act -- to deter willful infringing conduct.  For that

20 reason, a plaintiff who elects statutory damages need not prove actual damages or losses, and the

21 Court is given broad discretion in awarding statutory damages.  <u>See, e.g.</u>, <u>Harris v. Emus Records</u>

22 <u>Corp.</u>, 734 F.2d 1329, 1335 (9th Cir. 1984).

23

24           Here, Defendants' entire business was built on infringement.  <u>See</u> <u>Superior Form</u>

25 <u>Builders, Inc. v. Chase Taxidermy Supply Co.</u>, 74 F.3d 488, 497 (4th Cir. 1996) (finding illegal

26 copying was a "course of business"; awarding maximum statutory damages).  Virtually all of the

27 factors considered by the courts in assessing willfulness support the imposition of maximum

28 statutory damages here.  These factors include:  **(1)** continued infringement with knowledge there

1  was a question as to ownership of rights involved, <u>Dolman v. Agee</u>, 157 F.3d 708, 715 (9th Cir.

2  1998); **(2)** the identical nature of the infringing product, <u>N.A.S. Import Corp. v. Chenson</u>

3  <u>Enterprises, Inc.</u>, 968 F.2d 250, 252-53 (2d Cir. 1992); **(3)** defendant's continued infringement

4  after notice, <u>Chi-Boy Music v. Charlie Club, Inc.</u>, 930 F.2d 1224, 1228-29 (7th Cir. 1991);

5  **(4)** surreptitious business practices, such as the failure to keep complete and accurate business

6  records, <u>see</u> <u>Superior Form Builders, Inc.</u>, 74 F.3d at 497 (using pseudonyms to conceal his

7  identity, defendant purchased authentic copyrighted works for purposes of copying); <u>Sony Music</u>

8  <u>Entertainment v. Cassette Productions, Inc.</u>, 41 U.S.P.Q.2d 1198 (D.N.J. 1996); <u>Microsoft Corp. v.</u>

9  <u>Grey Computer</u>, 910 F. Supp. 1077 (D. Md. 1995); **(5)** failure to provide discovery, <u>Bally Midway</u>

10 <u>Manufacturing v. American Postage Machine</u>, 1983 Copyright Law Dec. ¶ 26,601 (E.D.N.Y. 1983)

11 ("Gaps in [defendants'] business records and evasive response to discovery requests demonstrate

12 consciousness of wrongdoing"); **(6)** the defendant's sophistication and experience in the business,

13 <u>Fitzgerald Publishing Co.</u>, 807 F.2d at 1115, <u>CBS Inc. v. Casino Record Distributors of Florida,</u>

14 <u>Inc.</u>, 654 F. Supp. 677, 679 (S.D. Fla. 1987), <u>New Gazette Corp.</u>, <u>supra</u>, 568 F. Supp. at 1173;

15 **(7)** the profits made and expenses saved by the defendant and plaintiffs lost revenues, <u>N.A.S.</u>

16 <u>Import</u>, 968 F.2d at 252; **(8)** the defendants' cooperation in providing evidence concerning the

17 value of the infringing material, <u>Fitzgerald Publishing Co.</u>, 807 F.2d at 1117; **(9)** and the need for

18 deterrence, <u>Kenbrooke Fabrics, Inc. v. Holland Fabrics, Inc.</u>, 602 F. Supp. 151, 156 (S.D.N.Y.

19 1984) (awarding the maximum statutory amount because of the need to deter defendant from

20 continuing as "one of the 'bad boys' of the textile industry"), <u>Blendingwell Music, Inc. v. Moore-</u>

21 <u>Law, Inc.</u>, 612 F. Supp. 474, 486 (D. Del. 1985) ("[t]wo factors often considered by courts in

22 determining an amount of appropriate to vindicate the statutory policy are the award's deterrent

23 value and the wilful [sic] nature of the defendants' infringement."). As here, an inference of

24 willfulness also is justified if the defendant sells products "in a market rife with knock-offs."

25 <u>N.A.S. Import</u>, 968 F.2d at 253.

