1  RUSSELL J. FRACKMAN
   YAKUB HAZZARD
2  MITCHELL SILBERBERG & KNUPP LLP
   11377 West Olympic Boulevard
3  Los Angeles, CA 90064-1683
   Telephone: (310) 312-2000
4  Facsimile: (310) 312-3100

5  KAREN L. STETSON
   2350 Prairie Avenue
6  Miami, FL 33140
   Telephone: (305) 532-4845
7  Facsimile: (305) 604-0598

8  Attorneys for Plaintiffs

9

**ORIGINAL**

99 OCT -4 PH 3: 55

10              UNITED STATES DISTRICT COURT

11              SOUTHERN DISTRICT OF FLORIDA

12

13  SONY MUSIC ENTERTAINMENT INC., a          CASE NO. 98-6507-Civ-Middlebrooks
    corporation; A & M RECORDS, INC., a
14  corporation; BMG MUSIC, d/b/a THE RCA
    RECORD LABEL, a general partnership;       **DECLARATION OF MATTHEW J.**
15  CAPITOL RECORDS, INC., a corporation;       **OPPENHEIM IN SUPPORT OF**
    ELEKTRA ENTERTAINMENT, a division of       **PLAINTIFFS' APPLICATION FOR**
16  WARNER COMMUNICATIONS, INC., a             **ENTRY OF DEFAULT JUDGMENT**
    corporation; MCA RECORDS, INC., a          **FOR DAMAGES AGAINST**
17  corporation; POLYGRAM RECORDS, INC.,       **DEFENDANTS GLOBAL ARTS**
    a corporation; and WARNER BROS.            **PRODUCTIONS AND DANNY JORDAN**
18  RECORDS INC., a corporation,

19                          Plaintiffs,

20          v.

21  GLOBAL ARTS PRODUCTIONS, an entity
    of unknown form; DANNY JORDAN, an
22  individual; SATURN RECORDS, an entity of
    unknown form; STACK-O-HITS, an entity of
23  unknown form; and JACK MILLMAN, an
    individual,
24
                            Defendants.
25

26

27

28

0161194.1

I, MATTHEW J. OPPENHEIM, declare:

1.      I am Vice President, Civil Litigation for the Recording Industry Association of America, Inc. ("RIAA"). I am an attorney and a member of the bars of Maryland and the District of Columbia. I have personal knowledge of the following facts, and if called as a witness, I could and would competently testify thereto.

2.      The RIAA is a not-for-profit trade association formed in 1952. The RIAA's members are record companies that, among other things, are the copyright proprietors of or owners of exclusive rights under copyright and common law in and to sound recordings of musical works that have been embodied in musical recordings lawfully made and distributed in the United States. The RIAA's member companies together create, manufacture or distribute over ninety percent of all legitimate sound recordings sold in the United States. Among its many other functions, the RIAA represents the collective interest of its membership before legislative, regulatory, and judicial bodies with respect to federal, state, and local proceedings affecting the entire record industry. The RIAA has also been responsible for the record industry's Gold, Platinum and Diamond Awards Program for certifying sales of sound recordings within the United States since 1958. One of the responsibilities of the RIAA is the commencement of civil proceedings on behalf of its member companies against those who unlawfully exploit and usurp the member companies' rights under copyright or common law.

3.      I was and am the attorney primarily responsible for overseeing the investigation of Danny Jordan ("Jordan"), Global Arts Productions ("Global Art"), Jack Millman, Stack-O-Hits and Saturn Records. I am also the attorney primarily responsible for supervising the instant litigation. I serve as the Plaintiffs' representative in this case.

4.      In the course of investigating the activities of Jordan and Global Arts, I have been active in coordinating the international aspects of the investigation. On a regular basis, I

1  speak, correspond, and meet with both international record companies and investigators at the

2  International Federation of the Phonographic Industry ("IFPI").  The IFPI is an international trade

3  association representing 1,300 record producers in 70 countries throughout the world.  Through our

4  coordination with the IFPI, we have discovered hundreds of additional infringements by Jordan

5  and Global Arts in numerous countries.  In connection with my investigative efforts with the IFPI ,

6  I have received numerous copies of bogus Global Arts licenses, correspondence between Global

7  Arts and various entities, decisions from European Courts involving litigation against Global Arts'

8  and Jordan's licensees, and other documents concerning the activities of Global Arts, Jordan, and

9  Just Great Music (the new name under which Jordan conducts his illicit business).  I have also

10 attended all of the depositions taken in this action and reviewed virtually all of the documents

11 produced in the action (by witnesses other than Jordan and Global Arts).

12

13          5.       I am providing this Declaration to summarize the results of the investigation

14 of Jordan and Global Arts and describe factual matters of which I have become aware.  I am not

15 waiving attorney/client privilege or work product.

16

17          6.       In late 1997, the RIAA began investigating Jordan and Global Arts to

18 determine whether, and to what extent, they were engaging in record piracy.  In particular, the

19 RIAA had information that Jordan and Global Arts were issuing bogus licenses to third-parties and

20 providing recordings to them to enable them to manufacture and distribute popular and valuable

21 recordings owned by RIAA members.  At the time, through its investigative efforts, the RIAA was

22 in possession of unauthorized compact discs containing its members recordings which had been

23 manufactured and distributed by third-parties who lacked the rights to do so.  Those compact discs

24 contain the by-lines :  "Licensed by Global Arts Productions" or "Courtesy of Global Arts

25 Productions."

26

27          7.       As set forth in greater detail in my declaration filed on July 2, 1998, in

28 support of Plaintiffs' Opposition to Defendants' Motions to Dismiss, prior to commencing the

1  instant action, I spoke with Jordan in an attempt to resolve this matter short of litigation.  During

2  our conversations, Jordan told me that he acquires rights to the recordings he licenses through

3  "bills of sales" from defendant Jack Millman ("Millman"), and pays Millman monthly for the

4  rights.[1]  Jordan further told me that he and Millman have all of the documents necessary to prove

5  his right to copy and distribute these recordings.  Although Jordan offered to meet with me and

6  show me this documentation, he subsequently canceled our meeting.  Thereafter, I was advised by

7  one of Jordan's attorneys that Jordan refused to meet with the RIAA to provide the "proof"

8  supporting his purported rights in and to the recordings he was exploiting.  Only then was this

9  lawsuit filed.  Schedules A (Copyrighted Recordings) and B (Pre-1972 Recordings) to the

10  Complaint listed the recordings infringed by Jordan and Global Arts of which we were aware at

11  that time.

12

13          (a)     The Magnitude of Jordan's and Global Arts' Unlawful Business.

14

15          8.      After the lawsuit was filed, through the RIAA and IFPI investigation and

16  despite not receiving any discovery in this action from Global Arts and Jordan, we discovered

17  hundreds of additional recordings being infringed by Global Arts and Jordan.  Among the

18  additional recordings we have discovered to date that are owned by Plaintiffs or their affiliated

19  companies are those listed on Schedules C and D attached to the default judgment entered in this

20  action.  (Schedule C is comprised of Copyrighted Recordings and Schedule D is comprised of Pre-

21  1972 Recordings.)  Even these Schedules are not complete, and I anticipate that we will continue

22  to discover recordings unlawfully licensed by Jordan, Global Arts, and Just Great Music.

23          9.      Defendants' unlawful exploitation of these recordings has been extremely

24  widespread.  Among the countries where we have discovered the Global Arts and Just Great Music

25

26          [1]     Jordan's claim is false.  Attached hereto as Exhibit 1 is copy of Millman's

27  Responses to Plaintiffs' First Set of Requests for Admissions.  In his responses to request for
   admissions Nos. 5 and 6, and in his deposition, Millman categorically denied ever issuing

28  licenses to Global Arts or Jordan for any recordings.  And, of course, Jordan has never provided
   any such licenses.

1   recordings are: Argentina, Australia, Austria, Belgium, Brazil, Canada, Czech Republic, Denmark,

2   Germany, Holland, Poland, Slovak Republic, South America, Spain, Sweden, Switzerland, the

3   U.K., and the U.S.   Jordan told us the he licensed product into Japan, though we have not been

4   able to obtain additional evidence of this beyond Jordan's statements.

5

6          10.    We are also aware that attempts have been made to import Jordan's licensed

7   recordings into Luxemburg, Italy, and South America.  Fortunately, these recordings were caught

8   at the border and denied entry.

9

10          11.    Since the commencement of this action and as recently as the past couple of

11   months, we have discovered numerous licenses and licensees of Global Arts and Just Great Music.

12   Attached hereto as Exhibit 2 is a copy of a purported license issued by Global Arts to one its

13   licensees.  Exhibit 2 is typical of the licenses issued by Jordan, Global Arts, and/or Just Great

14   Music which require the licensees to pay an advance payment and additional royalties based on

15   sales of the unauthorized product, and require the licensees to include on the packaging a reference

16   to "Global Arts" (and in some instances, "Just Great Music") as the licensor.  Attached hereto as

17   Exhibit 3 is a list of the purported licenses issued by Jordan, Global Arts, and/or Just Great Music

18   which we have discovered through our investigation.  Many of the licensees issued by Jordan

19   purport to provide the licensees with the right to manufacture and distribute recordings into the

20   future, and in some cases through the year 2002.  Attached hereto as Exhibit 4 is a list of the

21   twenty-eight (28) Global Arts and Just Great Music licensees and sub-licensees of which we are

22   currently aware, along with the source from which we learned of each licensee (e.g., license

23   agreement, compact disc, bank records, etc.).  We anticipate that we will learn of even more

24   licensees of Global Arts and Just Great Music as time passes.

25

26          12.    By defendants' own admission, the number of Plaintiffs' recordings being

27   unlawfully exploited by Global Arts and Jordan is "huge."  Attached hereto as Exhibit 5 is a copy

28   of a September 29, 1997, letter from Dr. Kukik to Mechanical-Copyright Protection Society Ltd

("MCPS") (in London).  In the letter, Dr. Kukik identifies himself as the "permanent legal representative of Global Arts Productions of Florida."  Dr. Kukik further explains that Global Arts is "licensee of a <u>huge</u> number of sound recordings which he grants by way of sublicensees to customers in Europe."

13.     Our own investigation has confirmed that the numerous licensees of Global Arts and Just Great Music have taken full advantage of the bogus licenses they have acquired from Jordan and Global Arts.  So far, millions of illicit compact discs have been located in Europe alone. Attached hereto as Exhibit 6 are copies of documents I received from the IFPI concerning the manufacturing of Global Arts' licensed recordings by one of its German licensees, Falcon.  The documents indicate that this one licensee, Falcon, manufactured over 750,000 CD copies in Germany.  This is but one manufacturer for one Global Arts licensee.

14.     Attached hereto as Exhibit 7 is a copy of a document I received from the IFPI showing the number of Global Arts licenced CDs manufactured by the licensee, Gruezi Schallplatten AG ("Gruezi").  According to Exhibit 7, in 1997/1998, Gruezi manufactured over 300,000 copies of Global Arts' licensed recordings.  We have also been informed of a single manufacturing order from Gruezi for the production of 25,000 CDs each of recordings of The Doors, Kool and the Gang, Simon & Garfunkel and Cat Stevens (all of whom have recordings identified in Schedule A and B of the Complaint).

15.     The bogus licenses of Jordan and Global Arts often provide for "export" rights.  We have discovered that the Global Arts' licensees often do distribute both in their own countries and in others.  For example, we are aware that Gruezi in Switzerland has been exporting its product into Brazil and the Netherlands.  Another licensee, Snake's Music in Poland, has been exporting in to the Czech Republic.  Similarly, Elam Music in Denmark has been exporting into Sweden.  When licensees export the illicit product, it makes it even more difficult to track down and stop the distribution.

1    16.    Jordan's and Global Arts' licensing of Plaintiffs' recordings has expanded

2  into television and radio licensing.  For example, a copy of another bogus license which Global

3  Arts apparently issued to use certain Dean Martin recordings is attached as hereto as Exhibit 8.

4  This license differs from other licenses Global Arts has issued in the past in that it is for television

5  and radio broadcast.  Dean Martin recordings purportedly licensed are among recordings originally

6  included in the Complaint in this action.  The license was, according to the document, issued on

7  November 19, 1998.  This is substantially after the filing of the Complaint in this action, on

8  May 18, 1998, and after this Court entered the Defaults of Jordan and Global Arts on October 14,

9  1998.

10

11    (b)    Jordan and Global Arts Steal our Member Companies' Valuable Recordings.

12

13    17.    Not surprisingly, Jordan and Global Arts select to infringe some of the most

14  popular and enduring recordings by the most successful recording artists of all time.  As mentioned

15  above, since 1958, the RIAA has been the official certification agency for Gold, Platinum, Multi-

16  Platinum, and Diamond sales awards.  Typically album sales are easier to track than sales of

17  individual sound recordings or "singles."  As a result, RIAA certified sales awards for singles

18  represent significant and unique achievements, and have only been awarded to a select few artists.

19  Currently, Gold certification is awarded when a single achieves sales of 500,000 or more.  Prior to

20  1989, singles were required to achieve sales of 1 million units to qualify for Gold certification.

21  Sales of 1 million or more singles now qualify for Platinum certification.  ***Of the recordings being***

22  ***unlawfully exploited by Global Arts and Jordan, 47 of them have achieved sales of over 1***

23  ***million units, and therefore have been certified Gold under the pre-1989 criteria or Platinum***

24  ***under the current standards.***

25    18.    Recently, the RIAA established a new certification, the Diamond Award, for

26  artists who sell over 10 million units of a specific album.  Since its creation, only a handful of

27  artists have received Diamond Awards.  Recordings by four Diamond Award winners -- ZZ Top,

28

1  Bob Marley & The Wailers, Kenny Rogers, and Billy Joel -- are being unlawfully infringed by

2  Jordan and Global Arts.

3

4          19.     The RIAA also tracks "chart" ratings for recordings published in various

5  recording industry publications, including Billboard Magazine. ***Global Arts and Jordan have***

6  ***issued bogus licenses for 41 recordings which have held <u>the number one</u> sales spot on the***

7  ***Billboard singles chart.***

8

9          20.     Attached hereto are annotated copies of  Schedules A through D identifying

10 those recordings being unlawfully infringed by Jordan and Global Arts which have achieved sales

11 of at least 1 million units, and therefore have been certified either Platinum under the current

12 criteria or Gold under the pre-1989 standards.  The annotated Schedules also contain the peak

13 positions that the recordings achieved on the Billboard Magazine singles charts.  Below are a few

14 of the highlights regarding the success of the artists and/or recordings identified on Schedules A

15 through D.

16

17       **<u>Schedule A</u>**

18            *    Schedule A contains six Gold certified singles and two Billboard

19                 number one singles by Barry White.  Barry White is among the top

20                 10 solo male performers who have received Gold single awards.

21            *    Joe Crocker's "Up Where We Belong" was number one on the

22                 Billboard charts and one of the first singles from a movie soundtrack

23                 to achieve Platinum certification.

24            *    Linda Ronstadt's "Blue Bayou" was certified Platinum.  Linda

25                 Ronstadt has also received 17 Gold singles awards.

26            *    Kool & The Gang is among the top five of groups with the most

27                 "certified" singles.  Schedule A includes six  Gold certified singles

28                 by Kool & The Gang.

1          *    Two singles by ZZ Top, "Gimme All Your Lovin'" and "Legs,"are

2             from ZZ Top's Diamond Award-winning album "<u>Eliminator</u>."

3

4    **Schedule B**

5          *    Neil Diamond has received the second-most Gold singles certified

6             by the RIAA (only Elvis Presley received more).

7          *    Perry Como's "Catch a Falling Star" is the very first single ever

8             certified Gold by the RIAA.

9          *    Schedule B includes numerous recordings by Simon & Garfunkel,

10            one of the top-selling duets in recording history, and contains three

11            of their Gold-certified singles, "Bridge Over Troubled Water,"

12            "Cecilia ," and "Sounds of Silence."

13

14    **Schedule C**

15          *    Dionne Warwick & Friends' "That's What Friends Are For" is one

16            of the first charity singles ever to sell over 1 million units.  The

17            single was distributed to raise money for AIDS research.

18          *    Schedule C includes numerous singles by Bob Marley & The

19            Wailers from the Diamond Award-winning "<u>Legend</u>" album.

20          *    The Mamas & The Papas' single "Monday, Monday" achieved Gold

21            certification.

22

23

24

25

26

27

28

**Schedule D**

\* Aretha Franklin is among the top three female solo artists with 15 Gold singles, including two, "Chain Of Fools" and "I Say A Little Prayer," identified on Schedule D.

\* The Beach Boys are among the top 10 groups with the most gold singles. "Good Vibrations," "Help Me Rhonda," "Sloop John B," and "I Get Around" were all certified as Gold singles.

\* Frank Sinatra is widely considered one of the greatest recording artists of all time. Eight of his Gold singles appear on Schedule D.

\* Kenny Rogers is one of the few Diamond Award winners. His single, "Ruby Don't Take Your Love To Town," is from Kenny Rogers' Diamond Award-winning Greatest Hits collection.

\* Billy Joel is also a Diamond Award recipient, whose U.S. cumulative sales for certified albums exceed 61.1 million units.

(c)    Jordan and Global Arts Engage in Fraudulent Business Practices.

21.    Not only have Jordan and Global Arts systematically appropriated our member companies' valuable assets, we have discovered that Jordan has done so by engaging in business practices designed both to secrete himself and continue his piracy. Jordan has conducted business under an alias in connection with transactions involving sound recordings. At his deposition, Millman testified that years ago, Jordan used another name, Jerry Florio, in a business transaction involving recordings. Despite their relationship, Millman further testified that he did not know of Jordan's location when he was last contacted by Jordan over one year ago. Attached hereto as Exhibit 9 are excerpts from the transcript of Millman's deposition taken in this action, and which I attended. Similarly, Liebowitz, the principal of defendant Saturn Records, testified that he did not know of Jordan's whereabouts, even though he had been a friend of Jordan's for many years, and Jordan is an agent of Saturn Records. When asked if he knew where Jordan lives,

1   Liebowitz responded: "No.  He's always -- he travels so much, I never knew where he's going to

2   call from."  Attached hereto as Exhibit 10 are excerpts from the transcript of Liebowitz's

3   deposition taken in this action, which I attended.

4

5           22.     We also learned that Jordan has changed the fictitious name under which he

6   does business from Global Arts to Just Great Music because Jordan's name had become "too

7   associated with Global Arts" - not a phenomenon that most legitimate businessmen would fear.

8   See, Declaration of Marcio Goncalves filed on July 2, 1998 in Opposition to Defendants' Motions

9   to Dismiss.  Attached hereto as Exhibit 11 is a copy of the Fictitious Business Name Statement

10  filed by Jordan with the California Secretary of State indicating that Jordan is doing business under

11  the name "Just Great Music."  Neither Jordan nor a business by the name of "Just Great Music" is

12  located at the address identified in the Fictitious Business Name Statement.

13

14          23.     Jordan has attempted to conceal himself a number of times, even during the

15  pendency of this action.  Although Jordan was a resident of Florida when this action was

16  commenced, in his motion to dismiss filed June 18, 1998, Jordan claimed to be a resident of

17  California.  Shortly thereafter, we were advised by David Seif, Jordan's first attorney of record in

18  this action, that Jordan had moved to Atlanta, Georgia.  Mr. Seif also advised us at that time that

19  Jordan had refused to give him, his own lawyer, a forwarding address in Atlanta.  Thereafter,

20  Mr. Seif informed us periodically that he was having difficulty in communicating with Jordan.

21  Jordan's current counsel of record, Kevin Barry McDermott, is also unaware of Jordan's

22  whereabouts.  Attached hereto as Exhibit 12 is a copy of a March 30, 1999, letter from

23  Mr. McDermott wherein he states that he has "lost all contact with Mr. Jordan."  We also

24  discovered, based upon bank records and his testimony in West Virginia State Bar proceedings

25  involving Richard Perlman (described below), that Jordan may have moved to Las Vegas.  We

26  have also been advised by Peter Baumgartner, a principal of Gruezi, one of Global Arts' licensees,

27

28

1    that Jordan has moved outside the United States to Toronto, Canada; however, we have never been

2    able to determine where Jordan actually now resides.[2]

3

4          24.     Notwithstanding his seclusion, Jordan has continued to misrepresent to their

5    licensees that they lawfully acquired rights in the recordings at issue through various tax shelters.

6    Attached hereto as Exhibit 13 is a memorandum sent Hans Ballo to one of Global Arts' licensees,

7    Snake's Music, attaching a six-page narrative concerning the use of master recordings in tax

8    shelter schemes.  In the narrative, Ballo attempts to create the false impression that the tax shelter

9    schemes through which Jordan and Global Arts purportedly acquired their rights were lawful and

10    sufficient to convey to Jordan and Global Arts (or their purported licensors) rights in the recordings

11    being licensed by Jordan and Global Arts.

12

13          25.     Similarly, Shelly Liebowitz, the principal of defendant Saturn Records,

14    testified at his deposition that contrary to Jordan's contention, Saturn Records never issued licenses

15    to Global Arts or Jordan for any recordings at issue in this action.  Liebowitz also testified that a

16    Global Arts representative in Europe falsified a document that Liebowitz prepared in a fraudulent

17    attempt to show that Liebowitz had licensed to Global Arts recordings which he never claimed the

18    right to license and never had licensed. (See Exhibit 10.)  And, Richard Perlman, at one time

19    identified as a Vice President of Global Arts, testified that Jordan amended his own name to, and

20    misrepresented, a document Perlman had prepared for another purpose, and has continuously

21    misrepresented Perlman's relationship with Jordan and Global Arts.

22

23          26.     Moreover, we have been advised that now rather than comply with this

24    Court's order to advise his licensees to cease their unlawful activity, Jordan has instead offered to

25

26       [2]      Interestingly, Mr. Baumgartner admitted that when he became concerned about a

judgment entered in Europe against one of Gruezi's distributors, his reaction was to form a sham

27    corporation in London to hide their activity in much the same fashion as Jordan's apparent

reaction to Plaintiffs' Complaint herein. The formation of Gruezi's sham corporation occurred

28    with Jordan's knowledge and consent.

1    provide legal services to Global Arts licensees to defend against European actions brought against

2    those licensees. Jordan himself submitted false affidavits in those European actions. For instance,

3    attached hereto as Exhibit 14 is an Affidavit of Danny Jordan himself submitted in litigation in

4    Europe which I received in connection with our investigation. The attachments referenced in the

5    Affidavit were never produced for the plaintiff or the Court in the European Action. In the

6    Affidavit, Jordan falsely claims that Global Arts is a "California company," and that Global Arts

7    has "representation in the United Kingdom, the States of Florida, New Jersey, New York and the

8    Country of Canada."

9

10          27.     Despite interjecting themselves in European action involving their licensees,

11   in those actions Jordan and Global Arts refused to produce any documentation evidencing their

12   rights in the recordings they license.   Attached hereto as Exhibit 15 is a translated copy of the

13   decision of the Belgian Court in a case brought against Dureco, another Global Arts' licensee. As

14   indicated in the Court's decision, Global Arts voluntarily intervened in that action. The Belgian

15   Court ruled against Dureco and noted at page 5 of the decision that Global Arts and its licensee

16   "have been unable to produce proper documentation concerning the right to produce the relevant

17   material, let alone furnishing any evidence to indicate consent of the producer or performing

18   artist. . . ."

19

20          28.     Global Arts' and Jordan's other licensees have had similar experiences. On

21   August 25, 1998, I attended the deposition of Rob Ebbers, Senior Product Manger of Dureco, one

22   of Global Arts' licensees. Attached hereto as Exhibit 16 are excerpts from Mr. Ebbers deposition

23   transcript. Mr. Ebbers testified that after Dureco's rights to recordings it licensed from Global Arts

24   and Jordan were questioned, Global Arts and Jordan failed and refused to supply Dureco with any

25   documentation supporting their claimed rights in several of the recordings.

26

27          29.     Nevertheless, Jordan and Global Arts not only have continued their unlawful

28   conduct, they have falsely advised their licensees that they are prevailing in this action and that the

uncovered. Unfortunately, we all know that we only know of a small piece of it. Based upon my experience, the only effective way record pirates can be deterred is by a strong message by the courts in actions such as this one.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this first day of October, 1999, at Washington, D.C.

MATTHEW J. OPPENHEIM

1 | RUSSELL J. FRACKMAN
YAKUB HAZZARD
2 | MITCHELL SILBERBERG & KNUPP LLP
11377 West Olympic Boulevard
3 | Los Angeles. CA 90064-1683
Telephone:  (310) 312-2000
4 | Facsimile:  (310) 312-3100

5 | KAREN L. STETSON
2350 Prairie Avenue
6 | Miami, FL 33140
Telephone:  (305) 532-4845
7 | Facsimile:  (305) 604-0598

8 | Attorneys for Plaintiffs

**RECEIVED**

**SEP 29 1998**

Mitchell. Silberberg & Knupp

9 |                UNITED STATES DISTRICT COURT

10 |               SOUTHERN DISTRICT OF FLORIDA

11 |

12 | SONY MUSIC ENTERTAINMENT INC., a
corporation; A & M RECORDS, INC., a
13 | corporation; BMG MUSIC, d/b/a THE RCA
RECORD LABEL, a general partnership;
14 | CAPITOL RECORDS, INC., a corporation;
ELEKTRA ENTERTAINMENT, a division of
15 | WARNER COMMUNICATIONS, INC., a
corporation; MCA RECORDS, INC., a
16 | corporation; POLYGRAM RECORDS, INC.,
a corporation; and WARNER BROS.
17 | RECORDS INC., a corporation.

18 |                       Plaintiffs,

19 |       v.

20 | GLOBAL ARTS PRODUCTIONS, an entity
of unknown form; DANNY JORDAN, an
21 | individual; SATURN RECORDS, an entity of
unknown form; STACK-O-HITS, an entity of
22 | unknown form; and JACK MILLMAN, an
individual.

23 |

24 |                       Defendants.

CASE NO. 98-6507

**PLAINTIFFS' FIRST SET OF
REQUESTS FOR ADMISSIONS TO
DEFENDANT JACK MILLMAN**

25 |

26 | PROPOUNDING PARTY:        PLAINTIFFS

27 | RESPONDING PARTY:         DEFENDANT JACK MILLMAN

28 | SET NO.:                  One (1)

Mitchell Silberberg &
Knupp LLP

0036868.1

1

2          Pursuant to Rule 36 of the Federal Rules of Civil Procedure, Plaintiffs hereby

3   request that defendant Jack Millman admit the following matters, within thirty (30) days of

4   service hereof or such other time as may be ordered by the Court.

5

6                                    DEFINITIONS

7

8       A.      "PHONORECORDS" means and refers to phonorecords as that term is

9   defined in Section 101 of the United States Copyright Act, 17 U.S.C § 101, including without

10  limitation compact discs, audio cassette tapes, long-playing disc record albums, digital audio

11  tapes, and reel to reel tapes.

12

13      B.      "YOU" and "YOUR" means and refers to defendant Jack Millman, and any of

14  his licensees, assigns or successors in interest, and any corporation or entity under which he

15  conducts business.

16

17                            REQUESTS FOR ADMISSIONS

18

19  REQUEST NO. 1:

20          Admit that YOU do not now claim and never have claimed any right to

21  license, manufacture, distribute, and/or sell PHONORECORDS of any of the sound

22  recordings listed and identified in Schedule A and Schedule B to the Complaint in this action,

23  copies of which are attached hereto, except for the following:

24

25          (a)     "Baby, We Better Try And Get It Together" - Barry White

26

27          (b)     "Honey Please, Can't Ya See" - Barry White

28

1    (c)    "Let The Music Play" - Barry White

2

3    (d)    "Never Never Gonna Give Ya Up" - Barry White

4

5    (e)    "You See The Trouble With Me" - Barry White

6

7    (f)    "Benedictus" - Simon & Garfunkel

8

9    (g)    "Peggy-O" - Simon & Garfunkel

10

11   (h)    "Sparrow" - Simon & Garfunkel

12

13   (i)    "The Sounds Of Silence" - Simon & Garfunkel

14

15   (j)    "Wednesday Morning - 3 A.M." - Simon & Garfunkel

16          ADMIT

17   **REQUEST NO. 2:**

18          Admit that Stack-O-Hits does not now claim and never has claimed any right

19   to license, manufacture, distribute, and/or sell PHONORECORDS of any of the sound

20   recordings listed and identified in Schedule A and Schedule B to the Complaint in this action,

21   copies of which are attached hereto.

22          ADMIT

23   **REQUEST NO. 3:**

24          Admit that Saturn Records does not now claim and never has claimed any right

25   to license, manufacture, distribute, and/or sell PHONORECORDS of any of the sound

26   recordings listed and identified in Schedule A and Schedule B to the Complaint in this action,

27   copies of which are attached hereto. I HAVE NO KNOWLEDGE OF SATURN RECORDS. I HAVE NO

28   ACCESS TO ANY OF SATURN RECORDS FILES, PAPERS, DOCUMENTS OR RECORDS.

- 3 -

Mitchell Silberberg &
Knupp LLP      0036868.1

**REQUEST NO. 4:**

Admit that, other than M/V Productions, Inc., no entity in which YOU have an ownership interest or under which YOU conduct business now claims or ever claimed any right to license, manufacture, distribute, and/or sell PHONORECORDS of any of the sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto.

ADMIT

**REQUEST NO. 5:**

Admit that YOU have not licensed, sold or otherwise transferred to defendant Danny Jordan any rights in any of the sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto.

ADMIT

**REQUEST NO. 6:**

Admit that YOU have not licensed, sold or otherwise transferred to defendant Global Arts Productions any rights in any of the sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto.

ADMIT

**REQUEST NO. 7:**

Admit that the only sound recordings listed and identified in Schedule A and Schedule B to the Complaint in this action, copies of which are attached hereto, that YOU licensed, sold or transferred to others are the following:

(a)     "Baby, We Better Try And Get It Together" - Barry White

(b)     "Honey Please, Can't Ya See" - Barry White

(c)     "Let The Music Play" - Barry White

Mitchell Silberberg &
Knupp LLP

0036868.1

- 4 -

1       (d)    "Never Never Gonna Give Ya Up" - Barry White

2

3       (e)    "You See The Trouble With Me" - Barry White

4

5       (f)    "Benedictus" - Simon & Garfunkel

6

7       (g)    "Peggy-O" - Simon & Garfunkel

8

9       (h)    "Sparrow" - Simon & Garfunkel

10

11      (i)    "The Sounds Of Silence" - Simon & Garfunkel

12

13      (j)    "Wednesday Morning - 3 A.M." - Simon & Garfunkel

14

15 **REQUEST NO. 8:**

16      Admit that Wesley Sanborn of Koala Records is the only person or entity to

17 whom YOU have licenced, sold or transferred any rights in the following sound recordings:

18

19      (a)    "Baby, We Better Try And Get It Together" - Barry White

20

21      (b)    "Honey Please, Can't Ya See" - Barry White

22

23      (c)    "Let The Music Play" - Barry White

24

25      (d)    "Never Never Gonna Give Ya Up" - Barry White

26

27      (e)    "You See The Trouble With Me" - Barry White

28

Mitchell Silberberg &
Knupp LLP

0036868.1

1    (f)    "Benedictus" - Simon & Garfunkel

2

3    (g)    "Peggy-O" - Simon & Garfunkel

4

5    (h)    "Sparrow" - Simon & Garfunkel

6

7    (i)    "The Sounds Of Silence" - Simon & Garfunkel

8

9    (j)    "Wednesday Morning - 3 A.M." - Simon & Garfunkel

10        DENI, SEE ANSWERS TO INTERROGATORIES

11   DATED;September ___ 29 ___ 1998                  JACK MILLMAN

12

13

14                                                   By:

15        NOTARY PUBLIC
          STATE OF ARIZONA
          YAVAPAI COUNTY
          FRANCES MELLO

16   My Commission Expires April 15, 1999

17

18

19

20

21

22

23

24

25

26

27

28

MASTER LICENSE AGREEMENT

AGREEMENT made as of the 16th day of June 1997,
by and between

GLOBAL ARTS PRODUCTIONS
represented by Mr. Danny Jordan
7160 Nob Hill Road
Suite 135 - Point Plaza Building
TAMARAC, FLA 33321
United States Of America
(hereinafter called "Licensor")

and

DURECO B.V.
represented by the General Manager Mr. Harry R. Chün
Pampuslaan 45
1382 JM Weesp
Netherlands
(hereinafter called "Licensee")

WITNESSETH:

IN CONSIDERATION of the mutual promises herein contained, other good
and valuable consideration receipt whereof is hereby acknowledged, and of
the promises, it is agreed:

1.      Licensor hereby authorizes in Licensee, for the territory of BENELUX
and export rights (the "Licensed Territory"), the non-exclusive rights to
manufacture, advertise, distribute and sell phonorecords derived from
Licensor's masters as listed and only through the method of sale as
stipulated in Schedule to the agreement, (the "Masters") for use only in one
album, but upon and subject to all of the terms, covenants and conditions of
this agreement.

2.      Upon the execution of this agreement, Licensee shall make payment
to Licensor the amount as stipulated in Schedule to the agreement in United
States currency as an advance payment for royalties payable hereunder.
Payments hereunder shall be non-returnable and shall be fully recoupable
from sums which may become due Licensor hereunder

3.      Licensee shall make payment to Licensor the royalty set forth in
Paragraph 2 of this agreement, for each phonorecord manufactured and sold
and/or distributed under this agreement and shall pay to Licensor fifty
percent (50%) of Licensee's net receipts of performance royalties received
by Licensee as a result of public performances of the master recordings
licensed hereunder in the Licensed Territory, if not contrary to government
rules/law





- 2 -

4.      It is a condition of this agreement that Licensee pay:

(a)   All so-called 'mechanical royalties' to the owners of the copyright in the musical compositions embodied in the Masters for the reproduction thereof in phonorecords manufactured and sold under the authority of this agreement, and

Licensee shall indemnify and hold Licensor harmless from any loss or damage suffered by this Paragraph 4.

5.      True and correct accounts, open to the inspection of Licensor or its authorized representatives (with the unrestricted right to make excerpts therefrom and copies thereof), shall be kept by Licensee, showing the number of phonorecords manufactured and sold under authority of this agreement and the amount of money payable to Licensor in respect thereof. Such inspection shall be made during normal business hours, upon 30 days prior written notice to Licensee and no more than once for each accounting period hereunder. In the event that in any inspection the books and records disclose a discrepancy in amounts payable to Licensor in excess of ten percent (10%) of the total royalties paid, Licensee shall promptly pay all costs of such inspection, including accountant's fees incurred by Licensor. Licensee shall prepare and forward to Licensor statements of account as of June 30, and December 31 in each year, within ninety (90) days after each of said dates, by mail, duly stamped and correctly addressed to Licensor, and all monies which shall become payable to Licensor on each of said dates under this agreement shall be paid by Licensee upon the rendition of each such statement.

6.      The Masters, together with sound recording copyright therein and the performance therein and the performance embodied therein, shall be entirely Licensor's property, free of any claims whatsoever by Licensee or any person deriving any rights or interest from Licensee. Licensee acknowledges that Licensor is to be considered the author for the purpose of copyrights in sound recordings and that Licensor owns all the rights comprised in such copyright, including any rights to renew and extend the copyright. Without limitation of the foregoing Licensee and/or Licensee's subsidiaries and affiliates shall have the right to make cassette tapes and/or compact disc reproductions of the performances embodied in the Masters, and to sell and deal in the same under trademark or tradenames or labels designated by Licensee during the term of this Agreement and the sell-off period provided in paragraph 10 below or Licensee may at its election refrain therefrom. Licensee shall take all steps and do all things necessary to secure and protect Licensor's rights in the Masters in the Licensed Territory in the name of the Licensor



- 3 -

7.    Licensee shall have the right to use and to allow to use others to use the name, likeness and biographical material concerning the artist performing on the Masters, for advertising and purposes of trade, in connection with the recordings licensed hereunder to the extent that Licensor has such rights. Notwithstanding anything herein to the contrary, the license granted by Licensor hereunder is limited to a one time use of the Masters in the album title as set forth in Schedule to the agreement. Licensee shall not have the rights to sub-license or convey any rights granted under the agreement.

8.    Licensor represents and warrants that it is under no disability, restriction or prohibition, whether contractual or otherwise, with respect to its right to execute this Agreement. Licensor agrees to and does hereby indemnify, save and hold Licensee harmless arising out of or connected with any claim by a third party which is not consistent with any of the warranties or representations made by Licensor in this Agreement, and Licensee at any time after the date hereof with respect to any liability or claim adjudicated by a competent court of law to which the foregoing indemnity applies.

9.    This Agreement sets forth  the entire agreement between the parties with respect to the subject matter hereof. No modification, amendment, waiver, assignment, termination or discharge of this Agreement or any provisions hereof shall be binding unless confirmed by a written instrument signed by an officer of Licensee and by Lisensor's authorized representative. No waiver of any provision of this Agreement or any default hereunder shall affect either party's rights or remedy in the event of any other default, whether or not similar.

10.    The term of this agreement shall be for the period set forth in Schedule to the agreement, annexed hereto. Licensee shall not have the right to manufacture any inventory after the expiration of the term hereof but shall have the right to sell all existing inventory on hand after the expiration of the term hereof, but shall have the right to sell all existing inventory on hand at the expiration of this agreement for a period of six (6) months afer the expiration date.

11.    In addition to all other rights and remedies in law or in equity which Licensor may have, upon the default of Licensee (1) in making any payment when the same shall be come due under this agreement, (2) in the keeping of any accounts or rendering of any statement thereof as in this agreement provided, and (3) in carrying out or performing any of the terms, covenants or conditions of this agreement, Licensor, upon any such default of Licensee, shall have the right, thirty (30) days from the sending of demand and if such default remains uncured,

- 4 -

to forthwith terminate this agreement by sending a written communication to Licensee  to such effect, and upon the sending of such written communication this agreement shall terminate and come to an end and any and all rights and interests whatsoever acquired by Licensee and everyone in interest through it under this agreement, shall, anything to the contrary notwithstanding, forthwith cease, terminate and revert to Licensor, without affecting the obligations of Licensee to make payment to Licensor of all monies as to which Licensee may be or become obligated under this agreement.

12.   In the event that at any time (a) any application, petition, suit or proceeding is filed or instituted by or against Licensee involving or relating to the general property rights of Licensee, (b) a receiver, liquidator, assignee, or anyone occupying a like  or similar position is designated or appointed for, or takes charge of, the business or any of the assets of Licensee, (c) an assignment, or any other steps or proceedings are taken by or against Licensee on behalf of or for the benefit of creditors, or (d) any rights, interest, property or assets of Licensee are levied upon and sold in any action or proceeding or under any judgment, lien, order or decree, then in any such event, Licensor shall have the right to forthwith terminate this agreement by sending of a letter or fax to Licensee to such effect. Upon the sending of such letter or fax, this agreement shall forthwith terminate and come to an end and any and all rights and interest whatsoever acquired by Licensee and everyone in interest through it under this agreement shall forthwith cease, terminate and revert to Licensor, anything to the contrary notwithstanding, without affecting the obligations of Licensee to make payment to Licensor of all monies as to which Licensee may be or become obligated under this agreement.