26

27        In similar situations, enhanced statutory damages for willfulness, such as those

28 sought by Plaintiffs here, may be and have been awarded as damages in default judgments entered

1  in copyright actions.  <u>Sony Music Entertainm</u>

2  million based upon award of maximum statu

3  copyrighted works infringed); <u>see</u> 10 Wright

4  at page 63 ("if defendant is not contesting th

5  for a sum certain or a sum that can be made

6  entered for that amount without any further h

7  <u>Records, Inc.</u>, 909 F.2d 1332 (9th Cir. 1990)

8  awarded on summary judgment).  <u>RSO Rcco</u>

9  (statutory damages of $1,450,000, based on

10  trial); <u>Superior Form Builders</u>, 74 F.3d at 49

11  damages for each willful infringement); Nati

12  F. Supp. 614, 653 (D. D.C. 1991) (awarding

13  totaling $2 million).[6]

15        The policy and rationale und

16  award of the maximum statutory damages fo

18  •    Defendants had actual notice

19       by this Court.  Nevertheless,

20       even after the judgment and i

21  •    Even months after institution

22       October 1998, sold an extens

23       extended the licensed territo

24  •    Defendants not only infringe

25       making exact mechanical du

28      [6] Damages for willful infringemen

in bankruptcy.  <u>See</u> <u>BMI v. Gabaldon</u>, 227 U

1    and Jordan were not even "garden variety" record piracy, but rather reflected a

2    systematic, coordinated, international syndication of piracy.

3    •    Global Arts and Jordan unlawfully have appropriated for their own use over 5

4    sound recordings owned by Plaintiffs.  The full extent of Defendants' worldw

5    piracy likely never will be known.  Even though Plaintiffs' damages here are l

6    upon the infringements alleged in the complaint, the existence of additional

7    infringements and widespread piracy support the largest permitted statutory d

8    award.

9    •    Global Arts and Jordan undoubtedly have obtained substantial, undisclosed p

10    from their lucrative, unlawful activities.

11    •    The very reason that Defendants' default was entered by the Court was their

12    steadfast refusal to provide the discovery that would have revealed the magni

13    their unlawful profits.

14    •    Global Arts and Jordan have reaped their profits without paying any royalties

15    Plaintiffs and by depriving the recording artists, whose recordings they have

16    and distributed, and the songwriters, musicians and others, of the benefits of

17    endeavors.

18    •    In the process of their activities, Defendants have further harmed Plaintiffs'

19    exploitation of their unique (and expensive and valuable) property by

20    misappropriating performances by some of the most well-known and popular

21    recording artists in American music.

22    •    The continued exploitation of their recordings by Plaintiffs is being significar

23    interfered with, and their potential value severely diminished, by Defendants

24    piratical activities which usurp Plaintiffs' exclusive right to determine when,

25    and how to exploit their unique intellectual property.

26    •    Defendants have not only copied Plaintiffs' recordings, but have arranged for

27    to be sold under the Global Arts name, thereby appropriating Plaintiffs' repu

28    and goodwill.

1    •    Defendants conducted their business in a false, fraudulent, and secreti

2         including claiming rights that did not exist, falsifying documents, and

3         statements to their licensees and to foreign courts.  Defendants refuse

4         documentation of their claimed rights to their own licensees and to on

5         foreign courts.

6    •    Defendants maintain foreign bank accounts to deposit some of the pro

7         infringing activities.

8    •    Defendants' overall conduct in the litigation evidences continuous co

9         Court and its process, including lying to the Court in an affidavit.

10   •    Defendants continue to accrue unpaid sanctions at the rate of $500 pe

11        Order on Plaintiffs' Motion for Entry of Partial Default Judgment, at

12        sanctions alone, which Plaintiffs suggest be replaced by the final dam

13        judgment, now amount to over $100,000.

14

15        Thus, Plaintiffs seek and respectfully suggest they are entitled to an a

16   $100,000 in statutory damages for each of the 53 Copyrighted Recordings willfully i

17   Global Arts and Jordan.[7]  This award will serve the several purposes of compensatin

18   and, equally important, deterring Defendants' future conduct as well as the conduct o

19   community of pirates.  It should and will deliver a needed message.