13.   All payments hereunder, including advances, shall be payable in the percentages listed below to GLOBAL ARTS PRODUCTIONS and Hans Ballo and shall be forwarded together with statements to the address set forth above for
GLOBAL ARTS PRODUCTIONS and to the address set forth below for Hans Ballo

(a.) Eighty (80%) percent to GLOBAL ARTS PRODUCTIONS.



(b.) Twenty (20%) percent to Hans Ballo, Goethestraße 73, 63477 Maintal, Germany



- 5 -

14.   As used in this agreement, the word 'phonorecords' shall include phonograph records, cassette tapes and compact discs, but shall exclude so-called audio-visual products and material.

15.   Neither this agreement nor any obligations undertaken by Licensee hereunder may be assigned by Licensee subject to Paragraph 12.

16.   All rights not expressly authorized in Licensee are reserved unto Licensor.

17.   Licensee agrees to furnish to Licensor, at no charge to Licensor and within thirty (30) days of the album release date, five (5) sample copies of each configuration of each phonorecord released hereunder.

18.   This agreement shall be construed and interpreted in accordance with the laws of the State of Florida, irrespective of the place of execution or performance. Licensee hereby consents and submits to the exclusive jurisdiction of the state and federal courts located in Tamarac, Florida for the adjudication of any dispute arising out of or relating to this agreement or the alleged breach thereof.

19.   This agreement constitutes the entire understanding of the parties relating to the subject matter and may not be modified except by an instrument in writing signed by each of the parties.

20.   Licensor and Licensee mutually agree that the advance payment on the albums of Schedule No. 1 until Schedule No. 12 shall be cross collateral against all earned royalties due and payable by Licensee to Licensor hereunder.

*→ only 6 schedules*

IN WITNESS WHEREOF, the parties hereto have executed this agreement and set their hands and seals the day first set forth above.

By: _____

Hans Ballo, as Agent for
GLOBAL ARTS PRODUCTIONS

GLOBAL ARTS PRODUCTIONS

By: _____

Danny Jordan

DURECO B.V.

By: _____

Harry R. Chün

SCHEDULE    NO
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: CAT STEVENS

1. b) TITLES:     1. Baby Get Your Head Screwed On
                  2. Bring Another Bottle Baby
                  3. Come On And Dance
                  4. Granny
                  5. Here Comes My Baby
                  6. Hummingbird
                  7. I Love My Dog
                  8. I'm Gonna Get Me A Gun
                  9. I've Found A Love
                  10. Lady
                  11. Lady d'Arbanville
                  12. Matthew & Son
                  13. Morning Has Broken
                  14. Portobello Road
                  15. School Is Out
                  16. The Tramp
                  17. When I Speak To The Flowers

2. TERRITORY:  BENELUX AND  export rights

3. CATEGORY OF RELEASE.  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
             club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting  July 1st, 1997
          until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE.  Licensed by GLOBAL ARTS

Tamarac,  June 16, 1997          Weesp,
GLOBAL ARTS                      DURECO B. V.
PRODUCTIONS

Danny Jordan                     Harry R. Chun

SCHEDULE    NO 2
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: NEIL DIAMOND

1. b) TITLES:      1. Cherry Cherry
                   2. Girl You'll Be A Woman Soon
                   3. Hanky Panky
                   4. I'll Come Running
                   5. I'm A Believer
                   6. Kentucky Woman
                   7. La Bamba
                   8. Monday Monday
                   9. New Orleans
                   10. Oh No No
                   11. Red Red Wine
                   12. Shilo
                   13. Solitary Man
                   14. Thank The Lord For The Nighttime
                   15. The Boat That I Row
                   16. You Got To Me

2. TERRITORY: BENELUX  AND  export rights

3. CATEGORY OF RELEASE. Compact Disc and MusiCassette
   - mid price category

4. ROYALTY: - 14 % on 100 % less 10% packaging; respectively
             club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM: 3 years, starting  July 1st, 1997
         until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE: Licensed by GLOBAL ARTS

Tamarac, June 16, 1997          Weesp,
GLOBAL ARTS                     DURECO B. V.
PRODUCTIONS
*Danny Jordan*                  *[signature]*
*for [signature]*

Danny Jordan                    Harry R. Chün

SCHEDULE    NO. 3

to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called 'Licensor')

and

DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST. THE DOORS

1. b) TITLES:      1. Crystal Ship
                   2. Hello I Love You
                   3. L. A. Woman
                   4. Light My Fire
                   5. Love Her Madly
                   6. Riders In The Storm
                   7. Roadhouse Blues
                   8. Touch Me
                   9. Wait For The Sun
                   10. When The Music Is Over

2. TERRITORY:  BENELUX  and  export rights

3. CATEGORY OF RELEASE.  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
               club sales 12 % on 100% less 10% packaging

5. ADVANCE. US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting  July 1st, 1997
           until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac,  June 16, 1997       Weesp,
GLOBAL ARTS                   DURECO B. V.
PRODUCTIONS

Danny Jordan                  Harry R. Chun

SCHEDULE     NO. 4
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: SIMON & GARFUNKEL

1. b) TITLES:     1. A Most Peculiar Man
                  2. Anji
                  3. Baby Driver
                  4. Blessed
                  5. Bridge Over Troubled Water
                  6. Bye Bye Love
                  7. Cecilia
                  8. El Condor Pasa
                  9. I Am A Rock
                  10. Kathy's Song
                  11. Richard Cory
                  12. Somewhere They Can't Find Me
                  13. The Boxer
                  14. The Sounds Of Silence

2. TERRITORY:  BENELUX  AND  export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY: - 14 % on 100 % less 10% packaging; respectively
             club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting July 1st, 1997
          until June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS


Tamarac,  June 16, 1997        Weesp,
GLOBAL ARTS                    DURECO B. V.
PRODUCTIONS

Danny Jordan                   Harry R. Chun

SCHEDULE    NO. 5
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: THE MAMAS & THE PAPAS

1. b) TITLES:        1. California Dreamin'
                     2. Creeque Alley
                     3. Dancing In The Street
                     4. Dedicated To The One I Love
                     5. Dream A Little Dream Of Me
                     6. Glad To Be Unhappy
                     7. I Call Your Name
                     8. I Saw Her Last Night
                     9. Look Through My Window
                     10. Midnight Voyage
                     11. Monday Monday
                     12. My Girl
                     13. Twelve-Thirty
                     14. Words Of Love

2. TERRITORY:  BENELUX  AND  export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY: - 14 % on 100 % less 10% packaging; respectively
             club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting July 1st, 1997
          until  June 30th, 2000, plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS


Tamarac, June 16, 1997          Weesp,
GLOBAL ARTS                     DURECO B. V.
PRODUCTIONS

Danny Jordan                    Harry R. Chin

SCHEDULE    NO. 6
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: THE WHO

1. b) TITLES.    1. Anyway, Anyhow, Anywhere
                 2. Baba O' Riley
                 3. Happy Jack
                 4. I Can See For Miles
                 5. I Can't Explain
                 6. I'm A Boy
                 7. Let's See Action
                 8. My Generation
                 9. Pictures Of Lily
                 10. Pinball Wizard
                 11. Substitute
                 12. Won't Get Fooled Again
                 13. Who Are You
                 14. You Better You Bet
                 15. The Seeker

2. TERRITORY:  BENELUX  and  export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
               club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting  July 1st, 1997
           until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS


Tamarac,  June 16, 1997          Weeso,
GLOBAL ARTS                      DURECO B. V
PRODUCTIONS

Danny Jordan                    Perry R. Chun

SCHEDULE     NO. 6
to the Agreement dated June 16th, 1997 by and between
GLOBAL ARTS PRODUCTIONS
(hereinafter called "Licensor")
and
DURECO B. V.
(hereinafter called "Licensee")

1. a) ARTIST: THE WHO

1. b) TITLES:     1. Anyway, Anyhow, Anywhere
                  2. Baba O' Riley
                  3. Happy Jack
                  4. I Can See For Miles
                  5. I Can't Explain
                  6. I'm A Boy
                  7. Let's See Action
                  8. My Generation
                  9. Pictures Of Lily
                  10. Pinball Wizard
                  11. Substitute
                  12. Won't Get Fooled Again
                  13. Who Are You
                  14. You Better You Bet
                  15. The Seeker

2. TERRITORY:  BENELUX  and  export rights

3. CATEGORY OF RELEASE:  Compact Disc and MusiCassette
   - mid price category

4. ROYALTY:  - 14 % on 100 % less 10% packaging; respectively
               club sales 12 % on 100% less 10% packaging

5. ADVANCE: US $ 3.000.- (Threethousand Dollars)

6. TERM:  3 years, starting  July 1st, 1997
               until  June 30th, 2000,  plus 6 months sell-off

7. COURTESY LINE:  Licensed by GLOBAL ARTS

Tamarac,  June 16, 1997          Weesp,
GLOBAL ARTS                      DURECO B. V.
PRODUCTIONS

Danny Jordan                     Harry R. Chin

## Bogus Agreements Obtained By Plaintiffs

| Licensor | Licensee | Agreement Date | Artist | Territory |
|----------|----------|----------------|--------|-----------|
| Global Arts | Dureco | 06/16/97 | Cat Stevens | 1. Belgium<br>2. Netherlands<br>3. Luxembourg<br>4. Export rights included |
| Global Arts | Dureco | 06/16/97 | Neil Diamond | 1. Belgium<br>2. Netherlands<br>3. Luxembourg<br>4. Export rights included |
| Global Arts | Dureco | 06/16/97 | Simon & Garfunkel | 1. Belgium<br>2. Netherlands<br>3. Luxembourg<br>4. Export rights included |
| Global Arts | Dureco | 06/16/97 | The Doors | 1. Belgium<br>2. Netherlands<br>3. Luxembourg<br>4. Export rights included |
| Global Arts | Dureco | 06/16/97 | The Mamas & The Papas | 1. Belgium<br>2. Netherlands<br>3. Luxembourg<br>4. Export rights included |
| Global Arts | Dureco | 06/16/97 | The Who | 1. Belgium<br>2. Netherlands<br>3. Luxembourg<br>4. Export rights included |
| Global Arts | Falcon Neue Medien | 03/17/97 | Frank Sinatra | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |

1

| Licensor | Licensee | Agreement Date | Artist | Territory |
|---|---|---|---|---|
| Just Great Music | Falcon Neue Medien | 04/02/98 | 1. Foreigner<br>2. Joe Cocker & J. Warrens<br>3. Phil Collins<br>4. Cat Stevens<br>5. Toto<br>6. Chicago<br>7. Bob Marley<br>8. America<br>9. Manfred Mann<br>10. 10 CC | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 07/28/96 | 1. Kool & The Gang<br>2. Toto<br>3. The Stray Cats<br>4. Air Supply<br>5. Kenny Rogers | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Denmark<br>5. South Africa |
| Global Arts | Gruezi | 09/03/96 | 1. Bellamy Brothers<br>2. Linda Ronstadt<br>3. Lee Marvin<br>4. Dolly Parton & Kenny Rogers<br>5. Nancy Sinatra & Lee Hazelwood<br>6. Olivia Newton-John<br>7. Bellamy Brothers<br>8. Hank Locklin<br>9. Susan Raye<br>10. Bellamy Brothers<br>11. Floyd Cramer<br>12. The Shaklefords<br>13. Roger Miller<br>14. Don Gibson<br>15. Kris Kristofferson | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | 1. Jim Reeves<br>2. Dean Martin<br>3. Bing Crosby<br>4. Dean Martin<br>5. Jim Reeves<br>6. Mahalia Jackson<br>7. Mahalia Jackson | 1. Germany<br>2. Austria<br>3. Switzerland |

2

| Licensor | Licensee | Agreement Date | Artist | Territory |
|---|---|---|---|---|
| Global Arts | Gruezi | 09/03/96 | 1. Mamas & Papas<br>2. Roger Miller<br>3. Dean Martin<br>4. Daniel Boone<br>5. The Carpenters<br>6. Ricky Nelson<br>7. Conny Francis<br>8. Tom Jones<br>9. The Monkees<br>10. Tom Jones<br>11. Bellamy Brothers<br>12. Harry Belafonte<br>13. The Rainbows | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | 1. Neil Diamond<br>2. Gloria Gaynor<br>3. Simon & Garfunkel<br>4. Tom Jones<br>5. Cat Stevens | Argentina |
| Global Arts | Gruezi | 09/03/96 | 1. Olivia Newton-John<br>2. B.J. Thomas<br>3. Simon & Garfunkel<br>4. Cat Stevens<br>5. Barry White<br>6. Lee Marvin<br>7. Gloria Gaynor<br>8. George McCrae<br>9. The Kinks<br>10. Lobo<br>11. The Equals<br>12. Ben E. King<br>13. The Who<br>14. Player | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | 1. Roger Miller<br>2. Nancy Sinatra & Dean Martin | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. South Africa |

3

| Licensor | Licensee | Agreement Date | Artist | Territory |
|---|---|---|---|---|
| Global arts | Gruezi | 09/03/96 | 1. Tony Orlando & Dawn<br>2. Albert Hammond<br>3. 1910 Fruitgum Company<br>4. Bay City Roller<br>5. Cher<br>6. The Kinks<br>7. Mungo Jerry<br>8. Joe Cocker<br>9. The Equals<br>10. The Archies<br>11. Redbone<br>12. Janis Joplin<br>13. Tommy James<br>14. Chrissie<br>15. Lobo<br>16. Olivia Newton-John | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | Cat Stevens | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | Frank Sinatra | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | Gloria Gaynor | Argentina |
| Global Arts | Gruezi | 09/03/96 | Harry Belafonte | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | Joe Cocker | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | Kool & The Gang | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |

4

| Licensor | Licensee | Agreement Date | Artist | Territory |
|---|---|---|---|---|
| Global Arts | Gruezi | 09/03/96 | Linda Ronstadt | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | Neil Diamond | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | Perry Como | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | Simon & Garfunkel | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | Sonny & Cher | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | The Doors | 1. Switzerland<br>2. Germany<br>3. Austria<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | The Mamas & The Papas | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 09/03/96 | The Monkees | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |

0161345.1.1

| Licensor | Licensee | Agreement Date | Artist | Territory |
|---|---|---|---|---|
| Global Arts | Gruezi | 09/03/96 | Tom Jones | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 11/18/97 | John Bongiovi | Brazil |
| Global Arts | Gruezi | 05/04/98 | Barry White | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruezi | 05/04/98 | Steppenwolf | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | Gruzi | 05/04/98 | Roy Orbison | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |
| Global Arts | K-Tel | 11/25/96 | Frank Sinatra | 1. Germany<br>2. Austria<br>3. Switzerland<br>4. Export rights included |

6

| Licensor | Licensee | Agreement Date | Artist | Territory |
|----------|----------|----------------|--------|-----------|
| Global Arts | Selected Sound Carrier AC | 12/30/96 | 1. Bob Marley & The Wailers<br>2. Bob Marley & The Wailers<br>3. Bob Marley & The Wailers<br>4. Bob Marley & The Wailers<br>5. Dean Martin<br>6. Dean Martin<br>7. Frank Sinatra<br>8. Frank Sinatra<br>9. Frank Sinatra<br>10. Frank Sinatra<br>11. Iron Butterfly<br>12. James Brown<br>13. James Brown<br>14. James Brown<br>15. Kool & The Gang<br>16. Kool & The Gang<br>17. Lovin' Spoonful<br>18. Lovin' Spoonful<br>19. Lovin' Spoonful<br>20. Lovin' Spoonful<br>21. Lovin' Spoonful<br>22. Olivia Newton-John<br>23. Olivia Newton-John<br>24. Olivia Newton-John<br>25. Olivia Newton-John<br>26. Olivia Newton-John<br>27. O. Newton-J. & J. Travolta<br>28. O. Newton-J. & J. Travolta<br>29. The Who<br>30. The Who<br>31. The Who<br>32. The Who<br>33. The Who<br>34. The Who<br>35. The Who | Europe - Non-exclusive |

| Licensor | Licensee | Agreement Date | Artist | Territory |
|---|---|---|---|---|
| Global Arts | Selected Sound Carrier AG | 12/30/96 | 1. Box Tops<br>2. Cher<br>3. Ike & Tina Turner<br>4. Ike & Tina Turner<br>5. Mungo Jerry<br>6. Kinks<br>7. Kinks<br>8. Kinks<br>9. Kinks<br>10. Kinks<br>11. Johnny Rivers<br>12. Johnny Rivers<br>13. Tommy James & The Shondells<br>14. Tommy James & The Shondells<br>15. Daniel Boone<br>16. Dan Fardon<br>17. Mary Hopkins<br>18. New Seekers<br>19. Al Martino<br>20. Carole King<br>21. Jimmy Hendrix<br>22. Zager and Evans<br>23. Don McLean<br>24. Manfred Mann<br>25. Gerland Jeffreys<br>26. Barry White<br>27. David Soul<br>28. Ben E. King<br>29. The Equals<br>30. Fats Domino | Europe - Non-exclusive |

| Licensor | Licensee | Agreement Date | Artist | Territory |
|---|---|---|---|---|
| Global Arts | Selected Sound Carrier AG | 12/30/96 | 1. Jimmy Clanton<br>2. Kenny Rogers<br>3. Mamas & The Papas<br>4. Osmonds<br>5. Ricky Nelson<br>6. Sam The Sham & The Pharaos<br>7. Steely Dan<br>8. Steppenwolf<br>9. Three Dog Night<br>10. War<br>11. Andy Williams<br>12. Eric Clapton<br>13. Hank Williams<br>14. Jerry Lee Lewis<br>15. Rod Stewart<br>16. Roy Orbison<br>17. Trini Lopez<br>18. Village People<br>19. Fats Domino<br>20. Everly Brothers<br>21. Tammy Wynette<br>22. Dean Martin<br>23. Blues Image | Europe - Non-exclusive |
| Global Arts | Snake's Music S.C. | 10/16/96 | The Doors | |
| Global Arts | Snake's Music S.C. | 08/01/97 | 1. Bob Marley<br>2. Carlos Santana<br>3. Cat Stevens<br>4. Doors<br>5. Frank Sinatra<br>6. Frank Sinatra<br>7. Chicago<br>8. Janis Joplin<br>9. Jimi Hendrix<br>10. Joe Cocker<br>11. Kool & The Gang<br>12. Paul Anka<br>13. Roy Orbison<br>14. Compilation<br>15. Compilation<br>16. Compilation<br>17. Compilation<br>18. Simon & Garfunkel<br>19. Tom Jones<br>20. Toto<br>21. ZZ Top | Czech Republic And Slovakia |

9

RECEIVED 08/18 07:43 1999 AT 3115
18-AUG-1999 12:14 FROM IFPI SECRETARIAT TO RIAA

R.I.A.A.
PAGE 5 PRINTED PAGE 5

Ø 005
P.04/11

| | | |
|---|---|---|
| 023 600212 BLR 89 411 | STAR POWER | SIMON & GARFUNKEL |
| 023 600210 BLR 89 409 | STAR POWER | JOPLIN, JANIS |
| 023 600213 BLR 89 412 | STAR POWER | STEVENS, CAT |
| 023 600216 BLR 89 415 | STAR POWER | ERIC BURDON AND T |
| 023 600214 BLR 89 413 | STAR POWER | THE WHO |

| | | |
|---|---|---|
| 289 600298 UN 2303 | THE SOUNDS OF SILENC | SIMON & GARFUNKEL |
| 289 600284 UN 3301 | UNCHAIN MY HEART | JOE COCKER |
| 289 600595 3333 | MOON SHADOOW | STEVENS, CAT |
| 289 600258 UN 3215 | I USED TO BE AN ANIM | ERIC BURDON AND T |
| 289 600972 UN 3365 | ERIC BURDON AND THE | ERIC BURDON AND T |
| 289 600317 UN3317 | GREATEST HITS | THE WHO |
| 289 600289 UN 3308 | ALABAMA SONG | THE DOORS |
| 289 600310 UN 3318 | VIVA LAS VEGAS | ZZ TOP |

RECEIVED 08/18/99 10:05
08/18/99 10:06 FAX 202 223     R.I.A.A.     @006
18-AUG-1999 12:14    FRC. IFPI SECRETARIAT     TO RI.     P.05/11

| FALCON | THE SOUNDS OF SILENCE | SIMON & GARFUNKEL | 38134 |
| FALCON | UNCHAIN MY HEART | JOE COCKER | 32534 |
| FALCON | MOON SHADOW | STEVENS, CAT | 6117 |
| FALCON | I USED TO BA AN ANIM | ERIC BURDON AND T | 513 |
| FALCON | ERIC BURDEN AND THE | ERIC BURDON AND T | 0 |
| FALCON | GREATEST HITS | THE WHO | 14010 |
| FALCON | ALABAMA SONG | THE DOORS | 26917 |
| FALCON | VIVA LAS VEGAS | ZZ TOP | 21009 |

RECEIVED 08/18 02:30 1999/M 3
08/18/99 10:06 FAX 202 223 R.I.A.A.
19-AUG-1999 12:15 FROM .FPI SECRETARIAT TO RIA
PRINTED PAGE 7
@007
P.06/11

| SORTIERUNG NACH WERKNUMMERN | | | | |
|---|---|---|---|---|
| 023 | 600212 001 000 | 0813352 | THE SOUND OF SILENCE | |
| 289 | 600790 005 000 | 0813352 | SONIDOS DEL SILENCIO | |
| 289 | 600187 004 000 | 0813352 | SOUNDS OF SILENCE | |
| 289 | 600184 010 000 | 0813352 | THE SOUND OF SILENCE | |
| 289 | 600288 008 000 | 0813352 | THE SOUNDS OF SILENC | |
| 289 | 600182 012 000 | 0813352 | SOUND OF SILENCE | |
| 289 | 600028 001 000 | 0813352 | THE SOUND OF SILENCE | |
| 289 | 600026 013 000 | 0813352 | SOUND OF SILENCE | |
| 289 | 600015 014 000 | 0813352 | SOUND OF SILENCE | |
| 289 | 600012 016 000 | 0813352 | SOUNDS OF SILENCE | |
| 023 | 600210 004 000 | 0368841 | PIECE OF MY HEART | |
| 289 | 600213 017 000 | 0430308 | SOLITARY MAN | |
| 289 | 600431 010 000 | 1332269 | UNCHAIN MY HEART | |
| 289 | 600254 012 000 | 1332269 | UNCHAIN MY HEART | |
| 023 | 600213 001 000 | 0827728 | MORNING HAS BROKEN | |
| 289 | 600886 008 000 | 0827728 | MORNING HAS BROKEN | |
| 289 | 600713 004 000 | 0827728 | MORNING HAS BROKEN | |
| 289 | 600885 004 000 | 0827728 | MORNING HAS BROKEN | |
| 289 | 600517 004 000 | 0827728 | MORNING HAS BROKEN | |
| 289 | 600404 006 000 | 0827728 | MORNING HAS BROKEN | |
| 289 | 600320 010 000 | 0827728 | MORNING HAS BROKEN | |
| 289 | 600080 002 000 | 0827728 | MORNING HAS BROKEN | |
| 289 | 600987 004 000 | 1744642 | CHERISH | |
| 289 | 600321 007 000 | 1744642 | CHERISH | |
| 023 | 600218 010 000 | 0583252 | RING OF FIRE | |
| 289 | 600881 009 000 | 0583252 | RING OF FIRE | |
| 289 | 600972 010 000 | 0583252 | RING OF FIRE | |
| 289 | 600910 014 000 | 0583252 | RING OF FIRE | |
| 289 | 600866 001 000 | 0583252 | RING OF FIRE | |
| 023 | 600214 001 000 | 0849021 | MY GENERATION | |
| 289 | 600317 003 000 | 0849021 | MY GENERATION | |
| 289 | 600108 013 000 | 0849021 | MY GENERATION | |
| 289 | 600109 014 000 | 0849021 | MY GENERATION | |
| 289 | 600238 004 000 | 0849021 | MY GENERATION | |
| 289 | 600237 004 000 | 0849021 | MY GENERATION. | |
| 023 | 600079 009 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600388 009 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600724 001 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600187 001 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600520 008 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600314 002 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600289 001 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600083 010 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600014 013 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600011 010 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600206 001 000 | 0436657 | LIGHT MY FIRE | |
| 289 | 600202 008 000 | 0436657 | LIGHT MY FIRE | |

QUELLE:
TONIS
Mai 99

[ RECEIVED BY IB 07.28 1999 AT 12:22 PAGE 8 (PRINTED PAGE 8)
08/18/99 10:07 FAX 202 223 R.I.A.A. 4008
18-AUG-1999 12:15 FRO. .FPI SECRETARIAT TO RIF. P.07/11

| RECORD COMANY | WORKS | on CAT.NO. | QUANTITY |
|---|---|---|---|
| FALCON | SONIDOS DEL SILENCIO | 138 | 100 |
| FALCON | SOUND OF SILENCE | 100.016 | 997 |
| FALCON | SOUND OF SILENCE | 100.013 | 5000 |
| FALCON | SONIDOS DEL SILENCIO | UN 9995 | 500 |
| FALCON | SOUND OF SILENCE | 2900031 | 300000 |
| FALCON | SOUND OF SILENCE | UN 3148 | 59179 |
| FALCON | SOUND OF SILENCE | 100.011 | 10000 |
| FALCON | UNCHAIN MY HEART | MARK 489 | 1007 |
| FALCON | MORNING HAS BROKEN | UN 3334 | 126 |
| FALCON | MORNING HAS BROKEN | 22480 | 100 |
| FALCON | MORNING HAS BROKEN | 3344 | 7021 |
| FALCON | MORNING HAS BROKEN | 3327 | 13534 |
| FALCON | MORNING HAS BROKEN | 3320 | 15419 |
| FALCON | MORNING HAS BROKEN | RO 22253 | 4800 |
| FALCON | CHERISH | 22374 | 2640 |
| FALCON | CHERISH | UN9321 | 31431 |
| FALCON | RING OF FIRE | 3345 | 0 |
| FALCON | RING OF FIRE | MJ 5921/1 | 0 |
| FALCON | RING OF FIRE | UN 3331 | 177 |
| FALCON | MY GENERATION | 2900022 | 422 |
| FALCON | MY GENERATION | UN 3065 | 13986 |
| FALCON | MY GENERATION | UN 3062 | 31665 |
| BELL | LIGHT MY FIRE | BLR 89033/89702 | 6781 |
| FALCON | LIGHT MY FIRE | UN 3361 | 0 |
| FALCON | LIGHT MY FIRE | 22113 | 2100 |
| FALCON | LIGHT MY FIRE | 100.016 | 997 |
| FALCON | LIGHT MY FIRE | CD 3/134 | 518 |
| FALCON | LIGHT MY FIRE | UN 3313 | 19417 |
| FALCON | LIGHT MY FIRE | UN 2071 | 16028 |
| FALCON | LIGHT MY FIRE | UN 3145 | 34564 |
| FALCON | LIGHT MY FIRE | UN 1409 | 5013 |
| FALCON | LIGHT MY FIRE | 2900019 | 420 |
| FALCON | LIGHT MY FIRE | 3070 | 5533 |

RECEIVED 08/18 02:17 1999 AT 3:52PM
18-AUG-1999 12:15 FROM FPI SECRETARIAT TO RI
R.I.A.A.
PHINTED PAGE 9
2009
P.08/11

| | | |
|---|---|---|
| 023 600212 004 000 0813006 | I AM A ROCK | SIMON & GARFUNKEL |
| 023 600212 012 000 0813891 | AT THE ZOO | SIMON & GARFUNKEL |
| 023 600212 001 000 0815352 | THE SOUND OF SILENCE | SIMON & GARFUNKEL |
| 023 600212 002 000 0813249 | MRS. ROBINSON | SIMON & GARFUNKEL |
| 023 600212 003 000 0814949 | THE BOXER | SIMON & GARFUNKEL |
| 023 600212 005 000 1332910 | BRIDGE OVER TROUBLED | SIMON & GARFUNKEL |
| 023 600212 008 000 1330889 | EL CONDOR PASA (IF I | SIMON & GARFUNKEL |
| 023 600212 009 000 0815321 | HOMEWARD BOUND | SIMON & GARFUNKEL |
| 023 600212 010 000 0813952 | SCARBOROUGH FAIR / C | SIMON & GARFUNKEL |
| 023 600212 011 000 0813618 | THE 59TH STREET BRID | SIMON & GARFUNKEL |
| 023 600212 013 000 0814399 | WEDNESDAY MORNING, 3 | SIMON & GARFUNKEL |
| 023 600212 014 000 0813513 | AMERICA | SIMON & GARFUNKEL |
| 023 600212 015 000 0387269 | BYE BYE LOVE | SIMON & GARFUNKEL |
| 023 600212 007 000 0813452 | KEEP THE CUSTOMER SA | SIMON & GARFUNKEL |
| 023 600212 006 000 1334055 | CECILIA | SIMON & GARFUNKEL |
| | | |
| 023 600210 006 000 0610187 | WORK ME LORD | JANIS JOPLIN |
| 023 600210 007 000 0571615 | MOVE OVER | JANIS JOPLIN |
| | | |
| 023 600213 002 000 0827224 | FATHER AND SON | CAT STEVENS |
| 023 600213 003 000 0827838 | PEACE TRAIN | CAT STEVENS |
| 023 600213 004 000 0827987 | WILD WORLD | CAT STEVENS |
| 023 600213 006 000 0827716 | MOONSHADOW | CAT STEVENS |
| 023 600213 007 000 0827103 | CAN'T KEEP IT IN | CAT STEVENS |
| 023 600213 008 000 0827787 | OH VERY YOUNG | CAT STEVENS |
| 023 600213 010 000 0827528 | LADY | CAT STEVENS |
| 023 600213 011 000 0827676 | MATTHEW AND SON | CAT STEVENS |
| 023 600213 001 000 0827728 | MORNING HAS BROKEN | CAT STEVENS |
| 023 600213 005 000 0827580 | LADY D'ARBANVILLE | CAT STEVENS |
| 023 600213 009 000 0827241 | FIRST CUT IS THE DEE | CAT STEVENS |
| 023 600213 012 000 0827382 | HERE COMES MY BABY | CAT STEVENS |
| 023 600213 013 000 0937795 | (REMEMBER THE DAYS O | CAT STEVENS |
| 023 600213 014 000 0827453 | I'M GONNA GET ME A G | CAT STEVENS |
| 023 600213 015 000 0827983 | WHERE DO THE CHILDRE | CAT STEVENS |
| 023 600213 016 000 0417173 | ANOTHER SATURDAY NIG | CAT STEVENS |
| | | |
| 023 600216 001 000 0734833 | HOUSE OF THE RISING | ERIC BURDON & THE |
| 023 600216 002 000 0355178 | DON'T LET ME BE MISU | ERIC BURDON & THE |
| 023 600216 003 000 0392095 | SAN FRANCISCAN NIGHT | ERIC BURDON & THE |
| 023 600216 005 000 1038117 | IT'S MY LIFE | ERIC BURDON & THE |
| 023 600216 006 000 0391580 | INSIDE LOOKING OUT | ERIC BURDON & THE |
| 023 600216 007 000 0392251 | WHEN I WAS YOUNG | ERIC BURDON & THE |
| 023 600216 008 000 0737863 | SEE SEE RIDER | ERIC BURDON & THE |
| 023 600216 009 000 1340395 | SPILL THE WINE | ERIC BURDON & THE |
| 023 600216 012 000 0531584 | I PUT A SPELL ON YOU | ERIC BURDON & THE |
| 023 600216 013 000 0553921 | BOOM BOOM | ERIC BURDON & THE |
| 023 600216 014 000 0480508 | GIN HOUSE BLUES | ERIC BURDON & THE |
| 023 600216 015 000 0392181 | SKY PILOT | ERIC BURDON & THE |
| 023 600216 016 000 0391737 | GOOD TIMES | ERIC BURDON & THE |
| 023 600216 004 000 0560301 | WE'VE GOTTA GET OUT | ERIC BURDON & THE |
| 023 600216 011 000 0602625 | MAMA TOLD ME NOT TO | ERIC BURDON & THE |
| 023 600216 010 000 0583252 | RING OF FIRE | ERIC BURDON & THE |

RECEIVED 18-AUG-1999 13:13 FROM
03/18/99 10:08 FAX 202 223
R.I.A.A.
18-AUG-1999 12:16 FROM IFPI SECRETARIAT
PAGE 10 (PRINTED PAGE 10)
TO RIAA.
☑010
P.09/11

| | | |
|---|---|---|
| 289 600713 003 000 1342118 | IF I COULD | SIMON & GARFUNKEL |
| 289 600187 004 000 0813352 | SOUNDS OF SILENCE | SIMON & GARFUNKEL |
| 289 600184 010 000 0813352 | THE SOUND OF SILENCE | SIMON & GARFUNKEL |
| 289 600320 009 000 1342118 | IF I COULD (EL CONDO | SIMON & GARFUNKEL |
| 289 600314 013 000 0813006 | I'M A ROCK | SIMON & GARFUNKEL |
| 289 600230 006 000 0768481 | THE TIMES ARE A CHAN | SIMON & GARFUNKEL |
| 289 600212 021 000 0813352 | THE SOUNDS OF SILENC | SIMON & GARFUNKEL |
| 289 600224 012 000 0813352 | SCARBOROUGH FAIR | SIMON & GARFUNKEL |
| 289 600202 015 000 0813353 | THE SOUND OF SILENCE | SIMON & GARFUNKEL |
| | | |
| 289 600408 007 000 0436589 | CHERRY CHERRY | NEIL DIAMOND |
| 289 600213 017 000 0430306 | SOLITARY MAN | NEIL DIAMOND |
| | | |
| 289 600408 005 000 0468844 | YOU ARE SO BEAUTIFUL | |
| | | |
| 289 600585 009 000 0827728 | MORNING HAS BROKEN | CAT STEVENS |
| 289 600713 004 000 0827728 | MORNING HAS BROKEN | CAT STEVENS |
| 289 600585 004 000 0827728 | MORNING HAS BROKEN | CAT STEVENS |
| 289 600585 009 000 0827838 | PEACE TRAIN | CAT STEVENS |
| 289 600517 004 000 0827728 | MORNING HAS BROKEN | CAT STEVENS |
| 289 600406 000 000 0827728 | MORNING HAS BROKEN | CAT STEVENS |
| 289 600407 012 000 0827838 | PEACE TRAIN | CAT STEVENS |
| 289 600408 013 000 0827590 | LADY D-RBANVILLE | CAT STEVENS |
| 289 600320 010 000 0827728 | MORNING HAS BROKEN | CAT STEVENS |
| | | |
| 289 600259 001 000 2064969 | I USED TO BE AN ANIM | ERIC BURDON & THE |
| 289 600259 002 000 2332905 | THE DREAM | ERIC BURDON & THE |
| 289 600259 003 000 2278824 | AMERICAN DREAMS | ERIC BURDON & THE |
| 289 600259 004 000 2278993 | GOING BACK TO MEMPHI | ERIC BURDON & THE |
| 289 600259 005 000 2297193 | LEO'S PLACE | ERIC BURDON & THE |
| 288 600259 007 000 2064881 | DON'T GIVE A DAMN | ERIC BURDON & THE |
| 289 600259 008 000 1773415 | LIVING IN FEAR | ERIC BURDON & THE |
| 289 600259 009 000 2278220 | I WILL BE WITH YOU A | ERIC BURDON & THE |
| 289 600259 010 000 2269012 | NEW ORLEANS RAP | ERIC BURDON & THE |
| | | |
| 289 600667 001 000 0732596 | VIVA LAS VEGAS | ZZ TOP |
| 289 600968 007 000 | I'M BAD I'M NATIONWI | ZZ TOP |

RECEIVED 08-18-1999 MON 11:17 Case 0:98-cv-06507-DMM Document 91 PAGE 11 PRINTED PAGE 11 Entered on FLSD Docket 10/07/1999 Page 48 of 180

| RECORD COMPANY | TITEL | ARTIST | QUANTITY |
|---|---|---|---|
| FALCON | THE TIMES ARE A CHAN | SIMON & GARFUNKEL | 5000 |
| FALCON | SCARBOROUGH FAIR | SIMON & GARFUNKEL | 5061 |
| FALCON | CHERRY CHERRY | NEIL DIAMOND | 8529 |
| FALCON | PEACE TRAIN | CAT STEVENS | 7529 |
| FALCON | VIVA LAS VEGAS | ZZ TOP | 0 |

[ RECEIVED 08/18 07:52 1999 AT MM 3
18-AUG-1999 12:16 FROM FPI SECRETARIAT TO RIAA

Global Arts Urteil

PRINTED PAGE 12
R.I.A.A.

#012
P.11/11

## Übertragung unterbrochen

cnt-Type" content="text/html; charset=windows-1252">

_Ind 20/ Global Arts_

Zurück

**PRESSEINFORMATION**

Urteil gegen US-amerikanischen Lizenzverkäufer "Global Arts"

Das Bezirksgericht in Miami/USA hat am 14. Januar 1999 dem unseriösen Treiben der Firma Global Arts ein Ende gesetzt. Sie hatte im großen Stil angebliche Lizenzen für Aufnahmen international bekannter Künstler vertrieben. Die Angebotspalette umfaßte u.a. Simon & Garfunkel ("The Sounds of Silence"), Janis Joplin ("Piece Of My Heart"), Neil Diamond ("Solitary Man"), Joe Cocker ("Unchain My Heart"), Cat Stevens ("Morning Has Broken"), Kool and the Gang ("Cherish"), Eric Burdon & The Animals ("Ring Of Fire"), The Who ("My Generation"), The Doors ("Light My Fire") und ZZ Top ("La Grange"). In dem Urteil wurde jetzt festgestellt, daß Global Arts weder Rechte von den Plattenfirmen noch von den betroffenen Künstlern erworben hat. Diese Entscheidung ist gerade auch für Deutschland von erheblicher Bedeutung. Hier hatte die US-amerikanische Firma viele Lizenznehmer gefunden, wodurch die angeblich autorisierten Tonträger in großer Zahl auf den deutschen Markt gelangten. Die betroffenen deutschen Tonträgerhersteller, denen die Rechte an den Originalaufnahmen zustehen, haben inzwischen rechtliche Schritte gegen die Vervielfältiger und Vertreiber dieser Produkte eingeleitet.

Hamburg, den 11. März 1998

Bei Rückfragen wenden Sie sich bitte an: Dr. Thorsten Braun (Rechtsabteilung)

© Deutsche Landesgruppe der IFPI e.V. / Bundesverband der Phonographischen Wirtschaft e.V.