20

21   **C.    Plaintiffs are Entitled to Damages Under State Law**

22        As with the Copyrighted Recordings involved in this case, Plaintiffs

23   damages for Defendants' infringement of Plaintiffs' Pre-1972 Recordings in the tota

24   ─────────────────────

25        [7]    The House and the Senate very recently passed a bill to increase the
     maximum statutory damages limits, in recognition that the present amounts are too l
26   the proposed changes, maximum statutory damages for willful infringement would l
     to $150,000 per infringement (and to a minimum of $30,000 per infringement for wi
27   infringement).  See S.1257 (106th Congress, 1st Sess.).  Further, the proposed chang
     that even higher damages are justified where "the infringement is part of a repeated
28   practice of willful infringement," by authorizing damages of up to $250,000 for each
     infringement.  Id.

Mitchell Silberberg &
Knupp LLP
                                    - 21 -

0060098.1.2

1  $100,000 per recording, inclusive of both compensatory and punitive damages.  As more

2  particularly set forth below, Plaintiffs believe it is appropriate to award compensatory damages of

3  $25,000 per recording and punitive damages of $75,000 per recording.  However, notwithstanding

4  the amount of compensatory damages awarded by the Court, Plaintiffs request punitive damages

5  against Defendants in such amount so that the total awarded equals $100,000 for each unlawful

6  recording to punish Defendants for their willful conduct and to act as a deterrence in the future.

7

8              1.     **Compensatory Damages**

9              Defendants' misappropriation of Plaintiffs' Pre-1972 Recordings constitutes, among

10  other things, infringement of common law copyright, unfair competition, and conversion under

11  Florida law.  Garrod, supra, 622 F. Supp. at 532.   Although clearly Plaintiffs have been damaged

12  by this tortious conduct, Defendants have made it impossible to prove the full extent of those

13  damages by secreting themselves and  refusing to provide basic discovery to Plaintiffs -- despite

14  Court orders.   Without the Court-ordered discovery, Plaintiffs cannot know the number of all

15  licenses issued, all of the titles licensed, the scope of use purportedly granted, the geographic

16  territory of such use, or the time period of such licensed use.  Without this information, it is

17  virtually impossible for Plaintiffs to assess its total lost licensing fees or damages.  What is known,

18  however, is that Defendants licensed each of the 84 Pre-1972 Recordings at issue at least once (and

19  frequently multiple times) and that Plaintiffs receive licensing fees for their recordings that include

20  sizeable advances and continuing royalties on a per album basis.[8]

21

22              The failure to provide discovery and keep adequate books and records is not

23  uncommon among infringers, for obvious reasons.  Thus, anticipated lack of cooperation on the

24  infringer's part was one of the primary reasons behind the enactment of the Copyright Act's

25

26      [8]  It should be noted that the 84 Pre-1972 Recordings for which Plaintiffs seek
27  compensation by this Motion are only those titles included in the Complaint and clearly are just
    the tip of the iceberg of Defendants' infringing activity.  As noted, since the filing of this lawsuit,
28  Plaintiffs have become aware of hundreds of additional recordings unlawfully exploited by
    Defendants that were not included in the Complaint.

Mitchell Silberberg &
Knupp LLP

0060098.1.2

1   statutory damages provisions. <u>See</u>, <u>e.g.</u>, <u>Doehrer v. Caldwell</u>, 207 U.S.P.Q. 391 (N.D. Ill. 1980)

2   ("[T]he purpose of statutory damages . . . is to permit a wronged plaintiff to recover where there is

3   insufficient proof of actual damages or profits"). Plaintiffs submit that the Court properly should

4   look to the statutory damages provisions of the Copyright Act as guidance and, as set forth

5   hereafter, award a combined *total of* compensatory and punitive damages of $100,000 for each

6   pre-1972 Recording. Based on the information included in the declarations filed herewith,

7   Plaintiffs request, as the compensatory damages component, $25,000 per work for the theft of

8   Plaintiffs' Pre-1972 Recordings (or such other amount as the Court deems appropriate).

9

10         At least one Court in this District has utilized the statutory damages provisions of

11   the Copyright Act to measure by analogy compensatory damages against a repeat offender who,

12   like Defendants here, violated the terms of an injunction.