Anfang

Zurück

Bitte besonders auf folgende Firmen achten:

023   Bell Music
193   Falcon

[ RECEIVED: 04/08/99 12:40; 3035073953 -> MMS312 Document 91 PAGE 14 PRINTED PAGE 14 Entered on FLSD Docket 10/07/1999   Page 50 of 180
04/08/99  12:46 FAX 202 223    2        R.I.A.A.                                    ☒014
08-APR-1999  15:05  FROM  IFPI SECRETARIAT          TO  RIAA                    P.13/20

Tabelle1

## Production of Global Arts Products - 1997/98

| Catalogue No | Artist | Number Produced |
|---|---|---|
| 22413 | Harry Belafonte | 24625 |
| 22414 | Neil Diamond | 22295 |
| 22415 | The Doors | 41956 |
| 22418 | Mamas & Papas | 19400 |
| 22419 | Simon & Garfunkel | 54044 |
| 22420 | Perry Como | 12964 |
| 22421 | Sonny & Cher | 6307 |
| 22425 | Linda Ronstadt | 10877 |
| 22426 | Kool & The Gang | 14103 |
| 22429 | The Monkees | 13981 |
| 22431 | Tom Jones | 16524 |
| 22435 | Cat Stevens | 50182 |
| 22446 | Frank Sinatra | 3656 |
| 22461 | Joe Cocker | 3094 |
| 22484 | Frank Sinatra | 981 |
| 22477 | Great Memories | 5000 |
| 22480 | Eu te Amo | 5000 |
| 22536 | Roy Orbison | 10 |
| 21101 | Barry White | 2000 |

**Total**                            **307269**



LETTER AGREEMENT made this 19th. day of November 1998
by and between
GLOBAL ARTS PRODUCTIONS INC
6025 Sandy Springs Circle, Suite 222
Atlanta, Georgia 30328
United States Of America
(hereinafter called "Licensor")
and



Germany
(hereinafter called "Licensee")

WHEREAS Licensor and Licensee mutually agree to sign the following agreement

1. Licensor grants to Licensee the right and non-exclusive license to use the title "Winter Wonderland" by Dean Martin in a TV- and Radiopromotion Spot for the company Douglas during the period November 23rd, 1998 until December 23rd, 1998 Licensee shall be entitled to let the promotion spot be broadcasted by the Radio- and TV Stations chosen by Licensee without any limitation in the territories of Germany, Austria and Switzerland during the agreed contractual period.

2. Licensor represents and warrants that it has the right to authorise the right on the contractual title for the use in TV and Radio promotion spots and that he is entitled to grant these rights to Licensee.

3. Licensor grants and warrants that the license rights granted to Licensee do not infringe copyright laws. In case of any claim of a third party arising in connection with this agreement, Licensor shall be obligated to use all legal steps to protect its interest to fulfill this agreement.

4. Licensee agrees to pay to Licenser for the rights granted under the terms of this agreement a onetime compensation payment / flat fee in the amount of $ 2.000,- (Twothousand US Dollar). Payment shall be made by Licensee to Licensor upon signing of this agreement, according to a seperate invoice with all relevant bank details

5. This agreement is subject to the laws of Georgia, USA and the court of Atlanta shall have jurisdiction in connection with all claims o this agreement.

IN WITNESS WHEREOF the parties hereto have caused this Letter Agreement to be executed by their duly authoried representatives as of the day and year first above written
Atlanta, Nov. 19th, 1998                    Koblenz, Nov. 19th, 1998
GLOBAL ARTS PRODDUCTIONS

Danny Jorden

*Ex 3*

THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

DEPOSITION OF:

**JACK MILLMAN**

SONY MUSIC ENTERTAINMENT,)
INC., et al.,             )
                          )
Plaintiffs,               )  CASE NO. 98-6507
                          )  CIV-MIDDLEBROOKS
vs.                       )
                          )
GLOBAL ARTS PRODUCTIONS,  )
et al.,                   )
                          )
Defendants.               )
_____  )

**VOLUME I**

PURSUANT TO NOTICE, the deposition of

JACK MILLMAN, called for examination by Counsel for

the Plaintiffs was taken at the Enchantment Resort,

525 Boynton Canyon Road, Sedona, Arizona beginning

at the approximate hour of 9:05 a.m., on Thursday,

October 29, 1998, before Laurie A. Peach, Shorthand

Reporter and Notary Public within and for the state

of Arizona.

COPY

LOTT REPORTING, INC.
122 North Cortez, Suite 307
Prescott, AZ  86301
520-776-1169

54

1    A.    No.

2    Q.    Never.  Do you know an individual named

3 Lucky Carl?

4    A.    No, no.

5    Q.    Do you know any other name that Mr. Jordan

6 may have used in any relationship or form over the

7 years?

8    A.    Yes.

9    Q.    What other names, sir?

10    A.    Jerry Florio.

11    Q.    Anything else?  Any other names, sir?

12    A.    No, no other names.

13    Q.    Okay.

14    A.    Only his relationship with me.

15    Q.    Right.  We'll get into that in a moment.

16          When did Mr. Jordan use the name Jerry

17 Florio?

18    A.    Oh, the only time that I'm aware of had to

19 be '80, '81, 1981.

20    Q.    And in what connection did he use that

21 name, sir?

22    A.    I don't know what connection outside of my

23 knowledge of it, but all I can give you is what I

24 know in my knowledge.

25    Q.    All right.  Give me that.

1    A.   Well, back in those days I bought something

2  from Hy Mizrahi that had to do with Highlight.   I

3  can't recall exactly what it was.   It may have been

4  the Sha-Na-Nas or it may have been some other dowap

5  group, and I have an original contract with Jerry

6  Florio's signature on it or purportedly Jerry

7  Florio's signature, and that -- and it was strange

8  that -- I said, "This is strange, Jerry Florio

9  signature,"  and I am holding a Schedule A that says

10  Highlight and one says Hy Mizrahi, and the other side

11  it says vice president, and, then, it was explained

12  by someone who I can't remember who, that the two

13  entities Danny Jordan and Jerry Florio were one in

14  the same, and that's all I know about it.

15    Q.   So if I understand you correctly in this

16  particular transaction, that it was a document that

17  you received that was signed by Jerry Florio, whom

18  you believe to be Danny Jordan.   Is that accurate?

19    A.   Yes.

20    Q.   Did you ever inquire or find out why he

21  used another name?

22    A.   No.

23    Q.   Do you have any knowledge or information on

24  that or a belief?

25    A.   No.

THE UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

DEPOSITION OF:

**JACK MILLMAN**

SONY MUSIC ENTERTAINMENT,)
INC., et al.,               )
                            )
Plaintiffs,                 ) CASE NO. 98-6507
                            ) CIV-MIDDLEBROOKS
vs.                         )
                            )
GLOBAL ARTS PRODUCTIONS,    )
et al.,                     )
                            )
Defendants.                 )
_____)

**VOLUME II**

PURSUANT TO NOTICE, the deposition of

JACK MILLMAN, called for examination by Counsel for

the Plaintiffs was taken at the Enchantment Resort,

525 Boynton Canyon Road, Sedona, Arizona beginning

at the approximate hour of 9:40 a.m., on Friday,

October 30, 1998, before Laurie A. Peach, Shorthand

Reporter and Notary Public within and for the state

of Arizona.

COPY

LOTT REPORTING, INC.
122 North Cortez, Suite 307
Prescott, AZ  86301
520-776-1169

1      Q.    (Continued by Mr. Frackman) All right.

2    This is a document entitled, "Bill of sale."  Can you

3    identify that, Mr. Millman.

4      A.    This is the draft bill of sale that I

5    constructed for the purpose of selling the logo

6    Stack-of-Hits or Stack-O-Hits to whomsoever might be

7    desiring to obtain it for usage, and the instrument

8    then contains -- uh -- intentions and statements that

9    speak for themselves simply by reading them, and this

10   was never used in fact.  And, in fact, no one ever

11   acquired any of this, and you asked me to bring a

12   sample of this, and that's the sample.

13             (Deposition Exhibit 13 marked.)

14             MR. FRACKMAN:  We also have produced -- why

15   don't we mark that, also, another original document.

16   It would be 14.

17             (Deposition Exhibit 14 marked.)

18      Q.    (Continued by Mr. Frackman) Yeah.  Would

19   you describe Exhibit 14, Mr. Millman.

20      A.    All right.  This is the year of 1981, a

21   small abbreviated version of the actual -- of what

22   was also in addition to this, not this, but larger

23   than this, 8-1/2 by 11, yes, about an 8-1/2 by 11

24   side book.  This is the reduced synopsis copy of this

25   book which was the Stack-O-Hits offering, and this

 1  particular instrument was designed to be a sales aide

 2  to the sales people that were working with the

 3  various financial individuals representing buyers,

 4  and it contains in it information about the tax

 5  shelters and/or certainly descriptions of what they

 6  were intended to accomplish, and how they're

 7  presented.

 8          And then in the middle of the book on page

 9  4 and 5 are pages of lists of product -- um -- or,

10  no, I'm sorry. I take that back -- strike that.

11          That's not product. They're descriptive

12  lists of -- rather they're lists indicating various

13  financial realities as pertaining to the modus

14  operandi purchased by a tax deferral purchaser. And

15  then in the back of the book on the last page is a

16  list of artists and price considerations, also, and

17  this material would be material we either at that

18  time possessed having bought it and/or in addition to

19  that, also, material that was available to us by one

20  or another of the people that has supplied us with

21  quote, unquote "shopping lists of product," that they

22  claimed to have rights to that we had not acquired.

23  But in the event of some buyer wanting them, we would

24  then acquire them.

25          Q.   Mr. Millman, I'm going to have some more

1    A.   I can only surmise that he might have

2    because there is a lawsuit saying that someone did,

3    and he was certainly one of the defendants, and so it

4    seems to be logical to proceed that he did.

5    Q.   Do you have, as you sit here, any opinion

6    or any knowledge or any belief as to what Mr. Jordan

7    claims to be the source of the product that he is

8    selling through Global Arts, or any surmise?

9    A.   I can only reflect upon what you furnished

10   me here and nothing else because until you have given

11   this I have seen nothing else aside from the lists

12   noted in the lawsuit.

13   Q.   Right.  And my question is:  As you sit

14   here knowing whatever you know now from any source,

15   do you have any idea, surmise or information as to

16   whether Mr. Jordan claims rights to those recordings

17   that Global Arts is licensing?

18   A.   No.

19        (Deposition Exhibit 17 marked.)

20   Q.   (Continued by Mr. Frackman) Can you

21   identify, sir, Exhibit 17?

22   A.   Well, this -- I am going to identify it as

23   follows:  This is a letter from Pete Marino who

24   was an employee, dated February 11th 1980, 18 years

25   ago, to Wesley Sanborn from an employee of M/V

1  Productions, and it was a letter to Wes Sanborn of

2  Koala Records in Birmingham, Michigan, and the letter

3  reads, "Enclosed please find a partial product list,

4  to be followed by the complete catalog to date upon

5  Jack's and Joy's return" - obviously, we weren't

6  there.  We were coming back from somewhere - "I hope

7  this will suffice in the interim.  If I can be of any

8  assistance please do not hesitate to call."  That's

9  the content of the first page.  Other than the fact

10  that it is dated -- it has a letterhead, and it is

11  signed by Pete Marino, and it was the property of

12  Joe Vincent who acquired it from somebody having to

13  do with Wes Sanborn.

14          Second page is a list of artists with fair

15  market values on the far left.  They, obviously, have

16  to be because they don't pertain to anything else

17  and -- um -- some other figures, monetary figures,

18  over to the far right, which I am only glancing at

19  them -- I don't know.  And it lists a bunch of

20  artists which were a part and parcel of the then

21  existing acquisition having been acquired by the

22  company and -- uh -- then at the bottom it says

23   "BULLETT PRODUCTIONS," and there is artists listed

24  there.

25          Q.    Now, the second page of Exhibit 17 where it

1  has the numbers on the right-hand corner.  To your

2  understanding those were the fair market values of

3  the particular masters calculated the way you've

4  discussed.

5       A.    That is what I perceive them to be.

6       Q.    Now, there are two -- if you look at --

7  there were two Barry White master albums referenced.

8       A.    Yes, I see them.

9       Q.    There are numbers next to each of the

10  albums on Barry White.  One is 374, and the other one

11  is 380.  Do you know what those numbers are

12  designating, sir?

13       A.    No, I don't -- uh -- I have no idea.

14       Q.    Now, in your interrogatory answers that we

15  went over yesterday, you identified the master

16  recordings or the recording "Baby, We Better Try To

17  Get It Together," "Honey, Please Can't You See," "Let

18  The Music Play," "Never, Never Going To Give You Up"

19  and "You See The Trouble With Me," as Barry White

20  selections that at one time M/V Productions had

21  exclusives to.  Were those selections embodied in one

22  of the other two Barry White albums referenced in

23  Exhibit 17?

24       A.    It would be my wild guess, but I would say

25  that more than likely they were.





PRESENTING

STACK-O-HITS

1981

MASTER RECORDING
LEASE PROGRAM

COPYRIGHT ©

## INTRODUCTION

Soundwave Records, Inc. is pleased to present its 1981 STACK-O-HITS Master Recording Lease Program. The STACK-O-HITS program has been designed to offer an unusual opportunity to qualified investors to become part of the record industry and share in the enormous profits available.

The STACK-O-HITS Master Recording Lease Program is structured to offer you, the prospective Lessee, strong profit potential from the release and exploitation of the leased Master Recording during the seven (7) year term of your lease. Additionally, substantial tax benefits are made available to the Lessee in the form of current deductions and Investment Tax Credits (ITC) amounting to a tax deduction equivalent of between $4.30 and $5.90 for each $1.00 invested in the lease.

More importantly, the program permits you to control the amount of risk you undertake. Your lease prepayment ranges from $10,750 to $41,000, and you have NO OTHER PAYMENTS to make to STACK-O-HITS except as a percentage of your receipts from the exploitation of the Master Recording. Your only other expenditures depend upon the amounts you wish to commit to exploitation.

YOUR STACK-O-HITS REPRESENTATIVE CAN SUPPLY YOU WITH A BOOKLET WHICH CONTAINS THE ENTIRE LEASE PROGRAM IN FULL DETAIL AND INCLUDES A TAX OPINION LETTER AND SAMPLES OF ALL DOCUMENTS AS WELL AS INFORMATION ABOUT THE RECORD BUSINESS AND STACK-O-HITS.

We invite your inquiries.

(Attach business card of representative)

- 1 -

STACK-O-HITS
1981 MASTER RECORDING LEASE PROGRAM

## SUMMARY

The STACK-O-HITS Recording Lease Program has been devised as an investment vehicle for persons desirous of exploiting the opportunities for profit in the record business.

The STACK-O-HITS program consists of the following procedures:

1. STACK-O-HITS will acquire, for a combination of cash and a full recourse "at risk" note, a Master Recording selected by the prospective lessee (Investor), from an extensive list of such Master Recordings known to be available for such purchase.

2. Prior to such purchase, STACK-O-HITS will obtain two (2) separate independent appraisals from qualified appraisers. Purchase price at which STACK-O-HITS acquires the Master will not exceed such appraisal value, and will generally range between $175,000 and $1 Million.

3. STACK-O-HITS will enter into a lease of such Master Recording with Lessee for a period of eighty-five (85) months on a non-exclusive basis for use in the United States only.

4. Lease rentals will consist of:

   a. A fixed sum for the first year of the lease, ranging between $9,000 and $31,000 depending upon the fair market value of the Master leased;

   b. A minimum rent, prepaid in advance, ranging between $1,750 and $10,000, to be allocated equally over the following six years of the lease;

   c. Seventy percent (70%) of gross proceeds received by the lessee, after deducting royalties, shall be paid to Lessor up to an amount equal to the fair market value of the Master, after the deduction of minimum rents prepaid and applied in Paragraph 4.b. Maximum rent due in any one month is $25,000.

   d. Twenty percent (20%) of gross proceeds received by the lessee after deducting royalties, shall be paid to Lessor after Lessor's lease payments have totaled an amount equal to the fair market value of the Master, as detailed in Paragraphs 4.b. and 4.c.

- 2 -

5. The Lessee may commercialize the Master in any manner it selects, including mail order, TV promotion, non-exclusive distribution agreements via an agent employed on its behalf, or otherwise. There will be no pre-negotiated distributor agreements of any kind accompanying the Lease. STACK-O-HITS nor any affiliate has any contractual arrangement or relationship with any marketing or distributing agent, individual or company concerning the exploitation and marketing of the leased Masters.

6. Each Lessee is entering into the lease with the dominant, controlling and impelling motivation of realizing an economic profit.

7. The new master sound recording which is the subject of any lease under this program has never previously been used commercially in its present configurative form and is protected by copyright. The useful economic life of the Master is considered to be fourteen (14) years. Purchase of such new Master Recording will entitle STACK-O-HITS to a 10% Investment Tax Credit. STACK-O-HITS agrees, as part of the Lease Agreement, that it will make proper election to pass through to the Lessee all of the tax credit to which STACK-O-HITS would otherwise be entitled.

   Prospective Lessees are advised that the foregoing, as well as the estimates of anticipated income tax consequences set forth herein, are intended as a descriptive summary only. Prior to entry into a lease with STACK-O-HITS, Lessee should, together will Lessee's tax and/or business advisor, examine the STACK-O-HITS LEASE PACKAGE which contains the lease, Purchase qualification documents and Legal Opinion.

   The STACK-O-HITS Lease Program is, as indicated in the Legal Opinion, suitable for individuals, joint-venturers, general partnerships, and corporations.

   STACK-O-HITS makes no representations, nor will it be responsible for any representations by any firm or individual, other than those set forth in this document and the STACK-O-HITS LEASE PACKAGE as described.

STACK-O-HITS invites your inquiries.

Mailing Address:
P.O. Box 2712
Hollywood, CA  90028

(213) 656-1834
(213) 658-5666
(213) 821-6818

Production Studio Address:
10825 Ellis Avenue
Fountain Valley, CA

- 3 -

# INCOME TAX CONSEQUENCES

STACK-O-HITS makes no representation as to potential earnings for a particular Master Recording, or for Master Recordings in general. Accordingly, the income tax examples which follow assume no income from sales. Prospective Lessees should consult their tax advisors as to the effect of earnings on Lessee's income tax liability.

Examples assume Lessee to be in the 50% income tax bracket. For clarity, the Investment tax credit is presented as an equivalent deduction ($10,000. of tax credit is equivalent to a $20,000 tax deduction for someone in the 50% tax bracket).

EXAMPLE 1.  Purchase Price and Fair Market Value: $175,000.

| | |
|---|---:|
| First year rental | $ 9,000. |
| 6-Year advance minimum rent | 1,750. |
| Total Cash paid for rentals | $ 10,750. |
| | |
| Investment tax credit, $17,500, equivalent deduction of | $ 35,000. |
| First year rent | 9,000. |
| Year 1:  Deduction & equivalent | $ 44,000. |
| * 2nd thru 7th year deduction at $291.66 per year | 1,750. |
| Total Tax Benefit | $ 45,750.  (4.3 : 1)+ |

+ $4.30 deduction for each $1.00 invested.

EXAMPLE 2.  Purchase Price and Fair Market Value: $250,000.

| | |
|---|---:|
| First year rental | $ 11,000. |
| 6-Year advance minimum rent | 2,500. |
| Total Cash paid for rentals | $ 13,500. |
| | |
| Investment tax credit, $25,000, equivalent deduction of | $ 50,000. |
| First year rent | 11,000. |
| Year 1:  Deduction & equivalent | $ 61,000. |
| * 2nd thru 7th year deduction at $416.66 per year | 2,500. |
| Total Tax Benefit | $ 63,500.  (4.7 : 1) |

EXAMPLE 3.  Purchase Price and Fair Market Value: $450,000.

| | |
|---|---:|
| First year rental | $ 17,000. |
| 6-Year advance minimum rent | 4,500. |
| Total Cash paid for rentals | $ 21,500. |
| | |
| Investment tax credit, $45,000, equivalent deduction of | $ 90,000. |
| First year rent | 17,000. |
| Year 1:  Deduction & equivalent | $107,000. |
| * 2nd thru 7th year deduction at $750.00 per year | 4,500. |
| Total Tax Benefit | $111,500.  (5.2 : 1) |

EXAMPLE 4.  Purchase Price and Fair Market Value: $725,000.

| | |
|---|---:|
| First year rental | $ 25,000. |
| 6-Year advance minimum rent | 7,250. |
| Total Cash paid for rentals | $ 32,250. |
| | |
| Investment tax credit, $72,500, equivalent deduction of | $145,000. |
| First year rent | 25,000. |
| Year 1:  Deduction & equivalent | $170,000. |
| * 2nd thru 7th year deduction at $1,208.33 per year | 7,250. |
| Total Tax Benefit | $177,250.  (5.5 : 1) |

EXAMPLE 5.  Purchase Price and Fair Market Value: $1,000,000.

| | |
|---|---:|
| First year rental | $ 31,000. |
| 6-Year advance minimum rent | 10,000. |
| Total Cash paid for rentals | $ 41,000. |
| | |
| Investment tax credit, $100,000, equivalent deduction of | $200,000. |
| First year rent | 31,000. |
| Year 1:  Deduction & equivalent | $231,000. |
| * 2nd thru 7th year deduction at $1,666.66 per year | 10,000. |
| Total Tax Benefit | $241,000.  (5.9 : 1) |

* Represents 1/6 of prepaid rent for Years 2 thru 7

PLEASE REFER TO THE SECTION ON INVESTMENT CREDIT (ITC) FOR FURTHER DISCUSSION AND INFORMATION

* Represents 1/6 of prepaid rent for Years 2 thru 7

## THE INVESTMENT TAX CREDIT ("ITC")

A tax credit reduces the amount of taxes owed; as opposed to a tax deduction which merely reduces the amount of taxable income. Thus $1 worth of deduction for a taxpayer in a 50 percent bracket puts only 50 cents in his pocket, while a $1 tax credit puts $1 in his pocket.

The Internal Revenue Code ("the Code") provides investment tax credits (ITC) in connection with the purchase, construction or production of tangible personal property used in a trade or business or for the production of income. Property that is eligible for the ITC is described in Section 38 of the Internal Revenue Code and is technically referred to as "Section 38 property". Property is eligible only if it is depreciable under Section 167 of the Code, is placed in service during the tax year the ITC is taken, and is not used predominately outside the United States. As stated in the Tax Law Opinion, STACK-O-HITS' Master Recordings qualify as Section 38 property.

### AMOUNT OF ITC

The amount of the ITC is 10 percent of the "qualified investment" a taxpayer makes in Section 38 property. If the property has a useful life of five years or more, the qualified investment will be equal to 100 percent of the property's "basis". "Useful life" for calculation must be the same as the useful life used for calculation of depreciation under Section 167. The estimated life of all Master Recordings purchased by STACK-O-HITS is 14 years.

"Basis" is the purchase price of the property, and the basis used for depreciation under Section 1012 of the Code. STACK-O-HITS purchases, from its suppliers, all property it leases to investors. The price paid by STACK-O-HITS is negotiated by its experienced personnel. In addition, STACK-O-HITS obtains two independent appraisals, which appraisals serve as further substantiation of the purchase price as the tax basis.

The dollar amount of ITC that may be credited against a taxpayer's tax liability for 1981 is limited to $25,000 plus 80 percent of the taxpayer's tax liability in excess of $25,000. In the event an investor's ITC for 1981 exceeds this limitation or the investor has more ITC than he can use, the excess may be carried back three years and carried forward 15 years.

### ITC PASS THROUGH

The Code expressly provides that a Purchaser/Lessor of new Section 38 property may elect to pass its ITC through to the Lessee, and upon such election the IRS will treat the Lessee as having acquired such property for an amount equal to the fair market value of such property. IRC Section 48(d)(1)(A). The amount of ITC available is the applicable percentage of the fair market value of the property on the date possession is transferred to the Lessee. Reg. Sec. 1.48-4(c).

(The title on this page is not readable on the original)

### RECAPTURE OF INVESTMENT CREDIT

IRC Section 47(a) provides for "recapture" of any investment credit (or part thereof) resulting from an early disposition of the subject property. We believe a Lessee is NOT AT RISK of such recapture for these reasons:

1. Lessee may not sell or assign the Lease.
2. Lessee will have prepaid all minimum rentals for the term of the Lease and therefore cannot default thereon.
3. Marketing of the product will be ongoing during the entire term of the Lease.

Only deliberate action by Lessee, such as failure to pay required percentages under the Lease, or other breach, can terminate the Lease and trigger recapture of some, or all, of the ITC.

Thus the STACK-O-HITS Master Recording Lease Program provides:

1. ECONOMIC REALITY
2. NO RECOURSE NOTES
3. NO RECAPTURE
4. NO FORECLOSURE
5. FULL ITC BASED ON FAIR MARKET VALUE
6. CARRY BACK OR FORWARD ANY EXCESS ITC
7. NO AT RISK LIMITATIONS

(Inside of back cover)

## MASTER RECORDING SAMPLE INVENTORY

### FAIR MARKET VALUE

This sampling of Master Recording tapes available for lease is simply to give the prospective Lessee an idea of the quality and variety which is represented by STACK-O-HITS. Your STACK-O-HITS representative will be able to provide a complete catalog for your choices.

**\*\*\$175,000\*\***

**Live at Melody Ranch Series**
featuring a major star performer *
and country talent of note such as:

JIMMY WAKELY *
GLEN CAMPBELL *
ROY CLARK *
TEX RITTER *
MERLE HAGGARD *
EDDIE DEAN *

**\*\*\$250,000\*\***

**Contemporary Pop**
SILVER CONVENTION
CAROL DOUGLAS
DORSEY BURNETTE
DENNY GREENE (of Sha Na Na)
RUSS MORGAN & ORCHESTRA

**Living Legend Series**

LOUIS ARMSTRONG
TOMMY DORSEY
CAB CALLOWAY
ELLA FITZGERALD

**Blues Greats**
LEADBELLY
MISSISSIPPI JOHN HURT
HOWLIN' WOLF
BIG JOE WILLIAMS

**Jazz Greats**
MOSE ALLISON
COUNT BASIE
DUKE ELLINGTON
BILLIE HOLIDAY
CHARLIE PARKER

**\*\*\$450,000\*\***

**Contemporary Pop**
MEL TORME
BEAU BRUMMELS
RAY CHARLES
WILSON PICKETT
MIKE BLOOMFIELD

**Country & Western**

BUCK OWENS
MERLE TRAVIS
DOC WATSON
FREDDY FENDER

**Jazz Greats**
ART BLAKEY
STAN GETZ
HERBIE HANCOCK
CHARLIE MINGUS
MILES DAVIS

**\*\*\$725,000\*\***

JOHN TRAVOLTA
ARTHUR FIEDLER & BOSTON POPS
SLY STEWART (of Sly & Family Stone)
SONNY BONO & FRIENDS
DEL SHANNON
RUPERT HOLMES

**\*\*\$1,000,000\*\***

PAUL SIMON
WARREN ZEVON
BOBBIE GENTRY
ELVIS PRESLEY (Historical Documentary)
TIMELESS BEATLES (Historical Documentary)
BEACH BOYS

---

## SOME COMMONLY ASKED QUESTIONS

**Q:** AFTER MAKING MY INITIAL LEASE PAYMENT FOR THE SEVEN YEARS, AM I COMMITTED TO ANY OTHER PAYMENTS?

**A:** Only out of receipts from exploitation of your lease. Should you have no receipts during any portion of the term of the lease, no additional rentals are due for such period. (See Lease Agreement, Paragraph 3)

**Q:** WHAT DOES IT COST TO EXPLOIT THE MASTER RECORDING?

**A:** STACK-O-HITS has no pre-arranged contracts for production and/or distribution to which you are committed. You make your own arrangements, negotiate your own deals, with your own distributor. You select the distributor from some reliable firms we can suggest or anywhere else. Experience in the industry tells us your minimum initial expenditure will range between $2,000 and $4,000.

**Q:** HOW DO I QUALIFY FOR THE INVESTMENT TAX CREDIT?

**A:** A full discussion of the Investment Tax Credit is set forth in the Tax Opinion Letter, Paragraph 3, beginning at Page 36. In summary, the Lessor (STACK-O-HITS) passes through to you, the Lessee, the Lessor's credit (IRC Section 48(d)(1)(A). The amount of credit is calculated based upon the purchase price Lessor pays (in cash and full recourse notes) for the Master Recording.

**Q:** AM I OBLIGATED ON LESSOR'S NOTE, OR ANY OTHER NOTE?

**A:** No. Your *only* obligation is to pay the Lease Rentals described herein.

**Q:** ARE THERE LIMITATIONS ON THE AMOUNT OF INVESTMENT TAX CREDIT I CAN TAKE?

**A:** For 1981, the credit is limited to $25,000, PLUS 80% of your regular tax liability in excess of $25,000. However, any credit not used in your 1981 return can be carried back to obtain refunds out of your prior tax liabilities for 1978, 1979, and 1980, and then carried forward beyond 1981 into the next fifteen years' returns until used up in full. (See the Tax Opinion Letter discussion, Paragraph 3.)

**Q:** WHAT DO I DO IF IRS QUESTIONS MY RETURN IN CONNECTION WITH THIS LEASE?

**A:** You are entitled to the guidance and representation of our attorneys (See representation letter) and should contact them directly or through STACK-O-HITS.

**Q:** I HAVE OTHER QUESTIONS - WHO DO I CONTACT?

**A:** Contact STACK-O-HITS at (213) 656-3834, (213) 658-5666 or (213)821-6818. If the questions pertain to the legal aspects of the tax opinion letter or representation letter, direct contacts can be made with our attorneys by calling us.

- 8 -

FROM : Shem Su Hru Foundation         PHONE NO. : 760 242 9265         Oct. 21 1998 02:22PM P1

# M/B Productions, Inc.

**356 NORTH ORLANDO AVE.**
**LOS ANGELES, CA 90048**
**(213) 658-5665**



*Jack Milliman*
**EXHIBIT NO.** 17
*LPeach 10/30/98*

February 11, 1980

Wesley E. Sanborn
5825 Crabtree Road
Birmingham, MI 48010

Property Of J. Vincent
Copy No. 101398 .
COPR 1997
All Rights Reserved

Dear Wes:

Enlcosed please find a partial product list, to be followed
by the complete catalog to date upon Jack's and Joy's return.

I hope this will suffice in the interim.  If I can be of any
assistance please do not hesitate to call.

Sincerely,

Pete Marino

# M / V Productions, Inc.

**M V P**

### VIDEO   MUSIC   INVESTMENTS

1617 WOODS DRIVE   LOS ANGELES, CA 90069   (213) 658-5665

| | | | |
|---|---|---|---|
| 375.000 | 340. | SONNY & CHER   (to replace Ike & Tina) | 375,000 |
| 250.000 | 347. | FATS WALLER | 250,000 |
| 312.500 | 348. | TEX WILLIAMS | 312,500 |
| 375.000 | 349. | LOVIN SPOONFUL | 375,000 |
| 375.000 | 350. | ROY ORBISON | 375,000 |
| ✓✓ | 351. | BOBBY DARIN | 375,000 |
| ✓✓ | 352. | SHA NA NA | 375,000 |
| ✓✓ | 353. | CHUCK MANGIONE | 375,000 |
| 281.250 | 354. | MICKEY GILLEY | 281,250 |
| 375.000 | 355. | JOHNNY DESMOND | 375,000 |
| 312.500 | 356. | LETTERMEN | 312,500 |
| 750.000 | 358. | BILLY JOEL | 750,000 |
| 750.000 | 359. | BILLY JOEL | 750,000 |

Property Of J. Vincent
Copy No. 101398
COPR 1997
All Rights Reserved

**BULLETT PRODUCTIONS**

| | | | |
|---|---|---|---|
| 500.000 | 374. | BARRY WHITE | 500,000 |
| 312.500 | 375. | CARL PERKINS | 312,500 |
| 375.000 | 376. | Paul anka (maybe) | 375,000 |
| 625.000 | 377. | CAROL KING | 625,000 |
| 312.500 | 378. | ED BRUCE | 312,500 |
| 281.250 | 379. | NINA SIMONE | 281,250 |
| 500.000 | 380. | BARRY WHITE | 500,000 |
| 250.000 | 381. | LIGHTIN' HOPKINS | 250,000 |
| 250.000 | 382. | CHARLY BARNETT | 250,000 |

ALL ALBUMS ADDRESSED TO:   KOALA RECORD COMPANY
~~108 La Verne Circle~~
Hendersonville, TN  37075

NEW ADDRESS FOR KOALA USE THIS IN FUTURE
FOR ALL EVALUATIONS

$750.000
250.000

Waylon Jennings — UN LEASING—24 Oakland Ave, Port Jefferson, N.Y. 11777
u/mv leasing   ROY CLARK & WAYLON JENNINGS  $250,000 each

1            UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF FLORIDA

3

4

5  SONY MUSIC ENTERTAINMENT,  )
    INC., et al.,           )

**CERTIFIED COPY**

6                     )

7          Plaintiffs,  )

8     vs.             )  No. 98-6507-CIV
                     )    MIDDLEBROOKS

9  GLOBAL ARTS PRODUCTIONS,   )
    et al.,              )

10         Defendants.  )
   ————————————————————)

11

12

13

14

15

16       DEPOSITION OF SHELLY LIEBOWITZ

17        Tuesday, December 1, 1998

18

19

20

21                   The

22                   Egnatuk
                   Agency

23  REPORTED BY:       CERTIFIED SHORTHAND REPORTERS
    Ingrid Suarez Egnatuk   370 South Crenshaw Blvd

24  CSR No. 3098, RPR     Suite E-102
                      Torrance, California 90503

25  File No.: 12-2-981    (310) 787-3240

                                     1

1    status of the lawsuit at that time?

2         A       No, he didn't.

3         Q       Did -- during the course of that

4    conversation, did you discuss with Mr. Jordan whether

5    he would pay your legal fees in connection with the

6    action?

7         A       No, I did not.

8         Q       Did he ask you to pay his legal fees?

9         A       No, he did not.

10         Q       Did the subject of legal fees come up

11   at all?

12         A       No.  Not at all.

13         Q       Is there anything else about that

14   conversation at all that you recall, sir?

15         A       No.  Nothing specific.

16         Q       How long did it take?

17         A       Maybe 10, 15 minutes.  I know Dan

18   Jordan a long time.  He's been a friend.  He knows my

19   wife and my child.  He was at my son's bris.  So he

20   asked a lot of questions, how the baby is doing, how

21   my wife is adjusting to California.  The basics.

22         Q       Did you make any notes during the

23   conversation?

24         A       No.  Not at all.

25         Q       Have you spoken to Mr. Jordan since

15

1    that time?

2          A      No, I haven't.

3          Q      Do you know where he is presently

4    residing?

5          A      No.  He's always -- he travels so much,

6    I never know where he's going to call from.

7          Q      But do you know where he lives?

8          A      I have an answering service that I

9    usually leave a message for him at.

10          Q      Do you happen to remember what that

11    number is?

12          A      No, I don't.  Not offhand.  I don't

13    have those numbers with me.

14          Q      Do you ever mechanically record,

15    tape-record, any telephone conversations?

16          A      Never.

17          Q      And it's your recollection that this

18    conversation with Mr. Jordan was before you were

19    served initially with a Subpena in this case?

20          A      Yes.

21          Q      And sometime thereafter you were served

22    with a Subpena, sir; correct?

23          A      Correct.

24          Q      Now, that Subpena asked you to appear

25    at a deposition on a specified date sometime earlier

                                                    16

1       any business with Intermusic, S.A., in Switzerland?

2              A      No, sir.

3              Q      Or hear of them?  "No"?

4              A      No.

5              Q      Have you ever had any contact or done

6       any business with Hans Ballo, B-a-l-l-o?

7              A      I've never done any business with him.

8       But I did get a phone call -- excuse me.  A fax at

9       one point in time a few years back from a company

10      called -- I believe it was San Juan Music, asking me

11      if I was purporting to have Bob Marley rights.  And I

12      said, "No, I did not."  And it supposedly came from

13      Hans Bollo saying that I did.

14             Q      And did you ever track down how that

15      happened, sir?

16             A      No, I did not.  I did find out that one

17      way or another he got that document that I put

18      together explaining about the original Stack-O-Hits

19      100 documents of that original -- explaining the

20      documents and the chain of title on them and that I

21      had known it had been used in some tax shelters, as

22      well as other things, the document I described

23      earlier.

24             Q      From Mr. Millman?

25             A      Right.  No.  The document that I put

                                                        79

1    together for Mr. Jordan regarding the Stack --

2    regarding the --

3         Q    I'm a little confused because I thought

4    what you gave Mr. Jordan was what Mr. Millman gave

5    you.

6         A    Yes.  Earlier I explained that what I

7    had given Mr. Jordan was either a bill of sale or

8    license on that material.  And I also put together

9    that document, an affidavit, basically a letter

10   stating that these are how -- these are the

11   background of these recordings and everything else.

12        Somehow Mr. Ballo got that letter and

13   attached that to some -- something pertaining to Bob

14   Marley.  Because when San Juan contacted me, I faxed

15   them back immediately saying I have no business

16   dealings with Hans Ballo.  I have nothing to do with

17   Bob Marley recordings.  I have never purported to own

18   or control or license Bob Marley recordings.

19        Q    Do you know whether Mr. Ballo got that

20   document from Mr. Jordan?

21        A    I have no idea.

22        Q    Did you ever discuss that with

23   Mr. Jordan?

24        A    No, I did not.  Excuse me.  Yes, I did.

25   I did mention once to him that if he knew this guy,

1   to make sure that he does not try to put something

2   out with anything to do with -- anything that I had

3   anything to do with.  It was not anything that I had

4   anything to do with.

5        Q      Did Mr. Jordan tell you he knew

6   Mr. Ballo?

7        A      I think that -- I believe that he

8   mentioned that he knows Mr. Ballo.

9        Q      Did Mr. Jordan tell you that Mr. Ballo

10  represented him or Global Arts?

11       A      No.  He didn't mention anything of that

12  sort.

13       Q      Did you ever learn that from any

14  source?

15       A      No, I haven't.

16       Q      Do you still have someplace the fax

17  that you got from San Juan Music or your reply?

18       A      I don't believe so.

19       Q      Who at San Juan Music?

20       A      I don't remember who it was.

21       Q      Do you remember what Bob Marley

22  recordings were involved?

23       A      Just mentioned Bob Marley recordings.

24       Q      Was it only Bob Marley recordings?

25       A      Yes, sir.

81

1        Q       Any other -- strike that.

2        A       No other artists.  Just Bob Marley

3   recordings.

4        Q       And how many?

5        A       They just mentioned that they owned and

6   controlled Bob Marley recordings.