13

14              Where the behavior which violates the Court's Order

15              involves copyright infringement, the Court may impose

16              compensatory fines to be paid to the damaged party based upon the

17              statutory damages provisions of the Copyright Act, 17 U.S.C.

18              Section 504(c).

19

20   <u>The Walt Disney Co. v. Video 47, Inc.</u>, 972 F. Supp. 595, 603 (S.D. Fla. 1996).

21

22      The <u>Walt Disney</u> Court also noted that:

23

24             'An award of 'substantial damages, well in excess of appropriate

25             licensing fees,' is appropriate where the Defendant 'repeatedly

26             violates copyright laws despite actual knowledge of their licensing

27             requirements.'

28

1    Id., quoting Morley Music Co.. v. Café Continental, Inc., 777 F. Supp. 1579 (S.D. Fla. 1991).

2

3        In light of Defendants' failure to provide discovery necessary to precisely establish

4 compensatory damages, coupled with Defendants' repeated and continued infringing activities in

5 violation of this Court's Orders, the statutory damages provisions of the Copyright Act should

6 serve as a guide and compensatory damages should be awarded in the amount of $25,000 per work

7 for each of the Pre-1972 Recordings for the same reasons Plaintiffs seek maximum statutory

8 damages for each of the Copyrighted Recordings.

9

10       **2.**    **Punitive Damages**

11        Punitive damages are imposed to punish the wrongdoer <u>and</u> as a deterrent to others.

12 Newport v. Fact Concerts, Inc., 453 U.S. 247 (1981); Alamo Rent-A-Car, Inc. v. Mancusi, 632

13 So.2d 1352 (Fla. 1994).  They are particularly appropriate where, as here, private injuries partake

14 of public wrongs.  Arab Termite and Pest Control of Florida, Inc. v. Jenkins, 409 So.2d 1039 (Fla.

15 1982); Ingram v. Pettit, 340 So.2d 922 (Fla. 1976).  Punitive damages are appropriately assessed

16 where the defendant has defaulted, and regardless of the amount of compensatory damages.  See,

17 e.g., Fostock v. Lampasone, 711 So.2d 1154 (Fla. 4th DCA 1998); Ault v. Lohr, 538 So.2d 454

18 (Fla. 1989), Far Out Music, Inc. v. Jordan, 502 So.2d 523 (Fla. 3d DCA 1987).  The need for

19 punitive damages is all the more critical where, as here, it is apparent that Plaintiffs have suffered

20 substantial damages as the result of Defendants' conduct, yet Defendants are themselves the barrier

21 to Plaintiffs' proof of such damages.[9]

22

23        Plaintiffs have alleged conduct sufficiently culpable to warrant the imposition of

24 punitive damages.  Freeman v. Freeman, 447 So.2d 963 (Fla. 1st DCA 1984) (default constitutes an

25 admission as to all well-pleaded facts and acquiesces in relief specifically prayed for).  Plaintiffs

26

27 _____

28     [9]  Given Defendants' apparent lack of regard for fulfilling their legal obligations, the non-dischargeability of punitive damages in bankruptcy may prove vital to Plaintiffs' ability to ever obtain monetary relief in this case.

1    specifically have prayed for punitive damages and, in support thereof, have alleged that

2    Defendants' infringing conduct was willful and intentional with reckless indifference to the rights

3    of the Plaintiffs.  All of Defendants' conduct during the course of this litigation has proven the

4    intentional and willful nature of their infringing activities, including Defendants' continued sale of

5    bogus licenses after the initiation of this lawsuit and Defendants' refusal to abide by this Court's

6    orders and injunctions.

7

8           Numerous courts have awarded punitive damages based on state law claims for

9    record piracy.  In one such case, the Court observed, in language appropriate here:

10

11          "The evidence in this case shows a continuous and

12          intentional pattern of misappropriation of property owned by others.

13          It also shows contempt of court, hindered discovery, and an attempt

14          to evade the injunctions. . . .  Under these circumstances, a grant of

15          punitive damages is clearly proper."