7        Q       In other words -- why was San Juan

8   Music contacting you?

9        A       I gather that Mr. Ballo was purporting

10  to have paperwork for me, or whatever, offering it

11  to -- the Bob Marley recordings.  And what he was

12  using was that one document they put together saying

13  that the following recordings were a product that I

14  know had come to tax shelter programs, had been used

15  for other things, and had been put out through the

16  years, originally came from Mr. Millman and his

17  assorted companies listing them out; and to the best

18  of my knowledge there have never been a challenge on

19  any of these recordings, blah, blah, blah.  That

20  statement was attached to obviously some kind of

21  schedule of Bob Marley recordings.

22       Q       In other words, Mr. Bollo, to your

23  understanding, had basically taken your statement and

24  switched the list of recordings, had falsified it?

25       A       That's how it appeared from when I was

1          MR. FRACKMAN:  Would you mark this, please.

2                    (Plaintiff's Exhibit 28 was

3                    marked for identification

4                    and is attached hereto.)

5      BY MR. FRACKMAN:

6          Q     Can you identify Exhibit 28,

7      Mr. Liebowitz.

8          A     Yes, sir.  This is the document that I

9      had mentioned earlier that I put together at

10     Mr. Jordan's request.  And this is what was

11     purportedly attached to that Bob Marley . . . . . .

12         Q     When you prepared this, for -- strike

13     that.

14               Just to make the record clear, this is

15     the document, Exhibit 28, that Mr. Ballo purportedly

16     attached to the Bob Marley recordings?

17         A     That's what I was told, sir.

18         Q     Now, when you prepared this document --

19     strike that.  Let me ask it first.

20               Did you prepare Exhibit 28, or did

21     Mr. Jordan prepare it for you?

22         A     I did, sir.

23         Q     When you prepared Exhibit 28, was there

24     a list or a schedule attached to it?

25         A     What was attached to this was the --

                                              85

# SRI Label Group

*Saturn Records*        SRI RECORDS        *Flamingo Jazz*

November 21, 1997

TO WHOM IT MAY CONCERN.

We purchased master recordings from Jack Millman (Stack-O-Hits, Banyon, etc.) on several occasions. These purchases also included recordings that were previously utilized for tax shelter purposes. We purchased these properties with the knowledge that these were legitimate properties and that they were no challenges from any original source. The dates of our purchases were 5/21/93, 11/5/93, 1/3/95 and 6/30/95.

We have negotiated for sales of these properties with Danny Jordan, the president of Global Arts Productions.

Sincerely,

*Shelly Liebowitz*

Shelly Liebowitz
President

Plfs ___ EXHIBIT 28
Ingrid Suarez Egnatuk, CSR #3098
12-1 ,19 98
WITNESS Liebowitz
Page 1 of 1

THIS FORM WILL BE ACCEPTED FOR FILE
OR PRINTED "LEGIBLY" IN BL      IF IT IS TYPED

Mailing Address:  (Not to newspaper)

Name: *Danny Jordan*

Address: *14715 Oxnard St.*

City: *Van Nuys, CA 91411*

REGISTRAR - RECORDER / COUNTY CLERK'S FILING STAMP

98   856773

RECORDED/FILED IN OFFICIAL RECORDS
RECORDER'S OFFICE
LOS ANGELES COUNTY
CALIFORNIA

4:01 PM MAY 20 1998

| 1 | [✓] First Filing      [ ] Renewal Filing      [ ] With Changes |

FICTITIOUS BUSINESS NAME STATEMENT      FEE $10.      BF&R

THE FOLLOWING PERSON(S) IS (ARE) DOING BUSINESS AS: (Attach additional pages if required)

| 2 | Fictitious Business Name(s)
1. JUST GREAT MUSIC
2. |

| 3 | Street Address & City of Principal place of Business in California (P.O. Box alone not acceptable)
15030 VENTURA BLVD SHERMAN OAKS CA 91403  S. 728      Zip Code 91403 |

| 4 | Full Name of Registrant      (If corporation - incorporated in what State)
DANNY JORDAN |
|   | Residence Street Address      City      State      Zip Code
14715 OXNARD St  VAN NUYS      CA      91411 |

| 4A | Full Name of Registrant      (If corporation - incorporated in what State) |
|    | Residence Street Address      City      State      Zip Code |

| 4B | Full Name of Registrant      (If corporation - incorporated in what State) |
|    | Residence Street Address      City      State      Zip Code |

| 5 | This Business is conducted by: (check one only)      [✓] an individual      [ ] co-partners      [ ] an unincorporated association other than a partnership      [ ] a general partnership      [ ] husband and wife      [ ] joint venture      [ ] a corporation      [ ] other - please specify      [ ] a business trust      [ ] a limited partnership |

| 6 | Type of Business
Example: Auto Repairing, Salon, Landscaping |

| 7 | [ ] The registrant commenced to transact business under the fictitious business name or names listed above on (Date):
[ ] Registrant has not yet begun to transact business under the fictitious business name or names listed herein. |

| 8 | If Registrant is not a corporation sign below:
*Danny Jordan*    DANNY JORDAN
SIGNATURE      TYPE OR PRINT NAME

SIGNATURE      TYPE OR PRINT NAME

SIGNATURE      TYPE OR PRINT NAME |
| 8A | If Registrant is a corporation sign below:
CORPORATION

SIGNATURE AND TITLE

TYPE OR PRINT OFFICER'S NAME & TITLE |

| CA Driver License No
OPTIONAL | Social security number (SSN)
OPTIONAL | Employer ID number (Not SSN)
OPTIONAL |

This statement was filed with the County Clerk of  LOS ANGELES  County on date indicated by file stamp above.

NOTICE - THIS FICTITIOUS NAME STATEMENT EXPIRES FIVE YEARS FROM THE DATE IT WAS FILED IN THE OFFICE OF THE COUNTY CLERK. A NEW FICTITIOUS BUSINESS NAME STATEMENT MUST BE FILED PRIOR TO THAT DATE. The filing of this statement does not of itself authorize the use in this state of a fictitious business name in violation of this rights of another under federal, state, or common law (See Section 14400 et seq., Business and Professions Code).

FORM # 70F205D-F029 (Rev. 8/93)      CLARION PUBLICATIONS, INC. P.O. BOX 531870 LOS ANGELES, CA 90053-1870 1-800-540-1870

*Ex 9*

This is a true and certified copy of the record
if it bears the seal, imprinted in purple ink,
of the Registrar-Recorder/County Clerk

OCT. 22 1998

REGISTRAR-RECORDER COUNTY CLERK
LOS ANGELES COUNTY, CALIFORNIA

MCDERMOTT-LAW          Fax:7147315649          Mar 3   9   16:13     P.02

LAW OFFICES OF
**KEVIN BARRY McDERMOTT**
ATTORNEY AT LAW

Kevin Barry McDermott*

17422 IRVINE BLVD., SUITE 200
TUSTIN, CALIFORNIA 92780

(714) 731-5297 (LAWS)
(714) 731-5649 (FAX)
(888) 733-6600 (VOICE PAGER)

* LICENSED TO PRACTICE IN ALL
STATE AND FEDERAL COURTS
FOR CALIFORNIA AND FLORIDA
AND ALL MILITARY COURTS
WORLDWIDE

March 30, 1999

Via telefax & U.S. Mail
(310) 312-3100

Mitchell Silberberg & Knupp LLP
11377 West Olympic Boulevard
Los Angeles, California 90064-1683

    Attn: Russell Frackman, Esq.
        Yakub Hazzard, Esq.

    Re: <u>Sony v. Global</u>
       Your letter dated 19 March 1999

Gentlemen,

I have had a chance to review your letter referenced above, with the enclosures and have been attempting to communicate same to Mr. Jordan. As of the approximate date of the original injunction, I have lost all contact with Mr. Jordan and have had no luck in relaying the court's order to him.

I assure you that I will continue trying and I will notify you as soon as I have reestablished some contact with him.

In the interim, I look forward to discussing the Millman agreement in the near future.

Your anticipated courtesy in this matter is greatly appreciated.

Sincerely,

LAW OFFICES OF KEVIN BARRY MC DERMOTT

BY KEVIN BARRY MC DERMOTT
KBM/jj

cc: Jack Millman

04/08/99  13:09 FAX 202 223    2          PAGE  11 (PRINTED PAGE  1
                                          R.I.A.A.

*To Mr. Szafa – Fax 0042C-2-2442414*

| | | |
|---|---|---|
| Ballo H.W.<br>Goethestr.73<br>63477 Maintal | Telefon/Fax<br>06109/65830 | **Fax Message**<br>*plus 6 pages TAX SHELTER* |

| (Datum)<br>DATE 23 - 11 - 98 | (Zeit)<br>TIME: | Fax-NO.:<br>0048 - 32 - 292 09 61 |
|---|---|---|
| An<br>TO:  Krzysztof Gurgul<br>          Name | | An<br>TO:  **SNAKE & MUSIC**<br>          Company (Firma) |
| Von<br>FROM: Hans Ballo | | Reply Required (Antwort)  Seite/n<br>[X] YES   [ ] NO      Page/s  **6** |
| Betreff<br>SUBJEKT/REF.:  JOE COCKER | | |

Dear Krzysztof,

I refer to your call of last week regarding the letter of the MD of EMI.

Only strictly confidental and only for your files I encl. send you the following copies:

1. One Bill of Sale dated Dec. 1st 1982 for one album of Joe Cocker - 3 pages.
   Please be informed that there are two further Bills of Sale for titles of Joe Cocker.
   Total payment US $ 30.000,-.
2. The copy of the Agreement beween ..... and Global Arts Prod. regarding the
   titles of Joe Cocker, dated August 8th, 1991.
3. A Sworn Affidavit of Mr. Jordan regarding the license for two further titles of Joe
   Cocker.

Based upon the foregoinig informations I assume that it is reasonable to ask the
MD of EMI to inform the IFPI societies that he is wrong claiming exclusive rights
on Joe Cocker and excuse his wrong information and please ask him what he is
able to say for his defence?
I assume that he is unknown and has no information how many times the Joe Cocker
titles have been sold in the United States. or shall I forward further documents.

Please ask him to show his exclusive agreements on Joe Cocker and ask him to
prove that A & M never sold the titles of Joe Cocker.

Last not least, inform him that in case that he intends to continue to claim exclusive
rights on an artist, we expect that he will be able to prove it by his agreements to-
gether with a sworn affidavit that at no time tapes of the relevant artist have been
sold in the USA according to Bills of Sale.
Krzysztof, you don´t have to fight, just tell the MD of EMI to tell the truth.
Kind regards,

Hans Ballo          Encl. as above mentioned

[ RECEIVED 04/08 16:08 1999 AT 3:12 PAGE 12 (PRINTED PAGE 7)
04/08/99  13:10 FAX 202 22.   :2        R.I.A.A.                          @012

1

## THE YEAR OF THE TAX SHELTER

The law offices of Greenberg, Irwin, Pellman and Slade were located on the ninth floor of a typical Madison Avenue high-rise office tower. The elevator opened to the firm's offices just in front of the receptionist. The partners spacious offices were located in a lengthy L-shaped corridor along the window side of the building. A large book-lined conference room and library in the middle of the floor provided easy access to the offices. The rent must have been enormous.

Harold Greenberg was a man of average height and pleasant manner, although he could be very hyper at times. Steve Irwin was one of those imposing over 6 footers and equally deliberate in his mannerisms. I never met Pellman for some unexplained reason despite many hours spent in the law office, he was like the phantom of the firm. Mel Slade was heavy set and a little on the sleazy side. I soon learned that he was the type to ask a million questions exploring for advice, and then would do exactly as he wanted, as if he had never asked for advice in the first place. For instance, he once called me into his office to question me about a music industry personality, Danny Puglise. Danny had applied for a loan from the Marine Midland Bank, which Mel Slade represented. Mel was doing his due-diligence for the financial institution checking the character and credit of the applicant, Puglise.

I knew Danny Puglise well, we both lived in New Jersey. Danny and his girlfriend had once purchased a St. Bernard puppy from my wife and me when we were breeding dogs. Just after their visit to our home to pick up the puppy, by coincidence, we met them on the TGF train between Cannes and Paris after MIDEM. More to the point, I had just received a call from an upset supplier to Danny pleading with me for information to help him collect some money Danny owed him. I believe the debt was under $50.00. I told Mel Slade that I would be very careful in making any major financial commitment to Danny from both from my knowledge and hearsay in the music industry, and I explained the reasons why I took that position. But, Marine Midland, in their infinite wisdom went ahead and financed Puglise's new record manufacturing plant in Linden, New Jersey. Only a few years later, when Puglise filed for bankruptcy, Marine Midland took a multi-million dollar hit. It was in Slade's interest to received his "fee" for his "due-diligence", and in the bank's interest at the time to put a profitable secured loan on the books. It was more profitable to both parties to make the deal than not to -- that is until the bankruptcy and the realization that used record manufacturing equipment has a far greater degree of depreciation than previously thought. A lot of short term profits were made allowing Slade and the other lawyers to contribute to the huge overhead for the Madison Avenue offices and their New York life style expenses. And when the bank took it's loss, you can bet Slade never returned any of his fee. But, that was life in the world of Madison Avenue law and finance, and we were all interested in making a buck any way we could -- providing it was on the correct side of the legal line. In 1978 master recording tax shelters were legal.

After the experience of the previous year it became crystal clear that I could grow the catalog (our list of record albums offered for sale) by selling recordings as tax shelters. The law firm was poised and ready to help me as it was equally profitable for the lawyers and accountants to participate

rdmat.tht.s 10/23/98

2

[ RECEIVED 04/08 10:09 1999 AT 31'      ]      PAGE 13 (PRINTED PAGE 1'
  04/08/99  13:10 FAX 202 223      2      R.I.A.A.                          @013

more unpleasant orders of the day, I began to make regular contact with Harold Greenberg at the law firm to discuss the start of the fall's tax shelter sales.

By this time I knew the drill well. The accountant or "salesperson" would find a wealthy individual who wanted to "shelter" income. The wealthy individual would be introduced to Greenberg, Irwin, Pellman & Slade at the prestigious and beautifully decorated Madison Avenue offices where the nature of the shelter would be explained. There were four elements. First was the legal written opinion from the lawyers to protect the investor in case of an IRS audit. This was a somewhat contrived document citing sections of the tax code and other authorities to make a case for the shelter's IRS tax eligibility. It had to be legitimate though, because the lawyers' malpractice insurance stood behind these opinions and any sophisticated investor knew that. Next there was the evaluation letter. An expert, someone from the music industry, with a reasonably good C.V. would have to write a letter authenticating the value of the selling price on the master tape. The going rate for an evaluation letter was about $1,200, so it was profitable for the author of the letter to agree with the stated evaluation. The evaluation usually projected "possible" income over a period of 5-10 years -- which in an idyllic world would work out to --you guessed it --"telephone" numbers.

With the legal memo and evaluation out of the way, a bargain would be struck as to how much cash the investor would pay vs. how much the non-recourse note would be for. The investor wanted to come up with as little as cash as possible and the lawyers, accountants and owner of the recording would want the cash to be large enough to cover costs and profits. The ratio of 7 or 10 to 1 would be the usual going deal. In other words, if the recording was worth, based on the evaluation, say $250,000, then the investor would come up with $25,000 in cash - enough money for everyone to make out. The balance would be due on the non-recourse note of $225,000. The note would be payable only from income generated from the sale of the recording (royalties), no other risk was at hand. The accountant might take a finder's fee of say, $2,500, the lawyer would take a legal fee of say $5,000 and expenses would eat up another thousand or two. Then the balance would go to the owner of the recording. The investor would get a tax write-off of $250,000 and save enough on his current tax bill to more than make up for the expenditure of $25,000 in cash. Therefore, it was actually Uncle Sam who paid for the recording, legal fees, finder's fee and expenses. Not a bad deal. And since the note was non-recourse, the investor had no risk for the future; unless of course Uncle Sam in the person of an IRS agent called "foul"!

Once the arithmetic was established, the Bill of Sale and a non-recourse note could be drawn up. It was a lengthy document with a lot of legal boiler plate, filled with warranty conditions and terms of the sale, plus a detailed schedule of the content of the master recording, including musicians' names and song titles. With the other documents out of the way, the last and final agreement negotiated was a distribution agreement. This document could allow distribution by the same company as the one that sold the original master, but from a practical standpoint most of the sellers of master recordings were only interested in making a profit on the sale of the master tape. If they

a brook7tas 10/21/96

[ RECEIVED 04/08 10:09 1999 AT 31      0      PAGE 14 (PRINTED PAGE 1
  04/08/99   13:11 FAX 202 223      2          R.I.A.A.

☑014

3

did acquire the distribution rights, a minimum quantity of records would be manufactured to satisfy the terms of the deal. Samples were sent to the investor and perhaps to the accountant and lawyer for posterity, and then the balance of the records stored in a warehouse or garage collecting dust. However, I was interested in releasing many more titles than I could afford to record and package without the tax shelter income. So our investors got a fair shake regarding distribution of their recording. Each production was actively sold in the music shops of the United States and in some cases, licensed to foreign manufacturer's for distribution overseas.

The distribution agreement would also contain legalese or boiler plate with warranties and representations and the terms of sale. It would expressly indicate how royalties would be paid and to whom. It was these royalties that were eventually to, in theory, pay off the non-recourse note. However, as I have said before, if the royalties were never paid, the notes became worthless and eventually the master recording would revert to the original owner. The distribution agreement also included a schedule with the names of musicians and the song titles.

Because these tax shelters were so profitable to those who sold the master recordings, recordings were coming out of the woodwork. Every Tom, Dick and Harry who could find a recording of some value, particularly some name value, was running to his lawyer and accountant in the hopes he could find investors to purchase the masters as tax shelters. And they did – by the hundreds. Working with the Greenberg law firm, two brokerage houses and a group of accountants with salespeople, I did over a half million dollars in tax shelter sales in 1979. The closer we got to the end of the year, and as word spread of this painless way to avoid taxes, we were flooded with calls and requests to set up shelters.

I had to find more recordings to sell.

c:book3\tax 10/23/96

[ RECEIVED 04/08 10:10 1999 AT 312'        PAGE  15 (PRINTED PAGE  15'
   04/08/99  13:11 FAX 202 223            R.I.A.A.                        @015

1

### Being At No Risk

The tax code of the United States had many more loopholes in the late 1970's than it does today. Some of the loopholes were called tax shelters. It was possible in those years to make a large investment, part in cash and part in a long term note, and take the total of both items as the basis for depreciation write-off. The savings to your tax bill usually exceeded the amount of the cash portion of the investment. What a great scheme at the expense of the United States government. One of the items that could be invested in were master recordings. The tax avoidance plan worked this way.

On behalf of an investor an accountant would locate a source for a a group of master recordings that he could use to shelter clients' income. The accountant would contact the entity that owned the recordings (usually a record company) and propose that one or more recordings be sold to his client. The clients would pay x amount in cash and then sign a non-recourse note for the balance of the agreed purchase price of the master recording. Then the label would arrange for a distributor for the new property -- the recording, which was supposed to sell records and earn income for the investor.

A distributor of the recording would agree (in a contract), to pay royalties to the owner of the master for the use of that recording, based on sales. Those royalties or a portion thereof would be used to pay the non-recourse note to the original owner. If the note was not retired in its term, usually many years, the master recording would revert to the original owner in lieu of the debt. Now, the catch -- the definition of a non-recourse note is that if it does not get paid, the holder of the note has no recourse or no ability to collect it. It also means that no one was at risk, except for, of course, the IRS. (I had just found my shovel.)

This scheme was so profitable to the taxpayer, to the accountant who took a fee for putting the transaction together, to the attorneys who drafted the legal documents and wrote the legal opinions, to the appraisers who certified the value of the recording, and to the new owners of the recording, that it was a bonanza to everyone involved. Even the distributor made out as he had an investment free recording to sell -- no risk. If the distributor happened to also be the original owner then the owner received the proceeds of the sale of the recording and also remained in complete control of the product and its future earnings. What a deal!

Of course, I knew nothing about such transactions until I received a call from my accountant, Art Robins. He asked me to come over to his office to discuss a way he had to help me finance the production of new recordings for Gateway Records and get out of my financial hole. Art told me he had a way to get me a few hundred thousand dollars. He knew that we were in financial straits based on what had happened with Handleman and the Mort Heiman episode and explained the tax shelter business, which at the time was booming. But time was of the essence because the transactions had to be done before December 31st in order for his clients to receive the benefits of the tax shelter for the current year. His plan was for Gateway Records to be not only the seller of the recordings, but the distributor also. With that method we would actually sell the ownership of the recording but

[ RECEIVED 04/08 10:10 1999 AT 31      0      PAGE  16 (PRINTED PAGE 1`
    04/08/99   13:12 FAX 202 223      2        R.I.A.A.                                      @016

2

retain the distribution rights, therefore it would become an active title in our catalog and we would keep virtual control of the product. It seemed like a win-win situation. So I agreed with Art to do a few transactions to see how it worked for us. We did and the money came rolling in.

By this time, the lease was up on Sound Book Studios on 46th Street and we had chosen a new location on 48th Street between 5th Avenue and Madison owned by our attorney, Paul Feinstein. We were moving up in the world to a high class neighborhood that was close to the advertising agency world on Madison Avenue and the fine shops of 5th Avenue. Money from the tax shelters was just what was needed to finance the move and the building of new studios. The tax shelter money also provided the funds to expand our line of records as Art had predicted, and in fact it was a win-win situation.

By working on the tax shelters with the accountant I was introduced to the law firm of Greenberg, Irwin, Pelkman, and Slade. A Madison Avenue establishment of hungry lawyers that made their living off others' problems, investments and the various financial institutions they represented. They were also experts in tax shelters. Although the season was about to end for that year, I quickly realized that my contacts with this law firm would provide many opportunities in the coming years for an expanding business in tax shelters -- at no risk.

woltwok 10/22/96

# AFFIDAVIT OF
# DANNY JORDAN

I, Danny Jordan President of and on behalf of Global Arts Productions Inc., a California Company with representation in the United Kingdom, The States of Florida, New Jersey, New York and the Country of Canada, hereby make oath and say as follows:

1. The recording artists listed in schedule "A" have been given to Global Arts Productions Inc.. These artists are part of an enormous list of recording artists that was provided by the Major Record Labels.

2. From 1975 through 1984 various tax shelters were set up by California Corporations for investors looking for a certain kind of tax benefit; (example) Recording artists master tapes were pledged to the investor. A five to one ratio was promised to the investor. If a contribution of twenty thousand ($20,000) US dollars was made by the investor, he/she would be given world wide rights to a master tape of an artist. In addition he/she would be allowed a legal write-off against earned income of one hundred thousand ($100,000) US dollars. A twenty thousand ($20,000) note was made by the Corporation to the investor, however there was never a specific time given on the note to pay off the loan. In the aforementioned contracts the investor was granted the non-exclusive right to exploit the artists master recording. There was never a specific time frame for that exploitation to run out.

3. There were various third parties who were granted these non exclusive rights for exploitation, by the owners of the tax shelters. We have proof that product was manufactured, distributed and put into commerce. The major record labels had, under US law, seven years from the date of the products distribution, to challenge those releases, however they have failed to do so.

4. These tax shelters did in fact exist and I need not prove that they did. The burden of proof is on the Plaintiff to prove that they did not.(see attachment entitled "Burden of Proof"). As you review the attachment, give close attention to the statement "Except in cases of Tax Fraud".

5. It is a fact that various agents who represented these type of tax shelters were convicted for income tax evasion. These cases were directly associated with the contracts given for the master recordings. Not because the premise of the contract was fraudulent, but rather because the income that these people received was not reported to the Government of the US, and taxes were evaded. During the trials of those individuals, the major record labels were not present, and I ask the question, why not?

6. If the major record labels are in fact claiming they have a right to challenge my ownership, and can be allowed to utilize documents, contracts and affidavits from the United States, I ask what is the difference between theirs and ours? Does the IFPI only recognize documents from the major record labels and discount any other proof as meaningless?

7. It is my opinion that foreign Companies who have objected to the release of my products, have no legal jurisdiction as it relates to ownership and contracts emanating from the United States. The foreign courts do have a right to know the truth before they make a judgment. In the United States the term Judgment is used to denote the

reason which the Court gives for it's decision, but this is more properly denominated an opinion. I look forward to your opinion.

Danny Jordan

Sworn and subscribed before me
By the said Danny Jordan This
20th day of October, 1997.

STATE OF FLORIDA
COUNTY OF BROWARD

On this 20th Day of October, 1997, Danny Jordan did appear before me and affix his signature to this document. Mr. Jordan is personally known to me.

GARY E. PIKE
MY COMMISSION # CC 437234
EXPIRES: February 8, 1999
Bonded Thru Notary Public Underwriters

IN THE PRESENCE OF:

GLOBAL ARTS PRODUCTIONS INC., having its registered office at Point Plaza Building, 7160 Nob Hill Road, Tamarac, Florida 33321 (United States).

VOLUNTARILY INTERVENING PARTY

Represented by Mr. Marinus VROMANS, Solicitor (1070 Brussels, Ninoofsesteenweg, 643).

*   *   *
*   *

Arguments at these proceedings were presented in Dutch at the public session of 5 December 1997.

After consultation the Chairman of the court of first instance handed down judgment:

Having seen:

- the summons issued by writ served by registered mail by Mr. Michel Leroy, bailiff resident at Etterbeek, dated 3 October 1997;

- the summons in intervention issued by writ served by registered mail by Mr. Thierry Van Diest acting for Mr. Emmanuel Leroy, bailiff resident at Etterbeek, dated 18 November 1997;

- the petition filed in voluntary intervention and legal arguments filed with the clerk of the court on 6 November 1997;

- the pleadings for the plaintiff filed at the sitting of 5 December 1997;

- the pleadings and second pleadings for Dureco Nederland filed at the sitting of 5 December 1997;

- the pleadings for Dureco Belgium filed at the sitting of 5 December 1997;

- the supplementary pleadings for Global Arts filed at the sitting of 5 December 1997;

The solicitors of the parties having presented their arguments at the sitting of 5 December 1997.

*   *   *
*   *

The action by IFPI against both DURECO NEDERLAND and DURECO BELGIUM, instituted subject to Section 87 of the Copyright Act, entails:

(1)  to establish that the defendants violated Sections 35 and

2

39 of the Act of 30 June 1994 concerning Copyright and
related rights by the distribution and/or offering for
sale of sound-recording mediums bearing unlawful (i.e.
made at the time without the consent of the copyright
owners) reproductions of musical recordings;

(2)   to have the defendants ordered to cease these practices
      subject to a fine of BEF 50,000 per copy of the sound-
      recording medium which, in contravention of the judgment
      to be handed down, was nevertheless distributed and/or
      offered for sale;

(3)   to have the judgment published in three newspapers as
      selected by the plaintiff, at the expense of the
      defendants, subject to the proviso that these costs shall
      be payable on demand upon submission of an invoice, even
      pro forma.

Both DURECO NEDERLAND and DURECO BELGIUM formulate a
subordinate action below against GLOBAL ARTS PRODUCTIONS as
follows: to have GLOBAL ARTS PRODUCTIONS ordered to hold
DURECO fully harmless for each order with respect to DURECO,
including the full legal costs.

* * *
* *

## CONCERNING THE FACTS

IFPI is a professional association in the sense of Section 87
§1 of the Act of 30 June 1994 concerning Copyright and related
rights (hereinafter referred to as "the Copyright Act"). It
brings together producers and distributors of phonograms.

DURECO is a producer and publisher of phonograms (records,
CD's, cassettes, ...).

GLOBAL ARTS is said to be DURECO's licensee for the disputed
sound-recordings.

In a letter of 15 September 1997 addressed to "DURECO, Mr. H.
CHUN, Louisalaan, 390, 1050 Brussels" IFPI warns DURECO
immediately to suspend the sale of the sound-recording mediums
issued under the "Hit Line" and "Mad Price" labels and to
recall these products from retail outlets. IFPI states that it
"strongly suspects" that the licensee (of DURECO) does not
have the necessary rights.

In response to this letter IFPI received a fax dated 17
September 1997 from DURECO NEDERLAND, signed by Harry R. CHUN,
General Manager, stating among other things that DURECO
BELGIUM handles the sale and distribution in Belgium on its
behalf of, among other things, the CD's issued under the "Mad
Price" label. It is curious that DURECO does not respond to
the summons by drawing attention to its rights to market the
CD's in question.

3

A further exchange of letters took place between IFPI and
DURECO (IFPI's faxes were consistently sent to DURECO BELGIUM)
before the summons was served, but with no constructive
outcome.

On 3 October 1997 IFPI served a temporary injunction on DURECO
NEDERLAND, while also instituting proceedings under Section 87
of the Copyright Act. On account of the overloading of the
list for trial and owing to the need to resolve a procedural
point relating to the rights of the defence, the two
proceedings took a different course from the sitting of 6
November 1997 onwards.

## CONCERNING THE ALLEGED INVALIDITY OF THE WRIT INSTITUTING PROCEEDINGS

DURECO NEDERLAND "enters reservations" with respect to the
"validity" of the summons as this had been served at neither
its registered office nor its business address.

The writ instituting the proceedings was served at "the
permanent establishment in Belgium" of DURECO NEDERLAND,
namely at Louisalaan, 390/2n, 1050 Brussels, being DURECO
BELGIUM's principal place of business. Not only did the
aforementioned exchange of letters take place via this address
(cf. Section 39 of the Civil Code) but, in particular, it
needs to be established that the alleged irregular summons
achieved the aim as intended by the law, without violating
DURECO NEDERLAND's rights of defence. The interests of DURECO
NEDERLAND were not harmed and the alleged irregularity does
not consequently involve any penalty (cf. Section 862 of the
Civil Code).

## CONCERNING THE NATURE OF THE MEASURES AND THE URGENCY

Both the defendants and the intervening party invoke
exceptions and arguments relating solely to the interim
injunction proceedings. Evidently these parties have applied
the same defence in both proceedings, although a number of
exceptions and arguments are not relevant to the suspension
proceedings, conducted as though an interim injunction. It is
sufficient to establish this without need for further
rebuttal.

## CONCERNING THE ALLEGED LACK OF INTEREST

DURECO contends that IFPI is unable to invoke its status as a
professional association in the sense of Section 87 §1 of the
Copyright Act since it is not representing (all) its members
in the proceedings in question but is seeking to support and
substantiate the individual interests of some of its members
against other of its members.

4

In so far as this argument proceeds from DURECO NEDERLAND this exception is factually incorrect since the latter party is not a member of IFPI (although it is of NVPI, the IFPI's sister organisation in the Netherlands). DURECO NEDERLAND and DURECO BELGIUM are evidently the one in the same when it suits them (in relation to the present exception) and to be distinguished when it suits them differently (see exception of irregular summonsing). Such an attitude is not easy to take seriously and creates suspicion.

DURECO BELGIUM is certainly a member of IFPI.

Among other things IFPI was set up in order to protect the professional and moral interests of its members and, more generally, of all those participating in the phonographic industry in Belgium. In furtherance of that goal it is authorised legally to contest any infringements of the rights and interests of its members and of the profession in general (cf. Article 3 of the statutes of the IFPI). The sale and distribution in Belgium of phonograms without the consent of the copyright-holders (authors, performing artists and producers) can constitute an infringement of the rights protected by Sections 35 and 39 of the Copyright Act. If the IFPI takes legal action against such infringements its action unquestionably comes within the formal objects of the association, namely the protection of the rights and interests - both patrimonial and moral - of its members. As a professional association it therefore in principle has the necessary interest to institute the action (see: RAES, S., "Het optreden in rechte van de Orde ter verdediging van het beroepsbelang", T.R.V., 1988, p. 59 ff.; note under Cass. 19 May 1987).

Neither the law nor the statutes of the IFPI oblige the latter to promote the interest of "all" its members. Nor does the law or the statutes of the IFPI prohibit the latter from instituting procedures against a member on the grounds of an infringement. The professional association can only take action in order to protect the "lawful" interest of its members. If DURECO's stance were to be adopted this would seriously complicate efforts to combat infringements of copyright and related rights. There is no conflict between the lawful interests of the members of the IFPI and the alleged unlawful interests of a single member.

IFPI has the necessary interests in this matter to institute proceedings (its interest is not purely theoretical).

## CONCERNING THE ALLEGED INADEQUACIES IN FOLLOWING THE ARBITRATION PROCEDURE

DURECO erroneously argues that an arbitration procedure should have been followed in this matter. This exception (in the absence of jurisdiction) is totally unfounded given the lack

5

of any useful and binding legal source.

## CONCERNING THE INFRINGING NATURE OF THE SOUND-RECORDING MEDIUMS

There are grounds for first establishing whether the CD's that are the subject of litigation form an infringement of Section 35 and 39 of the Copyright Act before establishing who the infringing party might be. It may be noted that if one of the summonsed parties has not performed any unlawful actions, this does not concern the admissibility but the grounds of the action.

Pursuant to Section 35 of the Copyright Act, only the performing artist has the right to reproduce his performances or to permit the reproduction thereof. Pursuant to Section 39 of the Copyright Act only the producer of phonograms has the right to reproduce his performance or permit the reproduction thereof.

The plaintiff argues that the CD's distributed under the "Rondo Hitline" and "Mad Prices" labels were reproductions of musical recordings that could be made without the consent of the producer or the performing artists. These are reproductions of recordings of musical performances by groups of singers, such as The Doors, Neil Diamond, ZZ Top, The Who and Linda Ronstadt.

The defendants and the voluntarily intervening party, who have been unable to produce proper documentation concerning the right to reproduce the relevant material, let alone furnishing any evidence to indicate the consent of the producer or the performing artist, allow that the vital question in this matter is whether the individual members of the plaintiff, who allege that they enjoy certain exclusive rights, in fact effectively enjoy those rights and whether those rights are indeed exclusive.

The challenge does not however concern CD's distributed by the plaintiff or certain other of its members.

In view of the role assigned to the plaintiff in the Copyright Act and in view of the documents submitted by the plaintiff in order to substantiate the suspicion that the defendants did not have the necessary rights, the stance adopted by the defendants and the voluntarily intervening party constitutes an unjustified reversal of the burden of proof. In addition the rules of evidence need to be interpreted dynamically and the plaintiff cannot be charged with supplying the proof that the copyright-holders have not transferred their rights of reproduction to the defendants and the voluntarily intervening party.

In fact it is sufficient to establish that the voluntarily intervening party writes in its most recent legal arguments,

6

deposited at the sitting of 5 December 1997, that it had
proved "impossible" for it to produce the necessary documents
in the brief time-span in order to substantiate its voluntary
intervention and to invalidate the plaintiff's action. This
argument does not hold up in the age of the fax.

## CONCERNING ANY PRE-1972 MUSICAL RECORDINGS

The distinction drawn in "American" law between recordings
made before and after 1972 is irrelevant in view of the
assimilation principle contained in Article 4 of the Berne
Convention (26 June 1948) and Article 1 of the Trip
agreements,(15 April 1994). The defendants do not demonstrate
that they enjoyed reproduction rights, even under foreign law,
so that the aforementioned distinction is of no relevance.

## CONCERNING THE INFRINGING PARTIES

The exchange of letters conducted between the parties prior to
the institution of legal proceedings took place between IFPI
and DURECO NEDERLAND or DURECO BELGIUM, but in all cases via
the same address in Brussels.

In its initial statement of defence DURECO NEDERLAND did not
assert that it was not performing any of the actions preferred
against it by IFPI. It did do so orally at the sitting of 13
November 1997, at the interim injunction proceedings, as a
result of which the plaintiff was obliged to draw DURECO
BELGIUM into the matter. The attitude adopted by DURECO
NEDERLAND in this matter cannot be regarded as serious.

When subsequently DURECO BELGIUM claims in its statement of
defence that it is not a distributor of the CD's forming the
subject of litigation but one B.V. MUSICNET, the attitude
towards the proceedings of the two DURECO'S can only arouse
suspicion. The appearances are that these parties wish to
postpone (the essence of) the debate as long as possible.

The reverse of the CD's forming the subject of litigation
bears the inscription "marketed by DURECO B.V.". There can be
no doubt that DURECO NEDERLAND has brought the litigious CD's
on to the Belgium market via DURECO BELGIUM (cf. the filed
exchange of letters). IFPI has produced an invoice made out by
DURECO BELGIUM in which the litigious CD's are invoiced to a
record shop in Mol. The attitude of the defendant is not
merely dilatory and hard to take seriously but also displays
evidence of bad faith. In a different legal system this might
amount to "contempt of Court".

Both defendants have committed infringing actions.

## CONCERNING THE SCOPE OF THE CLAIMS

7

The plaintiff has formulated its action in general terms and
has not confined itself to certain (unlawful) musical
recordings. If so required, it contends, the injunction could
be confined to unlawful reproductions of lawful musical
recordings "belonging to the category of the IFPI members".

An injunction may not be vague and amount to no more than a
repetition of the statutory prohibition. The formulation must
be sufficiently precise to permit the concrete application of
the injunction and also to provide sufficient room to prevent
new infringements arising out of the infringement in question
but taking another form, so as to prevent the injunction from
losing all efficacy (cf. EVRARD, J-J., Les pratiques de
commerce, Chronique de jurisprudence, J.T., 1985 p. 195, no.
92). A vital part of the judicial process is that the courts
are asked to qualify certain facts or actions so as to bring
them under the application of the law. If the decision of the
court does not relate to certain facts, the court will be
repeating the law and so not administering justice. The
judge's decision would then be enforceable according to the
personal insights of the litigant, which would no longer
involve implementation of a granted title.

In view of the above the injunction sought by the plaintiff
appears inadequate. The subordinate proposal by the plaintiff
confining matters to unlawful reproductions of lawful musical
recordings forming part of the catalogue of IFPI members is
equally as inadequate. The litigious CD's may well have
appeared on the catalogue of the second defendant, which is an
IFPI member. The injunction needs to be formulated as
determined below.

CONCERNING THE INTERVENING PARTY

No injunction is being sought with respect to the voluntarily
intervening party.

In so far as the voluntarily intervening party is being asked
to hold harmless from the parties forming the object of the
injunction with respect to each judgment against these
parties, it should be noted that the principal action concerns
the suspension of violations of reproduction rights committed
by these parties and that, in contrast to a demand for
compensation, an injunction cannot be transferred from one
party to another.

The action to be held harmless is consequently unfounded.

CONCERNING THE PUBLICATION MEASURE

An order for publication in extenso of this relatively lengthy
judgment would appear exaggerated, and publication of a part
thereof will suffice.

8

**FOR THESE REASONS;**

We, BOON J., Judge appointed to replace the Chairman of the Court of the first instance in Brussels;

Assisted by Clerk of the Court MELIS E.;

Given the Act of 15 June 1935 concerning the use of languages in legal proceedings;

Delivering judgment after full argument on both sides;

Rejecting all other or contrary decisions;

Grants GLOBAL ARTS PRODUCTIONS, INC. deed of its voluntary intervention.