16

17   A & M Records v. Heilman, 75 Cal. App. 3d 554, 570, 571 (1977) (citations omitted).  See also

18   Far Out Music, Inc. v. Jordan, 502 So.2d 523 (Fla. 3d DCA 1987); Gai Audio v. Columbia

19   Broadcasting Systems, Inc., 340 A.2d 736, 753-56 (Md. Ct. Spec. App. 1975); United Artists

20   Records, Inc. v. Eastern Tape Corp., 198 S.E.2d 452, 456 (N.C. App. 1973).

21

22          In determining the amount of punitive damages, courts generally consider a number

23   of factors, including: (1) the defendant's net worth; (2) the nature, extent, and enormity of the

24   wrong; (3) the defendant's degree of wantonness and culpability; and (4) all attending

25   circumstances.  Bankers Multiple Line Ins. Co. v. Farish, 464 So.2d 530, 533 (Fla. 1985); Rinaldi

26   v. Aaron, 314 So.2d 762, 763 (Fla. 1975).  With regard to Defendants' net worth, again,

27   Defendants have hampered Plaintiffs' ability to present evidence by failing to respond to discovery.

28   In a similar situation, the Third District Court of Appeal awarded punitive damages against a

Mitchell Silberberg &
Knupp LLP

- 25 -

1    record pirate where the defendant failed to comply with discovery orders.  See Far Out Music,

2    supra, at 523; see also Heilman, quoted above.  In this case, even without discovery from

3    Defendants, Plaintiffs have established that the profits Defendants received from their infringing

4    activities have been very substantial, likely running into the multi-millions by even a conservative

5    estimate.  With regard to the remainder of the factors to be considered, Plaintiffs have with this

6    Motion more than established Defendants' continued and persistent pattern of willful infringing

7    activities in reckless disregard for Plaintiffs' rights, both before and after this lawsuit was filed;

8    Defendants' utter contempt of numerous Court orders; and Defendants' persistent obfuscatory

9    tactics which have caused Plaintiffs to expend substantial time and money to prosecute this action.

10

11           Based on the totality of circumstances presented here, Plaintiffs submit that punitive

12   damages should be assessed against Defendants so that the ***total damages*** awarded for each Pre-

13   1972 Recording equals $100,000.  (Thus, if the Court awards compensatory damages of $25,000

14   for each Pre-1972 Recording, Plaintiffs request $75,000 per recording in punitive damages).

15   Without the assessment of punitive damages against Defendants, Plaintiffs believe that Defendants

16   (and others) will not be sufficiently discouraged from continuing their infringing activities in the

17   future.  See Richards v. Harrison, 262 So.2d 258 (Fla. 1st DCA 1972) (punitive damages especially

18   appropriate where the payment of compensatory damages only would not handicap the defendant

19   sufficiently to discourage conduct in the future).

20

21           **D.      Plaintiffs Are Entitled To An Award Of Their Attorneys' Fees And Costs**

22           Under 17 U.S.C. § 505, the Court may, in its discretion, include an award of

23   Plaintiff attorneys' fees and costs in a default judgment.  See, e.g., Sony Music Entertainment, 41

24   U.S.P.Q.2d at 1203 (including an award plaintiffs' attorneys' fees and costs in default judgment

25   against copyright infringer). The factors considered in determining whether to award attorneys'

26   fees include considerations of compensation and deterrence.  Fogerty v. Fantasy, Inc., 510 U.S. 517

27   (1994).  See McGauhy v. Twentieth Century Fox Television, 12 F.3d 62, 65 (5th Cir. 1995)

28   ("although attorneys' fees are awarded in the trial court's discretion [in copyright cases], they are

Mitchell Silberberg &
Knupp LLP

- 26 -

0060098.1.2

1   the rule rather than the exception and should be awarded routinely"; quoting <u>Micromanipulation</u>

2   <u>Co. v. Bough</u>, 779 F.2d 255, 259 (5th Cir. 1985)).  <u>Fantasy, Inc. v. Fogerty</u>, 94 F.3d 553 (9th Cir.