Declare the principal actions as admissible and founded as follows:

Establish that B.V. DURECO and N.V. DURECO BELGIUM, by the distribution or offering for sale of sound-recording mediums, such as CD's, under the labels "RONDO HITLINE" and "MAD PRICES", containing reproductions of musical recordings by The Door, Neil Diamond, Simon & Garfunkel, Cat Stevens, The Mama's & The Papa's, ZZ Top, The Who, and Linda Ronstadt are violating Sections 35 and 39 of the Act of 30 June 1994 concerning Copyright and related rights, as this is taking place without the consent of the copyright holders.

Order these parties to suspend these practices and any distribution or offerings for sale of sound-recording mediums, in respect of which no evidence of consent is deposited "from the performing artists or the producer" within 14 days from the notice of default served by registered mail by the V.Z.W. IFPI BELGIUM, subject to payment of a fine of BEF 50,000 per copy of the each sound-recording medium which, contrary to this order, is distributed or offered for sale, as determined solely by a bailiff.

Order the publication of the judgment as determined below and the enacting terms of the present judgment in three newspapers at the choice of IFPI BELGIUM, at the expense of DURECO B.V. and DURECO BELGIUM B.V., subject to the proviso that these costs, including any translation costs, shall be reclaimable upon simple submission of an invoice (even pro forma), the judgment establishing the identity of the court of justice, the date of the judgment and the identity of the parties.

Declare the action to be held harmless to be admissible but unfounded.

Leave the court expenses of GLOBAL ARTS PRODUCTIONS INC., estimated at 4,100 francs, to be borne by that party.

9

Order B.V, DURECO and N.V. DURECO BELGIUM to pay the remaining costs, assessed for V.Z.W. IFPI BELGIUM at 13,353 + 9,418 + 4,100 francs and for themselves at 4,100 francs.

Judgment handed down at the public interim injunction hearing on 31 December 1997.


[Signature]                              [Signature]
Melis E.                                 Boon J.

10

## COURT OF FIRST INSTANCE IN BRUSSELS

In public session of the interim injunction proceedings of 31 December 1997.

No. 97/1453/C
of the register

Annexes
___

1 summons
1 summons of intervention
1 partition for voluntary intervention
4 pleadings

Section 584 of Civil Code concerning Copyright - Interest of authors' association - Urgency

IN THE CASE OF:

The V.Z.W. IFPI BELGIUM BELGISCHE FONOGRAFISCHE INDUSTRIE, having its seat at Almaplein, 3/5, 1200 Sint-Lambrechts-Woluwe (hereinafter abbreviated as IFPI).

PLAINTIFF

Represented by Mr. Benoît MICHAUX, solicitor (Tervurenlaan, 268 A, 1150 Brussels).

AGAINST:

1.   B.V.DURECO, a company established under Dutch law, with its registered office at Pampuslaan, 45, 1382 Weesp, the Netherlands, H.R. Hilversum 26.275 (hereinafter abbreviated as "DURECO NEDERLAND")

FIRST DEFENDANT

2.   N.V. DURECO BELGIUM, a company established under Belgian law, with its registered office at Vleurgatsesteenweg, 213, 1050 Brussels, H.R.B. 426.117.

DEFENDANT IN ENFORCED INTERVENTION

Both represented by Mr. Joren DE WACHTER, solicitor (Vossendreef 6, 1180 Brussels - box 14).

IN THE PRESENCE OF:

GLOBAL ARTS PRODUCTION INC., established at Point Plaza Building, 7160 Nob Hill Road, Tamarac, Florida 33321 (United States).

VOLUNTARILY INTERVENING PARTY

11

Represented by Mr. Marinus VROMANS, solicitor
(Ninoofsesteenweg, 643, 1070 Brussels).

\* \* \*
\* \*

Arguments at these proceedings were presented in Dutch at the
public sittings of 13 and 27 November 1997.

After consultation the Chairman of the court of first instance
issued the following order:

Having seen:

- the summons issued by the writ served by registered mail
  by Mr. Michel Leroy, bailiff resident at Etterbeek, of 3
  October 1997;

- the summons in intervention issued by the writ served by
  registered mail by Mr. Thierry Van Diest acting for Mr.
  Emmanuel Leroy bailiff resident at Etterbeek, dated 18
  November 1997;

- the petition for voluntary intermediation and pleadings
  for Global Arts filed with the clerk of the court on 6
  November 1997;

- the pleadings for DURECO NEDERLAND filed with the clerk
  of the court on 6 November 1997;

- the pleadings for DURECO BELGIUM filed at the session of
  27 November 1997;

- the supplementary pleadings for Global Arts filed at the
  session of 27 November 1997;

- Having heard the arguments of the solicitors of the
  parties at the sessions of 13 and 27 November 1997.

\* \* \*
\* \*

The action by IFPI against both DURECO NEDERLAND and DURECO
BELGIUM, as instituted subject to the application of section
584 of the Civil Code, seeks:

(1)  to have the defendant ordered to suspend all distribution
     or offering for sale of sound-recording mediums
     containing an unlawful reproduction of a recording of a
     musical performance, subject to payment of a fine of BEF
     50,000 for each sound-recording medium which is
     nevertheless distributed or offered for sale at variance
     with the order in question;

(2)  to have the defendants ordered to recall all sound-
     recording mediums with an unlawful reproduction of a

12

recording of a musical performance from all their direct clients (subject to possible payments) within eight days after the order in question has been served, subject to a fine of BEF 50,000 per sound-recording medium that is not recalled within the aforementioned period;

(3)   to have a sequestrator appointed for all the sound-recording mediums recalled in this way (this demand is formulated somewhat differently with respect to DURECO BELGIUM: "to have a sequester appointed for all litigious CD's, including sound-recording mediums recalled").

Both DURECO NEDERLAND and DURECO BELGIUM have formulated a subordinated action against GLOBAL ARTS PRODUCTION as follows: to order Global Arts Productions to hold DURECO fully harmless from any judgment against DURECO, including the full court costs.

*  *  *
*  *

## CONCERNING THE FACTS

IFPI is a professional association in the sense of Section 87 § 1 of the Act of 30 June 1994 concerning Copyright and related rights (hereinafter referred to as "the Copyright Act"). It brings together producers and distributors of phonograms.

DURECO is a producer and publisher of phonograms (records, CD's, cassettes, ...).

GLOBAL ARTS is said to be DURECO's licensee for the disputed sound-recordings.

In a letter of 15 September 1997 addressed to "DURECO, Mr. H. CHUN, Louisalaan, 390, 1050 Brussels" IFPI warns DURECO immediately to suspend the sale of the sound-recording mediums issued under the "Hit Line" and "Mad Price" labels and to recall these products from retail outlets. IFPI states that it "strongly suspects" that the licensee (of DURECO) does not have the necessary rights.

In response to this letter IFPI received a fax dated 17 September 1997 from DURECO NEDERLAND, signed by Harry R. CHUN, General Manager, stating among other things that DURECO BELGIUM handles the sale and distribution in Belgium on its behalf of, among other things, the CD's issued under the "Mad Price" label. It is curious that DURECO does not respond to the summons by drawing attention to its rights to market the CD's in question.

A further exchange of letters took place between IFPI and DURECO (IFPI's faxes were consistently sent to DURECO BELGIUM) before the summons was served, but with no constructive

13

outcome.

On 3 October 1997 IFPI served a temporary injunction on DURECO NEDERLAND, while also instituting proceedings under Section 87 of the Copyright Act. On account of the overloading of the list for trial and owing to the need to resolve a procedural point relating to the rights of the defence, the two proceedings took a different course from the sitting of 6 November 1997 onwards.

## CONCERNING THE ALLEGED INVALIDITY OF THE WRIT INSTITUTING PROCEEDINGS

DURECO NEDERLAND "enters reservations" with respect to the "validity" of the summons as this had been served at neither its registered office nor its business address.

The writ instituting the proceedings was served at "the permanent establishment in Belgium" of DURECO NEDERLAND, namely at Louisalaan, 390/2n, 1050 Brussels, being DURECO BELGIUM's principal place of business. Not only did the aforementioned exchange of letters take place via this address (cf. Section 39 of the Civil Code) but, in particular, it needs to be established that the alleged irregular summons achieved the aim as intended by the law, without violating DURECO NEDERLAND's rights of defence. The interests of DURECO NEDERLAND were not harmed and the alleged irregularity does not consequently involve any penalty (cf. Section 862 of the Civil Code).

## CONCERNING THE COMPETENCE

Since the terms of the writ instituting the proceedings claim that the action is urgent in nature, the chairman of the temporary injunction session is in principle competent to investigate the grounds of that writ (Cass. 11 May 1990, Pas. 1990, I, 1045).

## CONCERNING THE ALLEGED INADMISSIBILITY OF THE ACTION

1.  According to DURECO IFPI is not demanding any "provisional" measures and the measures sought in fact go further a temporary injunction. The action would consequently be inadmissible.

    The question as to whether the measure sought are more than just provisional relates to the powers of the judge in interim injunction proceedings and the grounds of the interim injunction and not the competence of the Chairman or the admissibility of the action (MAERTENS A-S., "Uitspraak bij voorraad: voorschrift over de machten van de rechter in kort geding", note under Cass. 14 June 1991, T.B.H., 1992, 260). This question will accordingly be investigated below.

14

2.  DURECO argues that the ordinary administration of justice
    (as in interim injunction proceedings) is equipped to
    resolve the dispute in good time. The action would
    consequently be inadmissible.

    Implicitly DURECO therefore argues that the action is not
    urgent. Now that the competence of the judge in interim
    injunction proceedings in this matter is clear, the
    investigation into the actual urgency forms part of the
    grounds of the case, which will be investigated here.

3.  **CONCERNING THE ALLEGED LACK OF INTEREST**

    DURECO contends that IFPI is unable to invoke its status
    as a professional association in the sense of Section 87
    § 1 of the Copyright Act since it is not representing
    (all) its members in the proceedings in question but is
    seeking to support and substantiate the individual
    interests of some of its members against other of its
    members.

    In so far as this argument proceeds from DURECO NEDERLAND
    this exception is factually incorrect since the latter
    party is not a member of IFPI (although it is of NVPI,
    the IFPI's sister organisation in the Netherlands).
    DURECO NEDERLAND and DURECO BELGIUM are evidently the one
    in the same when it suits them (in relation to the
    present exception) and to be distinguished when it suits
    them differently (see exception of irregular summonsing).
    Such an attitude is not easy to take seriously and
    creates suspicion.

    DURECO BELGIUM is certainly a member of IFPI.

    Among other things IFPI was set up in order to protect
    the professional and moral interests of its members and,
    more generally, of all those participating in the
    phonographic industry in Belgium. In furtherance of that
    goal it is authorised legally to contest any
    infringements of the rights and interests of its members
    and of the profession in general (cf. Article 3 of the
    statutes of the IFPI). The sale and distribution in
    Belgium of phonograms without the consent of the
    copyright-holders (authors, performing artists and
    producers) can constitute an infringement of the rights
    protected by Sections 35 and 39 of the Copyright Act. If
    the IFPI takes legal action against such infringements
    its action unquestionably comes within the formal objects
    of the association, namely the protection of the rights
    and interests - both patrimonial and moral - of its
    members. As a professional association it therefore in
    principle has the necessary interest to institute the
    action (see: RAES, S., "Het optreden in rechte van de
    Orde ter verdediging van het beroepsbelang", T.R.V.,

15 -

1988, p. 59 ff.; note under Cass. 19 May 1987).

Neither the law nor the statutes of the IFPI oblige the latter to promote the interest of "all" its members. Nor does the law or the statutes of the IFPI prohibit the latter from instituting procedures against a member on the grounds of an infringement. The professional association can only take action in order to protect the "lawful" interest of its members. If DURECO's stance were to be adopted this would seriously complicate efforts to combat infringements of copyright and related rights. There is no conflict between the lawful interests of the members of the IFPI and the alleged unlawful interests of a single member.

IFPI has the necessary interests in this matter to institute proceedings (its interest is not purely theoretical).

4.   DURECO erroneously argues that an arbitration procedure should have been followed in this matter. This exception (in the absence of jurisdiction) is totally unfounded given the lack of any useful and binding legal source.


## CONCERNING THE ALLEGED LACK OF URGENCY

DURECO draws attention to the existence of "ordinary" administration of justice "as in" interim injunction proceedings, which would enable the dispute to be resolved in good time. In other words DURECO considers that IFPI does not have an "urgent interest" to seek protection in interim injunction proceedings.

Since interim injunction procedures should retain their exceptional nature, this proposition is "procedurally logical" and also relevant in terms of judicial efficiency.

IFPI argues however that it is demanding the appointment of a sequestrator in the interim injunction proceedings for the recalled sound-recording mediums – a measure it would not be able to demand if seeking an injunction in an ordinary court.

The appointment of a sequestrator constitutes a solely custodial measure in anticipation of the basic decision. In accordance with Section 87 § 2 of the Copyright Act the handing over (to the plaintiff) of the imitation products and those still in the possession of the defendant can be ordered. It therefore appears superfluous to institute interim injunction proceedings, in this case together with legal proceedings along the lines of an interim injunction, solely in order to order to enable the appointment of a sequestrator. There is no valid urgency in this matter. The interim injunction proceedings are unfounded.

16

**FOR THESE REASONS;**

We, BOON J., Judge appointed to replace the Chairman of the Court of the first instance in Brussels;

Assisted by Clerk of the Court MELIS E.;

Given the Act of 15 June 1935 concerning the use of languages in legal proceedings;

Delivering judgment on the interim injunction after full argument on both sides;

Rejecting all other or contrary decisions;

Grants GLOBAL ARTS PRODUCTIONS, INC. deed of its voluntary intervention.

Declare the interim injunction action as admissible but unfounded for lack of genuine urgency.

Declare the action to be held harmless consequently to be without substance.

Order the plaintiff to pay the costs, estimated for itself at 12,727 + 9,208 + 4,100 francs, for DURECO BELGIUM and DURECO NEDERLAND at 4,100 francs and for GLOBAL ARTS PRODUCTIONS at 4,100 francs.

Judgment handed down at the public interim injunction hearing on 31 December 1997.


[Signature]                              [Signature]
Melis E.                                 Boon J.

17

## COURT OF FIRST INSTANCE IN BRUSSELS

In public session of the interim injunction proceedings of 31 December 1997.

No. 97/10.661/A
of the roll

### Annexes

1 summons
1 summons of intervention
1 partition for voluntary intervention
4 pleadings

Section 87 of Copyright Act - Interest of professional association - Related rights - Burden of proof - Range of the injunction

IN THE CASE OF:

The V.Z.W. IFPI BELGIUM BELGISCHE FONOGRAFISCHE INDUSTRIE, having its seat at Almaplein, 3/5, 1200 Sint-Lambrechts-Woluwe (hereinafter abbreviated as IFPI).

PLAINTIFF

Represented by Mr. Benoît MICHAUX, solicitor (Tervurenlaan, 268 A, 1150 Brussels).

AGAINST:

1.  B.V.DURECO, a company established under Dutch law, with its registered office at Pampuslaan, 45, 1382 Weesp, the Netherlands, H.R. Hilversum 26.275 (hereinafter abbreviated as "DURECO NEDERLAND")

DEFENDANT

2.  N.V. DURECO BELGIUM, a company established under Belgian law, with its registered office at Vleurgatsesteenweg, 213, 1050 Brussels, H.R.B. 426.117.

DEFENDANT IN ENFORCED INTERVENTION

Both represented by Mr. Joren DE WACHTER, solicitor (Vossendreef 6, 1180 Brussels - box 14).

1
                 UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
2
            CASE NO. 98-6507-CIV-MIDDLEBROOKS

3

4
SONY MUSIC ENTERTAINMENT, INC.,    )
et al.,                        )
5
                         )
6
           Plaintiff,        )
                         )
7
    vs.                      )
                         )
8
GLOBAL ARTS PRODUCTIONS, et al.,    )
                         )
9
           Defendant.        )
                         )
10
--------------------------------------)

11
                DEPOSITION OF ROB EBBERS

12

13

14
           Taken before Andrea J. Stefanick,

15
Registered Merit Reporter and Notary Public in

16
and for the State of Florida at Large, pursuant

17
to Notice of Taking Deposition filed by the

18
Plaintiff in the above cause.

19

20
               - - -      **ORIGINAL**

21
Tuesday, August 25, 1998
Suite 2310
22
100 Southeast 2nd Street
Miami, Florida 33131
23
10:15 a.m. - 1:00 p.m.

24

25

MUDRICK·WITT
PROFESSIONAL REPORTING SERVICE

5

1    break, we'll conclude our questioning until

2    another time, to be continued on another

3    date.  So if there is time at the end to ask

4    the questions, you may ask questions today.

5         Is that agreeable?

6         MR. SEIF:  Yeah, that sounds fine.

7         MS. STETSON:  Okay.  Let's proceed.

8         THE WITNESS:  Well, I don't have that

9    much time, because I'm here only for the

10   MIDEM Convention and I am flying back on

11   Saturday.

12        MS. STETSON:  No, no, no, I didn't mean

13   to continue during this trip.  To continue

14   at some unspecified future time.

15        I understand the time commitments for

16   today and we'll honor that, as we've spoken

17   about previously.

18   BY MS. STETSON:

19        Q    Okay.  Mr. Ebbers, by whom are you

20   employed?

21        A    Dureco.

22        Q    How long have you been with Dureco?

23        A    Since 1972.

24        Q    And in what capacity are you employed

25   by them?

6

1     A     For the moment, being I'm senior

2  product manager, as you can see on my business

3  card.

4     Q     All right.  Can you describe generally

5  for us the business that Dureco is engaged in?

6     A     This is a Dutch record company,

7  completely independent company.  Completely

8  independent company.  We develop our own

9  product.  We have products under license.  And

10  the product that we record ourselves, we license

11  to foreign countries.

12          And most all the products that we put

13  out, go through marketing and promotion in

14  Benelux, Belgium.  That's Luxembourg.

15     Q     Is Dureco also involved in

16  manufacturing/distribution?

17     A     We have two sister companies, one that

18  makes CDs and the other one that distributes CDs.

19     Q     What are the names of those two sister

20  companies?

21     A     They -- the CD manufacturing company

22  is Dureco Manufacturing B.V., and distribution

23  company is Music Net B.V.

24     Q     Where are Dureco Manufacturing and

25  Music Net located?

30

1    communication with Danny Jordan?

2        A    Yes, several times.

3        Q    Okay.  Can you tell me the nature of

4    that communication, those communications?

5        A    Because we had been intimated by the

6    NVPI that the products may or may not be

7    illegal.

8            We tried to get information via the

9    phone and a fax to Danny Jordan, and we had

10   questions for him to -- for him to explain to us

11   how the product was acquired.

12       Q    Where was Danny Jordan located at that

13   time?

14       A    Either in New York or in California,

15   and I'm not sure whether it was San Francisco or

16   Los Angeles.

17       Q    Did he respond to your inquiries?

18       A    Yes.

19       Q    And what did le say?

20       A    He explained that the rights had been

21   acquired via tax shelters that he had bought and

22   that -- and he submitted documents, including the

23   prices and the titles that he had purchased.

24       Q    Okay.  Approximately when did this

25   take place?

31

1      A      That was approximately at the end of

2  '97, after we ceased the sale, we started to

3  inquire.

4      Q      Who has paid Dureco's legal fees that

5  they have incurred in connection with the IFPI

6  action?

7      A      We paid for our own attorney.

8      Q      Has Dureco ever asked Danny Jordan to

9  reimburse them for those legal fees?

10     A      I don't know.

11     Q      Who would know?

12     A      Maybe the general manager of Dureco.

13     Q      What is his name?

14     A      Harry Chun.  H-a-r like Harry, and

15  Chun is C-h-u-n, with two dots on the u-n.

16     Q      Okay.  And other than the Simon and

17  Garfunkel documents that you referred to

18  previously, do you recall any other artists

19  specifically referenced in the documents provided

20  to you by Danny Jordan, purportedly granting him

21  rights?

22     A      I believe, but I'm not quite sure,

23  that I also saw information about the Mamas and

24  the Papas and The Doors.

25     Q      Any others that you recall?

32

1      A      I may have seen others and I really

2   don't remember, but I definitely didn't see all

3   of -- 12 of them.

4      Q      Okay.  Do you think that they were

5   documents referencing at least six artists?

6      A      It could be.  Could be.  I don't

7   remember.

8            I believe I saw something about Neil

9   Diamond.  Neil Diamond.

10     Q      How much did Dureco ultimately pay

11  Global Arts in royalty fees?

12     A      I don't know.  Hans Ballo has the

13  statement and I have no idea what the amount was.

14     Q      You can't even approximate?

15     A      I know that we bought -- we paid about

16  $3,000 for the down payments, whether that was

17  covered or not -- approximately that.  I don't

18  remember.

19     Q      The approximate amount of the 18 to 20

20  percent, do you know the approximate amount of

21  that portion of the royalties?

22     A      I'm not quite sure that I understand

23  the question.

24     Q      Okay.  Well, we know that you paid

25  $3,000 per CD and that there were initially 12

12/03 '99 FR   13:02 FAX 41 1 202    87        DR. P. VOSSELER                              ☐001

LAW OFFICES OF
**KEVIN BARRY McDERMOTT**
ATTORNEY AT LAW

17482 IRVINE BLVD., SUITE 200
TUSTIN, CALIFORNIA 92780

(714) 731-6287 (LAWS)
(714) 731-6649 (FAX)
(800) 725-6586 (VOICE PAGER)

Kevin Barry McDermott*

February 23, 1999

* LICENSED TO PRACTICE IN ALL STATE AND FEDERAL COURTS FOR CALIFORNIA AND FEDERAL AND ALL MILITARY COURTS WORLDWIDE



Re: *Sony v. Global Arts*

I have been asked by my client, Danny Jordan, to pass along the following information. I want to make it clear from the onset that I represent Danny Jordan and Global Arts *only* in the capacity as counsel in the above referenced matter and in no other capacity.

As counsel in this case, I am very aware of its status. At the present time, Sony and the other plaintiffs have obtained a default judgment against Jordan and Global Arts for their collective failure to response to discovery. The default was taken as a means to sanction these entities for not complying with discovery. The default taken against Jordan and Global Arts was not contested largely because of a lack of funding to defend the action. Furthermore, the default was not given to the plaintiffs on any basis that they had proven their case. To the contrary, all they have proved to date is that Jordan and Global Arts have not complied with discovery. Confirmation of this assertion is enclosed herein.

At the present time, there are two entities left in the litigation that are not in default and have been conducting discovery. I represent these entities as well and know their status.

I have also been conducting legal research into this matter. It would appear that unless the plaintiffs can prove that the recordings were obtained in the United States and taken to Europe, there would appear to be a defense that the copyright laws of the United States do *not* apply. Accordingly, it would appear that any copyright infringement that does not have actual physical origin in the United States would not be subject to the laws of the United States, but rather, the laws of the various countries and also the Berne Convention.

Furthermore, it would appear that any payment made to any plaintiff or its representative in Europe for any alleged infringement that is the subject of this suit here in the state could be an offset to any claim of damage here in the States. For example, if one of the party plaintiffs here in the States has collected damages or payments for infringement or royalties for works that they have sued upon here, these damages or payments would offset any claim here in the States. Our laws here do not allow for

Page Two

for double indemnification of a plaintiff.

At the present time, several depositions have been taken and these depositions have revealed to me the dearth of information that the plaintiffs possess. As of this date, I have yet to see any document that directly ties any entity here in the States to any alleged infringement in Europe. I cannot state for certainty that no such document is possessed by the plaintiffs as discovery has only just began on our behalf, but the depositions would have been a logical time to release at least some of these materials if such existed and they possess them.

As you may know, the crux of the case in the States is legal title to many of the recording works. In the past twenty to twenty-five years, many such recordings and their titles were placed in tax shelters when such were permitted under our Internal Revenue Code. For a period of almost ten years, these shelters were the rage of wealthy individuals in the States and were used as a means to offset tax liability on earned income. When the IRS code was amended in approximately 1982, an estimated 3000-4000 titles had been in such shelters in one form or another. One of the major industry participants in this tax shelter enterprise was one of the defendants in this case, Jack Millman. In his deposition, no materials were released by the attorneys for the plaintiffs evidencing any documentation that they can confirm that Jordan and Global Arts are somehow involved with creating false chains of title to product in Europe. Although the plaintiffs claimed that Millman was the source of the product used by Jordan, no such testimony was given that confirmed such a claim nor did they confront Millman with any document supporting their claim. The same is true with other depositions taken in this case.

At issue in this case and in any case in which these plaintiffs are seeking payments for royalties is whether the plaintiffs own exclusive title to the recordings. What also may be at issue is whether such payments, when received, are being used to pay royalties due to the artists. In either event, unless the plaintiffs can show exclusive title, I would question where any licensee anywhere should make any payment at all to them.

I have been informed by my client that you possess certain documents that would shed light on these issues. Any materials that you have that in your opinion would assist us here, I would greatly appreciate receiving a copy. Any documents that you have confirming that these plaintiffs do not conduct business in an above board manner, I would also appreciate receiving a copy.

Please feel to contact me if you have any questions regarding this correspondence. Again, however, I want to iterate that I represent Jordan and Global Arts only as to the litigation ongoing here in the States and I make no warranties as to any activities occurring now or in the past in Europe.

Sincerely,

LAW OFFICES OF KEVIN BARRY MC DERMOTT

BY KEVIN BARRY MC DERMOTT
KBM/jj

enc

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| SONY MUSIC ENTERTAINMENT, INC., et al., | ) ) ) | |
| Plaintiffs, | ) ) | No. 98-6507-CIV MIDDLEBROOKS |
| vs. | ) ) | VOLUME I |
| GLOBAL ARTS PRODUCTIONS, et al., | ) ) ) | |
| Defendants. | ) ) | |

# CERTIFIED COPY

## DEPOSITION OF RICHARD HARRY PERLMAN

### Thursday, February 4, 1999



The Egnatuk Agency

CERTIFIED SHORTHAND REPORTERS

370 South Crenshaw Blvd.
Suite E-102
Torrance, California 90503
(310) 787-3240

REPORTED BY:
Theresa A. Crowley
CSR No. 5513, RPR

File No. 2-4-992

called you in the last year and a half?  You said "fairly regularly"?

A    I may have spoken to him 50 times.

Q    Do you know where he lives now?

A    No.

Q    Do you know what state?

A    No.

Q    Have you ever asked him?

A    I've asked him.  He hasn't been very forthcoming.

Q    Have you had any written communication with Mr. Jordan in the last year and a half?

A    No.

Q    Have you ever had any written communications with him?

A    Period?

Q    Yes.

A    I'm sure in connection with those business venture things I did.

Q    Other than that?

A    No.

Q    What was the nature of the discussion that you had?  What were the topics of the discussions you had during these 50 conversations within the last year and a half?

104

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

SONY MUSIC ENTERTAINMENT,      )
INC., et al.,                  )
                               )
              Plaintiffs,      )   No. 98-6507-CIV
                               )       MIDDLEBROOKS
        vs.                    )
                               )       VOLUME II
GLOBAL ARTS PRODUCTIONS,       )
et al.,                        )
                               )
              Defendants.      )
_____)

# CERTIFIED COPY

DEPOSITION OF RICHARD HARRY PERLMAN

Tuesday, March 2, 1999



The
Egnatuk
Agency

CERTIFIED SHORTHAND REPORTERS

370 South Crenshaw Blvd
Suite E-102
Torrance, California 90503
(310) 787-3240

REPORTED BY:
Theresa A. Crowley
CSR No. 5513, RPR

File No. 3-2-992

1    document that we Bates-stamped P 028.

2                    (Plaintiffs' Exhibit 41 was

3                    marked for identification

4                    and is attached hereto.)

5    BY MR. FRACKMAN:

6         Q       This is dated, it looks like,

7    August 17, 1998.  Do you see that, sir?

8         A       Yes.

9         Q       Do you have a recollection of

10   receiving Exhibit 41?

11        A       Yes, I do.  That's my marginalia on

12   the right side in the third paragraph, far right

13   side.

14        Q       The numbers?

15        A       The 8,000 to B of A; 9,600 to B of A;

16   32,000 to B of Scot; 4,000 to B of A.

17        Q       And what about the other numbers

18   written there?

19        A       That's Mr. Ballo.  That's Deutsch

20   marks.

21        Q       When did you write your marginalia?

22        A       Soon after I received this fax.

23        Q       Why did you do that?

24        A       Because I received information about

25   these transactions.

```
 1          Q       What information?

 2          A       That money had changed hands in these

 3    transactions.

 4          Q       Where did you receive that

 5    information?

 6          A       From Mr. Ballo.

 7          Q       You spoke to him?

 8          A       It's written there.

 9          Q       But what was the purpose of your

10    writing those notes?

11          A       I had been told that there were not a

12    number of transactions going on in Europe.

13          Q       I'm sorry.  Start that over again?

14          A       I had been told, as I told you in my

15    prior testimony, that the number of European

16    transactions was nonexistent or very limited in

17    terms of licenses.

18          Q       From whom?

19          A       From Danny or Global Arts.  And I had

20    been told that some of those transactions were not

21    authorized transactions.

22          Q       By Mr. Jordan?

23          A       That's correct.

24          Q       Okay.  Go ahead.

25          A       This seems to refute some of that.
```

1     Q    How?

2     A    Or it seems to suggest there were some

3  transactions that had occurred, and there were

4  payments made.

5     Q    But why did you make those specific

6  notes there?

7     A    Because it gave me -- I mean, this

8  was -- I verified with Mr. Ballo those transactions.

9     Q    Why?

10     A    As you might recall, I had called

11  Mr. Ballo before, on August 12 or thereabouts, and I

12  had spoken to him.  I don't know who initiated the

13  conversation.  And I had accused him of some fraud

14  with respect to, certainly, using my name.  And,

15  second, you know, I said, "I don't understand why

16  you're including me in a paper trail of transactions

17  that I have no place of.  And I do know Mr. Jordan.

18  I'm not aware of anything that he's been doing, and

19  I don't know why you're including me in this.  It

20  seems to me that this is all bogus paperwork that

21  you're sending to me, and you're trying to ask me to

22  support something that is completely adverse to my

23  clients' interests."

24         And I guess to prove his integrity and

25  honesty, he sent me information relating to what he

VIDEOTAPED TESTIMONY OF DANNY JORDAN BEFORE THE
STATE BAR OF WEST VIRGINIA DEPOSITION
(10/7/98)

| | |
|---|---|
| Videographer | Can you hear us okay? |
| Mr. Perlman: | Yes. |
| Videographer | Okay. Well, we got this videotaped and I'm going to leave the room. |
| Ms. Goodman: | Thank you. |
| Videographer | If you all need anything at all, please just pick this phone up on the wall, dial zero and you'll get me. When your video conference is over, if you would come and get me so I can turn it off so we want be charged for anymore time. |
| Ms. Goodman: | I'll run down. Okay. |
| Videographer | Just pick up the phone and dial zero. |
| Ms. Goodman: | Okay. |
| Videographer | We're all set up. I appreciate your time. |
| Ms. Goodman: | Thank you. |
| Videographer | We do have 30 minutes of credit so it will go off at 5:30. Okay? |
| Ms. Goodman: | Okay. Great. |
| Videographer | Okay. I'll be back to check on it. |
| Ms. Goodman: | Thank you Mr. _____. |
| Videographer | You're welcome. Sorry. |
| Ms. Goodman: | That's okay. Las Vegas is pretty far away. we are just having a little trouble connecting. |
| Mr. Jordan: | We can hear you. |
| Ms. Goodman: | Okay. And I can hear you. We'll have Mora swear Mr. Jordan in. |
| Mora | Will you please raise your right hand, Mr. Jordan. |

1

Mr. Perlman:      You never heard from Mr. Gray again?

Mr. Jordan:       No.

Mr. Perlman:      Where are the master recordings?

Mr. Jordan:       Well, we have master recordings in New York and offices in Jersey.

Mr. Perlman:      But where are Mr. Gray's master recordings?

Mr. Jordan:       They are there.

Mr. Perlman:      Okay. If Mr. Gray called you, would he be able to get his master recordings?

Mr. Jordan:       Absolutely.

Mr. Perlman:      Now, not to presume Ms. Goodman's questions, but there doesn't seem to be a lot of paperwork to reflect a transaction for these master recordings. Can you describe what other paperwork would be involved if you were to hear from Mr. Gray?

Mr. Jordan:       He would be given a bill of sale which would go along with the agreement in the documents and that is about it. He would just get a bill of sale which would be pertain to what the royalties would be and what he paid for them.

Mr. Perlman:      Okay. I haven't qualified you to be an expert in these matters, but you have been involved in how many licensing transactions and over what period of time?

Mr. Jordan:       Over 30 years. I would say thousands.

Mr. Perlman:      Okay. Thousands. Do you have an understanding of what these master recordings that Mr. Gray had rights to and what those master recordings are worth? Well, how would be converted into money?

Mr. Jordan:       No, they are converted into money by transferring them to CDs, pressing them and giving them to distributors to put into retail operations. I think today this would do a lot better than it would have done three ago. The reason why I think that is because the concept was given by me. This is a country concept.

Mr. Perlman:      What do you mean by that?

Mr. Jordan:       Well, it is all country artists, historical country artists. And so this is a great concept to put these guys into a CD box set. So right now this holds more water than it did maybe three or four years ago because the country music has been big.

9

| Mr. Perlman: | If you just give Ms. Goodman:  an understanding and this video conference tape is going to be played for each member of the panel for the disciplinary board of the State of West Virginia and I want to give them a little background.  Try to explain how much it cost to create an album from one of these master recordings.  What does a CD cost for example? |
|---|---|
| Mr. Jordan: | Well, the CD with the artwork would probably cost about a $1.65. |
| Mr. Perlman: | Okay.  And what would it sell wholesale? |
| Mr. Jordan: | About $5.40. |
| Mr. Perlman: | Okay.  And about how many units of this type of material could sell minimally in a year? |
| Mr. Jordan: | In a year? |
| Mr. Perlman: | Yeah. |
| Mr. Jordan: | On each artist at this juncture now? |
| Mr. Perlman: | With each album or artist. |
| Mr. Jordan: | With each album, about 10,000. |
| Mr. Perlman: | Per artist? |
| Mr. Jordan: | Per artist. |
| Mr. Perlman: | So conceivably each of these recordings could generate $30, $35,000 of profit a year? |
| Mr. Jordan: | Uh-huh.  And that is in a single CD.  This also could be put into a box set which would generate much more money. |
| Mr. Perlman: | And a box set could be sold in what outlet? |
| Mr. Jordan: | Every outlet that sells –.  If you do a single CD, you are probably looking more at your record chains like Blockbuster, Tower and stuff like that.  But if you do a box set, you are now into your Target, your K-Mart, Walmart.  You could put into those areas because they will buy in quantity and the price goes down on the wholesale but an outlet sets the price on the retail because it is a box set. |

10

copies. If you look at this list here that you have in front of you, I would venture to say to you right now that there are probably 2,000 companies in a 500 mile radius that has every one of these masters. (Inaudible) from where you are sitting.

Ms. Goodman:     And I'm sure Richard understands what I'm getting at and what the subcommittee wants is we are trying to explain kind of the lack of documentation in terms of because normally you buy something for $30,000 and you have something in writing.

Mr. Perlman:     Okay. In the business, when do things get reduced to writing?

Mr. Jordan:     After payments and product. Because we dealt so much with each other over the years –. Like, for instance, I'll tell you something, you could probably call any major company tomorrow after you reviewed this and they'll attest to this as very simple. Let's take Capitol Records EMI, let's take Sony Corporation. If Sony Corporation tomorrow calls up Capitol EMI and says, "We need a box set on your Beach Boy products. We need it for three years, 15,000 minimum down guarantee sales up front. No paperwork is done at that particular time. What they do is once the deal is done, they put it out and that paperwork won't get until maybe eight months later.

Mr. Perlman:     The usually done at release of product or delivery of product.

Mr. Jordan:     And sometimes not until eight or nine months later when someone in legal says, "you know, we didn't get this signed." And I am just telling you these are the facts of the way this industry is and that is exactly the way it is.

Ms. Goodman     So when you talk about, Richard, the delivery of the product, you are talking about using these recordings as opposed to actually just physically possessing them? Having the deal enter and boxing them and things.

Mr. Perlman:     Well, Mr. Gray, as I understand it and I didn't ask questions about this and I don't want to testify, Mr. Gray was going to take physical possession of the master recordings of the copies and he was going to do whatever he was going to do with them. At that time, he would have needed to have a document that shows that he had the rights but they don't prepare that. It is almost like they'll hold your car at the lot until you drive it off. They won't give you the title to it until you drive it off type thing. So Mr. Gray has never come to pick up his car, so they didn't make out the title work with him. That's really all that the documentation that you are talking about as between Mr. Gray, the agent and the licensor is the title paperwork as between the agent and the licensor. I mean I can ask you: How many transactions would you have with various licensors in the course of a year.

Mr. Jordan:     500.

22

Now, if you know somebody in the business, like Danny has been in the business 30 years and knows many of the people who are executives in major record companies today, and Danny says, "I've got this act. I've got this idea. I've got these recordings." They can trade with one another because they know one another. They trust one another. They figure his reputation is he doesn't rip people off and people have given millions of dollars over on that alone. Buy and large, if you were getting into the industry, you might not know, Sherry, you would look at this chain of title and you would have to research to make sure that the paperwork was enforced, that in fact it wasn't just a deal memo that was signed, but was never paid for.

I ran into a circumstance like that for Judy Garland's stuff just about 7, 8 weeks ago where somebody was going to release all of these recordings. They have a contract signed by Michael Lux, Michael Sidney Lux, Sidney Lux who is with Judy Garland's husband and widower.

But even though we signed the contract, we never got paid for the contract. So they hand out this paperwork to various distributors and people to rip them off. Unfortunately, the music business is replete with that type of scenario. So the paperwork is part of the answer, what is going to be analyzed in terms of paperwork.