3   1996) (affirming attorneys' fees award of $1,347,519; blameworthiness and exceptional

4   circumstances are not a pre-requisite to an award of attorneys' fees).  An award of attorneys' fees

5   also is justified where, as here, Defendants "conducted the litigation in a manner calculated to

6   delay hearing or the merits and increase the costs of litigation.  <u>Synercom Technology, Inc. v.</u>

7   <u>University Computing Co.</u>, 462 F. Supp. 1003, 1015 (N.D. Tex. 1978).  Moreover, an award of

8   attorneys' fees and costs is particularly warranted where, as here, the defendants' infringement was

9   willful.  <u>Montgomery v. Noga</u>, 168 F.3d 1282, 1303 (11th Cir. 1999); <u>Cable/Home</u>

10   <u>Communication Corp. v. Network Productions, Inc.</u>, 902 F.2d 829, 853 (11th Cir. 1990).  Plaintiffs

11   request that the Court award attorneys' fees and permit Plaintiffs' counsel to submit the necessary

12   information to calculate the amount of the award.  <u>See Cable/Home Communication</u>, 902 F.2d at

13   853 n.37 (enumerating factors).

14

15      **E.      The Court May Issue A Final Judgment Against Global Arts and Jordan**

16          The Court already has entered the defaults and a partial default judgment against

17   Global Arts and Jordan.  Their liability is independent of any liability by the other Defendants.  <u>See</u>

18   <u>Hospital for Sick Children v. Melody Fare Dinner Theatre</u>, 516 F. Supp. 67, 72-73 (E.D. Va. 1980)

19   (increased statutory damages for willful infringement against one co-defendant).  Moreover, the

20   other Defendants no longer are in the action, making the entry of a final judgment appropriate.

21   <u>Gulf Coast Fans, Inc. v. Midwest Electronics Importers, Inc.</u>, 740 F.2d 1499, 1512 (11th Cir.

22   1984).

23

24   **IV.   RELIEF SOUGHT**

25

26          For the foregoing reasons, Plaintiffs request the entry of a judgment for damages

27   against Defendants Global Arts and Jordan (doing business under the fictitious names Global Arts,

28   Just Great Music or any other name), jointly and severally, as follows:

Mitchell Silberberg &
Knupp LLP

- 27 -

1    1.  That Global Arts and Jordan shall be liable to Plaintiffs, jointly and

2 severally, for the sum of $5.3 million representing statutory damages of $100,000 for each

3 infringement under 17 U.S.C. § 504(c) for their willful infringement of each of the 53 Copyrighted

4 Recordings listed and identified on Schedule A to the Complaint, or in such other amount as the

5 Court may deem appropriate.

6

7    2.  That Global Arts and Jordan shall be liable to Plaintiffs, jointly and

8 severally, in the sum of $2.1 million as compensatory damages, and $6.3 million as punitive

9 damages for common law copyright infringement, unfair competition, and conversion.

10

11    3.  That Plaintiffs recover their reasonable attorneys' fees herein, pursuant to 17

12 U.S.C. § 505.

13

14    4.  That Plaintiffs recover their costs of suit incurred herein.

15

16 **V.**  **CONCLUSION**

17

18    For all of the foregoing reasons, Plaintiffs respectfully request that the Court enter

19 the requested judgment.

20

21 DATED: October ⎸ , 1999    RUSSELL J. FRACKMAN

22             YAKUB HAZZARD
               MITCHELL SILBERBERG & KNUPP LLP

23                 and

24             KAREN L. STETSON

25

26             By: *Russell J. Frackman*

27               Russell J. Frackman
               Attorneys for Plaintiffs

28

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true and correct copy of the foregoing Plaintiffs'

Application for Entry of Default Judgment for Damages Against Defendants Global Arts

Productions and Danny Jordan and Supporting Declarations and Exhibits were mailed to Kevin

Barry McDermott, 17452 Irvine Blvd., Suite 200, Tustin, CA 92780 this 4th day of October, 1999.

Karen L. Stetson

**KAREN L. STETSON, ESQ., P.O. Box 2731, Miami Beach, Florida 33140**
**Telephone (305) 532-4845      Fax (305) 604-0598**