Finally, that is where Danny and I really met is because I have been responsible in representing artists who get ripped off. Because when I go over to that conference that I have described to you in France, there are all these guys selling all of these master recordings and the artists are not getting paid royalties for them. So if you check with the artist and find out are they getting paid a royalty from their guys, usually if guys say, "No, they are not getting paid a royalty," that means that guy is out stealing. So Danny and some of the other major licensing people around the world have called me quite often to ask, "Do you know if this artist is getting paid on this set of licenses" and that helps establish whether or not it is good paperwork.

| Ms. Goodman | So in the product that Mr. Gray purchased which includes a couple of Willie Nelson's, if he were to market that, box it, do some kind of compilation, royalties would still need to be paid to the artist? |

| Mr. Perlman: | Yes. That is part of the contract. I have actually seen the bill of sale that underlies the Willie Nelson album and Willie Nelson signed the bill of sale to the original company. It was a deal between Willie Nelson and the original company and it calls for Willie Nelson to get paid so much money for the recording and to get paid so much money in royalty. It is not a lot of money. It is maybe 2, 3, 4% because it is an older artist and they tended not to get paid higher royalties. But that obligation was run with the master recording. Mr. Gray would also be responsible to pay publishing for the copyright. |

28

[ RECEIVED 03/03 06:19 1999 AT   30   PAGE   3 (PRINTED PAGE
MAR. 3. 1999   9:13AM   JR SEASONS HOTEL   NO.447   P.3

03/02/99 17:09 FAX 202 223 0333   R.I.A.A.   @003/003

KOCH INTERNATIONAL POLAND

TOTAL STOCK REPORT   Date: 17/02/99   Page: 1

NO. 5004   P. 2

**CONFIDENTIAL**

| ITEM NO | TITLE | ACTUAL INSTOCK | TOTAL SALES |
|---|---|---|---|
| 337312 | CD ORBISON ROY: GOLD | 593 | 16,681 |
| 337316 | MC ORBISON ROY: GOLD | 158 | 5,276 |
| 337322 | CD NEWBORN JIMI: GOLD | 1,178 | 17,516 |
| 337336 | MC NEWBORN JIMI: GOLD | 236 | 6,027 |
| 337332 | CD JOPLIN JANIS: GOLD | 1,303 | 19,119 |
| 337336 | MC JOPLIN JANIS: GOLD | 366 | 4,663 |
| 337342 | CD ROGERS JOHN LEE: GOLD | 1,611 | 9,461 |
| 337346 | MC ROGERS JOHN LEE: GOLD | 170 | 3,436 |
| 337353 | CD BURDON ERIC & THE ANIMALS: GOLD | 1,099 | 10,680 |
| 337354 | MC BURDON ERIC & THE ANIMALS: GOLD | 104 | 3,533 |
| 337362 | CD MARLEY BOB & THE WAILERS: GOLD | 684 | 11,587 |
| 337364 | MC MARLEY BOB & THE WAILERS: GOLD | 190 | 5,804 |
| 337372 | CD SIMON & GARFUNKEL: GOLD | 2,130 | 44,780 |
| 337374 | MC SIMON & GARFUNKEL: GOLD | 388 | 7,393 |
| 337382 | CD COOKER JOE: GOLD | 191 | 26,464 |
| 337384 | MC COOKER JOE: GOLD | 80 | 7,993 |
| 337392 | CD ZZ TOP: GOLD | 27 | 19,343 |
| 337394 | MC ZZ TOP: GOLD | 24 | 5,506 |
| 337402 | CD THE DOORS: GOLD | 1,397 | 29,766 |
| 337404 | MC THE DOORS: GOLD | 282 | 8,301 |
| 337422 | CD V.A.: EVERYBODY LOVES SOMEBODY | 1,403 | 3,791 |
| 337424 | MC V.A.: EVERYBODY LOVES SOMEBODY | 119 | 3,663 |
| 337482 | CD THE WHO: GOLD | 1,233 | 5,632 |
| 337484 | MC THE WHO: GOLD | 201 | 2,334 |
| 337492 | CD BEACH BOYS: GOLD | 337 | 9,461 |
| 337496 | MC BEACH BOYS: GOLD | 188 | 2,706 |
| 337572 | CD IS THIS LOVE...VOL.1 | 1,383 | 4,963 |
| 337574 | MC IS THIS LOVE...VOL.1 | 154 | 4,616 |
| KPL520072 | CD CHARLES, RAY: GOLD | 1,731 | 1,917 |
| KPL520074 | MC CHARLES, RAY: GOLD | 121 | 1,166 |
| KPL520082 | CD SWEET, THE: GOLD | 449 | 3,182 |
| KPL520084 | MC SWEET, THE: GOLD | 139 | 1,671 |
| KPL520222 | CD ROGERS KENNY: GOLD | 809 | 2,059 |
| KPL520224 | MC ROGERS KENNY: GOLD | 149 | 1,129 |
| TVPROMO0102 | CD V.A.: LOVE SONGS (5BOX) | 109 | 28,701 |
| TVPROMO0104 | MC V.A.: LOVE SONGS (5BOX) | 0 | 68,646 |

Report Summary :
Total CD+TOTAL SALES :   589,440 PLN
         Total CD-Stock :   20,861 units .

TOTAL LICENCE FEE PAID BY KOCH INT. TO G.A.P
IN 1997-98 = 780 297,83 PLN. (208.656,52 USD - 35 USD)
(LAST TWO MONTHS OF 1999 - JAN AND FEB IS NOT PAID )

08/02/99  MON 11:21 FAX 202 2.. 3003 

## SCHEDULE OF SUMS RECEIVED FROM LICENSEES BY JORDAN AND GLOBAL ARTS

## BANK OF AMERICA ACCOUNT NO. 04293-15681
### IN NAME OF DANNY JORDAN/GLOBAL ARTS PRODUCTION

| Date | Licensee | Amount |
|---|---|---|
| 12/19/96 | Gruezi | $2,385.00 |
| 12/30/96 | Also Starring Oy | $1,735.00 |
| 12/30/96 | K-Tel International | $3,685.00 |
| 2/18/97 | Gruezi | $7,185.00 |
| 2/24/97 | Gruezi | $7,185.00 |
| 2/26/97 | Selected Sound | $44,038.36 |
| 4/8/97 | Gruezi | $21,585.00 |
| 4/9/97 | This Is Music | $24,055.00 |
| 6/12/97 | K-Tel International | $3,985.00 |
| 7/14/97 | Unclear. bank records identify "Deutsche Bank A.G." | $1,585.00 |
| 7/16/97 | Dureco | $14,390.00 |
| 7/22/97 | Unclear. bank records identify "Kg Patricia Im - Und Export" | $22,343.58 |
| 8/11/97 | Disques Duchesse Sarf | $6,374.71 |
| 8/21/97 | Hans Ballo | $4,995.00 |
| 9/2/97 | Gruezi | $2,545.00 |
| 9/4/97 | Gruezi | $2,385.00 |
| 9/23/97 | Hans Ballo | $4,079.00 |
| 9/26/97 | Disimode Entertainment | $7,790.00 |
| 10/2/97 | Dureco | $14,390.00 |

1

08/02/99   MON 11:22 FAX 202 22~ 3003



| | | |
|---|---|---|
| 10/7/97 | Gruezi | $11,276.92 |
| 10/20/97 | Gruezi | $11,985.00 |
| 10/29/97 | Trend Music Group, Inc. | $8,000.00 |
| 11/4/97 | Disques Duchesse Sort | $11,262.43 |
| 11/17/97 | Herrn | $5,428.00 |
| 12/2/97 | Gruezi | $11,232.00 |
| 12/22/97 | Gruezi | $1,582.00 |
| 1/12/98 | Gruezi | $9,982.00 |
| 1/13/98 | K-Tel International | $2,894.14 |
| 1/21/98 | Hans Ballo | $58,998.00 |
| 1/29/98 | Koch International | $4,465.60 |
| 2/2/98 | Gruezi | $2,382.00 |
| 2/12/98 | Bell Musik | $1,535.36 |
| 2/13/98 | Gruezi | $11,232.00 |
| 2/23/98 | Koch International | $2,000.00 |
| 2/24/98 | Volker Spielberg | $982.00 |
| 3/5/98 | Koch International | $4,000.00 |
| 3/9/98 | Hans Ballo | $6,182.00 |
| 3/17/98 | Koch International | $2,000.00 |
| 3/17/98 | Volker Spielberg | $7,482.00 |
| 3/13/98 | Gruezi | $3,982.00 |
| 4/6/98 | Trend Music | $3,400.00 |
| 4/6/98 | Koch International | $4,800.00 |
| 4/7/98 | Snakes Music | $1,694.00 |
| 4/7/98 | Snakes Music | $1,775.00 |
| 4/7/98 | Gruezi | $7,982.00 |

0140465.1

08/02/99  MON 11:22 FAX 202 2.. 3003



| 4/7/98 | Compact Press & Licensing | $1.262.00 |
| 4/9/98 | Bell Musik | $1.849.03 |
| 5/1/98 | Bell Musik | $1.846.03 |
| 5/4/98 | Pony Express Records | $5.000.00 |
| 5/13/98 | Volker Spielberg | $14.982.00 |
| 5/19/98 | K-Tel International | $785.20 |
| 5/19/98 | Hans Ballo | $3,027.00 |
| 5/22/98 | Koch International | $35.211.48 |
| 5/27/98 | Snakes Music | $10.820.06 |
| 6/9/98 | Gruezi | $702.00 |
| 6/11/98 | Gruezi | $6.462.00 |
| 6/15/98 | Snakes Music | $1.780.00 |
| 7/6/98 | Compact Press & Licensing | $4.982.00 |
| 7/17/98 | Koch International | $2.077.57 |
| 7/31/98 | Volker Spielberg | $4.982.00 |
| 8/18/98 | Koch International | $24.823.29 |
| 8/27/98 | Snakes Music | $7.697.41 |
| 9/14/98 | Gruezi | $6.822.00 |
| 9/15/98 | Snakes Music | $1.775.00 |
| 9/25/98 | Unclear bank records identify "Dan Danske Bank" | $11.162.16 |
| 10/6/98 | Trend Music Group | $3.000.00 |
| 10/15/98 | Koch International | $5.400.00 |
| 10/22/98 | Snakes Music | $7.175.00 |
| 11/6/98 | Hans Ballo | $1.563.00 |
| 11/17/98 | Snakes Music | $7.175.00 |
| 11/25/98 | Snakes Music | $3.575.00 |

0140465.1

08/02/99  MON 11:23 FAX 202 22. 3003



| 11/25/98 | Koch International | $35,539.20 |
| 12/15/98 | Snakes Music | $6,815.00 |
| 12/30/98 | K-Tell International | $333.30 |
| 2/1/99 | Hans Ballo | $1,779.24 |
| 2/10/99 | Koch International | $360.00 |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  |  |  |
|  | Total for Account No. 04293-15681 | $616.013.07 |

4

0140465.1

08/02/99  MON 11:23 FAX 202 2      003                                      ☑031



## SCHEDULE OF SUMS RECEIVED FROM LICENSEES BY JORDAN AND GLOBAL ARTS

### BANK OF AMERICA ACCOUNT NO. 04291-05800 IN NAME OF DANNY JORDAN/CARMELA JORDAN FLORIO

| Date | Licensee | Amount |
|------|----------|--------|
| 8/5/96 | Salermo Cozzarreli | $100.00 |
| 8/22/96 | K-Tel International | $1,665.00 |
| 8/23/96 | Unclear, bank records show "Landeskirsche Des Kantos Thur" | $640.74 |
| 9/30/96 | Gruezi | $1,570.00 |
| 9/30/96 | Unclear, bank records show "Cdm. Heilbronn" | $2,500.00 |
| 10/11/96 | Selected Sound | $4,985.00 |
| 10/16/96 | Unclear, bank records show "Duetsche Bank Ag" | $3,085.00 |
| 11/4/96 | Cozzarelli Salerno | $2,000.00 |
| 11/8/96 | Trend Music Group | $4,996.00 |
| 11/26/96 | Gruezi | $1,905.00 |
| 12/13/96 | Trend Music Group | $2,496.00 |
| 1/22/97 | Trend Music Group | $2,496.00 |
| 2/4/97 | Cozzarelli Salerno | $2,000.00 |
| 6/26/97 | Gruezi | $5,185.00 |
| 7/15/97 | Gruezi | $12,235.00 |
| 2/3/98 | Trend Music Group | $2,200.00 |
|  |  |  |
|  |  |  |

0140465.1

08/02/99  MON 11:23 FAX 202 _   3003



| | | |
|---|---|---|
| | | |
| | Total for Account No. 04291-05300 | $50,058.74 |
| | Grand Total | $666,071.81 |

0140465.i

**Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: November 30 through December 31, 1996
Account Number: 04293-15681

## Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 12/19 | Intl Money Tfr Ref.Mta35409308  Source:  Br 5644 Sender Ref: 9635204082     Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | $2,385.00 |
| 12/30 | Intl Money Tfr Ref.Mta36545232  Source:  Br 5644 Sender Ref: 9635803933     Benef: Global Arts Productions.,Inc  Orig: Also Starring Oy | | 1,735.00 |
| 12/30 | Intl Money Tfr Ref.Mta36545003  Source:  Br 5644 Sender Ref: 9635902537     Benef: Global Arts Orig: K-Tel International | | 3,685.00 |
| | Total Other Deposits and Credits | | $7,805.00 |
| | **Other Withdrawals** | | |
| 12/23 | Telephone Transfer To Checking 04291-05800 CSR | | $600.00 |
| 12/26 | Telephone Transfer To Checking 04291-05800 CSR | | 500.00 |
| 12/31 | Telephone Transfer To Checking 04291-05800 CSR | | 838.98 |
| | Total Other Withdrawals | | $1,938.98 |
| | **Account Fees** | | |
| 12/31 | 13 Self Service Calls | | $6.50 |
| 12/31 | Monthly Service Charge | | 10.00 |
| | Total Account Fees | | $16.50 |

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 12/04 | $ 598.98 | 12/19 | 2,633.98 | 12/30 | 6,838.98 |
| 12/13 | 348.98 | 12/23 | 1,918.98 | 12/31 | 5,983.50 |
| 12/17 | 248.98 | 12/26 | 1,418.98 | | |

MISC-4641  9-92

# ▛▌ Bank of America

```
DANNY JORDAN                          Statement Period: February 1 through February 28, 1997
GLOBAL ARTS PRODUCTIONS               Account Number: 04293-15681
```

=========================================================================
Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 02/18 | Intl Money Tfr Ref.Mta04924231  Source:  Br 5644 Sender Ref: 9704902110     Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | $7,185.00 |
| 02/24 | Intl Money Tfr Ref.Mta05520489  Source:  Br 5644 Sender Ref: 9705202411     Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | 7,185.00 |
| 02/26 | Funds Transfer Ref.Mta05717871  Source: Fedwire Sender Ref: 1754 Benef: Global Arts Productions Inc. 7160  Orig: Selected Sound | | 44,038.36 |
| | **Total Other Deposits and Credits** | | **$58,408.36** |
| | **Other Withdrawals** | | |
| 02/25 | Telephone Transfer To Checking 04291-05800 VRU | | $1,500.00 |
| | **Account Fees** | | |
| 02/04 | Insufficient Funds | | $10.00 |
| 02/26 | Processing Fee For Funds Transfer Ref.Mta=05717871 | | 10.00 |
| 02/28 | 4 Self Service Calls | | 2.00 |
| 02/28 | Monthly Service Charge | | 10.00 |
| | **Total Account Fees** | | **$32.00** |

=========================================================================
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 02/04 | $ 27.50 | 02/20 | 4,887.50 | 02/26 | 52,600.86 |
| 02/18 | 7,212.50 | 02/24 | 12,072.50 | 02/27 | 50,179.16 |
| 02/19 | 7,012.50 | 02/25 | 9,572.50 | 02/28 | 45,602.62 |

**Page 2 of 2**

MISC-4641  9-92

# **Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: April 1 through April 30, 1997
Account Number: 04293-15681

===========================================================================
Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 04/08 | Intl Money Tfr Ref.Mta09828675  Source:  Br 5644 Sender Ref:  9709804864     Benef: Global Arts Production  Orig: Grueezi  Schallplatten Ag | | $21,585.00 |
| 04/09 | Intl Money Tfr Ref.Mta09948043  Source:  Br 5644 Sender Ref:  9709805604     Benef: Global Arts Productions Inc.  Orig: This Is  Music | | 24,055.00 |
| | Total Other Deposits and Credits | | $45,640.00 |
| | Other Withdrawals | | |
| 04/18 | Telephone Transfer To Checking 04291-05800 VRU | | $500.00 |
| 04/22 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| | Total Other Withdrawals | | $1,500.00 |
| | Account Fees | | |
| 04/30 | 16 Self Service Calls | | $8.00 |

===========================================================================
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 04/08 | $ 35,688.71 | 04/16 | 53,618.71 | 04/24 | 45,994.67 |
| 04/09 | 59,743.71 | 04/17 | 52,527.12 | 04/28 | 44,994.67 |
| 04/10 | 58,743.71 | 04/18 | 51,449.67 | 04/30 | 44,986.67 |
| 04/11 | 55,743.71 | 04/21 | 49,049.67 | | |
| 04/15 | 54,118.71 | 04/22 | 47,549.67 | | |

MISC-4641  9-92

**B] Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: May 31 through June 30, 1997
Account Number: 04293-15681

Account Activity   Continued

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 06/12 | Intl Money Tfr Ref.Mta16329231  Source:  Br 5644 Sender Ref: | | |
| | 9716301318        Benef: Global Arts Orig: K-Tel International | | 3,985.00 |
| | Total Other Deposits and Credits | | $9,070.00 |
| | Withdrawals, Transfers and Account Fees | | |
| 06/05 | Telephone Transfer To Checking 04291-05800 VRU | | $1,500.00 |
| 06/17 | Telephone Transfer To Checking 04291-05800 VRU | | 600.00 |
| 06/19 | Telephone Transfer To Checking 04291-05800 VRU | | 1,500.00 |
| 06/30 | 20 Self Service Calls | | 10.00 |
| | Total Withdrawals, Transfers and Account Fees | | $3,610.00 |

Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 06/02 | $ 36,859.77 | 06/10 | 31,134.77 | 06/20 | 28,669.77 |
| 06/04 | 35,859.77 | 06/11 | 28,634.77 | 06/23 | 27,969.77 |
| 06/05 | 34,359.77 | 06/12 | 32,619.77 | 06/24 | 26,969.77 |
| 06/06 | 33,759.77 | 06/17 | 32,019.77 | 06/30 | 26,959.77 |
| 06/09 | 32,134.77 | 06/19 | 29,919.77 | | |

MISC-4641  9-92

 **Bank of America**

DANNY JORDAN                                     Statement Period: July 1 through July 31, 1997
GLOBAL ARTS PRODUCTIONS                          Account Number: 04293-15681

## Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 07/14 | Funds Transfer Ref.Mta19546305  Source: Fedwire Sender Ref: 191tpsw519302000 Benef: Globel Atrs Produktions  Orig: Deutsche Bank A.G. Frankfurt, Ge | | $1,585.00 |
| 07/15 | Telephone Transfer From Checking 04291-05800 CSR | | 10,000.00 |
| 07/16 | Funds Transfer Ref.Mta19745869  Source: Fedwire Sender Ref: 000270 Benef: Global Arts Productions;7160 Nob  Orig: B.V. Dureco | | 14,390.00 |
| 07/22 | Intl Money Tfr Ref.Mta20350847  Source: Br 5644 Sender Ref: 9719907652      Benef: Globel Arts Productions  Orig: Kg Patricia Im- Und Export | | 22,343.58 |
| | **Total Other Deposits and Credits** | | **$48,318.58** |
| | **Withdrawals, Transfers and Account Fees** | | |
| 07/14 | Processing Fee For Funds Transfer Ref.Mta=19546305 | | $10.00 |
| 07/16 | Processing Fee For Funds Transfer Ref.Mta=19745869 | | 10.00 |
| 07/31 | 10 Self Service Calls | | 5.00 |
| | **Total Withdrawals, Transfers and Account Fees** | | **$25.00** |

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 07/07 | $ 25,359.77 | 07/16 | 37,850.84 | 07/23 | 57,354.85 |
| 07/08 | 17,798.37 | 07/17 | 37,350.84 | 07/31 | 57,349.85 |
| 07/14 | 17,434.05 | 07/18 | 37,050.84 | | |
| 07/15 | 23,964.68 | 07/22 | 59,394.42 | | |

## FACTS - FDIC Insured Account Disclosure Information

Effective September 5, 1997, for regulatory accounting purposes we may classify non-interest bearing checking accounts as two sub-accounts: a checking sub-account and a savings sub-account. Neither sub-account earns interest. We may transfer funds between these sub-accounts. We record the sub-accounts and any transfers between them on our internal accounting records only. Otherwise the sub-accounts are subject to the same terms as our other checking or savings accounts. You should continue to use your account as you do now. If you have any questions about this information, please call the 24-Hour Customer Service number on your account statement.

California

MISC-4641  9-92

# Bank of America

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: August 1 through August 29, 1997
Account Number: 04293-15681

================================================================================
Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 08/11 | Funds Transfer Ref.Mta22320256  Source: Fedwire Sender Ref: 970807015238    Benef: Global Arts Productions  Orig: Disques Duchesse Sarl | | $6,374.71 |
| 08/21 | Intl Money Tfr Ref.Mta23301217  Source:  Br 5644 Sender Ref: 9723101009    Benef: Global Arts Prod.  Orig: Hans Ballo | | 4,995.00 |
| | Total Other Deposits and Credits | | $11,369.71 |
| | Withdrawals, Transfers and Account Fees | | |
| 08/08 | Telephone Transfer To Checking 04291-05800 VRU | | $2,000.00 |
| 08/11 | Processing Fee For Funds Transfer Ref.Mta=22320256 | | 10.00 |
| 08/13 | Telephone Transfer To Checking 04291-05800 VRU | | 2,000.00 |
| 08/26 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 08/29 | 17 Self Service Calls | | 8.50 |
| | Total Withdrawals, Transfers and Account Fees | | $4,518.50 |

================================================================================
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 08/01 | $ 56,849.85 | 08/11 | 56,074.06 | 08/19 | 50,807.53 |
| 08/04 | 55,649.18 | 08/12 | 55,249.55 | 08/21 | 55,802.53 |
| 08/05 | 55,362.35 | 08/13 | 53,249.55 | 08/26 | 55,302.53 |
| 08/07 | 54,209.35 | 08/14 | 52,999.55 | 08/28 | 54,302.53 |
| 08/08 | 52,209.35 | 08/15 | 51,999.55 | 08/29 | 49,294.03 |

MISC-4641  9-92

**Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: August 30 through September 30, 1997
Account Number: 04293-15681

**Account Activity**

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 09/02 | Intl Money Tfr Ref.Mta24533987  Source:  Br 5644 Sender Ref:<br>9724102053      Benef: Global Arts Production  Orig: Gruaezi<br>Schallplatten Ag | | $2,545.00 |
| 09/11 | Intl Money Tfr Ref.Mta25409604  Source:  Br 5644 Sender Ref:<br>9725302191      Benef: Global Arts Production  Orig: Gruaezi<br>Schallplatten Ag | | 2,385.00 |
| 09/23 | Intl Money Tfr Ref.Mta26646235  Source:  Br 5644 Sender Ref:<br>9726203688      Benef: Global Arts Prod.  Orig: Ballo, Hans | | 4,079.00 |
| 09/26 | Funds Transfer Ref.Mta26918843  Source: Fedwire Sender Ref: 000069<br>Benef: .0429315681branch0429;Global Arts  Orig: Digimode<br>Entertainment | | 7,790.00 |
| | **Total Other Deposits and Credits** | | **$16,799.00** |
| | Withdrawals, Transfers and Account Fees | | |
| 09/02 | Telephone Transfer To Checking 04291-05800 VRU | | $500.00 |
| 09/08 | Telephone Transfer To Checking 04291-05800 VRU | | 1,500.00 |
| 09/11 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 09/15 | Telephone Transfer To Checking 04291-05800 VRU | | 250.00 |
| 09/22 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 09/26 | Processing Fee For Funds Transfer Ref.Mta=26918843 | | 10.00 |
| 09/30 | 27 Self Service Calls | | 13.50 |
| | **Total Withdrawals, Transfers and Account Fees** | | **$3,273.50** |

**Daily Balance**

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 09/02 | $ 50,285.42 | 09/11 | 42,697.90 | 09/24 | 41,071.80 |
| 09/03 | 46,382.67 | 09/15 | 42,447.90 | 09/26 | 48,851.80 |
| 09/05 | 45,616.78 | 09/17 | 42,171.52 | 09/29 | 47,951.80 |
| 09/08 | 43,312.90 | 09/18 | 41,671.52 | 09/30 | 47,360.85 |
| 09/09 | 41,812.90 | 09/22 | 40,923.35 | | |
| 09/10 | 40,812.90 | 09/23 | 44,802.35 | | |

California

MISC-4641  9-92

# Bank of America

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: October 1 through October 31, 1997
Account Number: 04293-15681

**Account Activity**

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 10/02 | Funds Transfer Ref.Mta27544015  Source: Fedwire Sender Ref: 000883  Benef: Global Arts Productions;7160 Nob  Orig: B.V. Dureco | | $14,390.00 |
| 10/07 | Funds Transfer Ref.Mta28015066  Source: Fedwire Sender Ref: 971003013524  Benef: Global Arts Prod  Orig: Disques Duchesse Sarl | | 11,276.92 |
| 10/20 | Intl Money Tfr Ref.Mta29316398  Source: Br 5644 Sender Ref: 9729005449  Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | 11,985.00 |
| 10/29 | Intl Money Tfr Ref.Mta30248558  Source: Br 5644 Sender Ref: 9730211245  Benef: Global Arts Product  Orig: Trend Music Group Inc | | 8,000.00 |
| | **Total Other Deposits and Credits** | | $45,651.92 |
| | **Withdrawals, Transfers and Account Fees** | | |
| 10/01 | Telephone Transfer To Checking 04291-05800 VRU | | $1,000.00 |
| 10/02 | Processing Fee For Funds Transfer Ref.Mta27544015 | | 10.00 |
| 10/03 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| 10/07 | Processing Fee For Funds Transfer Ref.Mta28015066 | | 10.00 |
| 10/14 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 10/27 | Cash withdrawal on 10/27, Versateller ATM #120101 (Card #230447377) | 000294 | 100.00 |
| 10/27 | Telephone Transfer To Checking 04291-05800 VRU | | 650.00 |
| 10/29 | Processing Fee For Funds Transfer Ref.Mta30248558 | | 10.00 |
| 10/30 | Cash withdrawal on 10/30, Versateller ATM #120101 (Card #230447377) | 001766 | 200.00 |
| 10/30 | Telephone Transfer To Checking 04291-05800 CSR | | 500.00 |
| 10/31 | 23 Self Service Calls | | 11.50 |
| | **Total Withdrawals, Transfers and Account Fees** | | $3,991.50 |

**Daily Balance**

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 10/01 | $ 46,241.42 | 10/10 | 64,640.24 | 10/23 | 67,361.24 |
| 10/02 | 60,621.42 | 10/14 | 61,640.24 | 10/27 | 63,111.24 |
| 10/03 | 59,473.04 | 10/15 | 61,440.24 | 10/28 | 60,432.85 |
| 10/06 | 56,512.14 | 10/16 | 57,647.68 | 10/29 | 68,422.85 |
| 10/07 | 66,565.24 | 10/17 | 57,208.75 | 10/30 | 67,222.85 |
| 10/09 | 66,265.24 | 10/20 | 67,861.24 | 10/31 | 65,711.35 |

**ATM Information**

This period, you visited the following ATM locations:

Bank of America's Versateller ATM Network
  #120101 Warner Center, Woodland Hill, CA

California

Page 2 of 2

MISC-4641  9-92

**Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: November 1 through November 28, 1997
Account Number: 04293-15681

## Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 11/04 | Funds Transfer Ref.Mta30848673   Source: Fedwire Sender Ref: 971031040943     Benef: Global Arts Prod.  Orig: Disques Duchesse Sarl | | $11,262.43 |
| 11/17 | Intl Money Tfr Ref.Mta32100891   Source:  Br 5644 Sender Ref: 9731701692     Benef: Global Arts Prod.  Orig: Herrn | | 5,428.00 |
| | Total Other Deposits and Credits | | $16,690.43 |
| | **Withdrawals, Transfers and Account Fees** | | |
| 11/04 | Processing Fee For Funds Transfer Ref.Mta=30848673 | | $10.00 |
| 11/07 | Cash withdrawal on 11/06, Versateller ATM #021805 (Card #230447377) | 000252 | 200.00 |
| 11/07 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| 11/14 | Telephone Transfer To Checking 04291-05800 CSR | | 400.00 |
| 11/14 | Telephone Transfer To Checking 04291-05800 VRU | | 400.00 |
| 11/28 | 11 Self Service Calls | | 5.50 |
| | Total Withdrawals, Transfers and Account Fees | | $2,015.50 |

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 11/04 | $ 76,963.78 | 11/14 | 53,095.69 | 11/26 | 53,185.18 |
| 11/07 | 75,763.78 | 11/17 | 57,937.77 | 11/28 | 53,179.68 |
| 11/12 | 72,763.78 | 11/19 | 55,181.96 | | |
| 11/13 | 67,010.52 | 11/20 | 54,681.96 | | |

## ATM Information

This period, you visited the following ATM locations:

Bank of America's Versateller ATM Network
  #021805 Santa Monica, Santa Monica, CA

California

Page 2 of 2

MISC-4641  9-92

**B** **Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: November 29 through December 31, 1997
Account Number: 04293-15681

==================================================================================================

Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 12/02 | Intl Money Tfr Ref.Mta33621374  Source:  Br 5644 Sender Ref: 9733602926     Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | $11,232.00 |
| 12/22 | Intl Money Tfr Ref.Mta35653447  Source:  Br 5644 Sender Ref: 9735302615     Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | 1,582.00 |
| | Total Other Deposits and Credits | | $12,814.00 |
| | Withdrawals, Transfers and Account Fees | | |
| 12/02 | Telephone Transfer To Checking 04291-05800 VRU | | $500.00 |
| 12/05 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 12/23 | Telephone Transfer To Checking 04291-05800 VRU | | 400.00 |
| 12/31 | 28 Self Service Calls | | 14.00 |
| 12/31 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| | Total Withdrawals, Transfers and Account Fees | | $2,414.00 |

==================================================================================================

Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 12/01 | $ 51,179.68 | 12/10 | 55,553.11 | 12/22 | 48,156.19 |
| 12/02 | 61,911.68 | 12/12 | 54,053.11 | 12/23 | 41,571.10 |
| 12/04 | 60,611.68 | 12/16 | 53,053.11 | 12/24 | 36,571.10 |
| 12/05 | 60,111.68 | 12/17 | 51,175.59 | 12/26 | 36,071.10 |
| 12/08 | 58,811.68 | 12/18 | 48,774.19 | 12/29 | 34,971.10 |
| 12/09 | 57,389.05 | 12/19 | 48,574.19 | 12/31 | 33,207.10 |

California

Page 2 of 2

MISC-4641  9-92

# **Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: January 1 through January 30, 1998
Account Number: 04293-15681

## Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 01/12 | Intl Money Tfr Ref.Mta01213412  Source:  Br 5644 Sender Ref: 9801202024     Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | $9,982.00 |
| 01/13 | Intl Money Tfr Ref.Mta01334494  Source:  Br 5644 Sender Ref: 9801304375     Benef: Global Arts Orig: K-Tel International | | 2,898.14 |
| 01/21 | Intl Money Tfr Ref.Mta02144589  Source:  Br 5644 Sender Ref: 9802003370     Benef: Global Arts Prod.  Orig: Ballo, Hans | | 5,898.00 |
| 01/29 | Funds Transfer Ref.Mta02907765  Source: Fedwire Sender Ref: 93701000027js    Benef: Global Art Production USA 7160 Hob  Orig: Koch International Poland Sp Z O O | | 4,465.60 |
| | Total Other Deposits and Credits | | $23,243.74 |
| | **Withdrawals, Transfers and Account Fees** | | |
| 01/12 | Telephone Transfer To Checking 04291-05800 VRU | | $1,000.00 |
| 01/26 | Telephone Transfer To Checking 04291-05800 VRU | | 3,000.00 |
| 01/29 | Processing Fee For Funds Transfer Ref.Mta=02907765 | | 10.00 |
| 01/30 | 23 Self Service Calls | | 11.50 |
| 01/30 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| | Total Withdrawals, Transfers and Account Fees | | $4,521.50 |

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 01/02 | $ 32,707.10 | 01/13 | 37,003.55 | 01/22 | 34,930.36 |
| 01/05 | 31,427.56 | 01/14 | 35,192.67 | 01/23 | 34,800.99 |
| 01/06 | 30,727.56 | 01/15 | 32,161.58 | 01/26 | 30,738.09 |
| 01/07 | 30,585.44 | 01/16 | 31,511.58 | 01/27 | 30,076.79 |
| 01/09 | 28,465.56 | 01/20 | 29,732.36 | 01/29 | 34,552.39 |
| 01/12 | 36,447.56 | 01/21 | 35,130.36 | 01/30 | 34,020.89 |

MISC-4641  9-92


**Bank of America**

```
DANNY JORDAN                                      Statement Period: January 31 through February 27, 1998
GLOBAL ARTS PRODUCTIONS                           Account Number: 04293-15681
```

===============================================================================================
Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 02/02 | Intl Money Tfr Ref.Mta03501078  Source:  Br 5644 Sender Ref: 9803002017      Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | $2,382.00 |
| 02/12 | Intl Money Tfr Ref.Mta04313625  Source:  Br 5644 Sender Ref: 9804303307      Benef: Global Arts Productions Inc.  Orig: Bell Musik Gmbh | | 1,535.36 |
| 02/13 | Intl Money Tfr Ref.Mta04440640  Source:  Br 5644 Sender Ref: 9804406068      Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | 11,232.00 |
| 02/23 | Funds Transfer Ref.Mta05451598  Source: Fedwire Sender Ref: 1858200050fs    Benef: Global Art Production  Orig: Koch International Poland Sp Z O O | | 2,000.00 |
| 02/24 | Intl Money Tfr Ref.Mta05512289  Source:  Br 5644 Sender Ref: 9805110149      Benef: Global Arts Productions  Orig: Volker Spielberg | | 4,982.00 |
| | Total Other Deposits and Credits | | $22,131.36 |
| | Withdrawals, Transfers and Account Fees | | |
| 02/02 | Telephone Transfer To Checking 04291-05800 VRU | | $1,000.00 |
| 02/23 | Processing Fee For Funds Transfer Ref.Mta=05451598 | | 10.00 |
| 02/27 | 18 Self Service Calls | | 9.00 |
| | Total Withdrawals, Transfers and Account Fees | | $1,019.00 |

===============================================================================================
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 02/02 | $ 35,402.89 | 02/09 | 16,856.38 | 02/18 | 24,378.35 |
| 02/03 | 34,613.31 | 02/11 | 15,856.38 | 02/23 | 25,708.35 |
| 02/04 | 31,613.31 | 02/12 | 17,391.74 | 02/24 | 30,634.09 |
| 02/05 | 28,852.03 | 02/13 | 28,623.74 | 02/25 | 28,703.54 |
| 02/06 | 17,741.33 | 02/17 | 25,594.76 | 02/27 | 28,694.54 |

MISC-4641  9-92

**Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: February 28 through March 31, 1998
Account Number: 04293-15681

## Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 03/05 | Funds Transfer Ref.Mta06433357  Source: Fedwire Sender Ref: 56818000062js   Benef: Global Arts Production  Orig: Koch International Poland Sp Z O O | | $4,000.00 |
| 03/09 | Intl Money Tfr Ref.Mta06820143  Source: Br 5644 Sender Ref: 9806403600   Benef: Globalarts-Prod.  Orig: Hans Ballo | | 6,182.00 |
| 03/17 | Funds Transfer Ref.Mta07651612  Source: Fedwire Sender Ref: 6058700072fs   Benef: Global Arts Productions  Orig: Koch International Poland Sp Z O O | | 2,000.00 |
| 03/17 | Intl Money Tfr Ref.Mta07650079  Source: Br 5644 Sender Ref: 9807209363   Benef: Global Arts Production  Orig: Volker Spielberg | | 7,482.00 |
| 03/18 | Intl Money Tfr Ref.Mta07711345  Source: Br 5644 Sender Ref: 9807604751   Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | 3,982.00 |
| | **Total Other Deposits and Credits** | | $23,646.00 |
| | **Withdrawals, Transfers and Account Fees** | | |
| 03/05 | Processing Fee For Funds Transfer Ref.Mta=06433357 | | $10.00 |
| 03/16 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| 03/17 | Processing Fee For Funds Transfer Ref.Mta=07651612 | | 10.00 |
| 03/19 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 03/24 | Cash withdrawal on 03/24, Versateller ATM #068803 (Card #230447377) | 003118 | 200.00 |
| 03/31 | 22 Self Service Calls | | 11.00 |
| | **Total Withdrawals, Transfers and Account Fees** | - | $1,731.00 |

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 03/05 | $ 31,525.05 | 03/13 | 33,126.29 | 03/24 | 38,188.14 |
| 03/06 | 30,525.05 | 03/16 | 29,126.29 | 03/25 | 36,270.88 |
| 03/09 | 36,707.05 | 03/17 | 37,461.90 | 03/30 | 35,270.88 |
| 03/10 | 35,771.30 | 03/18 | 40,288.14 | 03/31 | 35,259.88 |
| 03/11 | 35,471.30 | 03/19 | 38,388.14 | | |

## ATM Information

This period, you visited the following ATM locations:

Bank of America's Versateller ATM Network
  #068803 Silver Lake-Glendale, Los Angeles, CA

California

MISC-4641  9-92

# ☒ **Bank of America**

DANNY JORDAN                                    Statement Period: April 1 through April 30, 1998
GLOBAL ARTS PRODUCTIONS                         Account Number: 04293-15681

===========================================================================================
Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 04/06 | Intl Money Tfr Ref.Mta09683966  Source: MTA Sender Ref: 980406062693   Benef: Global Arts Prod  Orig: Trend Music | | $3,400.00 |
| 04/06 | Funds Transfer Ref.Mta09670283  Source: Fedwire Sender Ref: S0780927187601   Benef: Global Arts Productions  Orig: Koch International Poland Sp.Z O.O | | 4,800.00 |
| 04/07 | Funds Transfer Ref.Mta09795910  Source: Fedwire Sender Ref: 980407000236   Benef: Global Arts Production  Orig: Snakes Music | | 1,694.00 |
| 04/07 | Funds Transfer Ref.Mta09795911  Source: Fedwire Sender Ref: 980407001110   Benef: Global Arts Production  Orig: Snakes Music | | 1,775.00 |
| 04/07 | Intl Money Tfr Ref.Mta09796736  Source: MTA Sender Ref: 980407033106   Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | 7,982.00 |
| 04/08 | Intl Money Tfr Ref.Mta09817553  Source: MTA Sender Ref: 980406034284   Benef: Global Arts Production  Orig: Compact Press + Licencing | | 1,262.00 |
| 04/09 | Intl Money Tfr Ref.Mta09942852  Source: MTA Sender Ref: 980407022443   Benef: Global Artists Productions Inc.  Orig: Bell Musik Gmbh | | 1,849.03 |
| | Total Other Deposits and Credits | | $22,762.03 |
| | Withdrawals, Transfers and Account Fees | | |
| 04/06 | Processing Fee For Funds Transfer Ref.Mta=09670283 | | $10.00 |
| 04/06 | Processing Fee For Funds Transfer Ref.Mta=09683966 | | 10.00 |
| 04/07 | Processing Fee For Funds Transfer Ref.Mta=09795910 | | 10.00 |
| 04/07 | Processing Fee For Funds Transfer Ref.Mta=09795911 | | 10.00 |
| 04/08 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| 04/15 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| 04/30 | 18 Self Service Calls | | 9.00 |
| | Total Withdrawals, Transfers and Account Fees | | $2,049.00 |

===========================================================================================
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 04/02 | $ 34,259.88 | 04/10 | 41,224.31 | 04/27 | 23,241.86 |
| 04/03 | 33,345.75 | 04/13 | 40,637.08 | 04/28 | 19,765.78 |
| 04/06 | 39,136.98 | 04/14 | 40,087.08 | 04/29 | 16,636.23 |
| 04/07 | 40,092.98 | 04/15 | 39,087.08 | 04/30 | 15,627.23 |
| 04/08 | 40,554.98 | 04/16 | 28,437.08 | | |
| 04/09 | 42,094.91 | 04/24 | 25,337.08 | | |

MISC-4641  9-92

**Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: May 1 through May 29, 1998
Account Number: 04293-15681

## Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 05/01 | Intl Money Tfr Ref.Mtal2149843  Source: MTA Sender Ref: 980429023401    Benef: Global Artists Productions Inc.  Orig: Bell Musik Gmbh | | $1,846.03 |
| 05/04 | Funds Transfer Ref.Mtal2481932  Source: Fedwire Sender Ref: 82560  Benef: Global Arts Productions  Orig: Pony Express Records Inc | | 5,000.00 |
| 05/13 | Intl Money Tfr Ref.Mtal3352159  Source: MTA Sender Ref: 980511055298    Benef: Global Arts Productions  Orig: Volker Spielberg | | 14,982.00 |
| 05/19 | Intl Money Tfr Ref.Mtal3951627  Source: MTA Sender Ref: 980515035807    Benef: Global Arts Productions  Orig: K-Tel International | | 785.20 |
| 05/19 | Funds Transfer Ref.Mtal3954318  Source: Fedwire Sender Ref: 0515517795001766 Benef: Global Arts Productions  Orig: Ballo, Hans | | 3,027.00 |
| 05/22 | Funds Transfer Ref.Mtal4224877  Source: Fedwire Sender Ref: S0781395179901    Benef: Global Arts Production 7160 Kob Hie  Orig: Koch International Poland Sp.Z O.O | | 35,211.48 |
| 05/27 | Funds Transfer Ref.Mtal4785249  Source: Fedwire Sender Ref: 980527003590    Benef: Global Arts Production  Orig: Snakes Music | | 10,820.06 |
| | Total Other Deposits and Credits | | $71,671.77 |
| | Withdrawals, Transfers and Account Fees | | |
| 05/04 | Processing Fee For Funds Transfer Ref.Mta=12481932 | | $10.00 |
| 05/07 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| 05/12 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 05/19 | Processing Fee For Funds Transfer Ref.Mta=13954318 | | 10.00 |
| 05/22 | Processing Fee For Funds Transfer Ref.Mta=14224877 | | 10.00 |
| 05/26 | Cash withdrawal on 05/25, Versateller ATM #024704 (Card #230447377) | 004183 | 100.00 |
| 05/26 | Cash withdrawal on 05/26, Versateller ATM #024704 (Card #230447377) | 004458 | 100.00 |
| 05/27 | Processing Fee For Funds Transfer Ref.Mta=14785249 | | 10.00 |
| 05/29 | 28 Self Service Calls | | 14.00 |
| | Total Withdrawals, Transfers and Account Fees | | $1,754.00 |

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 05/01 | $ 14,871.68 | 05/12 | 12,449.40 | 05/20 | 21,752.75 |
| 05/04 | 19,861.68 | 05/13 | 27,365.15 | 05/22 | 56,954.23 |
| 05/05 | 18,774.40 | 05/14 | 26,520.25 | 05/26 | 54,961.27 |
| 05/07 | 15,274.40 | 05/15 | 24,142.62 | 05/27 | 64,271.33 |
| 05/08 | 14,274.40 | 05/18 | 21,477.57 | 05/29 | 64,257.33 |
| 05/11 | 13,449.40 | 05/19 | 22,752.75 | | |

## ATM Information

This period, you visited the following ATM locations:

Bank of America's Versateller ATM Network
  #024704 Studio City, Studio City, CA

MISC-4641  9-92

**Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: May 30 through June 30, 1998
Account Number: 04293-15681

=======================================================================
Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 06/09 | Intl Money Tfr Ref.Mta16035746  Source: MTA Sender Ref: 980608019694    Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | $702.00 |
| 06/11 | Intl Money Tfr Ref.Mta16284065  Source: MTA Sender Ref: 980610026326    Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | 6,462.00 |
| 06/15 | Funds Transfer Ref.Mta16633586  Source: Fedwire Sender Ref: 0211300161fs  Benef: Global Arts Production 7160 Nors HI  Orig: Snakes Music | | 1,780.00 |
| | **Total Other Deposits and Credits** | | **$8,944.00** |
| | Withdrawals, Transfers and Account Fees | | |
| 06/08 | Telephone Transfer To Checking 04291-05800 VRU | | $400.00 |
| 06/10 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| 06/15 | Processing Fee For Funds Transfer Ref.Mta=16633586 | | 10.00 |
| 06/18 | Telephone Transfer To Checking 04291-05800 CSR | | 1,000.00 |
| 06/18 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| 06/30 | 30 Self Service Calls | | 15.00 |
| | **Total Withdrawals, Transfers and Account Fees** | | **$3,425.00** |

=======================================================================
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 06/01 | $ 63,757.33 | 06/11 | 40,714.26 | 06/22 | 25,054.12 |
| 06/02 | 53,179.88 | 06/12 | 40,445.86 | 06/23 | 24,054.12 |
| 06/03 | 38,579.88 | 06/15 | 34,860.95 | 06/24 | 23,554.12 |
| 06/08 | 36,569.88 | 06/17 | 34,134.31 | 06/25 | 22,143.16 |
| 06/09 | 35,752.26 | 06/18 | 25,932.91 | 06/26 | 21,143.16 |
| 06/10 | 34,252.26 | 06/19 | 25,697.65 | 06/30 | 20,628.16 |

California

Page 2 of

MISC-4641  9-92

# Bank of America

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: July 1 through July 31, 1998
Account Number: 04293-15681

=================================================================================

## Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 07/06 | Intl Money Tfr Ref.Mta18738529  Source: MTA Sender Ref: 980702034240    Benef: Global Arts Prod  Orig: Compact Press + Licencing | | $4,982.00 |
| 07/17 | Funds Transfer Ref.Mta19861707  Source: Fedwire Sender Ref: 3946100196fs    Benef: Globalk Arts Production  Orig: Koch International Poland Sp Z O O | | 2,077.57 |
| 07/31 | Intl Money Tfr Ref.Mta21224101  Source: MTA Sender Ref: 980729050587    Benef: Global Arts Production/  Orig: Volker Spielberg | | 4,982.00 |
| | **Total Other Deposits and Credits** | | $12,041.57 |
| | **Withdrawals, Transfers and Account Fees** | | |
| 07/17 | Processing Fee For Funds Transfer Ref.Mta=19861707 | | $10.00 |
| 07/30 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 07/31 | 24 Self Service Calls | | 12.00 |
| | **Total Withdrawals, Transfers and Account Fees** | | $522.00 |

=================================================================================

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 07/06 | $ 25,610.16 | 07/17 | 13,533.48 | 07/29 | 8,919.97 |
| 07/09 | 24,910.16 | 07/20 | 12,533.48 | 07/30 | 4,562.47 |
| 07/10 | 24,756.59 | 07/23 | 10,373.48 | 07/31 | 9,532.47 |
| 07/13 | 17,156.59 | 07/27 | 10,021.55 | | |
| 07/14 | 15,656.59 | 07/28 | 9,919.97 | | |

=================================================================================

FACTS - FDIC Insured Account Disclosure Information

Important Announcement about Check Storage Service: If you use our check storage service, you do not receive cancelled checks. Instead, we store copies of cancelled checks on microfilm. Effective immediately, we are reducing the period of time that we keep the microfilm from 8 years to 7 years. If you have any questions, please call the 24 hour customer service number listed on your account statement.

California

Page 2 of 2

MISC-4641  9-92

**Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: August 1 through August 31, 1998
Account Number: 04293-15681

==================================================================================
Checks Paid   Continued   * Gap in check sequence

| Date Paid | Number | Amount | Date Paid | Number | Amount |
|-----------|--------|--------|-----------|--------|--------|
| 08/26 | 1433 | 1,000.00 | 08/31 | 1436 | 700.00 |
| 08/27 | 1434 | 396.80 | Total of 26 Checks Paid | | $25,348.48 |
| 08/31 | 1435 | 1,000.00 | | | |

==================================================================================
Account Activity

| Date Posted | Description | Reference Number | Amount |
|-------------|-------------|------------------|--------|
| | Other Deposits and Credits | | |
| 08/18 | Funds Transfer Ref.Mta23045162  Source: Fedwire Sender Ref: 0168600226fs    Benef: Global Arts Productions  Orig: Koch International Poland Sp Z O O | | $24,832.29 |
| 08/27 | Funds Transfer Ref.Mta23923987  Source: Fedwire Sender Ref: 980827003028    Benef: Global Arts Production  Orig: Snakes Music | | 7,697.41 |
| | Total Other Deposits and Credits | | $32,529.70 |
| | Withdrawals, Transfers and Account Fees | | |
| 08/10 | Telephone Transfer To Checking 04291-05800 VRU | | $500.00 |
| 08/18 | Processing Fee For Funds Transfer Ref.Mta=23045162 | | 10.00 |
| 08/24 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 08/27 | Processing Fee For Funds Transfer Ref.Mta=23923987 | | 10.00 |
| 08/31 | 41 Self Service Calls | | 20.50 |
| | Total Withdrawals, Transfers and Account Fees | | $1,040.50 |

==================================================================================
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 08/04 | $ 8,032.47 | 08/11 | 2,052.86 | 08/24 | 24,466.53 |
| 08/05 | 6,032.47 | 08/12 | 3,070.86 | 08/25 | 23,211.03 |
| 08/06 | 5,788.42 | 08/18 | 27,893.15 | 08/26 | 22,211.03 |
| 08/07 | 4,788.42 | 08/19 | 27,027.78 | 08/27 | 18,411.69 |
| 08/10 | 3,136.15 | 08/20 | 26,014.23 | 08/31 | 16,691.19 |

MISC-4641  9-92



DANNY JORDAN                                    Statement Period: September 1 through September 30, 1998
GLOBAL ARTS PRODUCTIONS                         Account Number: 04293-15681

==================================================================================================
Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 09/14 | Intl Money Tfr Ref.Mta25737548  Source: MTA Sender Ref: 980914018124    Benef: Global Arts Production  Orig: Grueezi Schallplatten Ag | | $6,822.00 |
| 09/15 | Funds Transfer Ref.Mta25866040  Source: Fedwire Sender Ref: 980915003069    Benef: Global Arts Production  Orig: Snakes Music | | 1,775.00 |
| 09/25 | Funds Transfer Ref.Mta26866295  Source: Fedwire Sender Ref: 100hamzlm042236  Benef: Global Arts Prod.  Orig: Den Danske Bank, Hamburg | | 11,162.16 |
| | Total Other Deposits and Credits | | $19,759.16 |
| | Withdrawals, Transfers and Account Fees | | |
| 09/01 | Telephone Transfer To Checking 04291-05800 VRU | | $400.00 |
| 09/14 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 09/15 | Processing Fee For Funds Transfer Ref.Mta25866040 | | 10.00 |
| 09/17 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 09/23 | Telephone Transfer To Checking 04291-05800 VRU | | 400.00 |
| 09/25 | Processing Fee For Funds Transfer Ref.Mta=26866295 | | 10.00 |
| 09/30 | 25 Self Service Calls | | 12.50 |
| | Total Withdrawals, Transfers and Account Fees | | $1,832.50 |

==================================================================================================
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 09/01 | $ 15,791.19 | 09/10 | 7,328.91 | 09/22 | 10,136.13 |
| 09/02 | 12,966.19 | 09/14 | 13,650.91 | 09/23 | 8,736.13 |
| 09/03 | 12,858.91 | 09/15 | 14,415.91 | 09/25 | 19,588.29 |
| 09/04 | 12,508.91 | 09/16 | 14,223.16 | 09/30 | 16,625.79 |
| 09/08 | 12,408.91 | 09/17 | 13,725.16 | | |
| 09/09 | 7,408.91 | 09/18 | 10,223.16 | | |

MISC-4641  9-92

**Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: October 1 through October 30, 1998
Account Number: 04293-15681

## Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 10/06 | Intl Money Tfr Ref.Mta27990762  Source: MTA Sender Ref: | | |
| | 981006046576    Benef: Global Arts Prod  Orig: Trend Music Group | | |
| | Inc | | $3,000.00 |
| 10/15 | Funds Transfer Ref.Mta28850944  Source: Fedwire Sender Ref: | | |
| | 8546400286fs    Benef: Global Arts Prod.7160 Nob Hill Road  Orig: | | |
| | Koch International Poland Sp Z O O | | 5,400.00 |
| 10/22 | Funds Transfer Ref.Mta29588995  Source: Fedwire Sender Ref: | | |
| | 981022015145    Benef: Global Arts Production  Orig: Snakes Music | | 7,175.00 |
| | **Total Other Deposits and Credits** | | **$15,575.00** |
| | **Withdrawals, Transfers and Account Fees** | | |
| 10/05 | Telephone Transfer To Checking 04291-05800 VRU | | $500.00 |
| 10/06 | Processing Fee For Funds Transfer Ref.Mta27990762 | | 10.00 |
| 10/14 | Check Printing Charge (includes Delivery Charges And All Applicable | | |
| | Taxes) | | 49.21 |
| 10/15 | Processing Fee For Funds Transfer Ref.Mta28850944 | | 10.00 |
| 10/22 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 10/22 | Processing Fee For Funds Transfer Ref.Mta29588995 | | 10.00 |
| 10/30 | 21 Self Service Calls | | 10.50 |
| | **Total Withdrawals, Transfers and Account Fees** | | **$1,089.71** |

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 10/02 | $ 16,600.83 | 10/14 | 15,638.38 | 10/23 | 21,980.72 |
| 10/05 | 15,580.16 | 10/15 | 21,003.32 | 10/26 | 21,277.62 |
| 10/06 | 18,370.16 | 10/16 | 20,755.32 | 10/27 | 18,277.62 |
| 10/07 | 17,870.16 | 10/19 | 20,353.32 | 10/29 | 17,153.83 |
| 10/08 | 17,703.49 | 10/20 | 17,065.72 | 10/30 | 16,393.33 |
| 10/09 | 16,703.49 | 10/21 | 15,565.72 | | |
| 10/13 | 16,657.18 | 10/22 | 22,230.72 | | |

California

Page 2 of

MISC-4641  9-92

**Bank of America**

```
DANNY JORDAN                              Statement Period: October 31 through November 30, 1998
GLOBAL ARTS PRODUCTIONS                   Account Number: 04293-15681
```

================================================================================
Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 11/06 | Funds Transfer Ref.Mta31000493  Source: Fedwire Sender Ref: 1104485102000142 Benef: Global Arts Prod.  Orig: Ballo, Hans | | $1,563.00 |
| 11/17 | Funds Transfer Ref.Mta32182393  Source: Fedwire Sender Ref: 981117003166    Benef: Global Arts Production 7160 Nors HI  Orig: Snakes Music | | 7,175.00 |
| 11/25 | Funds Transfer Ref.Mta32949493  Source: Fedwire Sender Ref: 981125004912    Benef: Global Arts Production 7160 Nors HI  Orig: Snakes Music | | 3,575.00 |
| 11/25 | Funds Transfer Ref.Mta32945803  Source: Fedwire Sender Ref: 47788003273s    Benef: Global Arts Production  Orig: Koch International Poland Sp Z O O | | 35,539.20 |
| | **Total Other Deposits and Credits** | | **$47,852.20** |
| | **Withdrawals, Transfers and Account Fees** | | |
| 11/06 | Processing Fee For Funds Transfer Ref.Mta=31000493 | | $10.00 |
| 11/17 | Processing Fee For Funds Transfer Ref.Mta=32182393 | | 10.00 |
| 11/19 | Cash withdrawal on 11/19, Versateller ATM #024704 (Card #230447377) | 008274 | 200.00 |
| 11/24 | Cash withdrawal on 11/23, Versateller ATM #761101 (Card #230447377) | 002758 | 200.00 |
| 11/25 | Processing Fee For Funds Transfer Ref.Mta=32945803 | | 10.00 |
| 11/25 | Processing Fee For Funds Transfer Ref.Mta=32949493 | | 10.00 |
| 11/27 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 11/30 | 23 Self Service Calls | | 11.50 |
| | **Total Withdrawals, Transfers and Account Fees** | | **$951.50** |

================================================================================
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 11/03 | $ 16,328.58 | 11/12 | 10,256.58 | 11/24 | 11,351.50 |
| 11/04 | 15,803.58 | 11/17 | 17,421.58 | 11/25 | 49,945.70 |
| 11/05 | 15,053.58 | 11/19 | 16,721.58 | 11/27 | 49,445.70 |
| 11/06 | 11,606.58 | 11/20 | 13,051.50 | 11/30 | 48,017.27 |
| 11/10 | 11,106.58 | 11/23 | 12,051.50 | | |

================================================================================
ATM Information

This period, you visited the following ATM locations:

Bank of America's Versateller ATM Network
  #024704 Studio City, Studio City, CA
  #761101 Green Valley, Henderson, NV

================================================================================
FACTS - FDIC Insured Account Disclosure Information

The following revision to your "Facts About Business Deposit Account Programs" Disclosure and Agreement is effective immediately: If you use Overdraft Line Service, we include the available business line of credit overdraft protection funds when we receive a call or request at a branch to verify that funds are available to cover a check. We transfer funds from your business line of credit to cover transactions conducted at a branch, withdrawals at automated teller machines, and transfers from your home or office computer.

<div align="center">California</div>

MISC-4641  9-92

# Bank of America

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: December 1 through December 31, 1998
Account Number: 04293-15681

## Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | Other Deposits and Credits | | |
| 12/15 | Funds Transfer Ref.Mta34932783  Source: Fedwire Sender Ref: 981215005083    Benef: Global Arts Production  Orig: Snakes Music | | $6,815.00 |
| 12/31 | Intl Money Tfr Ref.Mta36559928  Source: MTA Sender Ref: 981229030917    Benef: Global Arts Productions  Orig: K-Tel International | | 333.30 |
| | Total Other Deposits and Credits | | $7,148.30 |
| | Withdrawals, Transfers and Account Fees | | |
| 12/04 | Telephone Transfer To Checking 04291-05800 VRU | | $500.00 |
| 12/07 | Cash withdrawal on 12/06, Versateller ATM #761101 (Card #230447377) | 005768 | 100.00 |
| 12/14 | Cash withdrawal on 12/14, Versateller ATM #761101 (Card #230447377) | 007366 | 100.00 |
| 12/14 | Telephone Transfer To Checking 04291-05800 VRU | | 500.00 |
| 12/15 | Processing Fee For Funds Transfer Ref.Mta=34932783 | | 10.00 |
| 12/18 | Cash withdrawal on 12/18, Versateller ATM #761101 (Card #230447377) | 008454 | 200.00 |
| 12/21 | Cash withdrawal on 12/21, Versateller ATM #761101 (Card #230447377) | 008908 | 300.00 |
| 12/28 | Cash withdrawal on 12/27, Versateller ATM #765703 (Card #230447377) | 009010 | 100.00 |
| 12/28 | Telephone Transfer To Checking 04291-05800 VRU | | 1,500.00 |
| 12/31 | 22 Self Service Calls | | 11.00 |
| | Total Withdrawals, Transfers and Account Fees | | $3,321.00 |

## Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 12/02 | $ 47,717.27 | 12/15 | 46,891.33 | 12/24 | 38,951.61 |
| 12/04 | 46,236.33 | 12/16 | 45,762.32 | 12/28 | 37,247.73 |
| 12/07 | 43,886.33 | 12/17 | 44,762.32 | 12/29 | 37,072.73 |
| 12/08 | 43,386.33 | 12/18 | 44,562.32 | 12/30 | 33,572.73 |
| 12/11 | 40,886.33 | 12/21 | 43,275.78 | 12/31 | 33,395.03 |
| 12/14 | 40,286.33 | 12/22 | 39,785.41 | | |

## ATM Information

This period, you visited the following ATM locations:

Bank of America's Versateller ATM Network
  #761101 Green Valley, Henderson, NV
  #765703 Warm Springs, Las Vegas, NV

California

Page 2 of

MISC-4641  9-92

**Bank of America**

DANNY JORDAN
GLOBAL ARTS PRODUCTIONS

Statement Period: January 30 through February 26, 1999
Account Number: 04293-15681

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
Account Activity

| Date Posted | Description | Reference Number | Amount |
|---|---|---|---|
| | **Other Deposits and Credits** | | |
| 02/01 | Intl Money Tfr Ref.Mta03239359  Source: MTA Sender Ref: 990201034491  Benef: Danny Jordan Orig: Ballo, Hans | | $1,779.24 |
| 02/10 | Funds Transfer Ref.Mta04127803  Source: Fedwire Sender Ref: 49400000393s    Benef: Global Arts Productions Tamarac Fla  Orig: Koch International Poland Sp Z O O | | 360.00 |
| | Total Other Deposits and Credits | | $2,139.24 |
| | **Withdrawals, Transfers and Account Fees** | | |
| 02/02 | Telephone Transfer To Checking 04291-05800 VRU | | $500.00 |
| 02/03 | Cash withdrawal on 02/03, Versateller ATM #766704 (Card #230447377) | 007643 | 100.00 |
| 02/05 | Cash withdrawal on 02/05, Versateller ATM #761101 (Card #230447377) | 009445 | 100.00 |
| 02/08 | Cash withdrawal on 02/06, Versateller ATM #761101 (Card #230447377) | 009869 | 140.00 |
| 02/08 | Telephone Transfer To Checking 04291-05800 VRU | | 1,000.00 |
| 02/08 | Debit Adjustment Source: 4090 Iid#: 7681-08feb99 | | 2,601.24 |
| 02/08 | Telephone Transfer To Checking 04291-05800 CSR | | 3,500.00 |
| 02/08 | Legal Process Fee Source: 4090 Iid#: 7681-08feb99 | | 30.00 |
| 02/10 | Processing Fee For Funds Transfer Ref.Mta04127803 | | 10.00 |
| 02/16 | Cash withdrawal on 02/16, Versateller ATM #761101 (Card #230447377) | 002132 | 60.00 |
| 02/16 | Cash withdrawal on 02/13, Versateller ATM #765703 (Card #230447377) | 007780 | 140.00 |
| 02/19 | Cash withdrawal on 02/19, Versateller ATM #761101 (Card #230447377) | 002703 | 200.00 |
| 02/22 | Insufficient Funds Fee | | 10.00 |
| 02/26 | 24 Self Service Calls | | 12.00 |
| | Total Withdrawals, Transfers and Account Fees | | $8,403.24 |
| | **Service Charge** | | |
| 02/26 | Monthly Service Charge | | $10.00 |

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
Daily Balance

| Date | Amount | Date | Amount | Date | Amount |
|---|---|---|---|---|---|
| 02/01 | $ 9,802.73 | 02/08 | 550.87 | 02/19 | - 149.13 |
| 02/02 | 9,055.60 | 02/09 | 350.87 | 02/22 | - 159.13 |
| 02/03 | 8,820.10 | 02/10 | 700.87 | 02/26 | - 181.13 |
| 02/04 | 8,522.11 | 02/11 | 400.87 | | |
| 02/05 | 8,022.11 | 02/16 | 200.87 | | |

■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■■
ATM Information

This period, you visited the following ATM locations:

Bank of America's Versateller ATM Network
 #761101 Green Valley, Henderson, NV
 #765703 Warm Springs, Las Vegas, NV
 #766704 Tropicana-Decatur, Las Vegas, NV

MISC-4641  9-92

**BANK OF AMERICA**

DANNY JORDAN
CARMELA JORDAN FLORIO

Statement Period: July 26 through August 26, 1996
Account Number: 04291-05800

==========================================================================================
**Checks Paid    Continued    * Gap in check sequence**

| Date Paid | Number | Amount | Date Paid | Number | Amount |
|-----------|--------|--------|-----------|--------|--------|
| 08/26 | 1064 | 150.00 | 08/26 | 1070 | 84.60 |
| 08/26 | * 1067 | 100.00 | Total of 22 Checks Paid | | $6,504.69 |
| 08/19 | * 1069 | 250.00 | | | |

==========================================================================================
**Account Activity**

| Date Posted | Description | Reference Number | Amount |
|-------------|-------------|------------------|--------|
| | **Deposits and Credits** | | |
| 08/05 | Funds Transfer Ref.Mta21844012  Source: Fedwire Sender Ref: 4592 Benef: Danny Jordan Ac  Orig: Salermo Cozzarelli Etc | | $1,000.00 |
| 08/13 | Deposit | | 2,000.00 |
| 08/22 | Intl Money Tfr Ref.Mta25536173  Source:  Br 5644 Sender Ref: 9623503030    Benef: Danny Jordan Orig: K-Tel International | | 1,665.00 |
| 08/23 | Funds Transfer Ref.Mta23604428  Source: Fedwire Sender Ref: 0514 Benef: Mr. Danny Jordan 7160, Nors Hill  Orig: Kath. Landeskirche Des Kantons Thur | | 640.74 |
| | **Total Deposits and Credits** | | $5,305.74 |
| | **Account Fees** | | |
| 08/05 | Processing Fee For Funds Transfer Ref.Mta=21844012 | | $10.00 |
| 08/20 | Insufficient Funds | | 10.00 |
| 08/23 | Processing Fee For Funds Transfer Ref.Mta=23604428 | | 10.00 |
| 08/26 | Monthly Service Charge | | 8.00 |
| 08/26 | 34 Self Service Calls | | 17.00 |
| | **Total Account Fees** | | $55.00 |

==========================================================================================
**Daily Balance**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 07/29 | $ 2,719.27 | 08/09 | 83.44 | 08/20 | - 177.63 |
| 07/30 | 2,119.27 | 08/12 | 82.37 | 08/22 | 1,487.37 |
| 08/05 | 3,109.27 | 08/13 | 2,082.37 | 08/23 | 2,118.11 |
| 08/06 | 3,009.27 | 08/14 | 582.37 | 08/26 | 1,758.51 |
| 08/07 | 2,414.90 | 08/16 | 82.37 | | |
| 08/08 | 1,708.44 | 08/19 | - 167.63 | | |

MISC-4641  9-92

# ▉ Bank of America

DANNY JORDAN
CARMELA JORDAN FLORIO

Statement Period: September 25 through October 25, 1996
Account Number: 04291-05800

---

**Checks Paid    Continued    * Gap in check sequence**

| Date Paid | Number | Amount | Date Paid | Number | Amount |
|-----------|--------|--------|-----------|--------|--------|
| 10/21 | 1112 | 74.10 | 10/24 | 1119 | 57.88 |
| 10/23 | 1113 | 604.69 | 10/24 | 1120 | 557.94 |
| 10/23 | 1114 | 89.85 | 10/22 | 1121 | 1,000.00 |
| 10/23 | * 1116 | 356.65 | 10/23 | 1122 | 612.14 |
| 10/22 | 1117 | 188.95 | 10/25 | 1123 | 300.00 |
| 10/22 | 1118 | 452.93 | Total of 27 Checks Paid | | $13,078.98 |

---

**Account Activity**

| Date Posted | Description | Reference Number | Amount |
|-------------|-------------|------------------|--------|
| | **Deposits and Credits** | | |
| 09/27 | Deposit | | $3,285.00 |
| 09/30 | Fee Reversal | | 184.00 |
| 09/30 | Intl Money Tfr Ref.Mta27434814  Source:  Br 5644 Sender Ref: | | |
| | 9627102191       Benef: Danny Jordan Orig: Gruaezi Schallplatten Ag | | 1,570.00 |
| 09/30 | Funds Transfer Ref.Mta27438828  Source: Fedwire Sender Ref: 2246 | | |
| | Benef: Danny Jordan 7160 Nors Hill Road,  Orig: Cdm, Heilbronn | | 2,500.00 |
| 10/11 | Intl Money Tfr Ref.Mta28534588  Source:  Br 5644 Sender Ref: | | |
| | 9628501626       Benef: Janny Jordan Orig: Selected Sound Carr. | | 4,985.00 |
| 10/15 | Deposit | | 2,000.00 |
| 10/16 | Intl Money Tfr Ref.Mta29038349 Source:  Br 5644 Sender Ref: | | |
| | 9628903344       Benef: Mr. Danny Jordan  Orig: Deutsche Bank Ag | | 3,085.00 |
| | **Total Deposits and Credits** | | $17,609.00 |
| | **Account Fees** | | |
| 09/25 | Insufficient Funds | | $18.00 |
| 09/30 | Processing Fee For Funds Transfer Ref.Mta=27438828 | | 10.00 |
| 10/25 | Monthly Service Charge | | 8.50 |
| 10/25 | 28 Self Service Calls | | 14.00 |
| | **Total Account Fees** | | $50.50 |

---

**Daily Balance**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 09/25 | -$ 1,134.86 | 10/07 | 871.87 | 10/21 | 7,606.19 |
| 09/27 | 2,150.14 | 10/11 | 5,856.87 | 10/22 | 5,964.31 |
| 09/30 | 6,394.14 | 10/15 | 7,206.87 | 10/23 | 4,300.98 |
| 10/02 | 3,394.14 | 10/16 | 9,991.87 | 10/24 | 3,685.16 |
| 10/03 | 3,294.02 | 10/17 | 7,885.29 | 10/25 | 3,362.66 |
| 10/04 | 1,669.02 | 10/18 | 7,680.29 | | |

MISC-4641  9-92

**Bank of America**

DANNY JORDAN
CARMELA JORDAN FLORIO

Statement Period: October 26 through November 22, 1996
Account Number: 04291-05800

**Checks Paid**　　　　• Gap in check sequence

| Date Paid | Number | Amount | Date Paid | Number | Amount |
|-----------|--------|--------|-----------|--------|--------|
| 10/28 | 1124 | • 347.73 | 11/12 | 1136 | 1,625.00 |
| 10/29 | 1125 | 500.00 | 11/12 | 1137 | 250.00 |
| 11/04 | 1126 | 229.21 | 11/19 | • 1139 | 225.00 |
| 11/05 | 1127 | 356.65 | 11/18 | • 1141 | 93.83 |
| 10/30 | 1128 | 112.78 | 11/20 | 1142 | 84.95 |
| 11/13 | 1129 | 154.70 | 11/22 | • 1144 | 114.32 |
| 10/31 | 1130 | 400.00 | 11/14 | 1145 | 5,000.00 |
| 11/04 | 1131 | 160.00 | 11/14 | 1146 | 250.00 |
| 11/04 | 1132 | 350.00 | 11/15 | 1147 | 1,000.00 |
| 11/07 | 1133 | 500.00 | 11/22 | • 1149 | 200.00 |
| 11/12 | 1134 | 56.00 | 11/22 | 1150 | 200.00 |
| 11/08 | 1135 | 105.00 | Total of 23 Checks Paid | | •12,315.17 |

**Account Activity**

| Date Posted | Description | Reference Number | Amount |
|-------------|-------------|------------------|--------|
| | **Deposits and Credits** | | |
| 11/04 | Funds Transfer Ref.Mta30921354  Source: Fedwire Sender Ref: 0014 | | |
| | Benef: Danny Jordan Ac  Orig: Cozzarelli Salerno | | •2,000.00 |
| 11/08 | Funds Transfer Ref.Mta31312278  Source: Fedwire Sender Ref: 1527 | | |
| | Benef: Danny Jordan Tarzana, CA, US  Orig: Trend Music Group Inc 47 | | |
| | Racine R | | 4,996.00 |
| 11/15 | Deposit | | 2,000.00 |
| | **Total Deposits and Credits** | | •8,996.00 |
| | **Account Fees** | | |
| 11/04 | Processing Fee For Funds Transfer Ref.Mta=30921354 | | •10.00 |
| 11/08 | Processing Fee For Funds Transfer Ref.Mta=31312278 | | 10.00 |
| 11/15 | Insufficient Funds | | 25.00 |
| 11/22 | Monthly Service Charge | | 8.50 |
| 11/22 | 25 Self Service Calls | | 12.50 |
| | **Total Account Fees** | | •66.00 |

**Daily Balance**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 10/28 | • 3,014.93 | 11/07 | 2,396.29 | 11/18 | 822.76 |
| 10/29 | 2,514.93 | 11/08 | 7,277.29 | 11/19 | 597.76 |
| 10/30 | 2,402.15 | 11/12 | 5,346.29 | 11/20 | 512.81 |
| 10/31 | 2,002.15 | 11/13 | 5,191.59 | 11/22 | - 22.51 |
| 11/04 | 3,252.94 | 11/14 | - 58.41 | | |
| 11/05 | 2,896.29 | 11/15 | 916.59 | | |

MISC-4641  9-92

**Bank of America**

```
DANNY JORDAN                                    Statement Period: November 23 through December 24, 1996
CARMELA JORDAN FLORIO                           Account Number: 04291-05800
```

================================================================================

Checks Paid    Continued    * Gap in check sequence

| Date Paid | Number | Amount | Date Paid | Number | Amount |
|-----------|--------|--------|-----------|--------|--------|
| 12/18 | 1157 | 154.44 | 12/19 | * 1161 | 200.00 |
| 12/18 | 1158 | 134.00 | 12/24 | 1162 | 600.00 |
| 12/17 | 1159 | 200.00 | Total of 11 Checks Paid | | *7,547.98 |

================================================================================

**Account Activity**

| Date Posted | Description | Reference Number | Amount |
|-------------|-------------|------------------|--------|
| | **Deposits and Credits** | | |
| 11/26 | Intl Money Tfr Ref.Mta33143944  Source:  Br 5644 Sender Ref: 9632702783    Benef: Danny Jordan Orig: Grueezi Schallplatten Ag | | *1,905.00 |
| 12/13 | Funds Transfer Ref.Mta54834612  Source: Fedwire Sender Ref: 7352 Benef: Danny Jordan Tarzana, CA, US  Orig: Trend Music Group Inc. | | 2,496.00 |
| 12/17 | Deposit | | 1,500.00 |
| 12/17 | Fee Reversal | | 12.50 |
| 12/18 | Credit To Reverse Previously Posted Debit | | 2,000.00 |
| 12/23 | Telephone Transfer From Checking 04293-15681 CSR | | 600.00 |
| | **Total Deposits and Credits** | | **$8,513.50** |
| | **Withdrawals and Transfers** | | |
| 12/16 | Cash withdrawal on 12/14, Non-Versateller ATM #06609700 (Card #230447377) | 095125261 | *100.00 |
| 12/19 | Cash withdrawal on 12/19, Non-Versateller ATM #00003964 (Card #230447377) | 000054858 | 200.00 |
| 12/23 | Cash withdrawal on 12/21, Non-Versateller ATM #SFL20976 (Card #230447377) | 143036171 | 201.00 |
| 12/24 | Cash withdrawal on 12/24, Non-Versateller ATM #06609800 (Card #230447377) | 133040111 | 200.00 |
| | **Total Withdrawals and Transfers** | | **$701.00** |
| | **Account Fees** | | |
| 11/25 | Insufficient Funds | | *50.00 |
| 12/09 | Insufficient Funds | | 25.00 |
| 12/13 | Processing Fee For Funds Transfer Ref.Mta=54834612 | | 10.00 |
| 12/16 | Non-Versateller ATM withdrawal | 095125261 | 2.00 |
| 12/19 | Non-Versateller ATM withdrawal | 000054858 | 2.00 |
| 12/23 | Non-Versateller ATM withdrawal | 143036171 | 2.00 |
| 12/23 | Stop Payment Orders | | 12.00 |
| 12/24 | Non-Versateller ATM withdrawal | 133040111 | 2.00 |
| 12/24 | Monthly Service Charge | | 8.50 |
| 12/24 | 29 Self Service Calls | | 14.50 |
| | **Total Account Fees** | | **$128.00** |

================================================================================

**Daily Balance**

| Date | Amount | Date | Amount | Date | Amount |
|------|--------|------|--------|------|--------|
| 11/25 | -$ 72.51 | 12/09 | 125.35 | 12/18 | 956.01 |
| 11/26 | 1,832.49 | 12/13 | 2,611.35 | 12/19 | 554.01 |
| 12/02 | 650.35 | 12/16 | 884.35 | 12/23 | 939.01 |
| 12/03 | 150.35 | 12/17 | 196.85 | 12/24 | 114.01 |

================================================================================

**ATM Information**

This period, you visited the following ATM locations:

Non-Versateller ATMs
  #SFL20976 Nationsbank, #6650 N.State Roa, Coconut Creek, FL
  #00003964 1st Nation, 8201 Pine Island, Tamarac, FL
  #06609700 Citibank 06607, 1201 Univ. Dr., Crl Spg, FL
  #06609800 Citibank 06608, 1201 Univ. Dr., Crl Spg, FL

MISC-4641  9-92

**Global Arts Productions**
**Schedule A**

10/01/1999

| # | Publisher | Artist | No. | Title | Cert. |
|---|---|---|---|---|---|
| 1 | PolyGram Records, Inc. | Barry White | 92 | Baby, We Better Try And Get It Together | |
| 2 | PolyGram Records, Inc. | Barry White | | Bring Back My Yesterday | |
| 3 | PolyGram Records, Inc. | Barry White | 1 | Can't Get Enough Of Your Love Babe | Gold |
| 4 | PolyGram Records, Inc. | Barry White | 44 | Don't Make Me Wait Too Long | |
| 5 | PolyGram Records, Inc. | Barry White | | Honey Please, Can't Ya See | |
| 6 | PolyGram Records, Inc. | Barry White | 40 | I'll Do For You Anything You Want Me To | |
| 7 | PolyGram Records, Inc. | Barry White | 3 | I'm Gonna Love You Just A Little More Babe | Gold |
| 8 | PolyGram Records, Inc. | Barry White | | I've Found Someone | |
| 9 | PolyGram Records, Inc. | Barry White | 32 | I've Got So Much To Give | |
| 10 | PolyGram Records, Inc. | Barry White | 4 | It's Ecstasy When You Lay Down Next To Me | Gold |
| 11 | PolyGram Records, Inc. | Barry White | | Just The Way You Are | |
| 12 | PolyGram Records, Inc. | Barry White | 32 | Let The Music Play | |
| 13 | PolyGram Records, Inc. | Barry White | | Love Serenade | |
| 14 | PolyGram Records, Inc. | Barry White (Love Unlimited Orchestra) | 1 | Love's Theme | Gold |
| 15 | PolyGram Records, Inc. | Barry White (Love Unlimited Orchestra) | 48 | My Sweet Summer Suite | |
| 16 | PolyGram Records, Inc. | Barry White | 7 | Never Never Gonna Give Ya Up | Gold |
| 17 | PolyGram Records, Inc. | Barry White | 24 | Oh What A Night For Dancing | |
| 18 | PolyGram Records, Inc. | Barry White (Love Unlimited Orchestra) | 22 | Satin Soul | |
| 19 | A&M Records, Inc. | Barry White | | Sho' You Right | |
| 20 | PolyGram Records, Inc. | Barry White | | Standing In The Shadows Of Love | |
| 21 | A&M Records, Inc. | Barry White | | The Right Night | |
| 22 | PolyGram Records, Inc. | Barry White | 8 | What Am I Gonna Do With You? | |

- 1 -

**Global Arts Productions**
**Schedule A**

10/01/1999

| | | | | | |
|---|---|---|---|---|---|
| 23 | PolyGram Records, Inc. | Barry White | You See The Trouble With Me | | |
| 24 | PolyGram Records, Inc. | Barry White | You're The First, The Last, My Everything | 2 | Gold |
| 25 | PolyGram Records, Inc. | Barry White | Your Sweetness Is My Weakness | 60 | |
| 26 | Capitol Records, Inc. | Joe Cocker | Midnight Rider | 27 | |
| 27 | Capitol Records, Inc. | Joe Cocker | Shelter Me | 91 | |
| 28 | Capitol Records, Inc. | Joe Cocker | Unchain My Heart | | |
| 29 | Island - Affiliated with PolyGram Records, Inc. | Joe Cocker | Up Where We Belong (with Jennifer Warnes) | 1 | Platinum |
| 30 | Capitol Records, Inc. | Joe Cocker | When The Night Comes | 11 | |
| 31 | Capitol Records, Inc. | Joe Cocker | You Are So Beautiful | 5 | |
| 32 | PolyGram Records, Inc. | Kool And The Gang | Celebration | 1 | Platinum |
| 33 | PolyGram Records, Inc. | Kool And The Gang | Cherish | 2 | Gold |
| 34 | PolyGram Records, Inc. | Kool And The Gang | Fresh | 9 | |
| 35 | PolyGram Records, Inc. | Kool And The Gang | Get Down On It | 10 | Gold |
| 36 | PolyGram Records, Inc. | Kool And The Gang | Joanna | 2 | Gold |
| 37 | PolyGram Records, Inc. | Kool And The Gang | Ladies Night | 8 | Gold |
| 38 | PolyGram Records, Inc. | Kool And The Gang | Let's Go Dancin' (Ooh La, La, La) | 30 | |
| 39 | PolyGram Records, Inc. | Kool And The Gang | Misled | 10 | |
| 40 | PolyGram Records, Inc. | Kool And The Gang | Steppin' Out | 89 | |
| 41 | PolyGram Records, Inc. | Kool And The Gang | Take It To The Top | | |
| 42 | PolyGram Records, Inc. | Kool And The Gang | Take My Heart (You Can Have It If You Want It) | 17 | |
| 43 | PolyGram Records, Inc. | Kool And The Gang | Too Hot | 5 | Gold |
| 44 | Elektra Entertainment | Linda Ronstadt | Blue Bayou | 3 | Platinum |
| 45 | Elektra Entertainment | Linda Ronstadt | Desperado | | |

- 2 -

**Global Arts Productions**

**Schedule A**

10/01/1999

| | | | |
|---|---|---|---|
| 46 | Elektra Entertainment | Linda Ronstadt | 5 | Heat Wave |
| 47 | Elektra Entertainment | Linda Ronstadt | 63 | Love Is A Rose |
| 48 | Elektra Entertainment | Linda Ronstadt | 11 | That'll Be The Day |
| 49 | Elektra Entertainment | Linda Ronstadt | 25 | Tracks Of My Tears |
| 50 | MCA Records, Inc. | The Who | 14 | Who Are You |
| 51 | MCA Records, Inc. | The Who | 18 | You Better You Bet |
| 52 | Warner Bros. Records Inc. (?) | ZZ Top | 37 | Gimme All Your Lovin' |
| 53 | Warner Bros. Records Inc. (?) | ZZ Top | 8 | Legs |

- 3 -

**Global Arts Productions**
**Schedule B**

10/01/1999

| | | | | |
|---|---|---|---|---|
| 1 | Capitol Records, Inc. | Dean Martin | 1 | Memories Are Made Of This | Gold |
| 2 | Capitol Records, Inc. | Dean Martin | 2 | That's Amore | |
| 3 | Capitol Records, Inc. | Dean Martin | 12 | Volare (Nel Blu Di Pinto Di Blu) | |
| 4 | A&M Records, Inc. | Joe Cocker | 11 | Cry Me A River | |
| 5 | A&M Records, Inc. | Joe Cocker | | Darling Be Home Soon | |
| 6 | A&M Records, Inc. | Joe Cocker | 69 | Delta Lady | |
| 7 | A&M Records, Inc. | Joe Cocker | 22 | High Time  Went | |
| 8 | A&M Records, Inc. | Joe Cocker | 30 | She Came In Through The Bathroom Window | |
| 9 | A&M Records, Inc. | Joe Cocker | 7 | The Letter | |
| 10 | Elektra Entertainment | Linda Ronstadt | 67 | Silver Treads And Gloden Needles | |
| 11 | Sony Music Entertainment Inc. | Neil Diamond | 6 | Cherry Cherry | |
| 12 | Sony Music Entertainment Inc. | Neil Diamond | 10 | Girl You'll Be A Woman Soon | |
| 13 | Sony Music Entertainment Inc. | Neil Diamond | 62 | Red Red Wine | |
| 14 | Sony Music Entertainment Inc. | Neil Diamond | 24 | Shilo | |
| 15 | Sony Music Entertainment Inc. | Neil Diamond | 21 | Solitary Man | |
| 16 | Sony Music Entertainment Inc. | Neil Diamond | 13 | Thank The Lord For The Nighttime | |
| 17 | Sony Music Entertainment Inc. | Neil Diamond | | The Boat That I Row | |
| 18 | Sony Music Entertainment Inc. | Neil Diamond | 18 | You Got To Me | |
| 19 | RCA Records | Perry Como | | Catarina | |
| 20 | RCA Records | Perry Como | 1 | Catch A Falling Star | Gold |
| 21 | RCA Records | Perry Como | 1 | Don't Let The Stars Get In Your Eyes | |
| 22 | RCA Records | Perry Como | 25 | Dream On Little Dreamer | |
| 23 | RCA Records | Perry Como | | Go' Around (Yeah, Yeah) | |

- 1 -

**Global Arts Productions**
**Schedule B**

10/01/1999

| 24 | RCA Records | Perry Como | Hello Young Lovers | | |
| 25 | RCA Records | Perry Como | Hoop-Dee-Doo | | |
| 26 | RCA Records | Perry Como | Hot Diggity | 1 | |
| 27 | RCA Records | Perry Como | I Love You & Don't You Forget It | 39 | |
| 28 | RCA Records | Perry Como | It's Impossible | 10 | |
| 29 | RCA Records | Perry Como | Killing Me Softly With Her Song | | |
| 30 | RCA Records | Perry Como | Love Makes The World | 33 | |
| 31 | RCA Records | Perry Como | Magic Moments | 4 | |
| 32 | RCA Records | Perry Como | Papa Loves Mambo | | |
| 33 | RCA Records | Perry Como | Round And Round | 1 | |
| 34 | RCA Records | Perry Como | Try To Remember | | |
| 35 | RCA Records | Perry Como | Wanted | | |
| 36 | Sony Music Entertainment Inc. | Simon & Garfunkel | Baby Driver | | |
| 37 | Sony Music Entertainment Inc. | Simon & Garfunkel | Benedictus | | |
| 38 | Sony Music Entertainment Inc. | Simon & Garfunkel | Bridge Over Troubled Water | 1 | Gold |
| 39 | Sony Music Entertainment Inc. | Simon & Garfunkel | Cecilia | 4 | Gold |
| 40 | Sony Music Entertainment Inc. | Simon & Garfunkel | El Condor Pasa (if I Could) | 18 | |
| 41 | Sony Music Entertainment Inc. | Simon & Garfunkel | I Am A Rock | 3 | |
| 42 | Sony Music Entertainment Inc. | Simon & Garfunkel | Kathy's Song | | |
| 43 | Sony Music Entertainment Inc. | Simon & Garfunkel | Peggy O | | |
| 44 | Sony Music Entertainment Inc. | Simon & Garfunkel | Richard Cory | | |
| 45 | Sony Music Entertainment Inc. | Simon & Garfunkel | So Long Frank Lloyd Wright | | |
| 46 | Sony Music Entertainment Inc. | Simon & Garfunkel | Somewhere They Can't Find Me | | |

- 2 -

## Global Arts Productions
## Schedule B

10/01/1999

| # | Label | Artist | Title | No. | |
|---|---|---|---|---|---|
| 47 | Sony Music Entertainment Inc. | Simon & Garfunkel | Sparrow | | |
| 48 | Sony Music Entertainment Inc. | Simon & Garfunkel | The Boxer | 7 | |
| 49 | Sony Music Entertainment Inc. | Simon & Garfunkel | The Sounds Of Silence | 1 | Gold |
| 50 | Sony Music Entertainment Inc. | Simon & Garfunkel | Wednesday Morning, 3 A. M. | | |
| 51 | Elektra Entertainment | The Doors | Crystal Ship | | |
| 52 | Elektra Entertainment | The Doors | Hello, I Love You | 1 | Gold |
| 53 | Elektra Entertainment | The Doors | L.A. Woman | | |
| 54 | Elektra Entertainment | The Doors | Light My Fire | 1 | Gold |
| 55 | Elektra Entertainment | The Doors | Love Her Madly | 11 | |
| 56 | Elektra Entertainment | The Doors | Riders On The Storm | 14 | |
| 57 | Elektra Entertainment | The Doors | Roadhouse Blues | | |
| 58 | Elektra Entertainment | The Doors | Touch Me | 3 | Gold |
| 59 | Elektra Entertainment | The Doors | Wait For The Sun | | |
| 60 | Elektra Entertainment | The Doors | When The Music Is Over | | |
| 61 | MCA Records, Inc. | The Mama's & The Papa's | California Dreamin' | 4 | Gold |
| 62 | MCA Records, Inc. | The Mama's & The Papa's | Creeque Alley | 5 | |
| 63 | MCA Records, Inc. | The Mama's & The Papa's | Dancing In The Street | 73 | |
| 64 | MCA Records, Inc. | The Mama's & The Papa's | Dedicated To The One I Love | 2 | |
| 65 | MCA Records, Inc. | The Mama's & The Papa's | Dream A Little Dream Of Me | 12 | |
| 66 | MCA Records, Inc. | The Mama's & The Papa's | Glad To Be Unhappy | 26 | |
| 67 | MCA Records, Inc. | The Mama's & The Papa's | I Call Your Name | | |
| 68 | MCA Records, Inc. | The Mama's & The Papa's | I Saw Her Last Night | 5 | |
| 69 | MCA Records, Inc. | The Mama's & The Papa's | Look Through My Window | 24 | |

- 3 -

# Global Arts Productions
## Schedule B

10/01/1999

| | | | | |
|---|---|---|---|---|
| 70 | MCA Records, Inc. | The Mama's & The Papa's | | Midnight Voyage |
| 71 | MCA Records, Inc. | The Mama's & The Papa's | | Monday Monday | Gold |
| 72 | MCA Records, Inc. | The Mama's & The Papa's | | My Girl |
| 73 | MCA Records, Inc. | The Mama's & The Papa's | 20 | Twelve-Thirty |
| 74 | MCA Records, Inc. | The Mama's & The Papa's | 5 | Words Of Love |
| 75 | MCA Records, Inc. | The Who | | Anyway, Anyhow, Anywhere - Live |
| 76 | MCA Records, Inc. | The Who | 9 | I Can See For Miles |
| 77 | MCA Records, Inc. | The Who | | I'm A Boy |
| 78 | MCA Records, Inc. | The Who | | Let's See Action |
| 79 | MCA Records, Inc. | The Who | 74 | My Generation |
| 80 | MCA Records, Inc. | The Who | 51 | Pictures Of Lily |
| 81 | MCA Records, Inc. | The Who | 19 | Pinball Wizard |
| 82 | MCA Records, Inc. | The Who | | Substitute |
| 83 | MCA Records, Inc. | The Who | 44 | The Seeker |
| 84 | MCA Records, Inc. | The Who | 15 | Won't Get Fooled Again |

- 4 -

**Global Arts Productions**
**Schedule C**

10/01/1999

| # | Label | Artist | No. | Title | |
|---|---|---|---|---|---|
| 1 | A&M Records, Inc. | Cat Stevens | 6 | Another Saturday Night | |
| 2 | A&M Records, Inc. | Cat Stevens | | Can't Keep It In | |
| 3 | A&M Records, Inc. | Joe Cocker | 51 | Pardon Me, Sir | |
| 4 | A&M Records, Inc. | Joe Cocker | 46 | Put Out The Light | |
| 5 | Asylum - Affiliated with Elektra Entertainment | Linda Ronstadt | 51 | Love Has No Pride | |
| 6 | Atlantic - Affiliated with Warner Communications, Inc. | Ben E. King | 5 | Supernatural Thing | |
| 7 | Atlantic - Affiliated with Warner Communications, Inc. | Foreigner | 6 | Cold As Ice | |
| 8 | BMG Music | Bananarama (Extended Mix) | 1 | Venus | |
| 9 | BMG Music | Dionne Warwick | 10 | Heartbreaker | |
| 10 | BMG Music | Dionne Warwick & Friends | 1 | That's What Friends Are For | Gold |
| 11 | Capitol Records, Inc. | Linda Ronstadt | 47 | It Doesn't Matter Anymore | |
| 12 | Capitol Records, Inc. | Linda Ronstadt | 25 | Long Long Time | |
| 13 | Capitol Records, Inc. | Linda Ronstadt | 2 | When Will I Be Loved | |
| 14 | Capitol Records, Inc. | Linda Ronstadt | 1 | You're No Good | |
| 15 | EMI/Capitol Records, Inc. | Bobby McFerrin | 1 | Don't Worry Be Happy | Gold |
| 16 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | | Buffalo Soldier | |
| 17 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | | Could You Be Loved | |
| 18 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | | Exodus | |
| 19 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | | Get Up, Stand up | |

- 1 -

# Global Arts Productions
## Schedule C

10/01/1999

| | | | | |
|---|---|---|---|---|
| 20 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | I Shot The Sheriff | |
| 21 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Is This Love | |
| 22 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Jamming | |
| 23 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Natty Dread | |
| 24 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Natural Mystic | |
| 25 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | No Woman No Cry | |
| 26 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Rat Race | |
| 27 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Redemption Song | |
| 28 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Revolution | |
| 29 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Stir It Up | |
| 30 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Top Rankin' | |
| 31 | Island Records, Inc. - Affiliated with PolyGram Records, Inc. | Bob Marley | Trench Town Rock | |
| 32 | MCA Records, Inc. | Barry White (Love Unlimited Orchestra) | Walking In The Rain With The One I Love | 14 | Gold |
| 33 | MCA Records, Inc. | Chuck Berry | My Ding-A-Ling-Live | 1 | Gold |
| 34 | MCA Records, Inc. | Crosby Nash | Carry Me | |
| 35 | MCA Records, Inc. | Sonny & Cher | A Cowboy's Work Is Never Done | 8 |
| 36 | MCA Records, Inc. | Sonny & Cher | All I Ever Need Is You | 7 |

- 2 -

**Global Arts Productions**
**Schedule C**

10/01/1999

| | | | |
|---|---|---|---|
| 37 | MCA Records, Inc. | The Mama's & The Papa's | Monday Monday |
| 38 | MCA Records, Inc. | The Who | 16 | Squeeze Box |
| 39 | Motown Record Company LP - Affiliated with PolyGram Records, Inc. | Isley Brothers | 12 | This Old Heart Of Mine |
| 40 | PolyGram Records, Inc. | 10cc | | I'm Not In Love |
| 41 | PolyGram Records, Inc. | Barry White | | I'm Qualified To Satisfy You |
| 42 | PolyGram Records, Inc. | Carlos Santana | | Europa |
| 43 | PolyGram Records, Inc. | Eric Burdon & The Animals | 12 | Don't Bring Me Down |
| 44 | PolyGram Records, Inc. | Eric Burdon & The Animals | | Good Times |
| 45 | PolyGram Records, Inc. | Eric Burdon & The Animals | | Help Me Girl |
| 46 | PolyGram Records, Inc. | Eric Burdon & The Animals | | Inside Looking Out |
| 47 | PolyGram Records, Inc. | Eric Burdon & The Animals | 9 | San Franciscan Nights |
| 48 | PolyGram Records, Inc. | Eric Burdon & The Animals | 10 | See See Rider |
| 49 | PolyGram Records, Inc. | Eric Burdon & The Animals | | Sky Pilot |
| 50 | PolyGram Records, Inc. | Eric Burdon & The Animals | | When I Was Young |
| 51 | PolyGram Records, Inc. | Gloria Gaynor | 1 | I Will Survive |
| 52 | PolyGram Records, Inc. | Lipps Inc. | 1 | Funkytown |
| 53 | PolyGram Records, Inc. | The Who | | See Me, Feel Me |
| 54 | PolyGram Records, Inc. | Van Morrison | | Baby Please Don't Go |
| 55 | RCA Records | Harry Belafonte | | This Land Is Your Land |
| 56 | Sony Music Entertainment Inc. | Bob Dylan | | Blowing In The Wind |
| 57 | Sony Music Entertainment Inc. | Bob Dylan | | I Want You |
| 58 | Sony Music Entertainment Inc. | Carlos Santana | | American Gypsy |
| 59 | Sony Music Entertainment Inc. | Carlos Santana | | Hold On |

- 3 -

**Global Arts Productions**
**Schedule C**

10/01/1999

| | | | | | |
|---|---|---|---|---|---|
| 60 | Sony Music Entertainment Inc. | Carlos Santana | | Winning | |
| 61 | Sony Music Entertainment Inc. | Chicago | | (I've Been) Searchin' So Long | |
| 62 | Sony Music Entertainment Inc. | Chicago | | Baby What A Big Surprise | |
| 63 | Sony Music Entertainment Inc. | Chicago | | Feeling Stronger Every Day | |
| 64 | Sony Music Entertainment Inc. | Chicago | | If You Leave Me Now | |
| 65 | Sony Music Entertainment Inc. | Chicago | | Saturday In The Park | |
| 66 | Sony Music Entertainment Inc. | Chicago | | Take Me Back To Chicago | |
| 67 | Sony Music Entertainment Inc. | Chicago | | Wishing You Were Here | |
| 68 | Sony Music Entertainment Inc. | Janis Joplin | | Ball And Chain | |
| 69 | Sony Music Entertainment Inc. | Janis Joplin | | Combination Of The Two | |
| 70 | Sony Music Entertainment Inc. | Janis Joplin | | I Need A Man To Love | |
| 71 | Sony Music Entertainment Inc. | Janis Joplin | | Oh, Sweet Mary | |
| 72 | Sony Music Entertainment Inc. | Janis Joplin (Big Brother & The ?) | 12 | Piece Of My Heart | |
| 73 | Sony Music Entertainment Inc. | Janis Joplin | | Summertime | |
| 74 | Sony Music Entertainment Inc. | Janis Joplin | | Turtle Blues | |
| 75 | Sony Music Entertainment Inc. | Simon & Garfunkel | | Bleeker Street | |
| 76 | Sony Music Entertainment Inc. | The Who | | Tommy, Can You Hear Me? | |
| 77 | Sony Music Entertainment Inc. | Toto | 1 | Africa | Gold |
| 78 | Teldec - Affiliated with Elektra Entertainment | Eric Burdon & The Animals | 43 | Boom Boom | |
| 79 | Teldec - Affiliated with Elektra Entertainment | Eric Burdon & The Animals | | Mamma Told Me Not To Come | |
| 80 | Warner Bros. Records Inc. | America | 1 | A Horse With No Name | Gold |
| 81 | Warner Bros. Records Inc. | America | 5 | Lonely People | |

- 4 -

**Global Arts Productions**
**Schedule C**

10/01/1999

| | | | | |
|---|---|---|---|---|
| 82 | Warner Bros. Records Inc. | America | 1 | Sister Golden Hair |
| 83 | Warner Bros. Records Inc. | Bellamy Brothers | 39 | If I Said You Have A Beautiful Body |
| 84 | Warner Bros. Records Inc. | Four Seasons | 1 | December 63 (Oh What A Night)) | Gold |
| 85 | Warner Bros. Records Inc. | Mann, Manfred & Earthband | 1 | Blinded By The Light | Gold |
| 86 | Warner Bros. Records Inc. | Van Morrison | | And It Stoned Me |
| 87 | Warner Bros. Records Inc. | Van Morrison | | Here Comes The Night |

- 5 -

# Global Arts Productions
## Schedule D

10/01/1999

| | | | | |
|---|---|---|---|---|
| 1 | A&M Records, Inc. | Cat Stevens | | Lady d' Arbanville |
| 2 | A&M Records, Inc. | Cat Stevens | 6 | Morning Has Broken |
| 3 | A&M Records, Inc. | Cat Stevens | 7 | Peace Train |
| 4 | Abkco - Affiliated with PolyGram Records, Inc. | Eric Burdon & The Animals | 15 | Don't Let Me Be Misunderstood |
| 5 | Abkco - Affiliated with PolyGram Records, Inc. | Eric Burdon & The Animals | 57 | Gonna Send You Back To Walker |
| 6 | Atlantic - Affiliated with Warner Communications, Inc. | Aretha Franklin | 2 | Chain Of Fools | Gold |
| 7 | Atlantic - Affiliated with Warner Communications, Inc. | Aretha Franklin | 10 | I Say A Little Prayer | Gold |
| 8 | Atlantic - Affiliated with Warner Communications, Inc. | Percy Sledge | 1 | When A Man Loves A Woman | Gold |
| 9 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 53 | A Beautiful Story |
| 10 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 15 | But You're Mine |
| 11 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 56 | Good Combination |
| 12 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 49 | Have I Stayed Too Long |
| 13 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 1 | I Got You Babe | Gold |
| 14 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 50 | It's The Little Things |
| 15 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 20 | Just You |
| 16 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 21 | Little Man |

- 1 -

**Global Arts Productions**
**Schedule D**

10/01/1999

| | | | | |
|---|---|---|---|---|
| 17 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 87 | Living For You |
| 18 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 6 | The Beat Goes On |
| 19 | Atlantic - Affiliated with Warner Communications, Inc. | Sonny & Cher | 14 | What Now My Love |
| 20 | BMG Music | John Lee Hooker | | Boogie Chillun |
| 21 | BMG Music | John Lee Hooker | | Crawlin' King Snake |
| 22 | BMG Music | John Lee Hooker | | Dimples |
| 23 | BMG Music | John Lee Hooker | | Hobo Blues |
| 24 | BMG Music | John Lee Hooker | | I'm In The Mood |
| 25 | BMG Music | John Lee Hooker | | Little Wheel |
| 26 | BMG Music | John Lee Hooker | | No Shoes |
| 27 | BMG Music | John Lee Hooker | | Serves Me Right To Suffer |
| 28 | BMG Music | The Lovin' Spoonful | | Coconut Grove |
| 29 | BMG Music | The Lovin' Spoonful | 15 | Darling Be Home Soon |
| 30 | BMG Music | The Lovin' Spoonful | 2 | Daydream |
| 31 | BMG Music | The Lovin' Spoonful | 2 | Did You Ever Have To Make Up Your Mind? |
| 32 | BMG Music | The Lovin' Spoonful | | Didn't Want To Have To Do It |
| 33 | BMG Music | The Lovin' Spoonful | 9 | Do You Believe In Magic |
| 34 | BMG Music | The Lovin' Spoonful | | Jug Band Music |
| 35 | BMG Music | The Lovin' Spoonful | | Lonely (Amy's Theme) |
| 36 | BMG Music | The Lovin' Spoonful | 48 | Money |
| 37 | BMG Music | The Lovin' Spoonful | 8 | Nashville Cats |
| 38 | BMG Music | The Lovin' Spoonful | | Pow! ( Theme From What's Up, Tiger Lily?) |

- 2 -

# Global Arts Productions
## Schedule D

10/01/1999

| # | Label | Artist | Title | | |
|---|---|---|---|---|---|
| 39 | BMG Music | The Lovin' Spoonful | Rain On The Roof | 10 | |
| 40 | BMG Music | The Lovin' Spoonful | She Is Still A Mistery | 27 | |
| 41 | BMG Music | The Lovin' Spoonful | Six O'Clock | 18 | Gold |
| 42 | BMG Music | The Lovin' Spoonful | Summer In The City | 1 | |
| 43 | BMG Music | The Lovin' Spoonful | Wild About My Lovin' | | |
| 44 | BMG Music | The Lovin' Spoonful | Younger Generation | | |
| 45 | Capitol Records, Inc. | Al Martino | Spanish Eyes | 15 | |
| 46 | Capitol Records, Inc. | Beach Boys | Good Vibrations | 1 | Gold |
| 47 | Capitol Records, Inc. | Beach Boys | Help Me Rhonda | 1 | Gold |
| 48 | Capitol Records, Inc. | Beach Boys | Sloop John B | 3 | |
| 49 | Capitol Records, Inc. | Dean Martin | Here We Go Again | | |
| 50 | Capitol Records, Inc. | Dean Martin | Houston | 21 | |
| 51 | Capitol Records, Inc. | Dean Martin | I Will | 10 | |
| 52 | Capitol Records, Inc. | Dean Martin | I Wonder Who's Kissing Her Now | | |
| 53 | Capitol Records, Inc. | Dean Martin | It Keeps Right On A Hurtin | | |
| 54 | Capitol Records, Inc. | Dean Martin | My Heart Cries For You | | |
| 55 | Capitol Records, Inc. | Dean Martin | My Rifle, My Pony And Me | | |
| 56 | Capitol Records, Inc. | Dean Martin | Return To Me (Ritorna Me) | 4 | |
| 57 | Capitol Records, Inc. | Dean Martin | Rio Bravo | | |
| 58 | Capitol Records, Inc. | Dean Martin | Together Again | | |
| 59 | Capitol Records, Inc. | Dean Martin | Welcome To My Heart | | |
| 60 | Capitol Records, Inc. | Dean Martin | You're Nobody Till Somebody Loves You | 25 | |
| 61 | Capitol Records, Inc. | Dean Martin | You've Still Got A Place In My Heart | 60 | |

- 3 -

**Global Arts Productions**
**Schedule D**

10/01/1999

| | | | |
|---|---|---|---|
| 62 | Capitol Records, Inc. | Dion | The Wanderer |
| 63 | Capitol Records, Inc. | Eddie Cochran | 35 | C'mon Everybody |
| 64 | Capitol Records, Inc. | Eddie Cochran | 94 | Jeannie, Jeannie, Jeannie |
| 65 | Capitol Records, Inc. | Eddie Cochran | 18 | Sittin' In The Balcony |
| 66 | Capitol Records, Inc. | Eddie Cochran | 58 | Something Else |
| 67 | Capitol Records, Inc. | Eddie Cochran | 8 | Summertime Blues |
| 68 | Capitol Records, Inc. | Eddie Cochran | 99 | Teenage Heaven |
| 69 | Capitol Records, Inc. | Frank Sinatra | | Come Fly With Me |
| 70 | Capitol Records, Inc. | Frank Sinatra | | Here's That Rainy Day |
| 71 | Capitol Records, Inc. | Frank Sinatra | | I Get A Kick Out Of You |
| 72 | Capitol Records, Inc. | Frank Sinatra | | I've Got You Under My Skin |
| 73 | Capitol Records, Inc. | Frank Sinatra | 1 | Learnin' The Blues (CD 1) |
| 74 | Capitol Records, Inc. | Frank Sinatra | 5 | Love And Marriage |
| 75 | Capitol Records, Inc. | Frank Sinatra | 25 | Ol' McDonald (CD 2) |
| 76 | Capitol Records, Inc. | Frank Sinatra | | On The Sunny Side Of The Street |
| 77 | Capitol Records, Inc. | Frank Sinatra | | South Of The Border (CD 1) |
| 78 | Capitol Records, Inc. | Frank Sinatra | | The Lady Is A Tramp |
| 79 | Capitol Records, Inc. | Frank Sinatra | | The Last Dance |
| 80 | Capitol Records, Inc. | Frank Sinatra | | Three Coins In The Fountain |
| 81 | Capitol Records, Inc. | Frank Sinatra | 6 | Witchcraft (CD 1) |
| 82 | Capitol Records, Inc. | Frank Sinatra | 2 | Young At Heart (CD 1) |
| 83 | Capitol Records, Inc. | Joe Cocker | 33 | Feeling Alright |
| 84 | Capitol Records, Inc. | Joe Cocker | 68 | With A Little Help From My Friends |

# Global Arts Productions
## Schedule D

10/01/1999

| # | Label | Artist | No. | Title | Rating |
|---|---|---|---|---|---|
| 85 | Capitol Records, Inc. | Linda Ronstadt | 13 | Different Drum | |
| 86 | Capitol Records, Inc. | The Beach Boys | 2 | Barbara Ann | |
| 87 | Capitol Records, Inc. | The Beach Boys | 3 | California Girls | |
| 88 | Capitol Records, Inc. | The Beach Boys | 8 | Dance Dance Dance | |
| 89 | Capitol Records, Inc. | The Beach Boys | 5 | Fun, Fun, Fun | |
| 90 | Capitol Records, Inc. | The Beach Boys | 1 | Good Vibrations | Gold |
| 91 | Capitol Records, Inc. | The Beach Boys | 1 | Help Me Rhonda | |
| 92 | Capitol Records, Inc. | The Beach Boys | 12 | Heroes And Villians | |
| 93 | Capitol Records, Inc. | The Beach Boys | 1 | I Get Around | Gold |
| 94 | Capitol Records, Inc. | The Beach Boys | 23 | In My Room | |
| 95 | Capitol Records, Inc. | The Beach Boys | 1 | Kokomo | Platinum |
| 96 | Capitol Records, Inc. | The Beach Boys | 15 | Little Deuce Coupe | |
| 97 | Capitol Records, Inc. | The Beach Boys | 3 | Sloop John B | |
| 98 | Capitol Records, Inc. | The Beach Boys | 14 | Surfin' Safari | |
| 99 | Capitol Records, Inc. | The Beach Boys | 3 | Surfin' USA | |
| 100 | Capitol Records, Inc. | The Beach Boys | 8 | Wouldn't It Be Nice | |
| 101 | Decca - Affiliated with MCA Records, Inc. and PolyGram Records, Inc. | Eric Burdon & The Animals | | Gin House Blues | |
| 102 | Decca - Affiliated with MCA Records, Inc. and PolyGram Records, Inc. | Eric Burdon & The Animals | | I Put A Spell On You | |
| 103 | Decca - Affiliated with MCA Records, Inc. and PolyGram Records, Inc. | Eric Burdon & The Animals | | It's My Life | |
| 104 | Decca - Affiliated with MCA Records, Inc. and PolyGram Records, Inc. | Eric Burdon & The Animals | | Sweet Little Sixteen | |
| 105 | Elektra Entertainment | The Doors | | Alabama Song | |

- 5 -

**Global Arts Productions**
**Schedule D**

10/01/1999

| | | | | |
|---|---|---|---|---|
| 106 | Elektra Entertainment | The Doors | | Break On Through |
| 107 | Elektra Entertainment | The Doors | | Five To One |
| 108 | Elektra Entertainment | The Doors | 25 | Love Me Two Times |
| 109 | Elektra Entertainment | The Doors | 12 | People Are Strange |
| 110 | Elektra Entertainment | The Doors | | Spanish Caravan |
| 111 | Elektra Entertainment | The Doors | | Strange Days |
| 112 | Elektra Entertainment | The Doors | | The End |
| 113 | Elektra Entertainment | The Doors | 39 | The Unknown Soldier |
| 114 | Elektra Entertainment | The Doors | | The WASP |
| 115 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | Blue Suede Shoes |
| 116 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | Hallelujah! I Love Her So |
| 117 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | Lonely |
| 118 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | My Way |
| 119 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | One Kiss |
| 120 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | Sweetie Pie |
| 121 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | Tell Me Why |
| 122 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | Three Steps To Heaven |
| 123 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | Twenty Flight Rock |

- 6 -

**Global Arts Productions**
**Schedule D**

10/01/1999

| # | | Artist | | Weekend |
|---|---|---|---|---|
| 124 | London - Affiliated with PolyGram Records, Inc. | Eddie Cochran | | |
| 125 | MCA Records, Inc. | Chuck Berry | 37 | Back In the USA |
| 126 | MCA Records, Inc. | Chuck Berry | 18 | Carol |
| 127 | MCA Records, Inc. | Chuck Berry | 8 | Johnny B. Goode |
| 128 | MCA Records, Inc. | Chuck Berry | | Let It Rock |
| 129 | MCA Records, Inc. | Chuck Berry | 5 | Maybellene |
| 130 | MCA Records, Inc. | Chuck Berry | 23 | Nadine (Is It You?) |
| 131 | MCA Records, Inc. | Chuck Berry | 10 | No Particular Place To Go |
| 132 | MCA Records, Inc. | Chuck Berry | 27 | Reelin' And Rockin' |
| 133 | MCA Records, Inc. | Chuck Berry | 8 | Rock And Roll Music |
| 134 | MCA Records, Inc. | Chuck Berry | 29 | Roll Over Beethoven |
| 135 | MCA Records, Inc. | Chuck Berry | 3 | School Day |
| 136 | MCA Records, Inc. | Chuck Berry | 2 | Sweet Little Sixteen |
| 137 | MCA Records, Inc. | Chuck Berry | 14 | You Never Can Tell |
| 138 | MCA Records, Inc. | The Who | | Baba O'Riley |
| 139 | MCA Records, Inc. | The Who | 24 | Happy Jack |
| 140 | MCA Records, Inc. | The Who | 93 | I Can't Explain |
| 141 | MCA Records, Inc. | The Who | 25 | Magic Bus |
| 142 | PolyGram Records, Inc. | Astrud Gilberto (Stan Getz) | 5 | The Girl From Ipanema |
| 143 | PolyGram Records, Inc. | Righteous Brothers | 4 | Unchained Melody — Platinum |
| 144 | RCA Records | Frank Sinatra | | Blue Skies |
| 145 | RCA Records | Frank Sinatra | | Night And Day |

- 7 -

**Global Arts Productions**
**Schedule D**

10/01/1999

| | | | | |
|---|---|---|---|---|
| 146 | RCA Records | Harry Belafonte | | Angelina |
| 147 | RCA Records | Lee Marvin | | Wandrin Star |
| 148 | Reprise - Affiliated with Warner Bros. Records Inc. | Frank Sinatra | | For Once In My Life |
| 149 | Reprise - Affiliated with Warner Bros. Records Inc. | Frank Sinatra | 32 | Theme From New York, New York |
| 150 | Reprise - Affiliated with Warner Bros. Records Inc. | Frank Sinatra | | What Now My Love |
| 151 | Reprise - Affiliated with Warner Bros. Records Inc. | Kenny Rogers | 6 | Ruby Don't Take Your Love To Town |
| 152 | Reprise - Affiliated with Warner Bros. Records Inc. | Nancy Sinatra & Lee Hazlewood | 49 | Summer Wine |
| 153 | Reprise - Affiliated with Warner Bros. Records Inc. | The Kinks | 10 | Lola |
| 154 | Sony Music Entertainment Inc. | Billy Joel | | Cold Spring Harbor |
| 155 | Sony Music Entertainment Inc. | Billy Joel | | Everybody Loves You Now |
| 156 | Sony Music Entertainment Inc. | Billy Joel | | Falling Of The Rain |
| 157 | Sony Music Entertainment Inc. | Billy Joel | | Got To Begin Again |
| 158 | Sony Music Entertainment Inc. | Billy Joel | | Nocturne |
| 159 | Sony Music Entertainment Inc. | Billy Joel | 23 | She's Got A Way |
| 160 | Sony Music Entertainment Inc. | Billy Joel | | Tomorrow Is Today |
| 161 | Sony Music Entertainment Inc. | Billy Joel | | Turn Around |
| 162 | Sony Music Entertainment Inc. | Billy Joel | | Why Judy Why |
| 163 | Sony Music Entertainment Inc. | Billy Joel | | You Can Make Me Free |
| 164 | Sony Music Entertainment Inc. | Billy Joel | | You Look So Good To Me |
| 165 | Sony Music Entertainment Inc. | Bob Dylan | | All I Really Want To Do |

- 8 -

**Global Arts Productions**
**Schedule D**

10/01/1999

| | | | | |
|---|---|---|---|---|
| 166 | Sony Music Entertainment Inc. | Bob Dylan | | Black Crow Blues |
| 167 | Sony Music Entertainment Inc. | Bob Dylan | | Gates Of Eden |
| 168 | Sony Music Entertainment Inc. | Bob Dylan | | Highway Revisited |
| 169 | Sony Music Entertainment Inc. | Bob Dylan | | I Don't Believe You |
| 170 | Sony Music Entertainment Inc. | Bob Dylan | | I Shall Be Free |
| 171 | Sony Music Entertainment Inc. | Bob Dylan | | It Ain't Me Babe |
| 172 | Sony Music Entertainment Inc. | Bob Dylan | | It Takes A Lot To Laugh |
| 173 | Sony Music Entertainment Inc. | Chicago | 4 | 25 Or 6 to 4 |
| 174 | Sony Music Entertainment Inc. | Chicago | 7 | Beginnings |
| 175 | Sony Music Entertainment Inc. | Chicago | | Colour My World |
| 176 | Sony Music Entertainment Inc. | Chicago | 7 | Does Anybody Really Know What Time It Is? |
| 177 | Sony Music Entertainment Inc. | Chicago | 9 | Make Me Smile |
| 178 | Sony Music Entertainment Inc. | Chicago | 24 | Questions 67 & 68 |
| 179 | Sony Music Entertainment Inc. | Frank Sinatra | | Laura |
| 180 | Sony Music Entertainment Inc. | Frank Sinatra | | My Blue Heaven |
| 181 | Sony Music Entertainment Inc. | Frank Sinatra | | Nancy (CD 1) |
| 182 | Sony Music Entertainment Inc. | Frank Sinatra | | Ol' Man River |
| 183 | Sony Music Entertainment Inc. | Frank Sinatra | | The Music Stopped |
| 184 | Sony Music Entertainment Inc. | Janis Joplin | 42 | Cry Baby |
| 185 | Sony Music Entertainment Inc. | Janis Joplin | 41 | Kozmic Blues |
| 186 | Sony Music Entertainment Inc. | Janis Joplin | | Maybe |
| 187 | Sony Music Entertainment Inc. | Janis Joplin | 1 | Me And Bobby McGee |
| 188 | Sony Music Entertainment Inc. | Janis Joplin | | Mercedes Benz |

- 9 -